# EXHIBIT 1

<div align="center">

**SENIOR SECURED, SUPER-PRIORITY**
**DEBTOR-IN-POSSESSION**
**LOAN AGREEMENT**

</div>

This **SENIOR SECURED, SUPER-PRIORITY DEBTOR-IN-POSSESSION LOAN AGREEMENT** (as amended, supplemented, or otherwise modified from time to time, this "**Agreement**"), dated as of June [*], 2024, is entered into by and between **ST. CHRISTOPHER'S, INC.**, a New York not-for-profit corporation, as a debtor and debtor-in-possession ("**Borrower**"), and **LAYLA LENDING II LLC**, a Delaware limited liability company (together with its successors and assigns, "**Lender**"), and has reference to the following facts and circumstances:

<div align="center">

**WITNESSETH:**

</div>

**WHEREAS**, on April 29, 2024 (the "**Petition Date**"), Borrower filed a voluntary petition for relief under subchapter V of Chapter 11 of the Bankruptcy Code (as hereinafter defined) with the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**"), which proceeding is being jointly administered under Case No. 24-22373 (the "**Bankruptcy Case**"); and

**WHEREAS**, from and after the Petition Date, Borrower continues to operate its business and manage its property as a debtor-in-possession, pursuant to §§ 1182(2) and 1184 of the Bankruptcy Code; and

**WHEREAS**, Borrower has requested that Lender make a non-revolving line of credit facility available to Borrower in a maximum aggregate principal amount not to exceed FOUR MILLION AND 00/100 DOLLARS ($4,000,000.00) (the "**Loan**") in order to (a) fund the Interest Reserve (as hereinafter defined) in the amount of the Interest Reserve Amount (as hereinafter defined); (b) fund the Expense Reserve (as hereinafter defined) in the amount of the Expense Reserve Amount (as hereinafter defined); (c) pay Transaction Costs (as hereinafter defined); and (d) provide working capital to Borrower to be used by Borrower to pay administrative expenses of the Bankruptcy Case and for other general corporate and lawful purposes in accordance with the Budget (as hereinafter defined); and

**WHEREAS**, Lender is willing to provide the financing requested by Borrower on the terms, and subject to the conditions, hereinafter set forth, but only if, among other things, (a) all of the Indebtedness (i) constitutes an allowed super-priority, administrative expense claim in the Bankruptcy Case, pursuant to § 364(c)(1) of the Bankruptcy Code, as more particularly set forth herein and in the DIP Orders (as hereinafter defined), and (ii) is secured by valid, perfected, super-priority security interests in and liens on the Collateral, pursuant to § 364(c)(2) of the Bankruptcy Code, as more particularly set forth herein and in the DIP Orders; (b) the financing and the Loan Documents are authorized and approved by DIP Orders entered by the Bankruptcy Court; and (c) such DIP Orders are acceptable in form and substance to Lender in its sole discretion.

**NOW, THEREFORE**, for good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, and intending to be legally bound hereby, the parties hereto agree as follows:

## ARTICLE 1.
## DEFINITIONS

As used in this Agreement, the following capitalized terms shall have the following meanings:

"**Affiliate**" shall mean, with respect to any Person, any other Person (a) directly or indirectly Controlling, Controlled by, or under direct or indirect common Control with, such Person; or (b) that directly or indirectly owns ten percent (10%) or more of the direct or indirect Capital Stock in such Person.

"**ALTA**" shall mean the American Land Title Association.

"**Applicable Laws**" shall mean all Laws, statutes, ordinances, rules, regulations, judgments, decrees, or orders of any state, federal, or local government, agency, or instrumentality which are applicable to Borrower or any Collateral.

"**Assignment of Leases and Rents**" shall mean that certain Assignment of Leases and Rents, dated as of even date herewith, made by Borrower in favor of Lender with respect to the Real Property, as may be amended, restated, supplemented, or otherwise modified from time to time.

"**Award**" shall mean any compensation paid by any Governmental Authority in connection with a Condemnation.

"**Bankruptcy Code**" shall mean Title 11 of the United States Code entitled "Bankruptcy", as now or hereinafter in effect, or any successor statute.

"**Broker**" shall have the meaning set forth in Section 11.11 of this Agreement.

"**Budget**" shall mean the initial forecast of cash receipts, disbursements, balance of the Loan, and anticipated uses of proceeds of the Loan for the immediately following thirteen (13)-week period delivered on the Closing Date, as supplemented by each updated forecast delivered pursuant hereto and the DIP Orders to the extent each such updated forecast has been approved in writing by Lender in its sole discretion.

"**Budget Covenants**" has the meaning given to it in the DIP Orders.

"**Business Day**" shall mean each day excluding Saturdays, Sundays, and any other day on which national banks are authorized or required to close in Boca Raton, Florida.

"**Capital Stock**" shall mean any and all shares, participations, or other equivalents (however designated) of capital stock of a corporation, any and all membership interests in a limited liability company, any and all general or limited partnership interests in a partnership, any

and all other equity or ownership interests in a Person, and any and all warrants or options to purchase any of the foregoing.

"**Carve-Out**" has the meaning given to it in the DIP Orders.

"**Case Milestones**" has the meaning given to it in the DIP Orders.

"**Cash**" shall mean money, currency, or a credit balance in any deposit account.

"**Casualty**" shall have the meaning set forth in <u>Section 10.1</u> of this Agreement.

"**Change of Control**" shall mean the occurrence of any event which results in a transfer of Control of Borrower.

"**Closing**" shall mean the satisfaction of the conditions precedent to any Initial Disbursement.

"**Closing Date**" shall mean the date hereof.

"**Code**" shall mean the Internal Revenue Code of 1986, as now or hereinafter in effect, or any successor statute.

"**Collateral**" shall mean, collectively, all property and assets with respect to which liens and security interests in favor of Lender are granted pursuant to and in accordance with the terms of the Loan Documents.

"**Communication**" shall have the meaning set forth in <u>Section 11.18</u> of this Agreement.

"**Condemnation**" shall have the meaning set forth in <u>Section 10.2</u> of this Agreement.

"**Control**" shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management, policies, or activities of a Person, whether through the ownership of voting securities or other beneficial interests, by contract, or otherwise. The terms "Controlled by", "Controlling", and "under common Control with" shall have correlative meanings.

"**Default Interest**" shall mean all interest that accrues at the Default Rate.

"**Default Rate**" shall mean twenty-four percent (24%) per annum.

"**DIP Orders**" shall mean the Interim Order and the Final Order, as applicable.

"**DIP Super-Priority Claim**" shall mean the super-priority administrative expense claim granted by the Bankruptcy Court in the DIP Orders in respect of the Indebtedness, as more particularly described herein.

"**Disbursement**" shall mean a disbursement of proceeds of the Loan to or for the benefit of Borrower pursuant to the terms and provisions of this Agreement.

"**Disbursement Date**" shall mean the date of a Disbursement.

"**Dollar**" and "**$**" shall mean the lawful money of the United States of America.

"**Electronic Copy**" shall have the meaning set forth in <u>Section 11.18</u> of this Agreement.

"**Electronic Record**" shall have the meaning set forth in <u>Section 11.18</u> of this Agreement.

"**Electronic Signature**" shall have the meaning set forth in <u>Section 11.18</u> of this Agreement.

"**Embargoed Person**" shall mean any Person subject to trade restrictions under U.S. Law, including, but not limited to, the Patriot Act (including, without limitation, the anti-terrorism provisions thereof), the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701, et seq., The Trading with the Enemy Act, 50 U.S.C. App. 1, *et seq.*, and any Executive Orders or regulations promulgated thereunder including those related to Specially Designated Nationals and Specially Designated Global Terrorists, with the result that the investment in Borrower (whether directly or indirectly) is prohibited by Law or the Loan made by Lender is in violation of Law.

"**Environmental Law**" shall mean any current or future federal, state, or local legal requirement pertaining to: (a) the conservation, management, or use of natural resources and wildlife; (b) the protection or use of surface water and groundwater; (c) the management, manufacture, possession, presence, use, generation, transportation, treatment, storage, disposal, release, threatened release, abatement, removal, remediation, or handling of, or exposure to, any Hazardous Material; or (d) pollution (including, without limitation, any release to air, land, surface water, and groundwater), and includes, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended by the Superfund Amendments and Reauthorization Act of 1986, 42 U.S.C. § 9601 *et seq.*, Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act of 1976 and Hazardous and Solid Waste Amendments of 1984, 42 U.S.C. §§ 6901 *et seq.*, Federal Water Pollution Control Act, as amended by the Clean Water Act of 1977, 33 U.S.C. §§ 1251 *et seq.*, Clean Air Act of 1966, as amended, 42 U.S.C. §§ 7401 *et seq.*, Toxic Substances Control Act of 1976, 15 U.S.C. §§ 2601 *et seq.*, Hazardous Materials Transportation Act, 49 U.S.C. App. §§ 5101 *et seq.*, Occupational Safety and Health Act of 1970, as amended, 29 U.S.C. §§ 651 *et seq.*, Oil Pollution Act of 1990, 33 U.S.C. §§ 2701 *et seq.*, Oil Pollution Act of 1990, 33 U.S.C. §§ 2701 *et seq.*, Emergency Planning and Community Right-to-Know Act of 1986, 42 U.S.C. §§ 11001 *et seq.*, National Environmental Policy Act of 1969, 42 U.S.C. §§ 4321 *et seq.*, Safe Drinking Water Act of 1974, as amended, 42 U.S.C. §§ 300(f) *et seq.*, any similar, implementing, or successor Law, and any amendment, rule, regulation, order, or directive issued thereunder.

"**Event of Default**" shall have the meaning ascribed to it in <u>Article 8</u> of this Agreement.

"**Exit Fee**" shall have the meaning set forth in <u>Section 2.8(e)</u> of this Agreement.

"**Expense Reserve**" shall have the meaning ascribed to it in <u>Section 2.15</u> of this Agreement.

"**Expense Reserve Amount**" shall have the meaning ascribed to it in <u>Section 2.15</u> of this Agreement.

"**Final Order**" shall mean the order of the Bankruptcy Court entered in the Bankruptcy Case after a final hearing under Bankruptcy Rule 4001(c)(2) or such other procedures as approved by the Bankruptcy Court, which order shall be satisfactory in form and substance to Lender in its sole discretion, and which order is in effect and not stayed, together with all extensions, modifications, and amendments thereto, in each case in form and substance satisfactory to Lender in its sole discretion, which, among other matters but not by way of limitation, provides that the relief granted in the Interim Order is granted on a final basis.

"**First Interest Accrual Period**" shall mean the period from and including the date hereof through June 30, 2024.

"**GAAP**" shall mean United States generally accepted accounting principles as in effect as of the date of determination thereof and consistently applied. Notwithstanding the foregoing, for purposes of determining compliance with any covenant (including, without limitation, the computation of any financial covenant) contained herein, indebtedness of Borrower shall be deemed to be carried at 100% of the outstanding principal amount thereof, and the effects of FASB ASC 825 and FASB ASC 470-20 (or any other financial accounting standard having a similar result or effect) on financial liabilities shall be disregarded.

"**Governmental Authority**" shall mean the government of the U.S., any other nation, or any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank, or other entity exercising executive, legislative, judicial, taxing, regulatory, or administrative powers or functions of or pertaining to government.

"**Hazardous Materials**" shall mean any substance, chemical, compound, product, solid, gas, liquid, waste, by-product, pollutant, contaminant, or material which is regulated under any Environmental Law, and includes, without limitation: (a) asbestos, polychlorinated biphenyls, mold, and petroleum (*including crude oil or any fraction thereof*); and (b) any material classified or regulated as "hazardous" or "toxic" pursuant to the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended by the Superfund Amendments and Reauthorization Act of 1986, 42 U.S.C. §§ 9601 *et seq.*, Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act of 1976 and Hazardous and Solid Waste Amendments of 1984, 42 U.S.C. §§ 6901 *et seq.*, Federal Water Pollution Control Act, as amended by the Clean Water Act of 1977, 33 U.S.C. §§ 1251 *et seq.*, Clean Air Act of 1966, as amended, 42 U.S.C. §§ 7401 *et seq.*, Toxic Substances Control Act of 1976, 15 U.S.C. §§ 2601 *et seq.*, or Hazardous Materials Transportation Act, 49 U.S.C. App. §§ 5101 *et seq.* Without intending to limit the scope or breadth of the foregoing definition, the term Hazardous Materials shall include asbestos, urea formaldehyde, polychlorinated biphenyls, crude, oil, radioactive materials, and underground storage tanks. Hazardous Materials shall not include those materials that are used or stored at the Real Property in the ordinary course of business operations in compliance with Environmental Laws.

"**Improvements**" shall mean the buildings and other improvements on the Land.

"**Indebtedness**" shall mean all existing and future debts, liabilities, and obligations of every kind or nature at any time owing to Lender under this Agreement, the Note, the Security Instrument, or any other Loan Document, whether joint or several, related or unrelated, primary or

secondary, matured or contingent, due or to become due (including, without limitation, debts, liabilities, and obligations obtained by assignment), and whether principal, interest, fees, indemnification obligations, or costs and expenses, including, without limitation, the Loan, Loan Advances, accrued Interest, Interest charged at the Default Rate, Make Whole Payments, the Exit Fee, late charges, Loan Expenses, costs and expenses reimbursable under the Loan Documents, and all other monetary obligations owed to Lender under the Loan Documents, including, without limitation, amounts due as a result of any indemnification obligations thereunder.

"**Indemnitees**" shall have the meaning set forth in <u>Section 11.12</u> of this Agreement.

"**Initial Disbursement**" shall mean an initial Disbursement to be made by Lender on the Closing Date in the amount of ONE MILLION FIVE HUNDRED THOUSAND AND 00/100 DOLLARS ($1,500,000.00).

"**Interest**" shall mean the interest due and payable on the Principal Balance accruing at the Interest Rate or Default Rate, as applicable.

"**Interest Accrual Period**" shall mean the First Interest Accrual Period and, thereafter, the period from the first (1st) day of each calendar month through and including the last day of such calendar month.

"**Interest Payment Date**" shall mean the first (1st) day of each calendar month during the term of the Loan, commencing after the First Interest Accrual Period.

"**Interest Rate**" shall mean a fixed rate per annum equal to twelve and one-half percent (12.50%).

"**Interest Reserve**" shall have the meaning ascribed to it in <u>Section 2.14</u> of this Agreement.

"**Interest Reserve Amount**" shall have the meaning ascribed to it in <u>Section 2.14</u> of this Agreement.

"**Interim Order**" shall mean the order (in substantially the form of <u>Exhibit A</u> attached hereto and made a part hereof and otherwise in form and substance satisfactory to Lender in its sole discretion) of the Bankruptcy Court entered in the Bankruptcy Case after an interim hearing (assuming satisfaction of the standards prescribed in § 364 of the Bankruptcy Code and Bankruptcy Rule 4001 and other Applicable Law), together with all extensions, modifications, and amendments thereto, in each case in form and substance satisfactory to Lender in its sole discretion.

"**Land**" shall mean the real property located at 71 South Broadway, County of Westchester, State of New York, consisting of a ±119,951 square foot educational campus comprised of fifteen (15) buildings situated on a ±15.38-acre waterfront parcel with OF4 zoning, to be owned by Borrower in fee simple at Closing, as more particularly described in the Security Instrument.

"**Laws**" shall mean, collectively, all international, foreign, federal, state, and local statutes, treaties, rules, guidelines, regulations, ordinances, codes, and administrative or judicial precedents or authorities, including, without limitation, the interpretation or administration thereof by any

Governmental Authority charged with the enforcement, interpretation, or administration thereof, and all applicable administrative orders, directed duties, requests, licenses, authorizations, and permits of, and agreements with, any Governmental Authority, in each case, whether or not having the force of law.

"**Lease**" shall mean any lease, master lease, sublease or sub-sublease, letting, license, sublicense or sub-sublicense, concession, or other agreement (whether written or oral and whether now or hereafter in effect) pursuant to which any Person is granted a possessory interest in, or right to use or occupy, all or any portion of any real or personal property or asset, and every modification, amendment, or other agreement (whether written or oral and whether now or hereafter in effect) relating to such lease, license, or other agreement entered into in connection with such lease, license, or other agreement, and every guarantee of the performance and observance of the covenants, conditions, and agreements to be performed and observed by the other party thereto, whether before or after the filing by or against Borrower of any petition for relief under the Bankruptcy Code.

"**Loan Advance**" shall mean, individually as the context may require, (a) a Disbursement (including, without limitation, any Initial Disbursement); (b) a Protective Advance; and (c) any other advance made by Lender in connection with the Loan as provided by this Agreement or any of the other Loan Documents; and "**Loan Advances**" means, collectively, all of the foregoing.

"**Loan Amount**" shall mean Lender's commitment to make Disbursements in a maximum aggregate principal amount not to exceed (a) prior to the entry of the Final Order, ONE MILLION FIVE HUNDRED THOUSAND AND 00/100 DOLLARS ($1,500,000.00) and (b) upon the entry of the Final Order, FOUR MILLION AND 00/100 DOLLARS ($4,000,000.00).

"**Loan Documents**" shall mean this Agreement, any Note, the Security Instrument, the Assignment of Leases and Rents, the DIP Orders, and every other agreement, instrument, or document now or hereafter evidencing, securing, or otherwise executed in connection with the Loan, together with all amendments, restatements, supplements, and other modifications thereof.

"**Loan Expenses**" shall mean the expenses, charges, costs, and fees relating to the making, administration, negotiation, and documentation or any other aspect of the Loan or relating to the performance of any work related to the Loan, including, without limitation, (a) Lender's attorneys' fees and costs in connection with the Loan, (b) all recording fees and charges, title insurance charges and premiums, escrow fees, costs of surveys, and of any bonds required by the Title Company in connection with clearing title to the Real Property or the issuance of title reports, binders, policies, and the like, (c) appraisal fees, broker fees, property condition report fees, and environmental report fees, (d) [reserved], and (e) all other costs, expenses, charges, and fees referred to in or necessitated by the terms of this Agreement or any of the other Loan Documents.

"**Losses**" shall have the meaning set forth in <u>Section 11.12</u> of this Agreement.

"**Make Whole Interest Amount**" shall mean an amount equal to the sum of (a) the amount of Interest at the Interest Rate that actually accrued on the applicable Prepaid Principal from the Closing Date through the date on which such prepayment is being made, plus (b) the amount of Interest that would have accrued on the applicable Prepaid Principal at the Interest Rate in effect

on the date of such prepayment had the applicable Prepaid Principal remained outstanding from the date on which such prepayment is being made through and including the date that is nine (9) months after the Closing Date.

"**Make Whole Payments**" shall have the meaning set forth in <u>Section 2.8(d)</u> of this Agreement.

"**Material Adverse Effect**" shall mean a material adverse effect with respect to: (a) the business, assets, properties, financial condition, stockholders' equity, contingent liabilities, prospects, material agreements, or results of operations of Borrower (including, without limitation, by reason of a pandemic event), (b) [reserved], (c) the ability of Borrower to fully and timely perform its obligations under any Loan Document to which it is a party, (d) the Collateral, or (e) the validity or enforceability of this Agreement, any of the other Loan Documents, or the rights and remedies of Lender hereunder or thereunder.

"**Maturity Date**" shall mean December [*], 2025 or any earlier date as a result of a declaration of an accelerated maturity of the Loan made by Lender in accordance with the terms, conditions, and provisions of the Loan Documents.

"**Maximum Legal Rate**" shall mean the maximum non-usurious interest rate that at any time or from time to time may be contracted for, taken, reserved, charged, or received on the Indebtedness and as provided for herein or in the other Loan Documents under the Laws of such state or states whose Laws are held by any court of competent jurisdiction to govern the interest rate provisions of the Loan.

"**Net Proceeds**" shall have the meaning set forth in <u>Section 10.3</u> of this Agreement.

"**Note**" shall mean, if requested by Lender, a promissory note, in form and substance acceptable to Lender in its reasonable discretion, made by Borrower to the order of Lender, in the amount of the Loan Amount, as may be amended, restated, supplemented, or otherwise modified from time to time.

"**Notice**" and "**Notices**" have the meanings assigned to such terms in <u>Section 11.8</u> of this Agreement.

"**Origination Fee**" shall mean an amount equal to two percent (2.00%) of the Loan Amount, which amount shall be paid by Borrower to Lender in accordance with <u>Section 2.7</u> of this Agreement.

"**Other Charges**" shall mean, other than Taxes, all ground rents, maintenance charges, impositions, municipal payments, and any other charges, including, without limitation, vault charges and license fees for the use of vaults, chutes, and similar areas adjoining the Real Property, now or hereafter levied or assessed or imposed against the Real Property or any part thereof.

"**Participant Register**" shall have the meaning set forth in <u>Section 11.9(c)</u> of this Agreement.

"**Patriot Act**" has the meaning assigned to such term in <u>Section 5.25</u> of this Agreement.

"**Permitted Liens**" shall mean, collectively, (a) subject to <u>Section 6.10</u> of this Agreement, Post-Petition liens securing Taxes, assessments, governmental charges, levies, or Other Charges not yet due and payable; (b) liens in favor of Lender securing Indebtedness; (c) Post-Petition liens of mechanics, suppliers, materialmen, workmen, and other Persons entitled to the benefit of statutory or common law liens arising in the ordinary course of business, <u>provided</u> that such liens secure only amounts not yet due and payable or, if due and payable, such amounts are being contested in good faith and by appropriate proceedings by Borrower and have been bonded over by Borrower or Borrower shall have set aside on its books adequate reserves in respect thereof in accordance with GAAP, <u>provided</u> further that such liens are unfiled, no other action has been taken to enforce the same, and Borrower's title to, and rights to use, the Collateral are not materially adversely affected thereby; (d) all liens and other matters disclosed in the Title Policy insuring the Security Instrument which have been approved by Lender; (e) subject to ten (10) Business Days' prior written notice being provided to Lender, such governmental, public utility, and private restrictions, covenants, reservations, easements, licenses, or other agreements of an immaterial nature with respect to the Project; and (f) non-consensual Post-Petition liens that are being diligently contested by Borrower in good faith by appropriate proceedings and have been bonded over by Borrower or for which Borrower has set aside adequate reserves therefor in accordance with GAAP, <u>provided</u> that such liens are junior in priority to the liens in favor of Lender and no action has been commenced to enforce such liens or, if any such action has been commenced, it has been stayed by order of a court of competent jurisdiction.

"**Person**" shall mean any individual, firm, corporation, limited liability company, business enterprise, trust, association, joint venture, partnership, limited partnership, Governmental Authority, or other entity, whether acting in an individual, fiduciary, or other capacity.

"**Post-Petition**" shall mean the time-period beginning immediately upon the filing of the Bankruptcy Case.

"**Pre-Petition**" shall mean the time period prior to the filing of the Bankruptcy Case.

"**Prepaid Principal**" shall have the meaning ascribed to it in <u>Section 2.8(d)</u> of this Agreement.

"**Principal Balance**" shall mean the unpaid principal balance of the Loan Advances outstanding from time to time.

"**Project**" shall mean the Real Property and all equipment and fixtures owned by Borrower and located on or in the Land or the Improvements.

"**Protective Advances**" shall have the meaning set forth in <u>Section 2.15</u> of this Agreement.

"**Real Property**" shall mean the Land and the Improvements, as more particularly described in the Security Instrument.

"**Register**" shall have the meaning set forth in <u>Section 11.9(b)</u> of this Agreement.

"**Rent Roll**" shall mean a rent roll and rent arrearage report certified by Borrower to be true, correct, and complete as of the date of such report.

"**Restoration**" shall mean the repair and restoration of the Project after a Casualty or Condemnation as nearly as possible to the condition the Project was in immediately prior to such Casualty or Condemnation (or better condition), with such alterations as may be reasonably approved by Lender.

"**Restricted Payment**" shall mean any dividend or other distribution, direct or indirect.

"**Security Instrument**" shall mean that certain Mortgage, Assignment of Leases and Rents, Security Agreement, and Fixture Filing, dated as of even date herewith, made by Borrower in favor of Lender with respect to the Real Property, as may be amended, restated, supplemented, or otherwise modified from time to time.

"**Survey**" shall mean a current as-built survey of the Real Property, showing all utility easements and access easements benefitting the Real Property, prepared and certified by a registered and duly licensed surveyor in the State in which the Real Property is located.

"**Taxes**" shall mean any taxes, assessments, water rates, frontage charges, and sewer rents, now or hereafter levied or assessed or imposed against the Real Property or any part thereof.

"**Termination Date**" shall mean the earliest to occur of: (a) the date occurring exactly one hundred and twenty (120) days following the Disbursement Date for the Initial Disbursement, (b) July 12, 2024 to the extent the Final Order has not been entered by the Bankruptcy Court as of such date, and (c) the termination of Lender's commitment under the Loan Amount to make Disbursements, pursuant to Article 9 of this Agreement.

"**Title Company**" shall mean Old Republic National Title Insurance Company.

"**Title Policy**" shall mean an ALTA Loan Policy of Title Insurance issued by the Title Company evidencing that the Security Instrument will be a first priority lien on the Real Property subject to no liens, claims, exceptions, or encumbrances, except for the Permitted Liens, and containing such endorsements as are available and reasonably required by Lender.

"**Transaction Costs**" shall mean the fees, costs, and expenses (including, without limitation, Lender's due diligence costs and expenses and attorney's fees and costs) payable by Borrower in connection with the transactions contemplated by the Loan Documents to the extent approved in writing by Lender.

"**Transfer**" shall have the meaning set forth in Section 6.1 of this Agreement.

"**UCC**" shall mean the Uniform Commercial Code as adopted in the State of New York, as in effect from time to time; provided that, if by reason of mandatory provisions of law, perfection, or the effect of perfection or non-perfection, of a security interest in any Collateral or the availability of any remedy under the Loan Documents is governed by the Uniform Commercial Code as in effect in a jurisdiction other than New York, "**UCC**" means the Uniform Commercial Code as in effect in such other jurisdiction for purposes of the provisions hereof relating to such perfection or effect of perfection or non-perfection or availability of such remedy, as the case may be.

"**Unmatured Default**" shall mean an event or circumstance which with the giving of notice, the passage of time, or both, would constitute an Event of Default.

"**U.S.**" shall mean the United States of America.

## ARTICLE 2.
## LOAN

Section 2.1    Loan Amount.  At the times and in the manner set forth in this Article 2, and subject to the terms and conditions of this Agreement and relying upon the representations and warranties set forth in the Loan Documents, during the period from the Closing Date to the Termination Date, Lender agrees to make the Disbursements to or for the benefit of Borrower in an aggregate original principal amount not to exceed the Loan Amount in order to (a) fund the Interest Reserve in the amount of the Interest Reserve Amount; (b) fund the Expense Reserve in the amount of the Expense Reserve Amount; (c) pay Transaction Costs; and (d) provide working capital to Borrower to be used by Borrower to pay administrative expenses of the Bankruptcy Case and for other general corporate and lawful purposes in accordance with the Budget.  The aggregate original principal amount of Disbursements shall not exceed the Loan Amount.  Subject to such limitation and the other terms and conditions of this Agreement, the outstanding principal balance of Disbursements may change from time to time, to be increased by future Disbursements which may be made by Lender to or for the benefit of Borrower and to be reduced by repayments; provided, however, that the Loan is a straight line of credit, not a revolving line of credit, and principal amounts repaid may not be re-advanced.  At the Closing, Lender shall make the Initial Disbursement to Borrower upon the satisfaction of all conditions precedent thereto under this Agreement and the other Loan Documents.

Section 2.2    Loan Advances Evidenced by Note.  If requested by Lender, all Loan Advances shall be evidenced by the Note.

Section 2.3    Payment of Interest and Principal.  The payment of all Interest and principal shall be governed by the provisions of this Agreement.  Any and all payments by or on account of any Indebtedness of Borrower under any Loan Document shall be paid with immediately available funds and free and clear of, and without any deduction or withholding on account of, any Taxes.

Section 2.4    Interest and Principal Payments.

(a)    Interest Payments.  Prior to the Maturity Date, Borrower shall make payments of Interest only on the Principal Balance to Lender monthly in arrears on or before each Interest Payment Date.  So long as no Unmatured Default or Event of Default has occurred and is continuing, until the Interest Reserve is depleted, Lender shall make a disbursement from the Interest Reserve on an Interest Payment Date for the full or partial payment of the accrued Interest due and payable on such Interest Payment Date.  The Principal Balance shall bear Interest (subject to Section 2.5 below) at the Interest Rate, calculated on the basis of a 360-day year, based on actual days elapsed.  All Interest hereunder on the Principal Balance shall be computed on a daily basis based upon the Principal Balance as of the applicable date of determination.

(b)    Principal Payments.  All outstanding principal under the Loan Advances, together with all accrued and unpaid Interest thereon, and any accrued and unpaid fees in

connection therewith (including, without limitation, the Exit Fee), and all other outstanding Indebtedness, shall be due and payable by Borrower in full on the Maturity Date.

Section 2.5    Default Rate.  After the occurrence of an Event of Default, the Principal Balance and any other Indebtedness then owing by Borrower to Lender shall bear Interest at the Default Rate effective as of the date of the occurrence of the Unmatured Default that resulted in such Event of Default, and the Principal Balance and any other Indebtedness owing by Borrower to Lender shall continue to bear Interest at the Default Rate so long as such Event of Default is continuing.  After the Maturity Date, the Principal Balance and any other Indebtedness owing by Borrower to Lender shall bear Interest at the Default Rate.  Any unpaid accrued Interest at the Default Rate, in addition to being due and payable on each Interest Payment Date, shall be due and payable on demand and, if not paid, may be added to the Principal Balance on each Interest Payment Date, and such sum shall bear Interest therefrom until paid in full at the Default Rate. The Default Rate shall continue to apply whether or not judgment shall have been entered on the Indebtedness such that, after entry of a judgment against Borrower or in a foreclosure under the Security Instrument, Interest shall continue to accrue on sums due pursuant to said judgment at the Default Rate.  Borrower acknowledges that: (i) the Default Rate is a material inducement to Lender to make the Loan; (ii) Lender would not have made the Loan in the absence of the agreement of Borrower to pay the Default Rate; (iii) the Default Rate represents compensation for increased risk to Lender that the Indebtedness will not be repaid; and (iv) the Default Rate is not a penalty and instead represents a reasonable estimate of (x) the cost to Lender in allocating its resources (both personnel and financial) to the on-going review, monitoring, administration, and collection of the Indebtedness and (y) compensation to Lender for losses that are difficult to ascertain.

Section 2.6    Late Charge.  If any payment required under any of the Loan Documents (including, without limitation, the payment of Interest or principal due under this Agreement and the payment due on the Maturity Date) is not made within ten (10) days after such payment is due, then, in addition to the payment of the amount so due, Borrower shall pay to Lender on demand a "late charge" of five cents (5¢) for each whole dollar so overdue to defray part of the cost of collecting and handling such late payment.  Borrower acknowledges that the late charge is a reasonable forecast of just compensation for anticipated and actual harm incurred by Lender, which harm cannot be estimated with certainty and without difficulty.

Section 2.7    Origination Fee.  Notwithstanding anything to the contrary set forth herein or in any of the other Loan Documents, in addition to all Interest that accrues and is due and owing with respect to the Loan, Borrower acknowledges and agrees that to fix the Interest Rate it will pay to Lender an amount equal to the Origination Fee, which shall be fully earned upon entry of the DIP Orders, as applicable, and non-refundable.  Borrower further acknowledges and agrees that it shall be responsible for paying Interest on the entire Principal Balance, pursuant to the terms hereof and as set forth in the other Loan Documents.

Section 2.8    Prepayments.

(a)    Voluntary Prepayment.  Borrower shall have the right to prepay the Loan in whole or in part at any time on any Interest Payment Date, provided that such prepayment shall be accompanied by any amounts due under Sections 2.8(d) and (e) below

(b)    _Mandatory Prepayments_.   On the next occurring Interest Payment Date following the date on which Lender actually receives any Net Proceeds, if Lender does not elect to make such Net Proceeds available to Borrower for Restoration pursuant to Section 10.3 of this Agreement, Borrower authorizes Lender, at Lender's option, to apply Net Proceeds as a prepayment of the outstanding Indebtedness.

(c)    _Application_. Any partial prepayment under this Section 2.8 shall be applied (1) first, to any accrued and unpaid Interest on the Prepaid Principal; (2) second, to the Principal Balance, together with any amounts due under Sections 2.8(d) and (e) below; and (3) third, any other Indebtedness.  If an Event of Default has occurred and is continuing, Lender may apply such partial prepayment to the payment of the Indebtedness in any order, proportion, and priority as Lender may determine in its sole and absolute discretion.

(d)    _Make Whole Payment_.   In the event of any voluntary or mandatory prepayment, Borrower shall pay to Lender (i) an amount equal to the portion of the Principal Balance to be prepaid (the "**Prepaid Principal**"), (ii) all Interest accrued on such Prepaid Principal through the date on which such prepayment is being made that remains unpaid, and (iii) an amount (not less than zero) equal to the difference between (1) the Make Whole Interest Amount and (2) the accrued Interest at the Interest Rate actually paid on such Prepaid Principal as of the date of such prepayment (the "**Make Whole Payment**").   The Make Whole Payment shall be due and owing at any time the Principal Balance is being prepaid regardless of whether such payment is made voluntarily, mandatorily, involuntarily, upon any acceleration (automatic or otherwise) of the Loan, and/or after the occurrence and during the continuance of an Event of Default.

(e)    _Exit Fee_. Upon (i) any payment of all or any part of the Principal Balance prior to the Maturity Date or an Event of Default, whether such payment is voluntary or mandatory, or (ii) the earlier to occur of the Maturity Date and an Event of Default, Borrower shall pay to Lender an exit fee (the "**Exit Fee**") in an amount equal to one percent (1.00%) of either (x) the portion of the Principal Balance being repaid in the event of a partial repayment of the Principal Balance under clause (i) above or (y) otherwise, the Loan Amount, which Exit Fee shall be deemed fully earned by Lender on the Closing Date and non-refundable.

Section 2.9    _Usury Savings_.  This Agreement and the other Loan Documents are subject to the express condition that at no time shall Borrower be obligated or required to pay interest on the Principal Balance, or other Indebtedness, at a rate which could subject Lender to either civil or criminal liability as a result of being in excess of the Maximum Legal Rate.  If, by the terms of this Agreement or the other Loan Documents, Borrower is at any time required or obligated to pay interest on the Principal Balance, or other Indebtedness, at a rate in excess of the Maximum Legal Rate, then the Interest Rate or the Default Rate, as the case may be, shall be deemed to be immediately reduced to the Maximum Legal Rate and all previous payments in excess of the Maximum Legal Rate shall be deemed to have been payments in reduction of the Principal Balance and not on account of the Interest due hereunder.  All sums paid or agreed to be paid by Borrower for the use, forbearance, or detention of the sums due under the Loan, shall, to the extent permitted by Applicable Law, be amortized, prorated, allocated, and spread throughout the full stated term of the Loan until payment in full so that the rate or amount of interest on account of the Loan does not exceed the Maximum Legal Rate of interest from time to time in effect and applicable to the Loan for so long as the Loan is outstanding.

Section 2.10    Reserved.

Section 2.11    Requests for Disbursements.

(a)    Requests for Advance. All Disbursements shall be in the minimum amount of $500,000.00 each (except for the last Disbursement available under the Loan Amount) and made by Lender upon request from Borrower not more often than a total of two times (unless Lender otherwise agrees) during the period from the Closing Date to the Termination Date, and such request shall be submitted not less than ten (10) Business Days prior to the requested Disbursement Date for the Disbursement (unless Lender otherwise agrees). Lender shall not be obligated to make any Disbursements on or after the Termination Date and shall have the right to discontinue making Disbursements following the Termination Date.

(b)    Additional Requirements. Each request for a Disbursement shall include an updated Budget.

(c)    Representation and Warranty. Each request for a Disbursement and each receipt of the Disbursement requested thereby shall constitute a certification by Borrower, and a new and independent representation and warranty to Lender, that the representations and warranties contained in this Agreement and the other Loan Documents are true and correct on the date of such request or such receipt, as the case may be.

Section 2.12    Maturity Date Payment. On the Maturity Date, Borrower shall make a payment to Lender in the amount of (a) all accrued and unpaid Interest, (b) the Principal Balance, and (c) any other Indebtedness owed to Lender.

Section 2.13    Reserve Amounts. To the extent that Lender agrees to hold any amounts in reserve, Lender shall have the option to net fund such amounts from the Loan and shall not be required to establish or open an escrow account or segregate the funds in any way. After the occurrence and during the continuance of an Event of Default, Lender may apply any reserves held by Lender to and against the Indebtedness in any order, proportion, and priority as Lender may determine in its sole and absolute discretion.

Section 2.14    Interest Reserve. Borrower agrees that Lender shall fund into reserve (or net fund) from the Initial Disbursement and each subsequent Disbursement an amount equal to eighteen (18) months of Interest on such Disbursement at the Interest Rate (the "**Interest Reserve Amount**"), and such amount shall be deemed disbursed to Borrower, but held by Lender as a reserve for the payment of Interest as and when due and owing under this Agreement (the "**Interest Reserve**"). In accordance with Section 2.4(a) of this Agreement, Lender shall use the Interest Reserve to pay any accrued and unpaid Interest as and when the same becomes due and payable. The Interest Reserve shall be deemed disbursed to Borrower and constitute part of the Collateral for the Indebtedness, and Borrower hereby grants Lender a security interest in the Interest Reserve to secure the Indebtedness. The Interest Reserve shall be included in the calculation of the Origination Fee. In connection with the repayment in full of the Indebtedness, the balance, if any, of the Interest Reserve shall be applied as payment first, to accrued and unpaid Interest, second, to the Principal Balance, and thereafter, to any other outstanding Indebtedness.

Section 2.15   Protective Advances.  Any contrary provision of this Agreement or any other Loan Document notwithstanding, Lender shall have the right, but not the obligation, and is hereby authorized by Borrower (said authorization being coupled with an interest), at any time during the existence of an Unmatured Default or an Event of Default, regardless of whether the aggregate outstanding principal balance of Loan Advances will exceed the Loan Amount, to make advances that Lender, in its reasonable discretion, deems necessary or desirable (collectively, the "**Protective Advances**"): (a) to correct any such Unmatured Default or Event of Default (provided, however, that no such corrective action taken by Lender shall be deemed to cure any such Unmatured Default or Event of Default); (b) to pay costs and expenses incurred to perform or enforce the obligations of Borrower under the Loan Documents; (c) to pay any amount chargeable to Borrower pursuant to the terms of this Agreement or any other Loan Documents, including, without limitation, accrued and unpaid Interest and Loan Expenses; (d) to enhance the likelihood of, or maximize the amount of, repayment of the Loan and other Indebtedness; or (e) to protect the security of the Collateral. Any contrary provision of this Agreement or any other Loan Document notwithstanding, Lender may direct the proceeds of any Protective Advance to Borrower or to such other Person (including, without limitation, Lender) as Lender determines in its sole and absolute discretion.  All Protective Advances shall be payable by Borrower immediately upon demand and shall bear Interest from the date advanced at the Default Rate.  Borrower hereby agrees to execute additional notes, mortgages, and other additional documents, and modifications to Loan Documents, if necessary to evidence and secure Loan Advances funded in excess of the Loan Amount, promptly upon request by Lender.

Section 2.16   Expense Reserve.  Borrower agrees that, on the Closing Date, Lender shall fund into reserve (or net fund) from the Initial Disbursement an amount equal to ONE HUNDRED THOUSAND DOLLARS ($100,000.00) (the "**Expense Reserve Amount**"), and such amount shall be deemed disbursed to Borrower at Closing, but held by Lender as a reserve for the payment of Loan Expenses as and when due and owing under this Agreement (the "**Expense Reserve**"). Lender may, in its sole and absolute discretion, but shall not be obligated to, use the Expense Reserve to pay any accrued and unpaid Loan Expenses as and when the same becomes due and payable.  The Expense Reserve shall be deemed disbursed to Borrower at Closing and constitute part of the Collateral for the Indebtedness, and Borrower hereby grants Lender a security interest in the Expense Reserve to secure the Indebtedness.  The Expense Reserve shall be included in the calculation of the Origination Fee.  In connection with the repayment in full of the Indebtedness, the balance, if any, of the Expense Reserve shall be applied as payment first, to accrued and unpaid Interest, second, to the Principal Balance, and thereafter, to any other outstanding Indebtedness.

Section 2.17   Super-Priority Nature of Obligations and Lender's Liens.  Subject to the terms of the DIP Orders, all Indebtedness hereunder and under the other Loan Documents shall constitute an allowed super-priority administrative expense claim against Borrower, pursuant to §§ 503(b) and 354(c)(1) of the Bankruptcy Code, with priority in the Bankruptcy Case over any and all administrative expense claims and unsecured claims against Borrower and its estate, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in, arising under, or ordered pursuant to §§ 105, 326, 328, 330, 331, 503(b), 506, 507(a), 507(b), 546(c), 546(d), 726(b), 1113, or 1114 respectively, of the Bankruptcy Code, subject only to the Carve-Out.  The security interests and liens created by this Agreement and the other Loan Documents shall be and remain valid and perfected in the event of the substantive consolidation or conversion of the Bankruptcy Case or any other bankruptcy

case of Borrower to a case under Chapter 7 of the Bankruptcy Code or in the event of dismissal of the Bankruptcy Case or the release of any Collateral from the jurisdiction of the Bankruptcy Court for any reason, without the necessity that Lender file financing statements or otherwise perfect its security interests and liens under Applicable Law.

## ARTICLE 3.
## LOAN DOCUMENTS

Section 3.1    Initial Closing.  Prior to or on the Closing Date, Borrower shall deliver to Lender the following documents, execute those of the following documents as may be required to be executed by Borrower, and cause to be executed those of the following documents required to be executed by other Persons (other than Lender), all of which documents shall be satisfactory in form and substance to Lender in its sole and absolute discretion:

(a)    The Loan Documents, together with applicable UCC-1 financing statements.

(b)    The Survey.

(c)    A title commitment for the Title Policy and a *pro forma* Title Policy.

(d)    Copies of such documents, if any, Borrower has provided the Title Company in connection with the issuance of the Title Policy.

(e)    Copies of all recorded documents described in the Title Policy.

(f)    Acord Form-25, Acord Form-27, and Acord Form-28, as applicable, certificates evidencing the insurance coverages required under this Agreement, together with certified copies of all policies of such insurance.

(g)    A certificate of an officer of Borrower containing certified copies of (i) the articles/certificate of organization or formation of Borrower; (ii) the by-laws/operating agreement for Borrower; (iii) a recent (dated within 30 days of the Closing Date) Certificate of Good Standing or Subsistence in relation to Borrower; and (iv) requisite consents or resolutions authorizing this transaction and identifying all the names, incumbency, and signatures of the Persons authorized to execute this Agreement and other Loan Documents of behalf of Borrower.

(h)    Evidence that (i) no portion of the Real Property is located in an area federally, state, or locally designated as having special flood or earthquake hazards, or if any portion of the Real Property is so located, evidence that flood or earthquake insurance is in effect and (ii) no portion of the Real Property is located in a federally, state, or locally designated wetland or other type of government protected area or if any portion of the Real Property is so located, copies of all restrictions, consents, waivers, agreements, and other documents related thereto and evidence that the present use of the Real Property is a permitted use.

(i)     Such other assignments, certificates, opinions, licenses, permits, and other documents, instruments, and information affecting or relating to the Borrower and/or its interest in the Real Property or the Project or the use, operation, development, or construction of the Real Property or the Project or Borrower's business as Lender may reasonably require.

(j)     A Rent Roll.

(k)     Copies of all Leases as in effect with respect to the Real Property, together with valid and effective waivers of any rights of first refusal or rights of purchase that may apply to the same.

(l)     Such further and additional information, documents, and verifications as Lender may require in its sole and absolute discretion, including, without limitation, any appraisal or report required by Lender pursuant to Section 4.3, 4.4, 4.5, or 4.6 of this Agreement.

## ARTICLE 4.
## DISBURSEMENT OF THE LOAN

Section 4.1     Conditions Precedent.

(a)     The Initial Disbursement under this Agreement shall be conditioned upon and subject to the payment to Lender of all Transaction Costs and to satisfaction of all of the following conditions:

(i)     All representations and warranties contained in this Agreement and in the other Loan Documents shall be true and correct.

(ii)    Borrower shall have delivered or caused to be delivered to Lender the documents identified in Section 3.1 of this Agreement, which documents shall be properly executed and satisfactory in form and substance to Lender in its sole and absolute discretion.

(iii)   Borrower shall have performed all of its obligations under the Loan Documents which are required to be performed on or prior to the date of the Initial Disbursement.

(iv)    Neither the Project nor any part thereof shall have suffered any Casualty or be subject to any Condemnation proceeding.

(v)     There shall be no Event of Default or Unmatured Default under this Agreement or any of the other Loan Documents.

(vi)    Borrower shall have provided evidence to Lender that any and all claims made by any brokers, finders, or similar parties who were or who claim to have been engaged in procuring the Loan have released

any and all claims for compensation in connection therewith, as may be applicable.

(vii)  Borrower shall have provided evidence to Lender that all Taxes and Other Charges due and payable with respect to the Project have been, or on the Closing Date will be, paid in full.

(viii)  Borrower shall have provided evidence to Lender that all insurance required under this Agreement is in full force and effect.

(ix)  Borrower shall have provided evidence to Lender that all insurance premiums for the current year have been paid in full.

(x)  The Real Property having an "as is" appraised value acceptable to Lender in its sole and absolute discretion.

(xi)  The Bankruptcy Court shall have entered the Interim Order, the Interim Order shall not have been vacated, stayed, reversed, modified, or amended without Lender's consent and shall otherwise be in full force and effect, and the Interim Order shall not in any respect be the subject of a stay pending either appeal or a motion for reconsideration thereof.

(xii)  A Budget shall have been accepted by Lender.

(b)  <u>Subsequent Disbursements</u>.  Each Disbursement following the Initial Disbursement under this Agreement shall be conditioned upon and subject to satisfaction of all of the following conditions:

(i)  All representations and warranties contained in this Agreement and in the other Loan Documents shall be true and correct.

(ii)  There shall be no Event of Default or Unmatured Default under this Agreement or any of the other Loan Documents.

(iii)  Neither the Project nor any part thereof shall have suffered any Casualty or be subject to any Condemnation proceeding.

(iv)  The Bankruptcy Court shall have entered the Final Order, the Final Order shall not have been vacated, stayed, reversed, modified, or amended without Lender's consent and shall otherwise be in full force and effect, and the Final Order shall not in any respect be the subject of a stay pending either appeal or a motion for reconsideration thereof.

(v)  An updated Budget shall have been accepted by Lender.

(vi)  The Termination Date shall not have occurred.

(vii) Borrower shall have satisfied all of the requirements for Disbursements set forth in, and complied with all of the terms and conditions of, Section 2.11 of this Agreement.

Notwithstanding anything contained in this Agreement to the contrary, Lender shall be under no obligation to make any Disbursement subsequent to the Initial Disbursement, prior to Borrower's satisfaction of all the terms and conditions to subsequent Disbursements set forth herein and the other Loan Documents. The making of any subsequent Disbursement by Lender prior to the satisfaction of all terms and conditions to subsequent Disbursements set forth herein and the other Loan Documents shall not be or be deemed to be a waiver of any or all of such terms and conditions, which terms and conditions shall remain in full force and effect unless and until each such term or condition shall be specifically waived by Lender in writing. No Disbursement hereunder shall constitute a waiver of any of the conditions to Lender’s obligation to make further Disbursements.

Section 4.2 Certifications, Representations and Warranties. Borrower’s request for a Disbursement shall constitute (a) Borrower’s certification that the representations and warranties contained in Article 5 and elsewhere in this Agreement and in the Loan Documents are true and correct, and (b) Borrower’s certification that Borrower is in compliance with the conditions contained in this Article 4.

Section 4.3 Appraisal. Prior to the Closing Date and, thereafter, after the occurrence and during the continuance of an Event of Default, Lender shall have the right, but not the obligation, in its sole discretion, and at Borrower’s sole cost and expense, to have an appraisal of the Real Property completed by a licensed MAI real estate appraiser acceptable to Lender in its sole discretion. Any costs incurred by Lender in connection with any such appraisal shall become and be treated as Loan Expenses and shall be paid by Borrower in the manner set forth in Article 7 below.

Section 4.4 Property Condition Report. After the occurrence and during the continuance of an Event of Default, Lender shall have the right, but not the obligation, in its sole discretion, and at Borrower’s sole cost and expense, to have a property condition report for the Real Property completed by an engineering firm acceptable to Lender in its sole discretion. Any costs incurred by Lender in connection with any such report shall become and be treated as Loan Expenses and shall be paid by Borrower in the manner set forth in Article 7 below.

Section 4.5 Environmental Report. After the occurrence and during the continuance of an Event of Default, Lender shall have the right, but not the obligation, in its sole discretion, and at Borrower’s sole cost and expense, to have an environmental assessment report for the Real Property completed by an environmental firm acceptable to Lender in its sole discretion. Any costs incurred by Lender in connection with any such report shall become and be treated as Loan Expenses and shall be paid by Borrower in the manner set forth in Article 7 below.

Section 4.6 Property Zoning Report. After the occurrence and during the continuance of an Event of Default, Lender shall have the right, but not the obligation, in its sole discretion, and at Borrower’s sole cost and expense, to have a property zoning report for the Real Property completed by a professional firm acceptable to Lender in its sole discretion. Any costs incurred

by Lender in connection with any such report shall become and be treated as Loan Expenses and shall be paid by Borrower in the manner set forth in <u>Article 7</u> below.

## ARTICLE 5.
## REPRESENTATIONS AND WARRANTIES

Borrower agrees that all of the representations and warranties of Borrower set forth in this <u>Article 5</u> and elsewhere in this Agreement and in the Loan Documents shall survive the Closing. All representations and warranties made in this Agreement or in the other Loan Documents by Borrower shall be deemed to have been relied upon by Lender notwithstanding any investigation heretofore or hereafter made by Lender or on its behalf. In order to induce Lender to execute this Agreement and to make the Loan, Borrower represents and warrants to Lender as follows:

Section 5.1     <u>Corporate Status</u>.   Borrower is duly organized and validly existing under the Laws of the state of its formation, is in good standing and fully qualified to do business in each state where the nature and extent of its business requires qualification, and has full power and authority to own and operate its assets and properties and to consummate the transactions contemplated hereby, and has full power and authority to execute and deliver the Loan Documents to which it is a party and to perform its obligations hereunder and thereunder.

Section 5.2     <u>Title</u>.   Borrower has, and shall maintain, good and marketable title to the Collateral of Borrower. The Collateral of Borrower is and shall be owned by Borrower free and clear of all liens, claims, and encumbrances, except for Permitted Liens.

Section 5.3     <u>Validity and Enforceability of Documents</u>.   Upon the execution and delivery of the Loan Documents, the Loan Documents shall be valid and binding upon the parties that have executed the same in accordance with the respective provisions thereof and enforceable in accordance with the respective provisions thereof. Execution, delivery, and performance of the Loan Documents do not and will not contravene, conflict with, violate, or constitute a default under any organizational documents creating or governing Borrower or any agreement, indenture, or instrument to which Borrower is a party or is bound or is binding upon or applicable to the Collateral or any portion thereof.

Section 5.4     <u>Reserved</u>.

Section 5.5     <u>Utilities; Authorities</u>.   All utilities necessary for the use, operation, and occupancy of the Real Property (including, without limitation, water, storm sewer, sanitary sewer and drainage, electric, gas, and telephone facilities) are available at the boundaries of the Real Property (or across adjoining properties pursuant to valid and enforceable perpetual easement agreements), and all requirements for the use of such utilities have been fulfilled. All building, zoning, safety, health, fire, water district, sewerage, and environmental protection agency permits and other licenses and permits which are required by any Governmental Authority for the use, occupancy, and operation of the Real Property have been obtained or furnished and are in full force and effect.

Section 5.6     <u>Reserved</u>.

Section 5.7    Compliance with Laws.  The Real Property and the use, occupancy, and operation thereof does not violate any Applicable Laws of any kind whatsoever (including, without limitation, those relating to environmental protection, water use, zoning, building, fire, health, or safety), any contractual arrangements with third parties, or any covenants, conditions, easements, rights of way, or restrictions of record.  Neither Borrower nor any agent thereof has received any notice, written or otherwise, alleging any such violation or is otherwise aware of any such violation, and no such violation exists which violation has not previously been and remains cured.  Except as set forth on Schedule 5.7, no portion of the Real Property is located in a federally, state, or locally designated wetland or other type of government protected area or an area federally, state, or locally designated as having special flood or earthquake hazards.  The Real Property is in full compliance and conformity with all zoning requirements, including, without limitation, those relating to setbacks, height, parking, floor area ratio, fire lanes, and percentage of land coverage.  No rights to any off-site facilities are necessary to insure compliance by the Real Property with all environmental protection, public highway, water use, zoning, building, fire, health, safety, or similar statutes, Laws, ordinances, codes, rules, regulations, orders, and decrees.

Section 5.8    Hazardous Materials.  Except as set forth on Schedule 5.8, no Hazardous Materials have been generated, released, stored, or deposited over, beneath, in, or on the Real Property.  No Hazardous Materials have been used in the construction of all or any portion of the Real Property.  No Hazardous Material will be used by Borrower in connection with any development or construction of the Real Property (or, if used, they will be used in a lawful manner), and no part of the Real Property has been used for or as a land fill, the result of which could impose any liability against Borrower, Lender, or the Real Property under any Applicable Laws, including, without limitation, any Environmental Laws.

Section 5.9    Financing Statements.  There are no UCC financing statements in effect that name Borrower as debtor and pertain to any rights in all or any portion of the Collateral.

Section 5.10    Event of Default.  No Event of Default or Unmatured Default has occurred and is continuing.

Section 5.11    Lease and Concession Agreements.  There are no Leases affecting all or any portion of the Real Property as of the Closing Date, other than as set forth on the Rent Roll attached hereto as Exhibit B, and no Person has any possessory interest in the Real Property or right to occupy the same except under and pursuant to the provisions of the Leases described in said Rent Roll.  No tenant under any such Lease (or any sublease) is an Affiliate of Borrower.  The copies of such Leases delivered to Lender are true, correct, and complete copies.  The Rent Roll accurately describes all security deposits made by the tenants at the Project which have not been applied.  Except as provided on the Rent Roll:

(a)    no default or event of default has occurred and is continuing under such Leases, and no event has occurred and no condition exists that, with the giving of notice or the lapse of time or both, would constitute a default or event of default under such Leases;

(b)    the tenants under such Leases have accepted possession of are in occupancy of all of their respective demised premises and are paying full, unabated

rent, and no tenant under any such Lease has given notice of its intent to terminate such Lease or vacate the leased premises;

(c)     no revenue under any such Lease has been paid more than one (1) month in advance of its due date;

(d)     all work to be performed by any landlord under each such Lease has been performed as required and has been accepted by the applicable tenant, and any payments, free rent, partial rent, rebate of rent, or other payments, credits, allowances, or abatements required to be given to any tenant has already been received by such tenant;

(e)     no tenant listed on the Rent Roll has assigned its Lease or sublet all or any portion of the premises demised thereby, and no such tenant holds its leased premises under assignment or sublease, nor does anyone except such tenant and its employees occupy such leased premises;

(f)     there are no brokerage fees or commissions now due and payable in connection with the leasing of space at the Real Property, and no such fees or commissions will become due and payable in the future in connection with the Leases in effect as of the date hereof (including, without limitation, by reason of any extension of such Lease or expansion of the space leased thereunder);

(g)     such Leases do not have a right to expand into additional space in the Real Property or a purchase option, right of first offer, or right of first refusal to purchase the Real Property or any portion thereof; and

(h)     such Leases either (i) by their terms (x) provide for automatic subordination to the terms, conditions, and provisions of the Security Instrument, the lien imposed by the Security Instrument, and all advances made under the Security Instrument, without the need for any further instrument of subordination; (y) do not provide the tenant with an early termination option or a termination right upon, or anti-assignment rights with respect to, any foreclosure action, sale under a power of sale or receivership, transfer in lieu of the foregoing, or the exercise of any other remedy by Borrower under the Security Instrument; and (z) provide that the lessee agrees to attorn to a Person who becomes owner of the Real Property by reason any foreclosure action, sale under a power of sale or receivership, transfer in lieu of the foregoing, or the exercise of any other remedy by Borrower under the Loan Documents and recognize any such Person as landlord or (ii) are subordinated to the terms, conditions, and provisions of the Security Instrument, the lien imposed by the Security Instrument, and all advances made under the Security Instrument, pursuant to the DIP Orders.

Section 5.12     <u>Separate Lots and Special Assessments</u>. The Real Property is comprised of one (1) or more parcels which constitute a separate tax lot or lots and do not constitute a portion

of any other tax lot not a part of such property. There are no pending or proposed special or other assessments for public improvements or otherwise affecting the Real Property, nor are there any contemplated improvements to the Real Property that may result in such special or other assessments.

Section 5.13  Certificate of Occupancy; Licenses.  All certifications, permits, licenses, and approvals, including, without limitation, certificates of completion and certificates of occupancy required for the legal use, occupancy, and operation of the Real Property as currently operated have been obtained and are in full force and effect.  The use being made of the Real Property is in conformity with the certificate of occupancy issued for the Real Property and all Applicable Laws.

Section 5.14  Flood Zone; Seismic Zone.  Except as set forth on Schedule 5.7, none of the Improvements or the Real Property or any portion thereof are located in an area as identified by the Federal Emergency Management Agency as an area having special flood hazards, or, if so located, the flood insurance required under this Agreement is in full force and effect with respect thereto.  The Real Property is not located in Zone 3 or Zone 4 of the "Seismic Zone Map of the U.S."

Section 5.15  Physical Condition.  (a) The Real Property, including, without limitation, all buildings, improvements, parking facilities, sidewalks, storm drainage systems, roofs, plumbing systems, HVAC systems, fire protection systems, electrical systems, equipment, elevators, exterior sidings and doors, landscaping, irrigation systems, and all structural components, are in good condition, order, and repair in all material respects, and there exists no structural or other material defects or damages in the Real Property, whether latent or otherwise; and (b) Borrower has not received notice from any insurance company or bonding company of any defects or inadequacies in the Real Property, or any part thereof, which would adversely affect the insurability or bonding of the same or cause the imposition of extraordinary premiums or charges thereon or of any termination or threatened termination of any policy of insurance or bond.

Section 5.16  Management Agreement.  There is no property management agreement or third-party manager that operates the Project.

Section 5.17  Not a Foreign Person.  Borrower is not a "foreign person" within the meaning of § 1445(f)(3) of the Code.

Section 5.18  Investment Company Act.  Borrower is not (a) an "investment company" or a company "controlled" by an "investment company," within the meaning of the Investment Company Act of 1940, as amended; (b) a "holding company" or a "subsidiary company" of a "holding company" or an "affiliate" of either a "holding company" or a "subsidiary company" within the meaning of the Public Utility Holding Company Act of 1935, as amended; or (c) subject to any other federal or state Law or regulation which purports to restrict or regulate its ability to borrow money.

Section 5.19  Casualty and Condemnation.  No Casualty has occurred with respect to all or any portion of the Real Property.  No eminent domain, Condemnation, or other taking

proceeding has been commenced, threatened, or contemplated with respect to all or any portion of the Real Property.

Section 5.20   No ERISA.  Borrower is not subject to any provisions of the Employee Retirement Income Security Act of 1974, as amended.

Section 5.21   Construction.  There is no material construction, repairs, alterations, or improvements ongoing at the Real Property, and there are no claims for payment for work, labor, or materials affecting the Real Property.

Section 5.22   Forfeiture.  There has not been committed by Borrower or any other Person in occupancy of or involved with the operation or use of the Project, any act or omission affording the federal government or any other Governmental Authority the right of forfeiture as against the Collateral, the Project, or any part thereof.  No portion of the Project or the Collateral has been or will be purchased with proceeds of any illegal activity.

Section 5.23   Lien Priority. (a) This Agreement, together with the other Loan Documents, creates a valid and continuing lien on and security interest in the Collateral in favor of Lender, which security interest is prior to all other liens, security interests, or other encumbrances whatsoever upon any Collateral, other than Permitted Liens, and is enforceable in accordance with the terms thereof against creditors of Borrower; and (b) other than in connection with the Loan Documents and the Permitted Liens, Borrower have not sold, pledged, transferred, or otherwise conveyed the Collateral.

Section 5.24   Borrower Collateral. All of the Improvements lie wholly within the boundaries and building restriction lines of the Real Property, no improvements on adjoining properties encroach upon the Real Property, and no easements or other encumbrances upon the Real Property encroach upon any of the Improvements, in either case, so as to affect the value or marketability of the Real Property.  The Survey for the Real Property delivered to Lender in connection with the Loan does not fail to reflect any material matter affecting the Real Property or the title thereto.  The Real Property is located on or adjacent to a public road and has direct legal access to such road (or has access to it via an irrevocable easement or irrevocable right of way permitting ingress and egress to and from such public road).  All easements, cross easements, licenses, air rights, and rights of way or other similar property interests, if any, necessary for the full utilization of the Improvements for their intended purposes have been obtained and are in full force and effect without default thereunder.

Section 5.25   Patriot Act. To the extent applicable, Borrower is in compliance with the (a) Trading with the Enemy Act, and each of the foreign assets control regulations of the United States Treasury Department (31 CFR, Subtitle B, Chapter V) and any other enabling legislation or executive order relating thereto, and (b) Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA Patriot Act of 2001) (the "**Patriot Act**").  No part of the proceeds of the Loan will be used, directly or indirectly, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain, or direct business, or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977.

Section 5.26    Bankruptcy Matters.

(a)    The Bankruptcy Case was commenced on the Petition Date, and proper notice thereof was given, in accordance with Applicable Law.  Proper notice was, or will be, given for (x) the motions seeking approval of the Loan Documents, the Interim Order, and the Final Order, (y) the hearings for the approval of the Interim Order, and (z) the hearings for the approval of the Final Order.

(b)    From and after the entry of the Interim Order, subject only to the Carve-Out, the Indebtedness will constitute an allowed administrative expense claim in the Bankruptcy Case having priority over all other administrative expense claims and unsecured claims against Borrower, now existing or hereafter arising, of any kind whatsoever in accordance with the terms of the DIP Orders.

(c)    From and after the entry of the Interim Order, the Indebtedness will be secured by a valid and perfected super-priority security interest in and lien on all of the Collateral of Borrower.

(d)    The Interim Order (with respect to the period prior to entry of the Final Order) or the Final Order (with respect to the period on and after entry of the Final Order), as the case may be, is in full force and effect and has not been reversed, stayed, modified, or amended without Lender's consent.

Section 5.27    Purchase Options.  Except as provided on the Rent Roll, the Real Property nor any part thereof or interest therein are subject to any purchase options, rights of first refusal or offer to purchase, reconveyance rights, or other similar rights in favor of any Person.

Section 5.28    Other Associations.  The Real Property is not located in, or subject to the provisions of, any common interest community, homeowner's association, condominium association, or any similar community, association, declaration, or restriction.

Section 5.29    Embargoed Persons.  As of the date hereof and at all times throughout the term of the Loan, (a) none of the funds or other assets of Borrower constitute property of, or are beneficially owned, directly or indirectly, by any Embargoed Person; (b) no Embargoed Person has (or will have) any interest of any nature whatsoever in Borrower with the result that the investment in Borrower (whether directly or indirectly) is prohibited by any Applicable Law or the Loan is in violation of any Applicable Law; and (c) none of the funds of Borrower have been derived from any unlawful activity with the result that the investment in Borrower (whether directly or indirectly) is prohibited by any Applicable Law or the Loan is in violation of any Applicable Law.

Section 5.30    Secondary Financing.  There exists no secondary financing.  For such purposes, "secondary financing" is defined as financing secured or intended to be secured by a lien on, or security interest in, the Collateral that is equal, junior, or subordinate to the liens on, and security interests in, the Collateral in favor of Lender.

## ARTICLE 6.
## COVENANTS

Section 6.1     Transfers.  Borrower shall not, without either paying the entire Indebtedness in full in accordance with the terms and conditions hereof or without obtaining prior written approval of Lender, sell, Lease, sell and leaseback, absolutely, collaterally, or otherwise assign, exchange, license, convey, pledge, mortgage, dispose of, or otherwise transfer (collectively, a "**Transfer**") any Collateral, other than Leases entered into in accordance with Section 6.22.

Section 6.2     Compliance with Laws.  Borrower shall comply, or cause compliance, with all Applicable Laws applicable to Borrower or governing the development, use, occupancy, and operation of the Project.  There shall never be committed by Borrower, and Borrower shall use commercially reasonable efforts to not permit any other Person in occupancy of or involved with the operation or use of the Project to commit, any act or omission affording the federal government or any other Governmental Authority the right of forfeiture against the Collateral or any part thereof. Borrower shall not commit, permit, or suffer to exist any act or omission affording such right of forfeiture.  Borrower shall not use or occupy the Project, and shall not suffer or permit any commercial tenant under any Lease to use or occupy the Project, for any purpose related to the cannabis industry or otherwise in any manner that would constitute a violation of any state and/or federal laws involving controlled substances, even in a jurisdiction that allows such use by state or local law or ordinance.  In the event that Borrower becomes aware of such a violation, Borrower shall take all actions allowed by Law to terminate the violating activity.

Section 6.3     Inspection.  Borrower shall, upon prior reasonable notice to Borrower, permit inspection of the Collateral and Borrower's business during Borrower's business hours by Lender and any agent or designee of Lender.  In addition, Borrower shall permit Lender and/or its agents and designees access to, and the right to inspect, audit, and copy, all books, records, contracts, licenses, Leases, and other documents and information relating to Borrower or the Collateral and Borrower's business.  All such books, records, and accounts of operations relating to the Collateral and Borrower's business shall be kept in accordance with GAAP and shall be in a form acceptable to Lender.  Borrower shall promptly respond to any inquiry from Lender for information with respect to the Collateral which information may be verified by Lender at Borrower's expense; provided, however, that Lender shall at all times be entitled to rely upon any statements or representations made by Borrower or any agent thereof.

Section 6.4     Liens.  Borrower shall not permit any lien, security interest, other charge, or encumbrance, or any other type of assignment or preferential arrangement, upon or with respect to any Collateral, except for Permitted Liens, and Borrower shall promptly (and in any event within thirty (30) days after Borrower has received notice thereof), discharge or bond over, or cause the discharge or bonding over of, any such unpermitted matter.

Section 6.5     Release by Lender.  With respect to the unpermitted matters set forth in Section 6.4 above, if Borrower shall fail to promptly discharge any such unpermitted matter in accordance with Section 6.4, then Lender may, but shall not be required to, procure the release and discharge of any such unpermitted matter and, further, may, in its sole discretion, effect any settlement or compromise of the same, and any amounts so expended by Lender, including, without limitation, premiums paid or security furnished in connection with the issuance of any

surety company bonds, shall be deemed to constitute a Loan Advance hereunder and shall bear Interest from the date so disbursed until paid at the Default Rate.  In settling, compromising, or discharging any such unpermitted matters, Lender shall not be required to inquire into the validity or amount of any such unpermitted matter.

Section 6.6     Operation of Collateral.  Borrower shall maintain all Collateral in good condition (normal wear and tear excepted), free and clear of all liens (other than Permitted Liens), make all necessary renewals, replacements, additions, betterments, and improvements thereto and will pay and discharge when due the cost of repairs and maintenance to the Collateral.  None of the improvements, fixtures, or equipment of any kind used in connection with the Project shall be removed, demolished, or materially altered without the prior written consent of Lender.  No Person other than Borrower shall operate or manage the Project, except with the prior written consent of Lender.  All work associated with the construction, development, remodeling, rebuilding, re-imaging, refurbishing, or re-equipping of the Project shall be diligently undertaken, pursued, and finally completed at Borrower's sole cost and expense, in good and workmanlike manner, using licensed contractors, and in material compliance with all Applicable Laws, including, without limitation, Environmental Laws.  Borrower shall promptly comply with the provisions of any recorded covenants, conditions, or restrictions to which the Real Property or any part thereof may at any time be subject.  Borrower shall not cause or allow the construction or erection of any public, municipal, or utility improvements upon the Project, other than those required by public authorities, without the prior written consent of Lender. Borrower shall not drill or extract or enter into any Lease for the drilling for or extraction of oil, gas, or other hydrocarbon substances or mineral of any kind or character on or from the Project or any part thereof without the prior written consent of Lender.  Borrower shall not seek, make, or consent to any change in zoning or conditions of use of the Real Property without the prior written consent of Lender.  Borrower shall not commit or suffer any material waste of the Real Property, make any change in the use of the Real Property which will in any way materially increase the risk of fire or other hazard arising out of the operation of the Real Property, intentionally take any action that might invalidate or allow the cancellation of any insurance policy or bond, or do or permit to be done thereon anything that may in any way materially impair the value of the Real Property.

Section 6.7     Reserved.

Section 6.8     Alterations.  Borrower shall obtain Lender's prior written consent to any material alterations to the Real Property.  For purposes hereof, "material alterations" shall mean (a) any alteration to the Real Property which may have a Material Adverse Effect, (b) any alterations that affect, in any material respect, (i) any structural component or roof of any Improvements or (ii) any utility, HVAC, or other building-wide system contained in the Improvements, (c) any non-aesthetic alterations to the exterior of any building constituting a part of any Improvements, or (d) any alterations to any of the Real Property the estimated or actual costs of which exceeds $25,000.00.

Section 6.9     Financial Statements.

(a)     Borrower shall give Lender prompt written notice of any Casualty with respect to all or any portion of the Project.

(b)      Borrower shall give Lender prompt written notice of the initiation of, or notice of intent to initiate, any eminent domain, Condemnation, or other taking proceeding by any Person with respect to all or any portion of the Real Property.

(c)      Borrower shall promptly give to Lender notice of the occurrence of any event which does or would with the passage of time or the giving of notice, or both, constitute an Event of Default, or have any Material Adverse Effect.

(d)      Borrower shall provide Lender with such additional information, documentation, or verifications concerning Borrower or its assets, properties, and businesses, as Lender or its counsel reasonably deem necessary.

Section 6.10   <u>Taxes</u>.  Upon the recording of the Security Instrument or any other recordable Loan Document, Borrower will pay all state, county, and municipal transfer, documentary, stamp, recording, or other similar Taxes imposed upon the execution and/or recordation of the Security Instrument or other Loan Documents.  Borrower shall pay, when they become due and payable, all Post-Petition Taxes, assessments, governmental charges, levies, or Other Charges imposed upon Borrower or upon the Real Property; <u>provided</u>, <u>however</u>, that Borrower shall not be required to pay any such Tax, assessment, charge, levy, Other Charge, claim, or demand if the amount, applicability, or validity thereof shall, at the time, be contested in good faith with due diligence and by appropriate proceedings, and if the amount has been bonded over or adequate reserves shall have been set aside in respect thereof in accordance with GAAP; which deferment of payment is permissible so long as no lien has been filed, no other action has been taken to enforce any lien, and Borrower's title to and its right to use, and Borrower's interest in, the Real Property is not materially adversely affected thereby; <u>provided</u>, <u>further</u>, that, notwithstanding the foregoing, Borrower shall pay any past due Post-Petition real property Taxes with respect to the Real Property prior to any tax sale thereof or any appointment of a receiver for the Real Property to effect the collection thereof.  If requested by Lender, Borrower shall deliver to Lender receipts for payment or other evidence satisfactory to Lender that the Taxes and such Other Charges have been so paid or so contested no later than ten (10) days following such request.

Section 6.11   <u>Corporate Existence</u>. Borrower shall do (or cause to be done) all things necessary to preserve and keep in full force and effect its existence, good standing, and tax election status.  Borrower shall obtain and maintain any and all licenses, permits, franchises, or other governmental authorizations necessary to the ownership of the Collateral.

Section 6.12   <u>Title</u>.  Except for the Permitted Liens, and subject to the terms and conditions of <u>Section 6.4</u> of this Agreement, Borrower shall keep the title to the Collateral free of all liens, security interests, claims, and encumbrances.

Section 6.13   <u>Reserved</u>.

Section 6.14   <u>Proceedings Affecting Collateral</u>.  If any proceedings are filed seeking to enjoin or otherwise prevent or declare invalid or unlawful the construction, occupancy, use, maintenance, or operation of the Project, or any portion thereof, Borrower shall cause such

proceedings to be diligently contested in good faith, and in the event of an adverse ruling or decision, prosecute all allowable appeals therefrom, and shall, without limiting the generality of the foregoing, contest the entry or seek the stay of any temporary or permanent injunction that may be entered, and use its best efforts to bring about a favorable and speedy disposition of the all such proceedings. All costs incurred by Lender in connection with such proceedings, including, without limitation, all fees and costs of Lender's counsel in connection with any such proceedings, <u>provided</u> that Lender is a party thereto, shall be at Borrower's expense and the amount due from Borrower shall bear Interest from the date so incurred until repaid at the Default Rate and shall be payable to Lender on demand.

Section 6.15   <u>Insurance</u>.  Borrower shall maintain the following insurance coverages:

(a)     casualty insurance against all risk of physical loss, without deduction for depreciation, and for an amount not less than replacement cost;

(b)     comprehensive general public liability insurance with combined single limit coverage per occurrence, and with a minimum aggregate limit, in such amounts as may be reasonably required by Lender;

(c)     rent loss and business interruption insurance in such amounts as may be reasonably required by Lender;

(d)     flood or earthquake insurance, if the Real Property is located in an area designated as a special flood or earthquake hazard area by any Governmental Authority or other applicable authority having jurisdiction over the Real Property; and

(e)     during any period of construction, builder's risk insurance and workmen's compensation insurance (which may be maintained by the general contractor or Borrower).

All insurance shall be in amounts reasonably required by Lender, and all insurance shall be maintained in such form and with such companies as shall be reasonably approved by Lender. Borrower shall deliver to and keep deposited with Lender Acord Form-25, Acord Form-27, and Acord Form-28, as applicable, certificates evidencing such insurance, together with certified copies of all policies of such insurance and renewals thereof, with premiums prepaid.  Such insurance with respect to the Project shall include (i) standard non-contributory additional insured, mortgagee, and lender's loss payable clauses, as applicable, satisfactory to Lender, entitling Lender to collect any and all proceeds payable under such insurance, (ii) clauses providing for not less than thirty (30) days' prior written notice to Lender of cancellation or material modification of such policies, and (iii) standard waiver of subrogation endorsements.  Lender shall be an additional named insured, mortgagee, and lender loss-payee, as applicable, of all such policies of insurance delivered by Borrower.  All of the above-mentioned Acord Form-25, Acord Form-27, and Acord Form-28, as applicable, certificates of insurance and certified copies of such policies, together with receipts for the payment of premiums thereon, shall be delivered to and held by Lender, which delivery shall constitute assignment to Lender of all return premiums related to the Project, to be held as additional security hereunder. Borrower shall pay all premiums on all insurance policies required from time to time under this Agreement, and thirty (30) days prior to expiration of any such policies, Borrower shall furnish to Lender, with premiums current, renewal

and replacement policies, certificates, or binders for the same in form, and with companies, coverage, deductibles, and amounts, reasonably satisfactory to Lender. Lender shall be listed as additional insured, mortgagee, or lender loss payable, as applicable, on all such insurance policies related to the Project. In the event of failure by Borrower to maintain any insurance required hereunder, Lender may, but shall not be required to, place insurance and treat the amounts expended therefore as a Loan Advance and such amounts from the date so expended by Lender until repaid shall bear Interest at the Default Rate.

Section 6.16    Reserved.

Section 6.17    Organizational Documents.  Without the prior written consent of Lender in its sole and absolute discretion, there shall not occur any amendment, restatement, supplement, or other modification of any terms, conditions, covenants, or provisions of Borrower's organizational documents.

Section 6.18    Reserved.

Section 6.19    Additional Documents.  Without the prior consent of Lender, which consent shall not be unreasonably withheld, delayed, conditioned, or denied, Borrower shall not (a) execute or record any document pertaining to, affecting, or running with all or any portion of the Real Property, (b) initiate or consent to any zoning reclassification of any portion of the Real Property or seek any variance under any existing zoning ordinance or use or permit the use of any portion of the Real Property in any manner that could result in such use becoming a non-conforming use under any zoning ordinance or any other applicable land use Law, rule, or regulation, (c) fail to exercise any option or right to renew or extend the term of any easements, entitlement, land use covenant, or restrictive covenants benefitting the Real Property (if applicable) (and if Borrower shall fail to exercise any such option or right as aforesaid, Lender may exercise the option or right as Borrower's agent and attorney-in-fact in Lender's own name or in the name of and on behalf of a nominee of Lender, as Lender may determine in the exercise of its sole and absolute discretion), (d) waive, excuse, condone, or in any way release or discharge any party to any such easement, entitlement, land use covenant, or restrictive covenant of or from their material obligations, covenants, and/or conditions thereunder, (e) surrender, terminate, forfeit, or suffer or permit the surrender, termination, or forfeiture of, or amend, change, or otherwise modify in a material or adverse manner, any easement, entitlement, land use covenant, or restrictive covenants affecting the Real Property, or (f) suffer, permit, or initiate the joint assessment of all or any portion of the Real Property (i) with any other real property constituting a tax lot separate from the Real Property or (ii) which constitutes real property with any portion of the Real Property which may be deemed to constitute personal property, or any other procedure whereby the lien of any Taxes which may be levied against such personal property shall be assessed or levied or charged to such real property portion of the Real Property.

Section 6.20    Liens.  Unless Lender shall otherwise consent in writing, Borrower shall not, except for the Permitted Liens, and subject to the terms and conditions of Section 6.4 of this Agreement, create or suffer to exist, any lien, security interest, other charge, or encumbrance, or any other type of preferential arrangement in the nature of a lien or a security interest (including, without limitation, any conditional sale or other title retention agreement or other encumbrance on title to real property), upon or with respect to the Collateral, the Project, the Real Property, the

Land, or any Improvements, whether now owned or hereafter acquired, or assign any right to receive income, or secure or provide for the payment of any debt of any Person, except for Permitted Liens.

Section 6.21    Change of Control.  Borrower shall not permit a Change of Control.

Section 6.22    Leases.

(a)    Borrower shall not enter into, or extend or renew the term of, any Lease of any premises at the Real Property without the prior written consent of Lender.

(b)    Borrower shall not amend, restate, or supplement, consent to a departure from the terms of, waive the terms of, consent to an amendment, assignment, or sub-letting of, or otherwise modify any Lease of any premises at the Real Property, without the prior written consent of Lender.

(c)    Borrower shall not cancel, terminate, or accept surrender of any Lease of any premises at the Real Property, without the prior written consent of Lender.

(d)    Subject to the terms of the Loan Documents, Borrower shall timely comply with and perform all of its obligations under Leases of premises at the Real Property.

(e)    Upon any default or event of default under any Lease of premises at the Real Property, Borrower shall promptly preserve its rights and remedies.

Section 6.23    Use of Proceeds.  Borrower shall only use the proceeds of or with respect to the Loan as set forth in Article 2 of this Agreement.

Section 6.24    Reserved.

Section 6.25    Restricted Payments.  Borrower shall not directly or indirectly declare or make any Restricted Payment or incur any obligation to do so.

Section 6.26    Reserved.

Section 6.27    Additional Negative Covenants.

(a)    Borrower shall not (i) merge or consolidate with any Person; or (ii) engage in a division, conversion, or dissolution.

(b)    Borrower shall not acquire all or a material portion of the Capital Stock or assets of any Person in any transaction or in any series of related transactions or enter into any sale and leaseback transaction.

(c)    Borrower shall not create or acquire any subsidiary.

(d)    Borrower shall not enter into any joint venture.

(e)    Borrower shall not change its jurisdiction of organization.

(f)     Borrower shall not carry or use any proceeds of any Loan Advance to purchase or extend credit for the purpose of purchasing "margin stock" within the meaning of Regulations U, T or X of the Board of Governors of the Federal Reserve System, 12 C.F.R., Chapter II.

(g)     Borrower, as lender, equity holder, or investor, shall not make or have outstanding loans, advances, extensions of credit, or commitments or obligations to make the same or capital contributions to, or investments in, any Person.

Section 6.28     Survey Indemnification.  Borrower hereby indemnifies Lender for any loss, cost, expense, or damage resulting from any new matter not disclosed on the Survey provided to Lender that would have otherwise been disclosed in an updated survey.

Section 6.29     Transactions with Affiliates.  Borrower shall not enter into any transaction with any subsidiary or other Affiliate of Borrower, unless the transaction is (a) in the ordinary course, and pursuant to the reasonable requirements, of Borrower's business, (b) upon terms substantially the same, and no less favorable to Borrower, as Borrower would otherwise obtain in a comparable arm's length transaction with any Person not a subsidiary or other Affiliate of Borrower, and (c) not otherwise prohibited hereunder.  Any and all fees or other amounts payable by Borrower to any Affiliates of Borrower are and shall be subordinated in right of payment to the prior payment in full of the Indebtedness and are and shall be subject and subordinate in all respects to the liens, terms, covenants, and conditions of the Loan Documents and to all advances heretofore made or which may hereafter be made pursuant to the Loan Documents.

Section 6.30     Bankruptcy Covenants.

(a)     Notwithstanding anything in the Loan Documents to the contrary, Borrower shall comply with all covenants, terms, and conditions and otherwise perform all obligations set forth in the DIP Orders, as applicable, and shall not violate or breach any covenant, term, or condition or otherwise fail to perform any obligations set forth in the DIP Orders, as applicable.

(b)     Borrower will use commercially reasonable efforts to obtain the approval of the Bankruptcy Court of this Agreement and the other Loan Documents.

(c)     In connection with the Bankruptcy Case, and in accordance with Applicable Law, Borrower shall give proper notice of (x) the motions seeking approval of the Loan Documents, the Interim Order, and the Final Order, and (y) the hearings for the approval of the Interim Order, and the Final Order.  Borrower shall give, on a timely basis as specified in the DIP Orders, as applicable, all notices required to be given to all parties specified in the DIP Orders, as applicable.

(d)     Borrower shall not incur, create, assume, suffer to exist, or permit any administrative expense, unsecured claim, or other super-priority claim or lien (except for the Carve-Out) that is *pari passu* with or senior to the claims of Lender against Borrower under the Loan Documents or apply to the Bankruptcy Court for authority to do so.

(e)    Borrower shall not make or permit to be made any change, amendment, or other modification, or any application or motion for any change, amendment, or other modification, to the DIP Orders, as applicable, other than as approved by Lender.

(f)    Borrower shall not make (i) any Pre-Petition "critical vendor" payments or other payments on account of any creditor's Pre-Petition unsecured claims, (ii) payments on account of claims or expenses arising under § 503(b)(9) of the Bankruptcy Code, (iii) payments in respect of a reclamation program, or (iv) payments under any management incentive plan or on account of claims or expenses arising under § 503(c) of the Bankruptcy Code, except in each case in amounts and on terms and conditions that (x) are approved by order of the Bankruptcy Court and (y) are permitted by the Budget.

Section 6.31  <u>Management Agreement.</u>    Borrower shall not enter into a property management agreement with respect to the Project.

# ARTICLE 7.
## LOAN EXPENSES

Borrower agrees to pay, or reimburse Lender for, all of the Loan Expenses.  Any Loan Expenses shall bear Interest at the Default Rate commencing on the date which is five (5) Business Days after written demand for payment or reimbursement thereof is made by Lender until paid. Any Loan Expenses incurred shall be paid or reimbursed by Borrower regardless of whether there shall be any Loan Advances under the Loan.

# ARTICLE 8.
## EVENTS OF DEFAULT

The occurrence of any one or more of the following shall constitute an "**Event of Default**":

(a)    (x) Borrower fails to pay any of (i) the Principal Balance, or any portion thereof, when due and payable; or (ii) any Interest, or any portion thereof, when due and payable; or (y) Borrower fails to pay other Indebtedness, within five (5) Business Days after any such other Indebtedness is due and payable.

(b)    Any representation or warranty made under this Agreement or any other Loan Document (or any written certification made or delivered to Lender by Borrower or any of its officers, employees, or agents in connection with any Loan Document) shall have been incorrect, false, or misleading in any material respect as of the date made.

(c)    Failure to comply with any of the following provisions of this Agreement: <u>Sections 6.1</u>, <u>6.3</u>, <u>6.4</u>, <u>6.7</u>, <u>6.8</u>, <u>6.9</u>, <u>6.10</u>, <u>6.13</u>, <u>6.15</u>, <u>6.18</u>, <u>6.19</u>, <u>6.20</u>, <u>6.21</u>, <u>6.22</u>, <u>6.23</u>, <u>6.24</u>, <u>6.25</u>, <u>6.26</u>, <u>6.27</u>, <u>6.29</u>, <u>6.30</u>, or <u>6.31</u>.

(d)    Failure to comply with any provision of this Agreement (other than those referenced in clause <u>(c)</u> above or in any other clause in this <u>Article 8</u>), and such failure shall remain unremedied for twenty (20) days after the earlier

of (i) the date on which Lender notifies Borrower thereof and (ii) the date on which Borrower has knowledge thereof.

(e)     The occurrence of (i) any Event of Default (as defined in any of the other Loan Documents) or (ii) any default under any of the other Loan Documents that is not subject to a defined set of "Events of Default" and the lapse of any notice, grace, or cure period provided in such Loan Document with respect to such default.

(f)     The occurrence of any of the following in the Bankruptcy Case:

(i)     the bringing of a motion, taking of any action, or the filing of any plan or disclosure statement by Borrower in the Bankruptcy Case, or the entry of an order, (A) to obtain additional financing under § 364(c) or § 364(d) of the Bankruptcy Code from any Person other than Lender or (B) to authorize any Person to recover from any portions of the Collateral any costs or expenses of preserving or disposing of the Collateral under § 506(c) of the Bankruptcy Code;

(ii)     the dismissal of the Bankruptcy Case or the conversion of the Bankruptcy Case to a case under Chapter 7 of the Bankruptcy Code;

(iii)     the entry of an order which has not been withdrawn, dismissed, or reversed: (A) appointing an interim or permanent trustee in the Bankruptcy Case or the appointment of an examiner with expanded powers in the Bankruptcy Case, (B) granting relief from or modifying the automatic stay of § 362 of the Bankruptcy Code to allow any creditor to execute upon or enforce a security interest in or lien on any Collateral, (C) amending, supplementing, staying, reversing, vacating, or otherwise modifying any of the Interim Order, the Final Order, this Agreement, or any other Loan Document, or Lender's rights, benefits, privileges, or remedies under the Interim Order, the Final Order, this Agreement, or any other Loan Document, or (D) approving a sale of any Collateral of Borrower pursuant to § 363 of the Bankruptcy Code or approving bidding procedures therefor, unless such sale and bidding procedures and the orders approving the same are satisfactory to Lender in its sole discretion;

(iv)     Borrower's consolidating or combining with any other Person;

(v)     any Post-Petition judgment is entered against Borrower which would operate to divest Borrower of any Collateral;

(vi)     the imposition of any requirement that Lender marshal any of the Collateral;

(vii)     the termination or modification of Borrower's exclusivity as to the proposal of any plan;

(viii)     Borrower announcing or informing any other Person of its intention to file a plan that does not pay the Indebtedness in full in immediately available funds or is otherwise not acceptable to Lender;

(ix)     the filing of any plan that does not pay the Indebtedness in full in immediately available funds or is otherwise not acceptable to Lender or the filing of any disclosure statement attendant thereto; or

(x)     Borrower requesting or seeking authority for, or the entry of an order that approves or provides authority to take, any other action or actions adverse to Lender or its rights and remedies under the Loan Documents, the DIP Orders, or its interest in the Collateral.

## ARTICLE 9.
## EXERCISE OF REMEDIES

Upon the occurrence and during the continuation of any Event of Default, Lender, in addition to availing itself of any remedies conferred upon it by applicable Law and by the terms of the Loan Documents, may pursue any one or more of the following remedies first, concurrently, or successively with each other and with any other available remedies (but shall have no obligation to do so), it being the intent hereof that none of such remedies shall be to the exclusion of any others:

(a)     Withhold any Disbursement hereunder which would otherwise become due to Borrower; terminate Lender's commitment under the Loan Amount to make Disbursements; declare the maturity of the Loan to be accelerated; and/or declare the unpaid Indebtedness to be immediately due and payable.

(b)     Foreclose the Security Instrument and exercise any of the rights and remedies contained in this Agreement and/or any of the other Loan Documents and/or exercise any other rights and remedies that Lender may have at law or in equity, including but not limited to appointing a receiver over the Collateral and operational control of the Project.

(c)     Sever the Note and the other Loan Documents into one or more separate notes, mortgages, and other security documents in such denominations for purposes of evidencing and enforcing Lender's rights and remedies provided hereunder.

(d)     Apply the balance of any reserve to any Indebtedness in its sole and absolute discretion.

(e)     To the extent any amount or payment is tendered by or on behalf of Borrower or otherwise recovered by Lender (including, without limitation, through realization upon Collateral), apply such tender or recovery to the payment of the Indebtedness in any order, proportion, and priority as Lender may determine in its sole and absolute discretion.

(f)     Enter upon the Project to perform obligations under Leases, or to operate, maintain, repair, and improve the Project and employ watchmen to protect the Project, all at the risk, cost, and expense of Borrower, consent to such entry being hereby given by Borrower.

(g)     At any time discontinue any work commenced in respect of the Project or change any course of action undertaken by Borrower and not be bound by any limitations or requirements of time whether set forth herein or otherwise.

(h)     Exercise the rights of Borrower under any management agreement and any other contract or agreement in any way relating to the Project, including, without limitation, the right to terminate any such contract or agreement, and take over management of the Project and use all or any part of the labor, materials, supplies, and equipment contracted for by Borrower, whether or not previously incorporated into the Project.

(i)     In connection with any work or action undertaken by Lender pursuant to the provisions of the Loan Documents, (1) engage a property or project manager and builders, contractors, architects, engineers, and others for the purpose of managing the Project and furnishing labor, materials, and equipment, (2) pay, settle, or compromise all bills or claims which may become liens, security interests, or other encumbrances against the property and assets constituting the Collateral, or which have been or may be incurred in any manner in connection with the Project, or for the discharge of liens, security interests, encumbrances, or defects in the title of the Project or other Collateral, (3) take or refrain from taking such action hereunder as Lender may from time to time determine, and (4) engage marketing and leasing agents and real estate brokers to advertise, Lease, or sell portions or all of the Project or other Collateral upon such terms and conditions as Lender may determine.

Upon the occurrence and during the continuation of an Event of Default, all or any one or more of the rights, powers, privileges, and other remedies available to Lender under this Agreement or any of the other Loan Documents or at law or in equity may be exercised by Lender at any time and from time to time, whether or not all or any of the Indebtedness shall be accelerated and/or declared due and payable, and whether or not Lender shall have commenced any foreclosure proceeding or other action for the enforcement of its rights and remedies under any of the Loan Documents.  Any such actions taken by Lender shall be cumulative and concurrent and may be pursued independently, singularly, successively, together, or otherwise, at such time and in such order as Lender may determine in its sole and absolute discretion, without impairing or otherwise affecting the other rights and remedies of Lender.  Without limiting the generality of the foregoing, Borrower agrees that if an Event of Default is continuing (i) Lender is not subject to any "one action" or "election of remedies" Law or rule, and (ii) all liens and other rights, remedies, or privileges provided to Lender shall remain in full force and effect until the satisfaction of the Indebtedness or the Indebtedness has been paid in full.

Without limiting the generality of the foregoing or limiting in any way the rights of Lender under the Loan Documents or otherwise under applicable Laws, at any time after the occurrence, and during the continuance, of an Event of Default, Lender shall be entitled to apply for and have a receiver appointed under state or federal Law by a court of competent jurisdiction in any action taken by Lender to enforce its rights and remedies hereunder and under the Loan Documents in

order to manage, protect, preserve, sell, Lease, and otherwise dispose of all or any portion of the Collateral and continue the operation of the business of Borrower, and to collect all revenues and profits thereof and apply the same to the payment of all reasonable expenses and other charges of such receivership, including, without limitation, the reasonable compensation of the receiver, and to the payment of the Indebtedness until a sale or other disposition of such Collateral shall be finally made and consummated. BORROWER HEREBY IRREVOCABLY CONSENTS TO AND WAIVES ANY RIGHT TO OBJECT TO OR OTHERWISE CONTEST THE APPOINTMENT OF A RECEIVER AFTER THE OCCURRENCE AND DURING THE CONTINUANCE OF AN EVENT OF DEFAULT, AS PROVIDED ABOVE. BORROWER GRANTS SUCH WAIVER AND CONSENT KNOWINGLY AFTER HAVING DISCUSSED THE IMPLICATIONS THEREOF WITH COUNSEL, ACKNOWLEDGES THAT THE UNCONTESTED RIGHT TO HAVE A RECEIVER APPOINTED FOR THE FOREGOING PURPOSES IS CONSIDERED ESSENTIAL BY LENDER IN CONNECTION WITH THE ENFORCEMENT OF ITS RIGHTS AND REMEDIES HEREUNDER AND UNDER THE LOAN DOCUMENTS, AND THE AVAILABILITY OF SUCH APPOINTMENT AS A REMEDY UNDER THE FOREGOING CIRCUMSTANCES WAS A MATERIAL FACTOR IN INDUCING LENDER TO PROVIDE (AND COMMIT TO PROVIDE) FINANCIAL ACCOMMODATIONS TO BORROWER, AND BORROWER AGREES TO ENTER INTO ANY AND ALL STIPULATIONS IN ANY LEGAL ACTIONS, OR AGREEMENTS OR OTHER INSTRUMENTS, IN CONNECTION WITH THE FOREGOING AND TO COOPERATE FULLY WITH LENDER IN CONNECTION WITH THE ASSUMPTION AND EXERCISE OF CONTROL BY THE RECEIVER OVER ALL OR ANY PORTION OF THE COLLATERAL. NO RIGHT CONFERRED UPON LENDER HEREBY OR BY ANY LOAN DOCUMENT SHALL BE EXCLUSIVE OF ANY OTHER RIGHT REFERRED TO HEREIN OR THEREIN OR NOW OR HEREAFTER AVAILABLE AT LAW, IN EQUITY, BY STATUTE OR OTHERWISE.

## ARTICLE 10.
## CASUALTY AND CONDEMNATION

Section 10.1   Casualty.  If the Project shall be damaged or destroyed, in whole or in part, by fire or other casualty (a "**Casualty**"), Borrower shall give prompt written notice of such damage to Lender, shall promptly commence and diligently pursue insurance recovery with respect to such Casualty with its insurance company, and shall promptly commence and diligently pursue the completion of the Restoration of the Project as nearly as possible to at least as good as the condition the Project was in immediately prior to such Casualty, with such alterations as may be reasonably approved by Lender and otherwise in accordance with Section 10.3.  Borrower shall pay all costs of such Restoration whether or not such costs are covered by insurance.  Lender may, but shall not be obligated to make proof of loss if not made promptly by Borrower.  In addition, Lender may participate in any settlement discussions with any insurance company (and the final settlement shall be subject to the prior written approval of Lender) with respect to any Casualty, and Borrower shall deliver to Lender all instruments required by Lender to permit such participation.

Section 10.2   Condemnation.  Borrower shall promptly give Lender notice of the actual or threatened commencement of any proceeding for the condemnation or compulsory taking of the Real Property or any portion thereof (a "**Condemnation**") and shall deliver to Lender copies of any and all papers served in connection with such proceedings.  Lender may participate in any

such proceedings, and Borrower shall from time to time deliver to Lender all reasonable instruments requested by it to permit such participation. Borrower shall, at its expense, diligently defend any such proceedings and shall consult with Lender, its attorneys and experts, and cooperate with them in the carrying on or defense of any such proceedings. Notwithstanding any taking by any public or quasi-public authority through Condemnation or otherwise (including, but not limited to, any transfer made in lieu of or in anticipation of the exercise of such taking), Borrower shall continue to pay the Indebtedness at the time and in the manner provided for its payment in this Agreement, and the Indebtedness shall not be reduced unless and until any Award shall have been actually received and, pursuant to Section 10.3, applied by Lender to the reduction or discharge of the Indebtedness. The amount of the Award shall not be deemed to limit the amount of the Indebtedness outstanding under the Loan Documents. If the Real Property or any portion thereof is taken by a condemning authority, Borrower shall promptly commence and diligently pursue the completion of the Restoration of the Real Property as nearly as possible to at least as good as the condition the Real Property was in immediately prior to such taking, with such alterations as may be reasonably approved by Lender and otherwise in accordance with Section 10.3. Borrower shall pay all costs of such Restoration whether or not such costs are covered by the Award. If the Real Property is sold, through foreclosure or otherwise, prior to the receipt by Lender of the Award, Lender shall have the right, whether or not a deficiency judgment on the Indebtedness shall have been sought, recovered, or denied, to receive the Award, or a portion thereof, up to the amount sufficient to pay the Loan and all Indebtedness.

Section 10.3    Restoration. Lender shall have the right, in its sole and absolute discretion, to elect whether to apply the Net Proceeds to repay the balance of the Loan or other Indebtedness or to make the Net Proceeds available to Borrower for Restoration of the Project. The term "**Net Proceeds**" for purposes of this Section 10.3 shall mean: (a) the net amount of all insurance proceeds received as a result of any Casualty, after deduction of Lender's costs and expenses (including, but not limited to, counsel fees and costs), if any, in collecting the same, or (b) the net amount of the Award, after deduction of Lender's costs and expenses (including, but not limited to, counsel fees and costs), if any, in collecting the same, whichever the case may be. All Net Proceeds shall be promptly deposited by Borrower with Lender and held by Lender and disbursed or applied in accordance with the provisions of Sections 2.8(b) and 10.3.

## ARTICLE 11.
## MISCELLANEOUS

Section 11.1    Additional Indebtedness. If any Loan Advances or payments made by Lender pursuant to this Agreement or any other Loan Document, together with the Disbursement of the Loan, shall exceed the face amount of the Note, all such Loan Advances and payments shall constitute additional Indebtedness secured by the Loan Documents and all other security for the Loan and shall bear interest at the Default Rate from the date advanced until paid.

Section 11.2    Additional Acts. Borrower shall, upon request, execute and deliver such further agreements, instruments, and documents and do such further acts and things as may be reasonably required to provide to Lender evidence of and security for the Indebtedness.

Section 11.3    No Waiver. Failure by Lender to insist upon full and prompt performance of any provisions of this Agreement or any of the other Loan Documents, or to take action in the

event of any breach of any such provision or upon the occurrence of any Event of Default, shall not constitute a waiver of any rights of Lender, and Lender may at any time thereafter exercise all available rights and remedies with respect to such breach or Event of Default.

Section 11.4    Loan Agreement Governs.  In the event of any inconsistency between any provision of this Agreement and any provision of any other Loan Document, the provision of this Agreement shall govern; provided, however, that the provisions of all of the Loan Documents shall be construed as an integrated set of provisions governing the Loan and, accordingly, shall be interpreted and construed liberally to give the maximum validity, enforceability, and effect to all of such provisions.

Section 11.5    Additional Advances.  If an Event of Default shall occur and for so long as such Event of Default continues, Lender may, but shall not be obligated to, take any and all actions to correct such Event of Default, and all amounts expended in so doing, all Loan Expenses and all other amounts paid or advanced by Lender pursuant to the Loan Documents, and all other amounts advanced by Lender in connection with preserving any security for the Indebtedness, shall constitute Loan Advances and Indebtedness, shall be secured by the Loan Documents and all other security for the Loan, and shall bear Interest at the Default Rate from the date advanced until paid. If Borrower shall be in default under any Lease (without regard as to whether any applicable notice, grace, or cure periods have expired thereunder), then, without limiting the generality of the other provisions of this Agreement, and without waiving or releasing Borrower from any of its obligations under the Loan Documents, Lender shall have the right, but shall be under no obligation, to pay any sums and to perform any act or take any action as may be appropriate to cause all of the terms, covenants, and conditions of the Lease, on the part of Borrower to be performed or observed, to be performed or observed.  Lender and any Person designated by Lender shall have, and are hereby granted, the right (upon reasonable advance written notice to Borrower and subject to the rights of tenants and other occupancy at the Real Property) to enter upon the Real Property at any time and from time to time for the purpose of taking any such action.  If Lender receives any notice concerning a default under the Lease, such notice shall constitute full protection to Lender and its designees for any action taken or omitted to be taken thereby in good faith, in reliance thereon.  Any sums so expended by Lender shall constitute Loan Advances and Indebtedness, shall be secured by the Security Instrument and all other security for the Loan, and shall bear interest at the Default Rate from the date advanced until paid.

Section 11.6    Entire Agreement.    Borrower acknowledges that no statements, agreements, representations, oral or written, have been made either by Lender or by any employee, agent, or broker acting on Lender's behalf with respect to the Loan.  This Agreement and the other Loan Documents contain the entire agreement of the parties hereto and thereto in respect of the transactions contemplated hereby and thereby, and all prior agreements among or between such parties, whether oral or written, are superseded by the terms of this Agreement and the other Loan Documents.

Section 11.7    Amendment; Waiver; Approval.  This Agreement shall not be amended, restated, supplemented, or otherwise modified without the written agreement of Borrower and Lender.  No waiver of any provision of this Agreement or any of the other Loan Documents shall be effective unless set forth in writing signed by the party granting the waiver, and any such waiver shall be effective only to the extent expressly therein set forth.  Receipt by Lender of any

agreement, instrument, or document shall not constitute or be deemed to be an approval thereof. Any approvals required under any of the other Loan Documents must be in writing, signed by Lender and delivered to Borrower.

Section 11.8    Notices.    All notices, demands, requests, and other communications desired or required to be given hereunder (collectively, the "**Notices**" and individually, each a "**Notice**") shall be in writing and shall be given by: (i) hand delivery to the address for Notices; (ii) delivery by overnight courier service to the address for Notices; or (iii) sending the same by United States mail, postage prepaid, certified mail, return receipt requested, addressed to the address for Notices.  The addresses for Notices, in each case, are as follows:

|  |  |
|---|---|
| To Lender: | Layla Lending II LLC |
|  | 7777 Glades Road, Suite 309 |
|  | Boca Raton, Florida 33434 |
|  | Attn: Justin Cooper |
|  | (561) 571-5200 (telephone) |
|  |  |
| To Borrower: | St. Christopher's Inc. |
|  | 71 South Broadway |
|  | Dobbs Ferry, NY 10522 |

All Notices shall be deemed given and effective upon the earliest to occur of: (a) the hand delivery of such Notice to the address for Notices; (b) one (1) Business Day after the deposit of such Notice with an overnight courier service by the time deadline for next day delivery addressed to the address for Notices; or (c) three (3) Business Days after depositing the Notice in the United States mail as set forth in clause (iii) above.  All Notices shall be sent to a party at its address specified above or to such other address as shall have been designated by the applicable party by Notice to the other party hereto.

Section 11.9    Benefit; Assignment.

(a)    The rights, powers, and remedies of Lender under this Agreement shall inure to the benefit of Lender and its successors and assigns, and Lender shall have the full right to assign participate, sell, and/or transfer all or any part of its interest under the Loan Documents and/or in the Loan or otherwise, and Borrower shall execute and deliver any necessary or desirable documentation to facilitate same.  The rights and obligations of Borrower under this Agreement may not be assigned and any purported assignment by Borrower shall be null and void.

(b)    Lender, acting solely for this purpose as a non-fiduciary agent of Borrower, shall maintain at one of its offices in the United States a copy of each assignment agreement delivered to it and a register for the recordation of the names and addresses of the Lenders, and the principal amounts (and stated interest) of the Loan owing to, each Lender pursuant to the terms hereof from time to time (the "**Register**").  The entries in the Register shall be conclusive absent manifest error, and Borrower and Lender shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement. The Register shall be available for inspection by any Lender, at any reasonable time and from time to time upon reasonable prior notice. The parties intend that any interest in or with respect to the

Loan under this Agreement be treated as being issued and maintained in "registered form" within the meaning of Sections 163(f), 871(h)(2), and 881(c)(2) of the Code and any regulations thereunder (and any successor provisions), including, without limitation, under United States Treasury Regulations Section 5f.103-1(c) and Proposed Regulations Section 1.163-5 (and any successor provisions), and the provisions of this Agreement shall be construed in a manner that gives effect to such intent.

(c)     Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of Borrower, maintain a register complying with the requirements of Sections 163(f), 871(h) and 881(c)(2) of the Code and the Treasury regulations issued thereunder on which is entered the name and address of each participant and the principal amounts (and stated interest) of each participant's interest in the Loan or other obligations under the Loan Documents (the "**Participant Register**"); <u>provided</u> that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including, without limitation, the identity of any participant or any information relating to a participant's interest in any commitments, loans, letters of credit, or its other obligations under any Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such commitment, loan, letter of credit, or other obligation is in registered form under the Code or Treasury Regulations, including, without limitation, Section 5f.103-1(c) of the United States Treasury Regulations, or is otherwise required thereunder. The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.

Section 11.10   <u>Governing Law</u>.   This Agreement was negotiated in New York, and accepted by Borrower and Lender in the State of New York, which State the parties agree has a substantial relationship to the parties and to the underlying transaction embodied hereby, and in all respects, including, without limiting the generality of the foregoing, matters of construction, validity and performance, this Agreement and the obligations arising hereunder shall be governed by, and construed in accordance with, the Laws of the State of New York applicable to contracts made and performed in such State and any applicable Law of the United States of America, without giving effect to the conflict of laws provisions or rules thereof to the extent such principles or rules would require or permit the application of the Laws of any jurisdiction other than those of the State of New York.   To the fullest extent permitted by Law, Borrower hereby unconditionally and irrevocably waives any claim to assert that the Law of any other jurisdiction governs this Agreement, and this Agreement shall be governed by and construed in accordance with the Laws of the State of New York pursuant to § 5-1401 of the New York General Obligations Law.

Section 11.11   <u>Brokers and Financial Advisors</u>.   Borrower hereby represents and warrants that neither Borrower nor any Affiliate of Borrower has dealt with any financial advisors, brokers, underwriters, placement agents, agents, or finders (each, a "**Broker**") in connection with the transactions contemplated by this Agreement, other than Ariel Property Advisors who will be paid a one percent (1.00%) commission based on the Loan Amount at Closing.   Any compensation owed to any Broker shall be paid by Borrower on the Closing Date from the Loan proceeds and shall not be a liability of Lender. Borrower hereby agrees to indemnify, defend, and hold Lender harmless from and against any and all claims, liabilities, costs, and expenses of any kind (including, without limitation, Lender's attorneys' fees and expenses) in any way relating to or arising from a claim by any Broker that such Person acted on behalf of Borrower or any other

Person in connection with the transactions contemplated herein. The provisions of this Section 11.11 shall survive the expiration and termination of this Agreement and the payment of the Indebtedness.

Section 11.12  Indemnity. Borrower agrees to indemnify, defend, and hold Lender and its members, managers, partners, investors, auditors, attorneys, participants, successors, Affiliates, subsidiaries, officers, directors, employees, agents, controlling persons, funding sources, and other representatives and advisors (collectively, "**Indemnitees**") harmless from and against any and all suits, actions, proceedings, liabilities, obligations, losses, damages, claims, and costs and expenses (including, without limitation, attorneys' fees and court costs and disbursements and other costs of investigation or defense, including, without limitation, those incurred upon any appeal) of whatever kind or nature (collectively, "**Losses**") which may be imposed on, incurred by, or asserted against Lender or Indemnitees at any time which relate to or arise from Borrower's or any of its agent's actions or inactions related to the Loan, the Loan Documents, Borrower's use of the proceeds of the Loan, the ownership, construction, use, operation, or maintenance of the Collateral, including, without limitation, any brokerage commissions or finder's fees asserted by, through, or under Borrower against Lender with respect to the making of the Loan and any damages incurred by Lender by reason of Borrower and Lender being alleged to have the relationship of joint venturers or partners, or Borrower or Lender being deemed to have acted as agent for the other; provided, however, Borrower shall not be liable for any Losses caused by the gross negligence or willful misconduct of Lender or any of the other Indemnitees.

Section 11.13  Headings. The titles and headings of the articles, sections, and paragraphs of this Agreement have been inserted as a matter of convenience of reference only and shall not control or affect the meaning or construction of any of the terms or provisions of this Agreement.

Section 11.14  No Partnership or Joint Venture. Lender, by executing and performing this Agreement shall not become a partner or joint venturer with Borrower or any partner of Borrower or any of their respective associates or Affiliates and all inspections of the Collateral herein provided for are for the sole benefit of Lender.

Section 11.15  Time is of the Essence. Time is of the essence of the payment of all amounts due Lender under this Agreement and performance and observance by Borrower of each covenant, agreement, provision, and term of this Agreement and the other Loan Documents.

Section 11.16  Invalid Provisions. In the event any one or more of the provisions contained in this Agreement or in any of the other Loan Documents shall for any reason be held to be invalid, illegal, or unenforceable in any respect by a court of competent jurisdiction, such invalidity, illegality, or unenforceability shall not affect any other provision of this Agreement or any other Loan Document, and this Agreement and the other Loan Document shall be construed as if such invalid, illegal, or unenforceable provision had never been in the Loan Documents.

Section 11.17  Binding Provisions. The covenants, warranties, agreements, obligations, liabilities, and responsibilities of Borrower under this Agreement shall be binding upon and enforceable against Borrower and its legal representatives, administrators, successors, and permitted assigns and the estate of Borrower, and any trustee, other estate representative or any

successor in interest of Borrower in the Bankruptcy Case or any subsequent case commenced under Chapter 7 of the Bankruptcy Code.

Section 11.18 <u>Counterparts/Electronic Signatures</u>. To facilitate execution, this Agreement may be executed in as many counterparts as may be convenient or required. It shall not be necessary that the signature of, or on behalf of, each party, or that the signature of all Persons required to bind any party, appear on each counterpart. All counterparts shall collectively constitute a single document. It shall not be necessary in making proof of this document to produce or account for more than a single counterpart containing the respective signatures of, or on behalf of, each of the parties hereto. Any signature page to any counterpart may be detached from such counterpart without impairing the legal effect of the signatures thereon and thereafter attached to another counterpart identical thereto except having attached to it additional signature pages. Delivery of an executed counterpart of a signature page of this Agreement by telecopier or electronic image scan transmission (such as a "pdf" file) will be effective as delivery of a manually executed counterpart of the Agreement. This Agreement and any document, amendment, approval, consent, information, notice, certificate, request, statement, disclosure, or authorization related to this Agreement (each a "**Communication**"), including, without limitation, Communications required to be in writing, may, if agreed by Lender, be in the form of an Electronic Record and may be executed using Electronic Signatures, including, without limitation, facsimile and/or .pdf. Borrower agrees that any Electronic Signature (including, without limitation, facsimile or .pdf) on or associated with any Communication shall be valid and binding on Borrower to the same extent as a manual, original signature, and that any Communication entered into by Electronic Signature, will constitute the legal, valid, and binding obligation of Borrower enforceable against Borrower in accordance with the terms thereof to the same extent as if a manually executed original signature was delivered. Any Communication may be executed in as many counterparts as necessary or convenient, including, without limitation, both paper and electronic counterparts, but all such counterparts are one and the same Communication. For the avoidance of doubt, the authorization under this <u>Section</u> may include use or acceptance by Lender of a manually signed paper Communication which has been converted into electronic form (such as scanned into PDF format), or an electronically signed Communication converted into another format, for transmission, delivery, and/or retention. Lender may, at its option, create one or more copies of any Communication in the form of an imaged Electronic Record (an "**Electronic Copy**"), which shall be deemed created in the ordinary course of such Person's business, and destroy the original paper document. All Communications in the form of an Electronic Record, including, without limitation, an Electronic Copy, shall be considered an original for all purposes, and shall have the same legal effect, validity, and enforceability as a paper record. Notwithstanding anything contained herein to the contrary, Lender is under no obligation to accept an Electronic Signature in any form or in any format unless expressly agreed to in writing by Lender pursuant to procedures approved by it; <u>provided</u>, <u>further</u>, without limiting the foregoing, (i) to the extent Lender has agreed to accept such Electronic Signature, Lender shall be entitled to rely on any such Electronic Signature purportedly given by or on behalf of Borrower without further verification and regardless of the appearance or form of such Electronic Signature and (ii) upon the request of Lender, any Communication executed using an Electronic Signature shall be promptly followed by a manually executed, original counterpart. For purposes hereof, "**Electronic Record**" and "**Electronic Signature**" shall have the meanings assigned to them, respectively, by 15 USC § 7006, as it may be amended from time to time.

Section 11.19  <u>No Third Party Beneficiaries</u>.  This Agreement is only for the benefit of the parties hereto, and no other Person shall have any right herein or hereunder or be entitled to rely on any matter set forth herein without the prior written consent of such parties.

Section 11.20  <u>Jurisdiction and Venue</u>.

(a)  Borrower hereby agrees that all actions or proceedings arising directly or indirectly from this Agreement or the other Loan Documents if initiated by Borrower, shall be heard by the Bankruptcy Court or if initiated by Lender shall be, at Lender's sole election, heard by the Bankruptcy Court or any other court which has jurisdiction.  The exclusive choice of forum for Borrower set forth in this section shall not be deemed to preclude the enforcement by Lender of any order or judgment in any other appropriate jurisdiction, and Borrower hereby waives the right, if any, to collaterally attack any such order or judgment.

Section 11.21  <u>Waiver of Right to Jury Trial</u>.  LENDER AND BORROWER ACKNOWLEDGE AND AGREE THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT OR THE OTHER LOAN DOCUMENTS OR WITH RESPECT TO THE TRANSACTIONS CONTEMPLATED HEREIN AND THEREIN WOULD BE BASED UPON DIFFICULT AND COMPLEX ISSUES; AND THEREFORE, THE PARTIES AGREE THAT ANY COURT PROCEEDING ARISING OUT OF ANY SUCH CONTROVERSY WILL BE TRIED IN A COURT OF COMPETENT JURISDICTION BY A JUDGE SITTING WITHOUT A JURY.  BORROWER AND LENDER IRREVOCABLY WAIVE ANY RIGHT TO TRIAL BY JURY IN ANY ACTION OR PROCEEDING ARISING UNDER OR RELATED TO THIS AGREEMENT OR THE OTHER LOAN DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREIN OR THEREIN.

Section 11.22  <u>Damages Waiver</u>. Borrower shall not assert, and Borrower hereby waives, any claim against Lender on any theory of liability for special, indirect, consequential, diminution of value, or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document, or any agreement, instrument, or document contemplated hereby or thereby, or the Loan or the use of the proceeds thereof.

Section 11.23  <u>Consent of Lender</u>.  Whenever Lender's consent is required hereunder or under any other Loan Document, unless otherwise explicitly stated herein or in such other Loan Document, such consent may be given or withheld in Lender's sole and absolute discretion; and Borrower's sole remedy in connection with Lender unreasonably withholding, delaying, conditioning, or denying any consent (where Lender has expressly agreed not to unreasonably withhold, delay, condition, or deny such consent) shall be to seek declaratory judgment to permit Borrower to take the action for which consent is found to be unreasonably withheld, delayed, conditioned, or denied in a final unappealable judgment, and in no event shall Lender be responsible for any damages, including, without limitation, special, indirect, consequential, diminution of value, or punitive damages in connection therewith.

Section 11.24  <u>Recourse Obligations</u>.  The Loan shall be fully recourse to Borrower. Lender shall have the right to enforce the liability and obligation of Borrower against Borrower, by money judgment or otherwise, to the extent of any and all losses incurred by Lender (including, without limitation, attorneys' fees and expenses incurred), including, but not limited to, the

Principal Balance, any and all accrued and unpaid Interest, all fees, Loan Expenses, or liabilities incurred by Lender arising out of or in connection with the Loan, and all other Indebtedness. If there is more than one (1) Borrower, the obligations of each Borrower shall be and remain joint and several. Each reference to Borrower shall include each Borrower separately as well as all Borrowers collectively.

Section 11.25 <u>Cross-Default</u>. Borrower hereby agrees and consents that the occurrence of any Event of Default (as defined in any of the Loan Documents), or any default under any of the Loan Documents that is not subject to a defined set of "Events of Default" and the lapse of any notice, grace, or cure period provided in such Loan Document with respect to such default, shall be an Event of Default under this Agreement.

Section 11.26 <u>Rules of Construction</u>.  Except as expressly provided otherwise, when used in this Agreement, (a) "or" is not exclusive, (b) "hereunder," "herein," "hereof," and the like refer to this Agreement as a whole, (c) "Article," "Section," "Schedule," and "Exhibit" refer to Articles, Sections, Schedules, and Exhibits of this Agreement, (d) terms defined in the singular shall have a correlative meaning when used in the plural and vice versa, (e) a reference to a Law includes any amendment, modification, or supplement to, or replacement of, such Law and (f) a reference to a document shall mean such document as the same may be supplemented, restated, superseded, amended, or replaced from time to time in accordance with its terms.  The Exhibits and Schedules annexed hereto are incorporated as a part of this Agreement with the same effect as if set forth in the body hereof.  Any table of contents and all captions and headings herein are for convenience only and shall not affect the interpretation or construction hereof.

Section 11.27 <u>Uniform Commercial Code Terms</u>.  All terms used herein and defined in the UCC, including, without limitation, the terms accessions, account, account debtor, certificated security, chattel paper, commercial tort claim, deposit account, document, electronic chattel paper, equipment, financial asset, fixtures, general intangible, goods, health-care-insurance receivable, instrument, inventory, investment property, letter-of-credit right, payment intangibles, proceeds, securities accounts, security, security entitlement, security interest, software, supporting obligations, and uncertificated security, shall have the meaning given therein unless otherwise defined herein or unless the context provides otherwise.

Section 11.28 <u>USA Patriot Act Notice</u>**.** Lender hereby notifies Borrower that pursuant to the requirements of the Patriot Act, it may be required to obtain, verify, and record information that identifies Borrower, which information includes the name and address of Borrower and other information that will allow Lender to identify Borrower in accordance with the Patriot Act.

Section 11.29 <u>Remote Closing</u>.  Borrower and Lender explicitly consent to the electronic delivery of the terms of the transaction evidenced by this Agreement.  Borrower and Lender agree that their present intent to be bound by this Agreement may be evidenced by transmission of digital images of signed signature pages via facsimile, email, SMS, or other digital transmission and affirms that such transmission indicates a present intent to be bound by the terms of this Agreement and is deemed to be valid execution and delivery as though an original ink or electronic signature. Borrower shall deliver original executed signature pages to Lender, but any failure to do so shall not affect the enforceability of this Agreement. An electronic image of this Agreement (including, without limitation, signature pages) shall be as effective as an original for all purposes.

Section 11.30 <u>Advertisement</u>. Lender, in its sole discretion, shall have the right to announce and publicize the financing established hereunder, as it deems appropriate, by means and media selected by Lender. Such publication may include all pertinent information relating to such financing, including, without limitation, the term, purpose, pricing, loan amount, name of Borrower, and locations of the Project. The form and content of the published information shall be in the sole discretion of Lender and shall be considered the sole and exclusive property of Lender. All expenses related to publicizing the financing shall be the sole responsibility of Lender.

Section 11.31 <u>Additional Documentation</u>. Borrower shall execute and/or re-execute, and cause any other Person party to any Loan Document, to execute and/or re-execute and to deliver to Lender or Lender's counsel, as may be deemed appropriate, any agreement, instrument, or document signed in connection with this Agreement which was incorrectly drafted and/or signed, as well as any agreement, instrument, or document which should have been signed at or prior to the Closing but which was not so signed and delivered. Borrower agrees to comply with any such written request by Lender within ten (10) days after receipt by Borrower of such request.

<center>[SIGNATURE PAGES TO FOLLOW]</center>

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed by their duly authorized representatives, all as of the day and year first above written.

**BORROWER:**

**ST. CHRISTOPHER'S, INC.,** a New York not-for-profit corporation

By: _____

Name: _____

Its: _____

**LENDER:**

**LAYLA LENDING II LLC**, a Delaware limited liability company

By:  Layla Fund I GP, a Delaware limited liability company
Its: Sole Member


By: _____
Name:_____
Its: Authorized Signatory

**<u>Exhibit A</u>**

**INTERIM ORDER**

Attached.

**<u>Exhibit B</u>**

**RENT ROLL**

Attached.

## SCHEDULES

## SCHEDULE 5.7

## WETLANDS AND FLOOD ZONE DISCLOSURE

N/A

## SCHEDULE 5.8

## ENVIRONMENTAL MATTERS

None.

## SCHEDULE 5.11

## LEASES

[*]

**THIS DOCUMENT WAS
PREPARED BY, AND AFTER:
RECORDING, RETURN TO:**

Reed Smith LLP
Three Logan Square
1717 Arch Street, Suite 3100
Philadelphia, PA 19103
ATTN: Brian M. Schenker, Esq.

Section 3.110 Block 103 Lot 2
Section 3.160 Block 136 Lot 2

Property Address:
71 South Broadway, County of
Westchester, State of New York

*This space reserved for Recorders use only.*

# MORTGAGE, ASSIGNMENT OF LEASES AND RENTS, SECURITY AGREEMENT, AND FIXTURE FILING

by

## ST. CHRISTOPHER'S, INC.,
a New York not-for-profit corporation
(Mortgagor)

in favor of

## LAYLA LENDING II LLC,
a Delaware limited liability company
(Lender)

Dated as of June [*], 2024

# MORTGAGE,
## ASSIGNMENT OF LEASES AND RENTS,
## SECURITY AGREEMENT,
## AND FIXTURE FILING

THIS INSTRUMENT COVERS GOODS THAT ARE OR ARE TO BECOME FIXTURES ON THE PROPERTY DESCRIBED HEREIN AND IS TO BE FILED FOR RECORD IN THE REAL ESTATE RECORDS WHERE MORTGAGES ON REAL PROPERTY ARE RECORDED.  THE MORTGAGOR IS THE OWNER OF RECORD OF AN INTEREST IN THE PROPERTY.  THIS INSTRUMENT SHOULD BE APPROPRIATELY INDEXED, NOT ONLY AS A MORTGAGE BUT ALSO AS A FIXTURE FILING AND FINANCING STATEMENT COVERING GOODS THAT ARE OR ARE TO BECOME FIXTURES ON THE PROPERTY DESCRIBED HEREIN. THE MAILING ADDRESSES OF THE MORTGAGOR, AS DEBTOR, AND THE MORTGAGEE, AS SECURED PARTY, ARE SET FORTH IN THE INTRODUCTORY PARAGRAPH OF THIS INSTRUMENT.

This **MORTGAGE, ASSIGNMENT OF LEASES AND RENTS, SECURITY AGREEMENT, AND FIXTURE FILING** (as amended, supplemented, or otherwise modified from time to time, this "**Security Instrument**"), dated as of June [*], 2024, is made by **ST. CHRISTOPHER'S, INC.**, a New York not-for-profit corporation, as a debtor and debtor-in-possession and mortgagor, with a business address of 71 South Broadway, Dobbs Ferry, NY 10522 ("**Mortgagor**"), in favor of **LAYLA LENDING II LLC**, a Delaware limited liability company, as mortgagee and secured party, with a business address of 7777 Glades Road, Suite 309, Boca Raton, Florida 33434, Attn: Justin Cooper (together with its successors and assigns, "**Mortgagee**" or "**Lender**").

## W I T N E S S E T H:

A.      This Security Instrument is given to secure a loan in a maximum aggregate principal amount not to exceed FOUR MILLION AND 00/100 DOLLARS ($4,000,000.00) (the "**Loan**") being made available to Mortgagor pursuant to that certain Senior Secured, Super-Priority Debtor-in-Possession Loan Agreement, dated as of even date herewith, entered into by and between Mortgagor and Lender (as amended, restated, supplemented, or otherwise modified from time to time, the "**Loan Agreement**").  Capitalized terms used but not defined herein shall have the meaning given to them in the Loan Agreement.

B.      Mortgagor desires to secure the payment of the outstanding Principal Balance of the Loan, together with all Interest accrued and unpaid thereon and all other fees, late charges, and other amounts due to Lender in respect of the Loan, and all other Indebtedness owed to Lender under the Loan Documents, including, without limitation, this Security Instrument (collectively, the "**Debt**"), and the performance of all of the obligations under the Loan Agreement, this Security Instrument, and the other Loan Documents (collectively, the "**Other Obligations**" and collectively with the Debt, the "**Obligations**").

NOW, THEREFORE, in consideration of the foregoing and of Lender making the Loan

available to Mortgagor, and other good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, and intending to be legally bound hereby, Mortgagor agrees as follows:

## ARTICLE 1
## GRANTS OF SECURITY

Section 1.1    Property Conveyed.  For the purpose of securing payment and performance of the Obligations, Mortgagor does hereby irrevocably mortgage, grant, bargain, sell, pledge, assign, warrant, transfer, and convey to Lender, and creates and grants a security interest in, all of Mortgagor's right, title, and interest in and to the following property, rights, interests, and estates now owned or hereafter acquired by Mortgagor (collectively, the "**Property**"):

(a)    Land.  The real property described in **Exhibit A** attached hereto and made a part hereof (the "**Land**");

(b)    Development Rights.  All development rights now owned or hereafter acquired by Mortgagor pertaining to or for use in connection with the Land;

(c)    Improvements.    The building, rental units, structures, additions, enlargements, extensions, modifications, repairs, replacements, and improvements now or hereafter erected or located on the Land (collectively, the "**Improvements**");

(d)    Appurtenances.  (i) All air, light, water, sewer, and lateral support rights now or hereafter pertaining to or used in connection with the Land; (ii) all tenements, hereditaments, appendages, and appurtenances and property now or hereafter belonging or in any way appertaining to the Land; and (iii) all estate, right, title, claim, or demand whatsoever, either at law or in equity, in possession or expectancy, of, in, and to the Land (collectively, the "**Appurtenances**");

(e)    Easements.  All easements, rights-of-way or use, rights, strips and gores of land, streets, ways, alleys, passages, and water courses and powers, and all estates, rights, titles, interests, privileges, liberties, servitudes, reversion and reversions, and remainder and remainders of any nature whatsoever, in any way now or hereafter belonging, relating, or pertaining to the Land or the Improvements, and all land lying in the bed of any street, road, or avenue, opened or proposed, in front of or adjoining the Land, to the center line thereof, and all the estates, rights, titles, interests, dower and rights of dower, curtesy and rights of curtesy, property, possession, claim, and demand whatsoever, both at law and in equity, of Mortgagor of, in, and to the Land and the Improvements and every part and parcel thereof, with the appurtenances thereto;

(f)    Equipment.  All "equipment", as such term is defined in Article 9 of the Uniform Commercial Code, as adopted in the State of New York, as in effect from time to time (the "**Uniform Commercial Code**") (provided that, if by reason of mandatory provisions of law, perfection, or the effect of perfection or non-perfection, of a security interest in any Collateral or the

availability of any remedy under this Security Instrument is governed by the Uniform Commercial Code as in effect in a jurisdiction other than New York, "**Uniform Commercial Code**" means the Uniform Commercial Code as in effect in such other jurisdiction for purposes of the provisions hereof relating to such perfection or effect of perfection or non-perfection or availability of such remedy, as the case may be), now owned or hereafter acquired by Mortgagor, which is used at or in connection with the Improvements or the Land and is located thereon or therein and any and all additions, substitutions, and replacements thereof, together with all attachments, components, parts, equipment, and accessories installed thereon or affixed thereto (collectively, the "**Equipment**");

(g)     Fixtures.  All Equipment now owned, or the ownership of which is hereafter acquired, by Mortgagor and which is so related to the Land and the Improvements forming part of the Property that it is deemed fixtures or real property under the Law of the particular state in which the Equipment is located, together with all accessions, appurtenances, additions, replacements, betterments, and substitutions for any of the foregoing (collectively, the "**Fixtures**");

(h)     Leases and Rents.  All leases, subleases or subsubleases, lettings, licenses, concessions, or other agreements (whether written or oral) pursuant to which any Person is granted a possessory interest in, or right to use or occupy all or any portion of the Land and/or the Improvements, and every amendment, modification, or other agreement relating to such leases, subleases, subsubleases, or other agreements entered into in connection with such leases, subleases, subsubleases, or other agreements and every guarantee of the performance and observance of the covenants, conditions, and agreements to be performed and observed by the other party thereto, heretofore or hereafter entered into, whether before or after the filing by or against Mortgagor of any petition for relief under 11 U.S.C. § 101 *et seq.* (the "**Bankruptcy Code**"), as the same may be amended, restated, supplemented, extended, renewed, replaced, or otherwise modified from time to time (collectively, the "**Leases**"), and all right, title, and interest of Mortgagor therein and thereunder, including, without limitation, cash or securities deposited thereunder to secure the performance by the lessees of their obligations thereunder, and all proceeds from the sale or other disposition of the Leases, and all rents, additional rents, revenues, issues, and profits (including, without limitation, all oil and gas or other mineral royalties and bonuses) from the Land and/or the Improvements whether paid or accruing before or after the filing by or against Mortgagor of any petition for relief under the Bankruptcy Code (collectively, the "**Rents**");

(i)     Condemnation Awards.   All awards or payments, including, without limitation, interest thereon, which may heretofore and hereafter be made with respect to a condemnation or taking of the Property, whether from the exercise of the right of eminent domain (including, without limitation, any transfer made in lieu of or in anticipation of the exercise of such right) or otherwise;

(j)     Insurance Proceeds.  All proceeds received in respect of the Property under any insurance policies covering the Property, including, without limitation, the right to receive and

apply the proceeds of any insurance, or judgments or settlements made in lieu thereof, for damage to the Property;

(k)     Tax Certiorari.  All refunds, rebates, or credits received in connection with any reduction in taxes or other charges charged against the Property as a result of tax certiorari proceedings or any other applications or proceedings for reduction or otherwise;

(l)     Rights.  The right, in the name and on behalf of Mortgagor, to appear in and defend any action or proceeding brought with respect to the Property and to commence any action or proceeding to protect the interest of Lender in the Property;

(m)     Agreements.  All agreements, contracts, certificates, instruments, franchises, permits, licenses, plans, specifications, and other documents, now or hereafter entered into (including, without limitation, any architect, expediter, or engineer agreements), and all rights therein and thereto, respecting or pertaining to the use, occupation, construction, management, or operation of the Land and/or any Improvements or any part thereof;

(n)     Minerals; Vegetation. All minerals, crops, timber, trees, shrubs, flowers, and landscaping features now or hereafter located on, under, or above the Land;

(o)     Proceeds.  All proceeds and products of any of the foregoing, including, without limitation, all amounts paid or payable (including, without limitation, forfeited deposits) under contracts for the sale of any portion of the Land and.or the Improvements; and

(p)     Other Rights.  Any and all other rights of Mortgagor in and to the items set forth in Subsections (a) through (o) above.

AND, without limiting any of the other provisions of this Security Instrument, Mortgagor expressly grants to Lender, as secured party, a security interest in the portion of the Property which is or may be subject to the provisions of the Uniform Commercial Code which are applicable to secured transactions; it being understood and agreed that the Improvements and the Fixtures are part and parcel of the Land (the Land, the Improvements, and the Fixtures are collectively referred to as the "**Real Property**") appropriated to the use thereof and, whether affixed or annexed to the Land or the Improvements or not, shall for the purposes of this Security Instrument be deemed conclusively to be real estate and mortgaged hereby.

Section 1.2     Assignment of Rents.  Mortgagor hereby absolutely and unconditionally assigns to Lender all of Mortgagor's right, title, and interest in and to all current and future Leases and Rents; it being intended by Mortgagor that this assignment constitutes a present, absolute, and unconditional assignment and not a collateral assignment or an assignment for additional security only.  Nevertheless, until the occurrence and continuance of an Event of Default and subject to the terms of the Assignment of Leases and Rents and Section 7.1(h) of this Security Instrument, Lender grants to Mortgagor a revocable license, which license may not be revoked absent the

occurrence and during the continuance of an Event of Default, to collect, receive, use, and enjoy the Rents.  Mortgagor shall hold the Rents, or a portion thereof sufficient to discharge all current sums due on the Obligations, for use in the payment of such sums.

Section 1.3 <u>Security Agreement</u>.  This Security Instrument is both a real property mortgage and a "security agreement" within the meaning of the Uniform Commercial Code.  The Property includes both real and personal property.  By executing and delivering this Security Instrument, Mortgagor hereby grants to Lender, as security for the Obligations, a security interest in the Equipment, the Fixtures, and the other property constituting the Property to the full extent that the Equipment, the Fixtures, and such other property may be subject to the Uniform Commercial Code (said portion of the Property so subject to the Uniform Commercial Code being called the "**Collateral**").  If an Event of Default shall occur and be continuing, Lender, in addition to any other rights and remedies which it may have, shall have and may exercise immediately and without demand, any and all rights and remedies granted to a secured party upon default under the Uniform Commercial Code, including, without limiting the generality of the foregoing, the right to take possession of the Collateral or any part thereof and to take such other measures as Lender may deem necessary for the care, protection, and preservation of the Collateral.  Upon request or demand of Lender after the occurrence and during the continuance of an Event of Default, Mortgagor shall, at its expense, assemble the Collateral and make it available to Lender at a convenient place (at the Land if Equipment, Fixtures, or tangible property) reasonably acceptable to Lender.  Mortgagor shall pay to Lender within five (5) Business Days following receipt of written demand therefor any and all reasonable costs and expenses, including, without limitation, reasonable attorneys' fees and costs, actually incurred or paid by Lender in protecting its interest in the Collateral and in enforcing its rights hereunder with respect to the Collateral after the occurrence and during the continuance of an Event of Default.  Any notice of sale, disposition, or other intended action by Lender with respect to the Collateral sent to Mortgagor in accordance with the provisions hereof at least ten (10) days prior to such action shall constitute commercially reasonable notice to Mortgagor.  The proceeds of any disposition of the Collateral, or any part thereof, may, except as otherwise required by Applicable Laws, be applied by Lender to the payment of the Obligations in accordance with the terms of the Loan Agreement.  For purposes of this Security Instrument, the principal places of business for Mortgagor and Lender are as set forth in <u>Section 1.4</u>, below.

Section 1.4 <u>Fixture Filing</u>.  Certain of the Property is or will become "fixtures" (as that term is defined in the Uniform Commercial Code) on the Land or the Improvements, described or referred to in this Security Instrument, and this Security Instrument, upon being filed of record in the real estate records of the city or county wherein such fixtures are situated, shall operate also as a financing statement naming Mortgagor as the Debtor and Lender as the Secured Party filed as a fixture filing in accordance with the applicable provisions of said Uniform Commercial Code upon such of the Property that is or may become fixtures.  As to all of the above described Property which is or which hereafter becomes a "fixture" under Applicable Laws, this Security Instrument constitutes a fixture filing under the Uniform Commercial Code.

**Name of Debtor**:  **ST. CHRISTOPHER'S, INC.**, a New York not-for-profit corporation
**Debtor's Address**: 71 South Broadway, Dobbs Ferry, NY 10522
**Debtor's Jurisdiction of Organization**: New York
**Name of Secured Party**: **LAYLA LENDING II LLC**, a Delaware limited liability company
**Secured Party's Address**: 7777 Glades Road, Suite 309, Boca Raton, Florida 33434, Attn: Justin Cooper
**Collateral Covered by Financing Statement**:  As described in Section 1.3
**Place of Filing**:  To be filed in the Real Property Records of the County recorder of County of Westchester, State of New York
**Description of Real Property to which Collateral is Related**:  See attached Exhibit A
**Owner of Record of the Real Property is**:  Debtor

Section 1.5     Agreements of Sale.     Mortgagor hereby assigns to Lender all of Mortgagor's rights, title, interest, and privileges in and to any and all agreements of sale now or hereafter entered into by Mortgagor, as seller, with respect to the Property and all proceeds of such agreements of sale, including, without limitation, deposit monies.  At any time after the occurrence and during the continuance of an Event of Default, Lender shall have the right (but no obligation) to exercise and enforce any of Mortgagor's rights under all or some of the agreements of sale. Nothing herein shall obligate Lender to perform any obligation of Mortgagor under any agreement of sale (it being understood that all such agreements of sale shall be subordinate to this Security Instrument), and Mortgagor hereby agrees to indemnify Lender and save it harmless from and against any and all loss, liability, damage, or expense arising from or as a result of any claim by any purchaser or any other Person arising under or in connection with an agreement of sale. Neither the acceptance of this assignment, nor the collection by Lender of any sums due or becoming due under any agreement of sale, shall constitute a waiver of any rights of Lender under this Security Instrument or any other Loan Document.

Section 1.6     Grants to Lender.  This Security Instrument and the grants, assignments, and transfers made to Lender in this Article 1 shall inure to the benefit of Lender and its successors and assignees.

## CONDITIONS TO GRANT

TO HAVE AND TO HOLD the above granted and described Property unto and to the use and benefit of Lender and its successors and assigns, in fee simple, forever;

PROVIDED, HOWEVER, these presents are upon the express condition that, if Mortgagor shall well and truly pay and perform the Obligations (including, without limitation, the payment of the Debt) at the time and in the manner provided in this Security Instrument, the Loan Agreement, and the other Loan Documents, and shall well and truly abide by and comply with each and every covenant and condition set forth herein and in this Security Instrument, the Loan Agreement, and the other Loan Documents, these presents and the estate hereby granted shall

cease, terminate, and be void; provided, however, that all of Mortgagor's obligations to indemnify, defend, and hold harmless Lender shall survive any such payment or termination for the periods set forth in the Loan Documents.

## ARTICLE 2
## DEBT AND OBLIGATIONS SECURED

Section 2.1    Obligations.    This Security Instrument and the grants, assignments, and transfers made in Article 1 are given for the purpose of securing the Obligations, including, but not limited to, the Debt.

Section 2.2    Future Advances.    The amount of the Obligations secured hereby may decrease or increase from time to time pursuant to the Loan Agreement.  Lender hereby reserves the right to make future advances and extensions of any or all of the Obligations as permitted by the Loan Agreement. The right of Lender to make such future advances and extensions of any of the Obligations shall be independent of each of the other Obligations and any future advances or extensions of any of the Obligations shall not create or give rise to an obligation by Lender to make future advances or extensions of any of the other Obligations.  Mortgagor shall make all payments of the Obligations when due and in accordance with this Security Instrument, the Loan Agreement, and the other Loan Documents.

## ARTICLE 3
## MORTGAGOR COVENANTS

Mortgagor covenants and agrees that:

Section 3.1    Payment and Performance of Obligations.    Mortgagor shall pay the Debt and perform the Other Obligations at the time and in the manner provided in this Security Instrument, the Loan Agreement, and the other Loan Documents.

Section 3.2    Loan Agreement Governs.    In the event of any inconsistency between any provision of this Security Instrument and any provision of the Loan Agreement, the provision of the Loan Agreement shall govern; provided, however, that the provisions of all of the Loan Documents shall be construed as an integrated set of provisions governing the Obligations  and, accordingly, shall be interpreted and construed liberally to give the maximum validity, enforceability, and effect to all of such provisions.

## ARTICLE 4
## OBLIGATIONS AND RELIANCES

Section 4.1    Relationship of Mortgagor and Lender.    The relationship between Mortgagor and Lender is solely that of debtor and creditor, and Lender has no fiduciary or other special relationship with Mortgagor, and no term or condition of this Security Instrument, the Loan

Mortgage, Assignment of Leases and Rents, Security Agreement, and Fixture Filing

Agreement, or the other Loan Documents shall be construed so as to deem the relationship between Mortgagor and Lender to be other than that of debtor and creditor.

Section 4.2    No Lender Obligations.

(a)    Notwithstanding the provisions of Sections 1.1 and 1.2, Lender is not undertaking the performance of (i) any obligations of Mortgagor under the Leases or (ii) any obligations of Mortgagor with respect to any other agreements, contracts, certificates, instruments, franchises, permits, trademarks, licenses, or other documents related to the Property.

(b)    By accepting or approving anything required to be observed, performed, or fulfilled or to be given to Lender pursuant to this Security Instrument, the Loan Agreement, or the other Loan Documents, Lender shall not be deemed to have warranted, consented to, or affirmed the sufficiency, legality, or effectiveness of the same, and such acceptance or approval thereof shall not constitute any warranty or affirmation with respect thereto by Lender.

# ARTICLE 5
# FURTHER ASSURANCES

Section 5.1    Recording of Security Instrument, Etc.  Mortgagor forthwith upon the execution and delivery of this Security Instrument and thereafter, from time to time, will cause this Security Instrument and any of the other Loan Documents creating a lien or security interest or evidencing a lien and security interest on, in, or to the Property and each instrument of further assurance to be executed, acknowledged, filed, registered, or recorded in such manner and in such places as may be required by any present or future Law in order to publish notice of and fully to protect and perfect the lien and the security interest on, and the interest of Lender in, the Property. Mortgagor will pay all filing, registration, or recording fees and taxes, and all expenses incident to the preparation, execution, acknowledgment, filing, registration, and/or recording of this Security Instrument or any other Loan Document, any mortgage supplemental hereto, any security instrument with respect to the Property, or any instrument of further assurance, and any amendment, supplement, or other modification of any of the foregoing documents, and all federal, state, county, and municipal taxes, duties, imposts, assessments, and charges arising out of or in connection with the execution and delivery of this Security Instrument or any other Loan Document, any mortgage supplemental hereto, any security instrument with respect to the Property, or any instrument of further assurance, and any amendment, supplement, or other modification of any of the foregoing documents.

Section 5.2    Further Acts, Etc.  Mortgagor will, at the cost of Mortgagor, and without expense to Lender, within ten (10) Business Days after demand by Lender, do, execute, acknowledge, and deliver all and every such further acts, deeds, conveyances, deeds of trust, mortgages, deeds to secure debt, assignments, notices of assignments, transfers, and assurances as Lender shall, from time to time, require for the better assuring, conveying, assigning, transferring, and confirming unto Lender the property and rights hereby mortgaged, deeded, granted, bargained,

sold, conveyed, confirmed, pledged, assigned, warranted, and transferred or intended now or hereafter so to be, or which Mortgagor may be or may hereafter become bound to convey or assign to Lender, or for carrying out the intention or facilitating the performance of the terms of this Security Instrument or for filing, registering, or recording this Security Instrument, or for complying with all legal requirements.  In the event Mortgagor shall fail, within ten (10) Business Days of such demand to so execute and deliver any such agreement, instrument, or document, Mortgagor hereby authorizes Lender to execute, in the name of Mortgagor or without the signature of Mortgagor, any such agreement, instrument, or document. Mortgagor hereby grants to Lender an irrevocable power of attorney coupled with an interest for the purpose of exercising and perfecting any and all rights and remedies available to Lender at law or in equity, including, without limitation, such rights and remedies available to Lender pursuant to this Section 5.2.

Section 5.3     Changes in Tax, Debt, Credit and Documentary Stamp Laws.

(a)     If any Law is enacted or adopted or amended after the date of this Security Instrument which deducts the Debt from the value of the Property for the purpose of taxation or which imposes a tax, either directly or indirectly, on the Debt or Lender's interest in the Property, Mortgagor will pay the tax, with interest and penalties thereon, if any.

(b)     Mortgagor will not claim or demand or be entitled to any credit or credits on account of the Debt for any part of the taxes or other charges assessed against the Property, or any part thereof, and no deduction shall otherwise be made or claimed from the assessed value of the Property, or any part thereof, for real estate tax purposes by reason of this Security Instrument or the Debt.

(c)     If at any time the United States of America, any State thereof, or any subdivision of any such State shall require revenue or other stamps to be affixed to this Security Instrument or any of the other Loan Documents or shall impose any other tax or charge on the same, Mortgagor will pay for the same, with interest and penalties thereon, if any.

Section 5.4     Splitting of Security Instrument.  Subject to the terms and conditions contained in the Loan Agreement, this Security Instrument may, at any time until the Obligations shall be fully paid and satisfied, at the sole election of Lender, be split or divided into two or more mortgages, in such denominations as Lender shall determine in its sole discretion (subject to the following sentence), each of which shall cover all or a portion of the Property to be more particularly described therein.  To that end, subject to the terms and conditions contained in the Loan Agreement, Mortgagor, upon written request of Lender, shall execute, acknowledge, and deliver, or cause to be executed, acknowledged, and delivered by the then owner of the Property, to Lender substitute mortgages in principal amounts aggregating not more than the then unpaid principal amount of the Debt, and containing the same terms, provisions, and clauses contained herein, and such other agreements, instruments, and documents as may be reasonably required by Lender.

Section 5.5 <u>Replacement Documents</u>. Upon receipt of an affidavit of an officer of Lender as to the loss, theft, destruction, or mutilation of any Loan Document which is not of public record, and, in the case of any such mutilation, upon surrender and cancellation of such Loan Document, Mortgagor will issue, in lieu thereof, an identical replacement Loan Document.

## ARTICLE 6
## DUE ON SALE/ENCUMBRANCE

Section 6.1 <u>Lender Reliance</u>. Mortgagor acknowledges that Lender has a valid interest in maintaining the value of the Property so as to ensure that, after the occurrence and during the continuance of an Event of Default, Lender can recover the Debt by a sale of the Property.

Section 6.2 <u>No Transfer</u>. Mortgagor shall not permit or suffer any Transfer of the Property to occur, except in accordance with the express terms of the Loan Agreement.

## ARTICLE 7
## RIGHTS AND REMEDIES UPON DEFAULT

Section 7.1 <u>Remedies</u>. The occurrence of any one of the following events shall constitute an event of default by Mortgagor under this Security Instrument ("**Event of Default**"): (a) Mortgagor fails to comply with any provision of this Security Instrument and such failure shall remain unremedied for twenty (20) days after the earlier of (i) the date on which Mortgagee notifies Mortgagor thereof and (ii) the date on which Mortgagor has knowledge thereof; or (b) the occurrence of an Event of Default (as defined in the Loan Agreement) under the Loan Agreement. Upon the occurrence and during the continuance of an Event of Default, Mortgagor agrees that Lender may, at its option, take such lawful action, without notice or demand, as it deems advisable to protect and enforce its rights against Mortgagor and in and to the Property, including, but not limited to, the following actions, each of which may be pursued concurrently or otherwise, at such time and in such order as Lender may determine, in its sole and absolute discretion, without impairing or otherwise affecting the other rights and remedies of Lender:

(a) declare the entire unpaid Debt to be immediately due and payable;

(b) institute proceedings for the complete foreclosure of this Security Instrument under any applicable provision of Law, in which case the Property or any interest therein may be sold for cash or upon credit in one or more parcels or in several interests or portions and in any order or manner;

(c) with or without entry, to the extent permitted and pursuant to the procedures provided by Applicable Laws, institute proceedings for the partial foreclosure of this Security Instrument for the portion of the Debt then due and payable, subject to the continuing lien and security interest of this Security Instrument for the balance of the Obligations not then due and payable, unimpaired and without loss of priority;

(d)       sell for cash or upon credit the Property or any part thereof and all estate, claim, demand, right, title, and interest of Mortgagor therein and rights of redemption thereof, pursuant to power of sale or otherwise, at one or more sales, as an entirety or in parcels, at such time and place, upon such terms and after such notice thereof, as Lender may determine in its sole discretion or as may be required or permitted by Applicable Laws; and, without limiting the foregoing:

(i)       Lender shall be entitled to elect to proceed against any or all of the Property in any manner as Lender may determine in its sole and absolute discretion or as may be required or permitted by Applicable Laws;

(ii)       where the Property consists of Real Property and Collateral, whether or not such Collateral is located on or within the Real Property, the rights and remedies herein granted shall be exercisable with respect to all or any of such Property, as designated by Lender; and Lender is hereby authorized and empowered to conduct a sale of all or any of such Property in accordance with the procedures applicable to real property and/or treat any of the Property which consists of (x) Collateral, (y) Property that can be severed from the Real Property, or (z) any Improvements or Fixtures that can be removed form the Real Property (without causing structural damage thereto) as if the same were Collateral and dispose of the same in accordance with Applicable Laws, separate and apart from the sale of the Real Property;

(iii)       if the Property consists of several lots, parcels, or items of property, Lender shall, subject to Applicable Laws, (A) designate the order in which such lots, parcels, or items shall be offered for sale or sold, or (B) elect to sell such lots, parcels, or items through a single sale, or through two or more successive sales, or in any other manner Lender designates in Lender's sole discretion;

(iv)       should Lender desire that more than one sale or other disposition of the Property be conducted, Lender shall, subject to Applicable Laws, cause such sales or dispositions to be conducted simultaneously, or successively, on the same day, or at such different days or times and in such order as Lender may designate, and no such sale shall terminate or otherwise affect the lien and security interest of this Security Instrument on any part of the Property not sold until all the Obligations have been satisfied in full; and in the event Lender elects to dispose of the Property through more than one sale, except as otherwise provided by Applicable Laws, Mortgagor agrees to pay the costs and expenses of each such sale and of any judicial proceedings wherein such sale may be made;

(v)       Lender may purchase any Property at any sale hereunder by credit bid or otherwise; and

(vi)       Lender may from time to time postpone any sale hereunder by public announcement thereof at the time and place noticed for any such sale.

Mortgage, Assignment of Leases and Rents, Security Agreement, and Fixture Filing

(e) institute an action, suit, or proceeding in equity for the specific performance of any covenant, condition, or agreement contained herein, in this Security Instrument, in the Loan Agreement, or in the other Loan Documents;

(f) recover judgment on the Debt either before, during, or after any proceedings for the enforcement of this Security Instrument or the other Loan Documents;

(g) apply for the appointment of a receiver, trustee, liquidator, or conservator of the Property, without notice and without regard for the adequacy of the security and collateral for the Obligations and without regard for the solvency of Mortgagor, any guarantor, or indemnitor with respect to the Obligations or any Person otherwise liable for the payment of the Obligations or any part thereof; and MORTGAGOR HEREBY IRREVOCABLY CONSENTS TO AND WAIVES ANY RIGHT TO OBJECT TO OR OTHERWISE CONTEST THE APPOINTMENT OF A RECEIVER, TRUSTEE, LIQUIDATOR, OR CONSERVATOR OF THE PROPERTY AFTER THE OCCURRENCE AND DURING THE CONTINUANCE OF AN EVENT OF DEFAULT; AND MORTGAGOR GRANTS SUCH WAIVER AND CONSENT KNOWINGLY AFTER HAVING DISCUSSED THE IMPLICATIONS THEREOF WITH COUNSEL, ACKNOWLEDGES THAT THE UNCONTESTED RIGHT TO HAVE A RECEIVER, TRUSTEE, LIQUIDATOR, OR CONSERVATOR APPOINTED FOR THE PROPERTY IS CONSIDERED ESSENTIAL BY LENDER IN CONNECTION WITH THE ENFORCEMENT OF ITS RIGHTS AND REMEDIES HEREUNDER AND UNDER THE LOAN DOCUMENTS, AND THE AVAILABILITY OF SUCH APPOINTMENT AS A REMEDY WAS A MATERIAL FACTOR IN INDUCING LENDER TO ACCEPT THIS SECURITY INSTRUMENT, AND MORTGAGOR AGREES TO ENTER INTO ANY AND ALL STIPULATIONS IN ANY LEGAL ACTIONS, OR AGREEMENTS OR OTHER INSTRUMENTS IN CONNECTION WITH THE FOREGOING AND TO COOPERATE FULLY WITH LENDER IN CONNECTION WITH THE ASSUMPTION AND EXERCISE OF CONTROL BY THE RECEIVER, TRUSTEE, LIQUIDATOR, OR CONSERVATOR OVER ALL OR ANY PORTION OF THE PROPERTY;

(h) revoke the license granted to Mortgagor under Section 1.2 hereof, enter into or upon the Property, either personally or by its representatives, nominees, or attorneys, and dispossess Mortgagor and its representatives and servants therefrom, without liability for trespass, damages, or otherwise and exclude Mortgagor and its representatives or servants wholly therefrom, and take possession of all books, records, and accounts relating thereto, and Mortgagor agrees to surrender possession of the Property and of such books, records, and accounts to Lender upon demand, and thereupon Lender may (i) use, operate, manage, control, insure, maintain, repair, restore, and otherwise deal with all and every part of the Property; (ii) complete any construction on the Property in such manner and form as Lender deems advisable; (iii) make alterations, additions, renewals, replacements, and improvements to or on the Property; (iv) exercise all rights and powers of Mortgagor with respect to the Property, whether in the name of Mortgagor or otherwise, including, without limitation, the right to make, cancel, enforce, or modify Leases, obtain and evict tenants, and demand, sue for, collect, and receive all Rents of the Property and every part thereof; (v) require Mortgagor to pay monthly in advance to Lender, or any receiver

appointed to collect the Rents, the fair and reasonable rental value for the use and occupation of such part of the Property as may be occupied by Mortgagor; (vi) require Mortgagor to vacate and surrender possession of the Property to Lender or to such receiver and, to the extent in default thereof beyond any applicable notice and cure period, Mortgagor may be evicted by summary proceedings or otherwise; (vii) enter into contracts for the sale of units and consummate the sale of any units substantially in accordance with the contracts for the sale thereof; and (viii) apply the receipts from the Property to the payment and performance of the Obligations (including, without limitation, the payment of the Debt), in such order, proportion, and priority as Lender shall deem appropriate in its sole and absolute discretion after deducting therefrom all reasonable expenses (including, without limitation, reasonable attorneys' fees and costs) incurred in connection with the aforesaid operations and all amounts necessary to pay the Taxes, Other Charges, insurance premiums, and other expenses in connection with the Property, as well as reasonable compensation for the services of Lender, its internal counsel, and Lender's employees;

(i) exercise any and all rights and remedies granted to a secured party upon default under the Uniform Commercial Code, including, without limiting the generality of the foregoing: (i) the right to take possession of Collateral, or any part thereof, and to take such other measures as Lender may deem necessary for the care, protection, and preservation of Collateral, and (ii) request that Mortgagor, at its sole cost and expense, assemble Collateral and make it available to Lender at a convenient place acceptable to Lender (which place shall be the Land to the extent same is already located there); and any notice of sale, disposition, or other intended action by Lender with respect to Collateral sent to Mortgagor in accordance with the provisions hereof at least ten (10) days prior to such action, shall constitute commercially reasonable notice to Mortgagor; and/or

(j) pursue such other rights and remedies as Lender may have under Applicable Laws.

In the event of a sale, by foreclosure, power of sale, or otherwise, of less than all of Property, this Security Instrument shall continue as a lien and security interest on the remaining portion of the Property unimpaired and without loss of priority.

Section 7.2    Application of Proceeds.  The purchase money proceeds and avails of any disposition of the Property or any part thereof, or any other sums collected by Lender pursuant to this Security Instrument or the other Loan Documents, may be applied by Lender to the payment of the Obligations as provided in the Loan Agreement.

Section 7.3    Right to Cure Defaults.  Upon the occurrence and during the continuance of any Event of Default, Lender may, but without any obligation to do so and without notice to or demand on Mortgagor, and without releasing Mortgagor from any Obligation, perform such obligations in such manner and to such extent as Lender may deem necessary or appropriate to protect and preserve the Property or the security hereof.  Lender is authorized to enter upon the Property for such purposes, or appear in, defend, or bring any action or proceeding to protect its

interest in the Property or to foreclose this Security Instrument or to collect the Obligations, and the reasonable cost and expense thereof (including, without limitation, reasonable attorneys' fees and expenses), with interest as provided in this <u>Section 7.3</u>, shall constitute a portion of the Obligations and shall be due and payable to Lender within five (5) Business Days of Mortgagor's receipt of written demand therefor. All such reasonable and documented costs and expenses actually incurred by Lender in remedying any Event of Default, or in appearing in, defending, or bringing any such action or proceeding, as hereinabove provided, if not repaid in full by the fifth (5th) Business Day after demand by Lender for payment thereof, shall bear interest at the Default Rate until repaid in full. All such costs and expenses, together with interest thereon calculated at the Default Rate, shall be deemed to constitute a portion of the Obligations and to be secured by this Security Instrument and the other Loan Documents and shall be immediately due and payable upon demand by Lender therefor.

Section 7.4 <u>Actions and Proceedings</u>. Lender shall have the right to appear in and defend any action or proceeding brought with respect to the Property and, if Mortgagor should fail to do so after prior written notice from Lender and the expiration of fifteen (15) days (or such lesser time as may be required to preserve Lender's rights), to bring any action or proceeding to protect its interests in the Property, in the name and on behalf of Mortgagor, which Lender, in its sole and absolute discretion, decides should be brought to protect its interest in the Property.

Section 7.5 <u>Recovery of Sums Required to be Paid</u>. Lender shall have the right from time to time to take action to recover any sum or sums which constitute a part of the Obligations as the same become due (after any applicable grace period), without regard to whether or not the balance of the Obligations shall be due, and without prejudice to the right of Lender thereafter to bring an action of foreclosure, or any other action, for any Event of Default by Mortgagor existing at the time such earlier action was commenced.

Section 7.6 <u>Other Rights, Etc</u>.

(a) The failure of Lender to insist upon strict performance of any term hereof shall not be deemed to be a waiver of any term of this Security Instrument. Mortgagor shall not be relieved of Mortgagor's Obligations by reason of (i) the failure of Lender to comply with any request of Mortgagor or any guarantor or indemnitor with respect to the Obligations to take any action to foreclose this Security Instrument or otherwise enforce any of the provisions hereof or of the other Loan Documents, (ii) the release, regardless of consideration, of the whole or any part of the Property, or of any Person liable for the Obligations or any portion thereof, or (iii) any agreement or stipulation by Lender extending the time of payment of the Obligations or supplementing or otherwise modifying the terms of this Security Instrument or the other Loan Documents.

(b) It is agreed that the risk of loss or damage to the Property is on Mortgagor, and Lender shall have no liability whatsoever for any decline in value of the Property, for failure to maintain insurance policies, or for failure to determine whether insurance in force is adequate

as to the amount of risks insured. Possession by Lender shall not be deemed an election of judicial relief.

(c)     Lender may resort for the payment and performance of the Obligations (including, but not limited to, the payment of the Debt) to any other security or collateral held by Lender in connection with the Loan in such order, manner, and priority as Lender, in its sole and absolute discretion, may elect. Lender may take action to recover the Debt, or any portion thereof, or to enforce the Other Obligations or any covenant hereof, without prejudice to the right of Lender thereafter to foreclose this Security Instrument. The rights of Lender under this Security Instrument shall be separate, distinct, and cumulative, and none shall be given effect to the exclusion of the others. No act of Lender shall be construed as an election to proceed under any one provision herein to the exclusion of any other provision. Lender shall not be limited exclusively to the rights and remedies herein stated but shall be entitled to every right and remedy now or hereafter afforded at Law or in equity.

Section 7.7    <u>Right to Release Any Portion of the Property</u>. Lender may release any portion of the Property for such consideration as Lender may require without, as to the remainder of the Property, in any way impairing or affecting the lien, security interest, or priority of this Security Instrument, or improving the position of any subordinate lienholder with respect thereto, except to the extent that the Obligations shall have been reduced by the actual monetary consideration, if any, received by Lender for such release, and Lender may accept by assignment, pledge, or otherwise any other property or assets in place thereof as Lender may require without being accountable for so doing to any other lienholder. This Security Instrument shall continue as a lien and security interest in the remaining portion of the Property.

Section 7.8    <u>Violation of Laws</u>. If the Property is not in compliance with any legal requirements in any manner reasonably likely to have a Material Adverse Effect, Lender may impose additional requirements upon Mortgagor in connection herewith reasonably necessary to address any such noncompliance, including, without limitation, monetary reserves or financial equivalents.

Section 7.9    <u>Recourse and Choice of Remedies</u>. The provisions of <u>Article 9</u> of the Loan Agreement are hereby incorporated by reference as if set forth at length herein. Notwithstanding any other provision of this Security Instrument, the Loan Agreement, or the other Loan Documents, including, without limitation, <u>Article 9</u> of the Loan Agreement, Lender is entitled to enforce the Obligations of (a) Mortgagor contained in the Loan Documents and (b) to the extent that the Obligation is one which is the responsibility of a guarantor or indemnitor pursuant to any guaranty or indemnity signed by such guarantor or indemnitor, any guarantor or indemnitor with respect to such instrument, in each case, without first resorting to or exhausting any security or collateral and without first having recourse to any of the Property, through foreclosure, acceptance of a deed in lieu of foreclosure, or otherwise, and in the event Lender commences a foreclosure action against the Property, Lender shall be entitled to pursue a deficiency judgment against (a) Mortgagor with respect to its respective Obligations and (b) any guarantor or indemnitor with

respect to their respective Obligations, in each case, as applicable. The liability of Mortgagor with respect to the Obligations is not limited to the original principal amount of the Loan to the extent additional funds are advanced under the Loan Documents. Notwithstanding the foregoing, nothing herein shall inhibit or prevent Lender from foreclosing or exercising any other rights and remedies pursuant to this Security Instrument, the Loan Agreement, and/or the other Loan Documents, whether simultaneously with foreclosure proceedings or in any other sequence. A separate action or actions may be brought and prosecuted against Mortgagor with respect to the Obligations, whether or not an action is brought against any other Person and whether or not any other Person is joined in such action or actions.

Section 7.10    Non-Merger.  In the event Lender shall acquire a judgment on the Debt or this Security Instrument or title to the Property by conveyance from Mortgagor or as a result of foreclosure or otherwise, at the election of Lender, this Security Instrument shall not merge in any such judgment or any such Property but shall remain and continue as an existing and enforceable agreement and lien on the Property as security for the Obligations until this Security Instrument shall be released of record by Lender.

## ARTICLE 8
## INDEMNIFICATION

Section 8.1    General Indemnification.  The provisions of Section 11.12 of the Loan Agreement are hereby incorporated by reference as if set forth at length herein.

Section 8.2    Mortgage and/or Intangible Tax.  Mortgagor shall, at its sole cost and expense, protect, defend, indemnify, release, and hold harmless the Indemnitees from and against any and all Losses imposed upon or incurred by or asserted against any Indemnitees and directly or indirectly arising out of or in any way relating to any tax on the making and/or recording of this Security Instrument or any of the other Loan Documents.

Section 8.3    ERISA Indemnification.  Mortgagor shall, at its sole cost and expense, protect, defend, indemnify, release, and hold harmless the Indemnitees from and against any and all Losses (including, without limitation, reasonable attorneys' fees and costs incurred in the investigation, defense, and/or settlement of Losses incurred in correcting any prohibited transaction or in the sale of a prohibited loan or in obtaining any individual prohibited transaction exemption under ERISA that may be required in Lender's sole discretion) that Lender may incur, directly or indirectly, as a result of a breach of Section 5.20 of the Loan Agreement.

Section 8.4    Duty to Defend; Attorneys' Fees and Other Fees and Expenses.  Upon written request by any Indemnitee, Mortgagor shall defend the Indemnitee (if requested by any Indemnitee, in the name of the Indemnitee) against any claim for which indemnification is required hereunder, by attorneys and other professionals reasonably approved by Lender. Notwithstanding the foregoing, (a) upon the occurrence and during the continuation of an Event of Default, or (b) if any Indemnitee determines that (i) Mortgagor's attorneys and professionals are not defending

any claim or proceeding in a manner acceptable to Indemnitee, or (ii) its interests, in connection with any claims or proceedings, conflict with those of Mortgagor, such Indemnitee may engage its own set of attorneys and other professionals for such claim to defend or assist it, Mortgagor's attorneys shall consult in all respects with the Indemnitee's law firm with respect to such claim or proceeding and no compromise or settlement shall be entered without Lender's consent. Promptly following receipt of written invoices therefor, but in no event more than five (5) Business Days after such receipt, Mortgagor shall pay or, in the sole and absolute discretion of the Indemnitees, reimburse the Indemnitees for the payment of, the fees and disbursements of attorneys, engineers, environmental consultants, laboratories, and other professionals retained by the Indemnitee pursuant to this <u>Section 8.4</u>.

<div align="center">

**ARTICLE 9**
**<u>WAIVERS</u>**

</div>

Section 9.1   <u>Marshaling and Other Matters</u>.   To the extent permitted by Applicable Laws, Mortgagor hereby waives the benefit of all appraisement, valuation, stay, extension, reinstatement, and redemption Laws, now or hereafter in force and all rights of marshaling in the event of any sale hereunder of the Property or any part thereof or any interest therein. Further, to the extent permitted by Applicable Laws, Mortgagor hereby expressly waives any and all rights of redemption from sale under any order or decree of foreclosure of this Security Instrument on behalf of Mortgagor and on behalf of each and every Person acquiring any interest in or title to the Property subsequent to the date of this Security Instrument.

Section 9.2   <u>Waiver of Notice</u>.   To the extent permitted by Applicable Laws, Mortgagor shall not be entitled to any notices of any nature whatsoever from Lender, except with respect to matters for which this Security Instrument or the Loan Documents specifically and expressly provide for the giving of notice by Lender to Mortgagor, and except with respect to matters for which Lender is required by Applicable Laws to give notice, and Mortgagor hereby expressly waives the right to receive any notice from Lender with respect to any matter for which this Security Instrument does not specifically and expressly provide for the giving of notice by Lender to Mortgagor.

Section 9.3   <u>Waiver of Statute of Limitations</u>.   To the extent permitted by Applicable Laws, Mortgagor hereby expressly waives and releases its right to plead any statute of limitations as a defense to the payment and performance of the Obligations (including, without limitation, the payment of the Debt).

Section 9.4   **<u>Waiver of Jury Trial</u>**.   **MORTGAGOR AND LENDER, BY ITS ACCEPTANCE HEREOF, HEREBY AGREE NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND FOREVER WAIVE, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAWS, ANY RIGHT TO TRIAL BY JURY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST, WITH REGARD TO THIS SECURITY INSTRUMENT, THE LOAN**

<div align="center">Mortgage, Assignment of Leases and Rents, Security Agreement, and Fixture Filing</div>

AGREEMENT, OR THE OTHER LOAN DOCUMENTS, OR ANY CLAIM, COUNTERCLAIM, OR OTHER ACTION ARISING IN CONNECTION HEREWITH OR THEREWITH. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY MORTGAGOR AND LENDER AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE. LENDER IS HEREBY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER BY MORTGAGOR.**

Section 9.5    Survival.  The indemnifications made pursuant to Article 8 herein shall continue indefinitely in full force and effect and shall survive and shall in no way be impaired by (a) any satisfaction, release, or other termination of this Security Instrument or any other Loan Document, (b) any assignment or other transfer of all or any portion of this Security Instrument or any other Loan Document or Lender's interest in the Property (but, in such case, such indemnifications shall benefit both the Indemnitees and any such assignee or transferee), (c) any exercise of Lender's rights and remedies pursuant hereto, including, but not limited to, foreclosure or acceptance of a deed in lieu of foreclosure, any exercise of any rights and remedies pursuant to this Security Instrument, the Loan Agreement, or any of the other Loan Documents, and  any transfer of all or any portion of the Property (whether by Mortgagor or by Lender following foreclosure or acceptance of a deed in lieu of foreclosure or at any other time), (d) any amendment or other modification to this Security Instrument, the Loan Agreement, or any other Loan Document, and/or (e) any act or omission that might otherwise be construed as a release or discharge of Mortgagor from the Obligations or any portion thereof.

## ARTICLE 10
## RECOURSE

The Obligations shall be fully recourse to Mortgagor.

## ARTICLE 11
## NOTICES

All notices or other written communications hereunder shall be delivered in accordance with Section 11.8 of the Loan Agreement.

## ARTICLE 12
## APPLICABLE LAW

Section 12.1    **Governing Law.**  This Security Instrument was negotiated in New York, and accepted by Mortgagor and Lender in the State of New York, which State the parties agree has a substantial relationship to the parties and to the underlying transaction embodied hereby, and in all respects, including, without limiting the generality of the foregoing, matters of construction, validity,

and performance, this Security Instrument and the obligations arising hereunder shall be governed by, and construed in accordance with, the laws of the State of New York applicable to contracts made and performed in such State and any applicable law of the United States of America, without giving effect to the conflict of laws provisions thereof to the extent such principles or rules would require or permit the application of the laws of any jurisdiction other than those of the State of New York. To the fullest extent permitted by Law, Mortgagor hereby unconditionally and irrevocably waives any claim to assert that the Law of any other jurisdiction governs this Security Instrument, and this Security Instrument shall be governed by and construed in accordance with the Laws of the State of New York pursuant to § 5-1401 of the New York General Obligations Law.

      Section 12.2   **Jurisdiction.**  Mortgagor hereby agrees that all actions or proceedings arising directly or indirectly from this Security Instrument or the other Loan Documents if initiated by Mortgagor, shall be heard by the Bankruptcy Court or if initiated by Lender shall be, at Lender's sole election, heard by the Bankruptcy Court or any other court which has jurisdiction. The exclusive choice of forum for Mortgagor set forth in this section shall not be deemed to preclude the enforcement by Lender of any order or judgment in any other appropriate jurisdiction, and Mortgagor hereby waives the right, if any, to collaterally attack any such order or judgment.

## ARTICLE 13
## DEFINITIONS

      Unless the context clearly indicates a contrary intent or unless otherwise specifically provided herein, words used in this Security Instrument may be used interchangeably in the singular or plural form, the word "include" and its derivatives, whether or not so stated, mean by way of example and not by way of exclusion or limitation, and the word "Mortgagor" shall mean "Mortgagor and any subsequent owner or owners of the Property or any part thereof or any interest therein," the word "Lender" shall mean "Lender and any successor or assign as Lender," the word "Lender" shall mean "Lender and any subsequent holder of the Note," the word "Note" shall mean "the Note and any other evidence of indebtedness secured by this Security Instrument," the word "Property" shall include any portion of the Property and any interest therein, and the phrases "attorneys' fees", "legal fees" and "counsel fees" shall include any and all attorneys', paralegal, and law clerk fees and disbursements, including, but not limited to, fees and disbursements at the pre-trial, trial and appellate levels, incurred or paid by Lender in protecting its interest in the Property, the Leases, and/or the Rents and/or in enforcing its rights hereunder. Whenever the context may require, any pronouns used herein shall include the corresponding masculine, feminine or neuter forms.

## ARTICLE 14
## MISCELLANEOUS PROVISIONS

      Section 14.1   No Oral Change. This Security Instrument, and any provisions hereof, may not be amended, waived, extended, changed, discharged, terminated, or otherwise modified orally or by any act or failure to act on the part of Mortgagor or Lender but only by an agreement in

writing signed by the party(ies) against whom enforcement of any amendment, waiver, extension, change, discharge, termination, or modification is sought.

Section 14.2 <u>Successors and Assigns</u>. The rights, powers, and remedies of Lender under this Security Instrument shall inure to the benefit of Lender and its successors and assigns and shall be binding upon the Mortgagor and its legal representatives, administrators, successors, and permitted assigns. Lender shall have the right to assign or transfer this Security Instrument in connection with any assignment or transfer of the Loan and the Loan Documents. Any assignee or transferee of Lender shall be entitled to all the benefits afforded to Lender under this Security Instrument. The rights and obligations of Mortgagor under this Security Instrument may not be assigned and any purported assignment by Mortgagor shall be null and void.

Section 14.3 <u>Inapplicable Provisions</u>. In the event any one or more of the provisions contained in this Security Instrument shall for any reason be held to be invalid, illegal, or unenforceable in any respect by a court of competent jurisdiction, such invalidity, illegality, or unenforceability shall not affect any other provision of this Security Instrument, and this Security Instrument shall be construed as if such invalid, illegal, or unenforceable provision had never been in this Security Instrument or to be limited to the extent necessary so that such provision will not render this Security Instrument invalid, unenforceable, or not entitled to be recorded, registered, or filed under the provisions of any Applicable Laws.

Section 14.4 <u>Headings, Etc</u>. The titles and headings of the articles, sections, and paragraphs of this Security Instrument have been inserted as a matter of convenience of reference only and shall not control or affect the meaning or construction of any of the terms or provisions of this Security Instrument.

Section 14.5 <u>Subrogation</u>. If any or all of the proceeds of the Loan have been used to extinguish, extend, or renew any indebtedness heretofore existing against the Property, then, to the extent of the funds so used, Lender shall be subrogated to all of the rights, claims, liens, titles, and interests existing against the Property heretofore held by, or in favor of, the holder of such indebtedness, and such former rights, claims, liens, titles, and interests, if any, are not waived, but rather are continued in full force and effect in favor of Lender and are merged with the lien and security interest created herein as cumulative security for the payment, performance, and discharge of the Obligations (including, but not limited to, the payment of the Debt).

Section 14.6 <u>Entire Agreement</u>. This Security Instrument, the Loan Agreement, and the other Loan Documents constitute the entire understanding and agreement between Mortgagor and Lender with respect to the transactions arising in connection with the Obligations and supersede all prior written or oral understandings and agreements between Mortgagor and Lender with respect thereto. Mortgagor hereby acknowledges that, except as incorporated in writing in this Security Instrument, the Loan Agreement, and the other Loan Documents, there are not, and were not, and no Persons are or were authorized by Lender to make, any representations, understandings, stipulations, agreements, or promises, oral or written, with respect to the

transaction which is the subject of this Security Instrument, the Loan Agreement, and the other Loan Documents.

Section 14.7    Limitation on Lender's Responsibility.    No provision of this Security Instrument shall operate to place any obligation or liability for the control, care, management, or repair of the Property upon Lender, nor shall it operate to make Lender responsible or liable for any waste committed on the Property by the tenants or any other Person, or for any dangerous or defective condition of the Property, or for any negligence in the management, upkeep, repair, or control of the Property resulting in loss or injury or death to any tenant, licensee, employee, stranger, or other Person.    Nothing herein contained shall be construed as constituting Lender a "mortgagee in possession."

Section 14.8    Recitals.    The recitals hereof are a part hereof, form a basis for this Security Instrument, and shall be considered *prima facie* evidence of the facts and documents referred to therein.

Section 14.9    Incorporation by Reference.    To the extent that any provisions or defined terms contained in any other Loan Document (including, without limitation, the Loan Agreement) are used herein or incorporated herein by reference, and such other Loan Document is terminated or otherwise satisfied prior to the termination of this Security Instrument, then, for the avoidance of doubt, such provisions and/or defined terms shall survive until the satisfaction of the Obligations without regard to the fact that the Loan Document originally containing the same has been otherwise terminated or satisfied.

## ARTICLE 15
## STATE-SPECIFIC PROVISIONS

Section 15.1    Principles of Construction.    In the event of any inconsistencies between the terms and conditions of this Article 15 and the terms and conditions of this Security Instrument, the terms and conditions of this Article 15 shall control and be binding.

Section 15.2    Section 291-f Agreement.

(a)    This Security Instrument is intended to be, and shall operate as, the agreement described in Section 291-f of the Real Property Law of the State of New York, and Lender shall be entitled to all of the benefits afforded thereby.

(b)    Mortgagor shall (unless such notice is contained in any Lease) deliver notice of this Security Instrument, which notice shall be to all present and future holders of any interest in any Lease, by assignment or otherwise, and shall take such other action as may now or hereafter be reasonably required to afford Lender the full protections and benefits of such Section 291-f; and

(c)     Mortgagor shall request the recipient of any such notice to acknowledge the receipt thereof.

Section 15.3    <u>Certain Waivers</u>.  Mortgagor hereby waives and releases all benefit that might accrue to Mortgagor by virtue of any present or future Law exempting the Property, or any part of the proceeds arising from any sale thereof, from attachment, levy, or sale on execution, or providing for any stay of execution, exemption from civil process, or extension of time for payment, or any right of marshalling in the event of any sale hereunder of the Property, and, unless specifically required herein, all notices of Mortgagor's default or of Lender's election to exercise, or Lender's actual exercise of any option under this Security Instrument or any other Loan Documents.  To the extent permissible under Applicable Law, Mortgagor waives all rights or defenses arising by reason of any "one action" or "anti-deficiency" law, or any other Law which may prevent Lender from bringing any action against Borrower, including, without limitation, a claim for deficiency to the extent Lender is otherwise entitled to a claim for deficiency, before or after Lender's commencement or completion of any foreclosure action or any other action to exercise its remedies hereunder or otherwise available at law or in equity.

Section 15.4    <u>Taxes</u>.  Mortgagor shall pay all taxes imposed pursuant to Article 11 of the Tax Law of the State of New York or any other statute, order, or regulation, whether said tax is imposed at the time of recording or subsequent thereto.  This obligation shall survive the satisfaction or other termination of this Security Instrument.

Section 15.5    <u>Maximum Principal Amount Secured</u>.  Notwithstanding anything to the contrary contained in this Security Instrument, the maximum amount of principal indebtedness secured by this Security Instrument or which under any contingency may be secured by this Security Instrument is $4,000,000.00 (the "**Maximum Principal Amount**") plus (a) taxes, charges, or assessments which may be imposed by Law upon the Property; (b) premiums on insurance policies covering the Property; (c) actual out-of-pocket expenses incurred in upholding the lien of this Security Instrument, including, but not limited to, (i) the actual out-of-pocket expenses of any litigation to prosecute or defend the rights and lien created by this Security Instrument; (ii) any amount, cost, or charges to which Lender becomes subrogated, upon payment, whether under recognized principles of law or equity, or under express statutory authority, and (iii) Interest, Default Interest, and other charges at the rate and in the amounts set forth in the Loan Documents, and (d) any other "protective advances" permitted under the applicable Laws of the State of New York without the imposition of any additional mortgage recording taxes upon this Security Instrument.  To the extent that this Security Instrument secures only a portion of the Indebtedness owing or which may become owing by Mortgagor, the parties agree that any payments or repayments of such Indebtedness shall be and be deemed to be applied first to the portion of the Indebtedness that is not secured hereby, it being the parties' intent that the portion of the Indebtedness last remaining unpaid shall be secured hereby.  To that extent, the Maximum Principal Amount shall be reduced only by the last and final sums Mortgagor repays on account of the principal amount of the Indebtedness.  The Maximum Principal Amount shall not be reduced by any intervening repayments of principal of the Indebtedness.

Section 15.6    Application of Insurance Proceeds.    In no event shall the provisions of Subsection 4 of Section 254 of the Real Property Law of the State of New York with respect to the application of insurance proceeds apply to this Security Instrument.

Section 15.7    Mortgage Tax Statement.    Mortgagor represents and warrants that this Security Instrument does not cover real property principally improved by one or more structures containing in the aggregate not more than six residential dwelling units, each bearing its own cooking facilities.

Section 15.8    Application of Real Property Law Sections.    The covenants and conditions in this Security Instrument shall be construed as affording to Lender rights additional to, and not exclusive of, the rights conferred under the provisions of Sections 254, 271, 272, and 291-f of the Real Property Law of the State of New York.    Any inconsistency between this Security Instrument and Section 254, 271, 272, or 291-f of the Real Property Law of the State of New York shall be resolved in favor of this Security Instrument.

Section 15.9    Repayment of Indebtedness.    Upon repayment in full of all Obligations, upon request of Mortgagor, Mortgagee shall provide to Mortgagor either an assignment of this Security Instrument or a satisfaction of this Security Instrument, at Mortgagor's sole option and direction and at the sole cost and expense of Mortgagor, including, without limitation, a reasonable attorney's fee to be paid by Mortgagor not to exceed $2,000.00 in the event of an assignment of the Security Instrument, and if Mortgagee charges any assignment fee, such fee shall not exceed $750.00.

[SIGNATURE PAGE TO FOLLOW]

IN WITNESS WHEREOF, THIS SECURITY INSTRUMENT has been executed by Mortgagor as of the day and year first above written.

**MORTGAGOR:**

WITNESS:

**ST. CHRISTOPHER'S, INC.**, a New York not-for-profit corporation

_____

By:_____

Name:_____

Print Name:_____

Title:_____

STATE OF _____)

                             ) SS.

COUNTY OF _____)

On this _____ day of June, 2024, before me, _____, a Notary Public (or before any officer within this State or without the State now qualified under existing law to take acknowledgments), duly commissioned, qualified, and acting, within and for said County and State, appeared in person the within named _____ (being the person authorized by said entity, to execute such instrument, stating their respective capacities in that behalf), to me personally well known (or satisfactorily proven to be such person), who stated that he/she was the _____ of **ST. CHRISTOPHER'S, INC.**, a New York not-for-profit corporation, and was duly authorized in his/her respective capacity to execute the foregoing instrument for and in the name and behalf of said entity, and further stated and acknowledged that he/she had so signed, executed, and delivered said foregoing instrument for the consideration, uses, and purposes therein mentioned and set forth.

IN TESTIMONY WHEREOF, I have hereunto set my hand and official seal this _____ day of _____, 2024.

_____
(Notary Public)

# EXHIBIT A

## LEGAL DESCRIPTION

**THIS DOCUMENT WAS PREPARED BY, AND AFTER RECORDING, RETURN TO:**

Reed Smith LLP
Three Logan Square
1717 Arch Street, Suite 3100
Philadelphia, PA 19103
ATTN: Brian M. Schenker, Esq.


Section 3.110 Block 103 Lot 2
Section 3.160 Block 136 Lot 2

Property Address:
71 South Broadway, County of
Westchester, State of New York

*This space reserved for Recorders use only.*

# ASSIGNMENT OF LEASES AND RENTS

by

## ST. CHRISTOPHER'S, INC.,
a New York not-for-profit corporation

(Assignor)

in favor of

## LAYLA LENDING II LLC,
a Delaware limited liability company

(Assignee)


Dated as of June [*], 2024

# ASSIGNMENT OF LEASES AND RENTS

This **ASSIGNMENT OF LEASES AND RENTS** (as amended, supplemented, or otherwise modified from time to time, this "**Assignment**"), dated as of June [*], 2024, is made by **ST. CHRISTOPHER'S, INC.**, a New York not-for-profit corporation, as a debtor and debtor-in-possession and assignor, with a business address of 71 South Broadway, Dobbs Ferry, NY 10522 ("**Assignor**"), to and for the benefit of **LAYLA LENDING II LLC**, a Delaware limited liability company, as assignee, with a business address of 7777 Glades Road, Suite 309, Boca Raton, Florida 33434, Attn: Justin Cooper (together with its successors and assigns, the "**Assignee**").

## WITNESSETH:

A.      This Assignment is given as a condition to the Assignee's obligation to make a loan in a maximum aggregate principal amount not to exceed FOUR MILLION AND 00/100 DOLLARS ($4,000,000.00) (the "**Loan**") to Assignor, pursuant to that certain Senior Secured, Super-Priority Debtor-in-Possession Loan Agreement, dated as of even date herewith, by and between Assignor and Assignee (as amended, restated, supplemented, or otherwise modified from time to time, the "**Loan Agreement**").  Capitalized terms used but not defined herein shall have the meaning given to them in the Loan Agreement.

B.      The Loan is secured by, among other things, that certain Mortgage, Assignment of Leases and Rents, Security Agreement, and Fixture Filing, dated as of even date herewith, made by Assignor in favor of Assignee (as amended, restated, supplemented, or otherwise modified from time to time, the "**Security Instrument**"), encumbering, as a lien and security interest thereon, certain real property more particularly described on Exhibit A annexed hereto and made a part hereof, and the buildings, structures, fixtures, additions, enlargements, extensions, modifications, repairs, replacements, and improvements now or hereafter located thereon (collectively, the "**Property**").

D.      Assignor has agreed to execute and deliver this Assignment.

NOW, THEREFORE, in consideration of the foregoing and of Assignee making the Loan available to Assignor, and other good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, and intending to be legally bound hereby, Assignor agrees as follows:

## ARTICLE 1
## ASSIGNMENT

Section 1.1      Property Assigned.  Subject to the provisions of Section 2.1 of this Assignment, Assignor hereby absolutely, presently, irrevocably, and unconditionally grants, assigns, and transfers to Assignee, the following property, rights, interests, and estates, now owned or hereafter acquired by Assignor:

(a)      Leases. All leases, subleases or subsubleases, lettings, licenses, concessions, or other agreements (whether written or oral) pursuant to which any Person is granted a possessory interest in, or right to use or occupy all or any portion of the Property, and every

amendment, modification, or other agreement relating to such leases, subleases, subsubleases, or other agreements entered into in connection with such leases, subleases, subsubleases, or other agreements and every guarantee of the performance and observance of the covenants, conditions, and agreements to be performed and observed by the other party thereto, heretofore or hereafter entered into, whether before or after the filing by or against Assignor of any petition for relief under 11 U.S.C. § 101 et seq. (the "**Bankruptcy Code**"), as the same may be amended, restated, supplemented, extended, renewed, replaced, or otherwise modified from time to time (collectively, the "**Leases**"); this Assignment of existing and future Leases being effective without any further or supplemental assignment documents;

(b)    Rents. All rents, additional rents, revenues, issues, and profits (including, without limitation, all oil and gas or other mineral royalties and bonuses) from the Property that are now due or may hereafter become due by reason of the renting, leasing, bailment, or licensing of all or any portion of the Property, or the use or occupancy thereof, whether paid or accruing before or after the filing by or against Assignor of any petition for relief under the Bankruptcy Code (collectively, the "**Rents**");

(c)    Bankruptcy Claims. All of Assignor's claims and rights to the payment of damages arising from any rejection by a lessee of any Lease under the Bankruptcy Code (the "**Bankruptcy Claims**");

(d)    Lease Guaranties. All of Assignor's right, title, and interest in, and claims under, any and all lease guaranties, letters of credit, and any other credit support (individually, a "**Lease Guaranty**" and collectively, the "**Lease Guaranties**") given by any guarantor in connection with any of the Leases (individually, a "**Lease Guarantor**" and collectively, the "**Lease Guarantors**");

(e)    Proceeds. All proceeds from the sale or other disposition of the Leases, the Rents, the Lease Guaranties, and/or the Bankruptcy Claims;

(f)    Other. All rights, powers, privileges, options, and other benefits of Assignor as the lessor under any of the Leases and the beneficiary under any of the Lease Guaranties, including, without limitation, the immediate and continuing right to make claims for, and to receive, collect, and acknowledge receipt for all Rents payable or receivable under the Leases and all sums payable or receivable under the Lease Guaranties (and to apply the same to the payment of the Indebtedness or other obligations in accordance with the Loan Agreement), and to do all other things which Assignor or any lessor is or may become entitled to do under any of the Leases or the Lease Guaranties;

(g)    Entry. The right, at Assignee's option, upon revocation of the license granted to Assignor pursuant to Section 2.1 herein, to enter upon the Property in person, by Assignee or its representatives or by court-appointed receiver and to collect the Rents;

(h)    Power of Attorney. Assignor's irrevocable power of attorney, coupled with an interest, to take any and all of the actions set forth in Section 3.1 of this Assignment from and after, and during the continuance of, an Event of Default, and any or all other actions designated by Assignee for the proper management and preservation of the Property; and

(i)      <u>Other Rights and Agreements</u>.  Any and all other rights of Assignor in and to the items set forth in subsections (a) through (f) above.

## ARTICLE 2
## TERMS OF ASSIGNMENT

Section 2.1    <u>Present Assignment and License Back</u>.  It is intended by Assignor that this Assignment constitute an irrevocable, present, absolute, and unconditional assignment of the Leases, the Rents, the Lease Guaranties, and the Bankruptcy Claims, and not a collateral assignment or an assignment for additional security only.  Nevertheless, until the occurrence and during the continuance of an Event of Default, Assignee grants to Assignor a revocable license, which license may not be revoked absent an Event of Default, to collect, receive, use, and enjoy the Rents, as well as any sums due under the Lease Guaranties or the Bankruptcy Claims.  Assignor shall hold the Rents and any other sums, or a portion thereof sufficient to discharge all current sums due on the Indebtedness, for use in the payment of such sums.

Section 2.2    <u>Notice to Lessees</u>.  Upon the occurrence and during the continuance of an Event of Default, Assignor hereby authorizes and directs the lessees named in the Leases, any other future lessees or occupants of the Property, and all Lease Guarantors to pay over to Assignee, or to such other party as Assignee directs, all Rents and all sums due under any Bankruptcy Claims or any Lease Guaranties, upon receipt from Assignee of written notice to the effect that Assignee is then the holder of this Assignment.  All such amounts received shall be applied by Assignee to the Indebtedness in accordance with the Loan Agreement.

## ARTICLE 3
## REMEDIES

Section 3.1    <u>Remedies of Assignee</u>.  The occurrence of any one of the following events shall constitute an event of default by Assignor under this Assignment ("**Event of Default**"): (a) Assignor fails to comply with any provision of this Assignment and such failure shall remain unremedied for twenty (20) days after the earlier of (i) the date on which Assignee notifies Assignor thereof and (ii) the date on which Mortgagor has knowledge thereof; or (b) the occurrence of an Event of Default (as defined in the Loan Agreement) under the Loan Agreement.  Upon the occurrence and during the continuance of an Event of Default, Assignee shall have the immediate and automatic right to revoke the license granted to Assignor in <u>Section 2.1</u> of this Assignment, and Assignee shall be immediately and automatically entitled to all Rents and all sums due under any Bankruptcy Claims and any Lease Guaranties, whether or not Assignee enters upon or takes control of the Property.  Upon any such revocation, Assignor shall hold any Rents received by Assignor, as well as any sums received by Assignor pursuant to any Bankruptcy Claim or any Lease Guaranty, in trust for the benefit of Assignee and shall promptly deliver such amounts to the Assignee, together with any necessary endorsements.  All such amounts received shall be applied by Assignee to the Indebtedness in accordance with the Loan Agreement.  In addition, Assignee may, at its option, in its own name or in the name of Assignor, demand, sue for, or otherwise collect and receive all Rents and all sums due under all Bankruptcy Claims and all Lease Guaranties, including, without limitation, those past due and unpaid.

Section 3.2    Other Remedies.  Nothing contained in this Assignment and no act done or omitted by Assignee pursuant to the power and rights granted to Assignee hereunder shall be deemed to be a waiver by Assignee of its rights and remedies under the Loan Agreement, the Security Instrument, or the other Loan Documents, and this Assignment is made and accepted without prejudice to any of the rights and remedies possessed by Assignee under the terms thereof. The right of Assignee to enforce the Indebtedness and to realize upon any other security or Collateral therefor held by it may be exercised by Assignee either prior to, simultaneously with, or subsequent to any action taken by it hereunder.

Section 3.3    Other Security.  Assignee may: (a) take or release other security or Collateral for the payment and performance of the Indebtedness, (b) release any Person primarily or secondarily liable therefor, and/or (c) apply any other security or Collateral held by it to the payment and performance of the Indebtedness, in each instance, without prejudice to any of its rights under this Assignment.

Section 3.4    Non-Waiver.  The exercise by Assignee of the option granted to it in Section 3.1 of this Assignment and the collection of the Rents and the sums due under the Bankruptcy Claims and the Lease Guaranties and the application thereof to the Indebtedness as provided in the Loan Agreement shall not be considered a waiver of any Unmatured Default or any Event of Default under the Loan Agreement, the Security Instrument, this Assignment, or the other Loan Documents.  The failure of Assignee to insist upon strict performance of any term hereof shall not be deemed to be a waiver of any term of this Assignment.  Assignor shall not be relieved of Assignor's obligations hereunder by reason of (a) the failure of Assignee to comply with any request of Assignor or any other Person to take any action to enforce any of the provisions hereof or of the Loan Agreement, the Security Instrument, or the other Loan Documents, (b) the release, regardless of consideration, of the whole or any part of the Property, or of any Person liable for the Indebtedness or any portion thereof, or (c) any agreement or stipulation by Assignee extending the time of payment of the Indebtedness or supplementing or otherwise modifying the terms of this Assignment, the Loan Agreement, the Security Instrument, or the other Loan Documents.  Assignee may resort for the payment and performance of the Indebtedness to any other security or Collateral held by Assignee in connection with the Loan in such order and manner as provided in the Loan Agreement.  Assignee may take any action to recover the Indebtedness, or any portion thereof, or to enforce the other Loan Documents or any covenant hereof, without prejudice to the right of Assignee thereafter to enforce its rights under this Assignment.  The rights of Assignee under this Assignment shall be separate, distinct, and cumulative, and none shall be given effect to the exclusion of the others.  No act of Assignee shall be construed as an election to proceed under any one provision herein to the exclusion of any other provision.  Assignee shall not be limited exclusively to the rights and remedies herein stated but shall be entitled to every right and remedy now or hereafter afforded at law or in equity.

Section 3.5    Bankruptcy.

(a)    Upon the occurrence and during the continuance of an Event of Default, Assignee shall have the right to proceed in its own name or in the name of Assignor in respect of any claim, suit, action, or proceeding relating to the rejection of any Lease, including, without limitation, the right to file and prosecute, to the exclusion of Assignor, any proofs of claim,

complaints, motions, applications, notices, and other documents in any case in respect of the lessee under such Lease under the Bankruptcy Code.

(b)     If Assignor, as lessor under any Lease, shall determine to reject such Lease pursuant to Section 365(a) of the Bankruptcy Code, then Assignor shall give Assignee not less than ten (10) Business Days prior notice of the date on which Assignor shall apply to the bankruptcy court for authority to reject such Lease.  Assignee shall have the right, but not the obligation, to serve upon Assignor within such ten (10) Business Day period a notice stating that (i) Assignee demands that Assignor assume and assign the Lease to Assignee pursuant to Section 365 of the Bankruptcy Code and (ii) Assignee covenants to cure defaults by Assignor, and provide adequate assurance of future performance, under the Lease.  If Assignee serves upon Assignor the notice described in the preceding sentence, Assignor shall not seek to reject the Lease and shall comply with the demand provided for in clause (i) of the preceding sentence within thirty (30) days after Assignee's notice shall have been given, subject to the performance by Assignee of the covenant provided for in clause (ii) of the preceding sentence.

## ARTICLE 4
## NO LIABILITY, FURTHER ASSURANCES

Section 4.1     No Liability of Assignee.  This Assignment shall not be construed to bind Assignee to the performance of any of the terms, covenants, or agreements contained in any Lease or any Lease Guaranty or otherwise impose any obligation upon Assignee thereunder.  Assignee shall not be liable for any loss sustained by Assignor resulting from Assignee's failure to let the Property or to collect any Rents or any sums due under any Bankruptcy Claims or any Lease Guaranties during the existence of an Event of Default or from any other act or omission of Assignee under this Assignment during the existence of an Event of Default, unless such loss is caused by the gross negligence or willful misconduct of Assignee.  Assignee shall not be obligated to perform or discharge any obligation, duty, or liability under any Leases or any Lease Guaranties by reason of this Assignment, and Assignor shall indemnify Assignee for, and defend and hold Assignee harmless from, (a) any and all liability, loss, or damage which may or might be incurred under any Leases or any Lease Guaranties and (b) any and all claims and demands whatsoever under any Leases or any Lease Guaranties, including, without limitation, any such claims or demands which may be asserted against Assignee by reason of any alleged obligations or undertakings on its part to perform or discharge any of the terms, covenants, or agreements contained in any Leases or any Lease Guaranties, unless caused by the gross negligence or willful misconduct of Assignee.  Should Assignee incur any such liability, loss, or damage, the amount thereof, including, without limitation, costs, expenses, and reasonable attorneys' fees and costs, shall be secured by this Assignment and by the Security Instrument and the other Loan Documents, and Assignor shall reimburse Assignee therefor within five (5) Business Days following written demand, and upon the failure of Assignor to do so, such amount shall thereafter bear interest at the Default Rate until repaid in full.  This Assignment shall not operate to place any obligation or liability for the control, care, management, or repair of the Property upon Assignee or for the carrying out of any of the terms, covenants, or agreements of any Leases or any Lease Guaranties; nor shall it operate to make Assignee responsible or liable for any waste committed on the Property by the tenants or any other Person, or for any dangerous or defective condition of the Property, or for any negligence in the management, upkeep, repair, or control of the Property resulting in loss or injury or death to any tenant, licensee, employee, stranger, or other Person.

Assignment of Leases and Rents

Section 4.2 <u>No Mortgagee In Possession.</u> Nothing herein contained shall be construed as constituting Assignee a "mortgagee in possession".

Section 4.3 <u>Further Assurances.</u> Assignor will, at the cost of Assignor, and without expense to Assignee, within ten (10) Business Days after written demand by Assignee, do, execute, acknowledge, and deliver all and every such further acts, deeds, conveyances, mortgages, deeds of trust, deeds to secure debt, mortgages, pledges, assignments, notices of assignments, transfers, and assurances as Assignee shall, from time to time, require for the better assuring, conveying, assigning, transferring, perfecting, and confirming unto Assignee the property and rights hereby deeded, mortgaged, granted, bargained, sold, conveyed, confirmed, pledged, assigned, warranted, secured, and transferred or intended now or hereafter so to be, or which Assignor may be or may hereafter become bound to convey or assign to Assignee, or for carrying out the intention or facilitating the performance of the terms of this Assignment or for filing, registering, or recording this Assignment, or for complying with all legal requirements. In the event Assignor shall fail, within ten (10) Business Days of such demand to so execute and deliver any such agreement, instrument, or document, Assignor hereby authorizes Assignee to execute, in the name of Assignor or without the signature of Assignor, any such agreement, instrument, or document. Assignor hereby grants to Assignee, exercisable upon the occurrence and during the continuance of an Event of Default, an irrevocable power of attorney coupled with an interest for the purpose of exercising any and all rights and remedies available to Assignee at law or in equity, including, without limitation, such rights and remedies available to Assignee pursuant to this <u>Section 4.3</u>.

# ARTICLE 5
## MISCELLANEOUS PROVISIONS

Section 5.1 <u>Conflict of Terms.</u> In the event of any inconsistency between any provision of this Assignment and any provision of the Loan Agreement, the provision of the Loan Agreement shall govern; <u>provided</u>, <u>however</u>, that the provisions of all of the Loan Documents shall be construed as an integrated set of provisions governing the Indebtedness and, accordingly, shall be interpreted and construed liberally to give the maximum validity, enforceability, and effect to all of such provisions.

Section 5.2 <u>No Oral Change.</u> This Assignment, and any provisions hereof, may not be amended, waived, extended, changed, discharged, terminated, or otherwise modified orally or by any act or failure to act on the part of Assignor or Assignee but only by an agreement in writing signed by the party(ies) against whom enforcement of any amendment, waiver, extension, change, discharge, termination, or other modification is sought.

Section 5.3 <u>General Definitions.</u> Unless the context clearly indicates a contrary intent or unless otherwise specifically provided herein, words used in this Assignment may be used interchangeably in the singular or plural form and the word "Assignor" shall mean "Assignor and any subsequent owner or owners of the Property or any part thereof or interest therein," the word "Assignee" shall mean "Assignee and any subsequent Assignee of the Loan," the word "Assignee" shall mean "Assignee and any subsequent holder of the Note," the word "Note" shall mean "the Note and any other evidence of indebtedness secured by the Loan Documents," the word "Property" shall include any portion of the Property and any interest therein, and the phrases "attorneys' fees," "legal fees," and "counsel fees" shall include any and all attorneys', paralegal,

and law clerk fees and disbursements, including, but not limited to, fees and disbursements at the pre-trial, trial, and appellate levels, incurred or paid by Assignee in protecting its interest in the Property, the Leases, the Rents, the Lease Guaranties, and/or the Bankruptcy Claims and/or in enforcing its rights hereunder. Whenever the context may require, any pronouns used herein shall include the corresponding masculine, feminine, or neuter forms.

Section 5.4    Inapplicable Provisions.  In the event any one or more of the provisions contained in this Assignment shall for any reason be held to be invalid, illegal, or unenforceable in any respect by a court of competent jurisdiction, such invalidity, illegality, or unenforceability shall not affect any other provision of this Assignment, and this Assignment shall be construed as if such invalid, illegal, or unenforceable provision had never been in this Assignment or to be limited to the extent necessary so that such provision will not render this Assignment invalid, unenforceable, or not entitled to be recorded, registered, or filed under the provisions of any Applicable Laws.

Section 5.5    Governing Law.  This Assignment was negotiated in New York, and accepted by Assignor and Assignee in the State of New York, which State the parties agree has a substantial relationship to the parties and to the underlying transaction embodied hereby, and in all respects, including, without limiting the generality of the foregoing, matters of construction, validity, and performance, this Assignment and the obligations arising hereunder shall be governed by, and construed in accordance with, the Laws of the State of New York applicable to contracts made and performed in such State and any applicable Law of the United States of America, without giving effect to the conflict of laws provisions thereof to the extent such principles or rules would require or permit the application of the Laws of any jurisdiction other than those of the State of New York.  To the fullest extent permitted by Law, Assignor hereby unconditionally and irrevocably waives any claim to assert that the Law of any other jurisdiction governs this Assignment, and this Assignment shall be governed by and construed in accordance with the Laws of the State of New York pursuant to § 5-1401 of the New York General Obligations Law.

Section 5.6    Jurisdiction; Service of Process.  Assignor hereby agrees that all actions or proceedings arising directly or indirectly from this Security Instrument or the other Loan Documents if initiated by Assignor, shall be heard by the Bankruptcy Court or if initiated by Assignee shall be, at Assignee's sole election, heard by the Bankruptcy Court or any other court which has jurisdiction.  The exclusive choice of forum for Assignor set forth in this section shall not be deemed to preclude the enforcement by Assignee of any order or judgment in any other appropriate jurisdiction, and Assignor hereby waives the right, if any, to collaterally attack any such order or judgment.

Section 5.7    Termination of Assignment.  Upon the termination or satisfaction of the Security Instrument, this Assignment shall automatically become and be void and of no effect.

Section 5.8    Notices.  All notices or other written communications hereunder shall be delivered in accordance with Section 11.8 of the Loan Agreement.

Section 5.9    **WAIVER OF TRIAL BY JURY.  ASSIGNOR AND ASSIGNEE, BY ITS ACCEPTANCE HEREOF, HEREBY AGREE NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND FOREVER WAIVE, TO THE**

**FULLEST EXTENT PERMITTED BY APPLICABLE LAWS, ANY RIGHT TO TRIAL BY JURY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST, WITH REGARD TO THIS ASSIGNMENT, THE LOAN AGREEMENT, OR THE OTHER LOAN DOCUMENTS, OR ANY CLAIM, COUNTERCLAIM, OR OTHER ACTION ARISING IN CONNECTION HEREWITH OR THEREWITH. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY ASSIGNOR AND ASSIGNEE AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE. ASSIGNEE IS HEREBY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER BY ASSIGNOR.**

Section 5.10   <u>Recourse.</u>   The Indebtedness shall be fully recourse to Assignor.

Section 5.11   <u>Successors and Assigns.</u>   The rights, powers, and remedies of Assignee under this Assignment shall inure to the benefit of Assignee and its successors and assigns and shall be binding upon the Assignor and its legal representatives, administrators, successors, and permitted assigns. Assignee shall have the right to assign or transfer this Assignment in connection with any assignment or transfer of the Loan and the Loan Documents. Any assignee or transferee of Assignee shall be entitled to all the benefits afforded to Assignee under this Assignment. The rights and obligations of Assignor under this Assignment may not be assigned and any purported assignment by Assignor shall be null and void.

Section 5.12   <u>Headings, Etc.</u>   The titles and headings of the articles, sections, and paragraphs of this Assignment have been inserted as a matter of convenience of reference only and shall not control or affect the meaning or construction of any of the terms or provisions of this Assignment.

Section 5.13   <u>Entire Agreement</u>.   This Assignment, the Loan Agreement, and the other Loan Documents constitute the entire understanding and agreement between Assignor and Assignee with respect to the transactions arising in connection with the Indebtedness and supersede all prior written or oral understandings and agreements between Assignor and Assignee with respect thereto. Assignor hereby acknowledges that, except as incorporated in writing in this Assignment, the Loan Agreement, and the other Loan Documents, there are not, and were not, and no Persons are or were authorized by Assignee to make, any representations, understandings, stipulations, agreements, or promises, oral or written, with respect to the transaction which is the subject of this Assignment, the Loan Agreement, and the other Loan Documents.

Section 5.14   <u>Recitals.</u>   The recitals hereof are a part hereof, form a basis for this Assignment, and shall be considered *prima facie* evidence of the facts and documents referred to therein.

Section 5.15   <u>Incorporation by Reference.</u>   To the extent that any provisions or defined terms contained in any other Loan Document (including, without limitation, the Loan Agreement) are used herein or incorporated herein by reference, and such other Loan Document is terminated or otherwise satisfied prior to the termination of this Assignment, then, for the avoidance of doubt, such provisions and/or defined terms shall survive until the satisfaction of the Indebtedness without

regard to the fact that the Loan Document originally containing the same has been otherwise terminated or satisfied.

[SIGNATURE PAGE TO FOLLOW]

IN WITNESS WHEREOF, Assignor has executed, sealed, acknowledged, and delivered this Assignment as of the day and year first above written.

**ASSIGNOR:**

WITNESS:                                    **ST. CHRISTOPHER'S, INC.,** a New York not-for-profit corporation

_____          By:_____
                                          Name:_____
Print Name:_____            Title:_____


STATE OF _____)
                                 ) SS.
COUNTY OF _____)

On this _____ day of June, 2024, before me, _____, a Notary Public (or before any officer within this State or without the State now qualified under existing law to take acknowledgments), duly commissioned, qualified, and acting, within and for said County and State, appeared in person the within named _____ (being the person authorized by said entity, to execute such instrument, stating their respective capacities in that behalf), to me personally well known (or satisfactorily proven to be such person), who stated that he/she was the _____ of **ST. CHRISTOPHER'S, INC.,** a New York not-for-profit corporation, and was duly authorized in his/her respective capacity to execute the foregoing instrument for and in the name and behalf of said entity, and further stated and acknowledged that he/she had so signed, executed, and delivered said foregoing instrument for the consideration, uses, and purposes therein mentioned and set forth.

IN TESTIMONY WHEREOF, I have hereunto set my hand and official seal this _____ day of _____, 2024.


_____
(Notary Public)

**EXHIBIT A**

**LEGAL DESCRIPTION**