Hearing Date/Time:  April 24, 2025 at 10:00 a.m. EST
Objection Deadline:  April 17, 2025 at 4:00 p.m. EST
Reply Deadline:  April 21, 2025 at 4:00 p.m. EST

**BARCLAY DAMON LLP**
Janice B. Grubin
Ilan Markus
Scott Fleischer
1270 Avenue of the Americas, Suite 501
New York, New York 10020
Telephone:  (212) 784-5800
jgrubin@barclaydamon.com
imarkus@barclaydamon.com
sfleischer@barclaydamon.com

*Counsel to Debtors and Debtors-in-Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| ST. CHRISTOPHER'S, INC., *et al.*,[1] | : | Case No. 24-22373 (shl) |
| | : | Main Case |
| Debtors. | : | Jointly Administered |

**DEBTORS' MOTION FOR ENTRY OF ORDER (I) APPROVING THE PRIVATE SALE OF THE NEW WINDSOR REAL ESTATE BY DEBTOR THE MCQUADE FOUNDATION TO 621 BLOOMING GROVE LLC UNDER THE PURCHASE AND SALE AGREEMENT FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES EXCEPT FOR CERTAIN PERMITTED LIENS; (II) AUTHORIZING THE POTENTIAL ASSUMPTION AND ASSIGNMENT OF THE GNC LEASE AND THE REJECTION OF THE RESIDENTIAL LEASE IN CONNECTION THEREWITH; AND (III) GRANTING RELATED RELIEF**

St. Christopher's, Inc. ("St. Christopher's") and The McQuade Foundation ("McQuade"),

the above-captioned debtors and debtors-in-possession (collectively, the "Debtors"), hereby move

(the "Motion") pursuant to sections 105(a), 363, and 365 of Title 11 of the United States Code, 11

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are:  St. Christopher's, Inc. (0485) and The McQuade Foundation (2652).

U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"), Rules 2002, 6004, 6006, and 9014 of the Federal

Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and the Local Bankruptcy Rules for the

Southern District of New York (the "Local Rules"), for entry of an order, substantially in the form

annexed hereto as **Exhibit A** (the "Sale Order"): (a) approving the private sale of approximately

22.1 acres of real property owned by McQuade located in New Windsor, New York 12553 (the

"New Windsor Real Estate"), as described more specifically in the Collins Declaration (as defined

herein) by Debtor The McQuade Foundation to 621 Blooming Grove LLC ("Purchaser") under

the Purchase and Sale Agreement dated February 14, 2025 (the "PSA") in the form annexed as

**Exhibit 1** to the Sale Order, free and clear of liens, claims, encumbrances and interests except for

the DASNY Bonds (as defined herein) and the GNC Lease (as defined herein); (b) authorizing the

potential assumption and assignment of the unexpired lease of nonresidential real property

between McQuade and Greenburgh-North Castle Union Free School District ("GNC") dated

January 1, 2012 (the "GNC Lease") and the rejection of the Residential Lease (as defined herein);

and (c) granting related relief (collectively, the "Sale").  In support of this Motion, the Debtors rely

on the *Declaration of Thomas A. Collins, CCIM, in Support of the Debtors' Private Sale Motion*

(the "Collins Declaration") and the *Declaration of Dr. Sarah Ruback  in Support of the Debtors'*

*Private Sale Motion* (the "Ruback Sale Declaration"), filed contemporaneously herewith.   In

further support of this Motion, the Debtors respectfully state as follows:

## PRELIMINARY STATEMENT

The Debtors request this Court's approval of the private Sale of the New Windsor Real

Estate for $9 million after (i) obtaining an updated appraisal for the New Windsor Real Estate with

an effective date of January 29, 2025 and an appraised value of $5.1 million, and (ii) undertaking

an extensive and expansive marketing process designed to attract local, regional and national interest for the New Windsor Real Estate.

As set forth herein, the Debtors and their real estate professionals believe that further marketing or attempts to sell the New Windsor Real Estate will not result in a higher sale price, but would result in generating less net value for the Debtors' estates. The Debtors' Boards of Directors view receipt of the proposed Sale proceeds under the PSA as in the best interests of the Debtors' estates and have, in the exercise of their business judgment, approved the Sale, subject only to this Court's approval of the Sale. The Debtors respectfully request that the Court also approve the Sale.

## JURISDICTION AND VENUE

1.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334. Consideration of this matter is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue of this proceeding is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The statutory predicates for the relief requested herein are Bankruptcy Code sections 105(a), 363, and 365, Bankruptcy Rules 2002, 6004, 6006, and 9014 and Local Rule 9014, and the Amended Guidelines for the Conduct of Asset Sales, approved by Administrative Order Number 383 in the United States Bankruptcy Court for the Southern District of New York.

## BACKGROUND

### A.      The Chapter 11 Cases

3.      On April 29, 2024 (the "Petition Date"), the Debtors commenced these Subchapter V Chapter 11 cases (the "Chapter 11 Cases") by filing voluntary petitions for relief in the United States Bankruptcy Court for the Southern District of New York (the "Court"). The Debtors

31071035.1

continue to manage their properties as debtors-in-possession pursuant to sections 1182(2) and 1184 of the Bankruptcy Code.

4.      On the Petition Date, the Office of the United States Trustee filed the *Notice of Appointment of Subchapter V Trustee* [Docket Nos. 7] in each of the Chapter 11 Cases appointing Heidi J. Sorvino, Esq. as Subchapter V Trustee.

5.      Other than the appointment of Ms. Sorvino as the Subchapter V Trustee, no request for the appointment of a trustee or examiner has been made in these Chapter 11 Cases and no statutory committees have been appointed or designated.

6.      By Order dated July 31, 2024 [Docket No. 129], the Court approved on a final basis the debtor-in-possession loan (the "DIP Loan") to St. Christopher's in the total amount of $4.0 million, collateralized by the Debtors' improved real property located in Dobbs Ferry, New York.[2]

7.      Additional information about the Debtors' now closed businesses, the events leading up to the Petition Date and the Chapter 11 Cases can be found in the *Declaration of Dr. Sarah Ruback Pursuant to Local Bankruptcy Rule 1007-2 and in Support of Chapter 11 Petitions and First Day Motions* [Docket. No. 6] (the "Ruback Declaration"), the *Debtors' Pre-Status Conference Report Pursuant to Bankruptcy Code Section 1188(c)* [Docket No. 88] (the "Pre-Status Conference Report"), the *Debtors' Joint Chapter 11 (Subchapter V) Plan of Reorganization* [Docket No. 125] (the "Plan"), and the *Debtors' Motion for Entry of an Order Authorizing Debtors to Reject Certain Executory Contracts Related to the Health Homes Business, Nunc Pro Tunc to November 25, 2024* [Docket No. 185] (the "Health Homes Motion").  The Ruback Declaration,

---

[2] The Debtors are in the process of preparing a motion for approval of an amended DIP Loan through which the DIP lender would replace its lien on the Dobbs Ferry Real Estate with a lien on the New Windsor Real Estate sale proceeds in exchange for permitting the Debtors to retain some of the Dobbs Ferry Real Estate sale proceeds to ensure a runway for the liquidation of the Chapter 11 Cases pending the closing of the proposed sale of the New Windsor Real Estate when the balance of the DIP Loan would be paid.

31071035.1

Pre-Status Conference Report, Plan, and Health Homes Motion are incorporated herein as if fully set forth herein.

**B.**    **The Debtors' Operations**

8.    St. Christopher's was established in 1881 – and incorporated as a not-for-profit New York corporation in 1885 as St. Christopher's Home – as a refuge for homeless, orphaned and neglected children.  St. Christopher's has evolved over time such that its mission became to empower children and youth with special needs with the social-emotional coping skills and strengths they need, and the healthcare, mental health and social support services they require, to enter adulthood confident and equipped to meet life's challenges and opportunities, and live happy, healthy and meaningful lives.

9.    As of early 2024, St. Christopher's on-campus operations included the Dobbs Ferry residential treatment center (RTC) and the Jennie Clarkson RTC located at its Dobbs Ferry and Valhalla campuses, respectively, both licensed by New York State's Office of Children and Family Services ("OCFS").  St. Christopher's closed its Dobbs Ferry RTC in March, 2024 and closed its Jennie Clarkson RTC in August, 2024, pursuant to this Court's order dated August 16, 2024 [Docket No. 148].  St. Christopher's other operations consisted of its health homes care management program, licensed by the New York State Department of Health, as a member organization of the Collaborative for Children and Families ("CCF"), which terminated its operations as of approximately November 25, 2024, and for which a contract rejection motion was entered by an order dated January 9, 2025 [Docket No. 193], and its Office of Refugee Resettlement Residential Shelter Program for Unaccompanied Children ("ORR Program") which

closed its doors on December 12, 2024.[3]  All programs were closed in accordance with OCFS, CCF and ORR Program regulatory procedures and, by December 12, 2024, St. Christopher's had neither children in its care nor employees with the exception of its Chief Executive Officer, Dr. Sarah Ruback, who is managing the Debtors' wind down and liquidation under the boards' supervision.

10.     On July 23, 2024, the Debtors filed a motion seeking to (i) establish the procedures under which the Dobbs Ferry Real Estate would be sold and (ii) approve the ultimate sale of the Dobbs Ferry Real Estate [Docket No. 124] (the "Dobbs Ferry Sale Motion").  The bid procedures aspect of the Dobbs Ferry Sale Motion was granted by an order dated August 16, 2024 [Docket No. 149] and the sale was granted by order dated November 7, 2024 [Docket No. 180].

11.     McQuade is a not-for-profit New York organization holding land and buildings for the ORR Program formerly operated by St. Christopher's and The Kaplan Career Academy currently operated by GNC. [4]

## C.    The New Windsor Real Estate

12.     Historically, the Debtors utilized the New Windsor Real Estate for several purposes, including, by way of a lease, The Kaplan Career Academy.  The buildings and improvements for the Kaplan Academy were constructed in 2007 utilizing bond financing organized by DASNY and, as a result of a restructuring in 2012,  lease agreements between McQuade and GNC, on the one hand, and McQuade and St. Christopher's, on the other.  The DASNY bond financing is secured by, among other things, a mortgage dated November 3, 2005 on all of McQuade's real and personal property.  The remaining buildings on the campus have

---

[3]The ORR Program was established by a grant provided by the Administration of Children and Families, an office within the United States Department of Health and Human Services, created with the passage of the United States Refugees Act of 1980.
[4] Prior to 2024, St. Christopher's had operated other programs at the New Windsor campus, including an RTC.

historically been utilized by the Debtors and include a central office building, dormitory residences, maintenance building, pool house, and in-ground pool.[5]

13.      As noted, with respect to the DASNY bond financing, the New Windsor Real Estate is encumbered solely by a mortgage securing The McQuade Foundation Insured Revenue Bonds, Series 2005 (the "DASNY Bonds") with the Dormitory Authority of the State of New York ("DASNY"), which had an outstanding balance of $1,472,343.75 as of the Petition Date.  Since the Petition Date and pursuant to Order dated July 12, 2024 [Dkt No. 115], $747,504.15 of the DASNY Bonds have been paid, leaving approximately $790,000.00 on deposit McQuade's DASNY Reserve Account for the benefit of DASNY, which is sufficient to satisfy the remaining principal and interest amount of $724,839.60 owed on the DASNY Bonds upon the July 1, 2025 maturity.[6]

14.      In September 2023, the New Windsor Real Estate was appraised by Leitner Berman, who determined that the New Windsor Real Estate had an as-is market value (as of September 7, 2023) of $4.7 million (the "2023 Appraisal"). *See* Exhibit A to Roback Declaration..

15.      In February 2025, the New Windsor Real Estate was appraised by Millenium Valuations Inc., who determined that the New Windsor Real Estate  had an as-is market value (as of January 24, 2025) of $5.1 million (the "2025 Appraisal" and collectively with the 2023 Appraisal, the "Appraisals").  *See* Exhibit B to Roback Declaration .

16.      As noted, the New Windsor Real Estate is subject to a lease agreement for McQuade's residential units, dated January 1, 2012 (the "Residential Lease"), between McQuade

---

[5] St. Christopher's was selected to oversee the operations of McQuade as its sole managing member in or about 2009, after New York State closed the McQuade school programs.

[6] DASNY and the Bond Trustee have notified the Debtors that they each assert claims for fees and expenses, pursuant to the DASNY Bonds documents.  Such reasonable fees and expenses will be paid from the proceeds of the Sale.  .

as landlord and St. Christopher's as tenant and an agency lease for the school buildings and related structures, dated July 1, 2012 (the "GNC Lease"), between St. Christopher's and GNC.

17.    Under the Residential Lease, St. Christopher's is required to pay McQuade a basic use charge, approved by OCFS, which represents the "fair market Use Charge value of the Premises," in addition to being responsible for the maintenance, upkeep and overhead of the residential facilities.    The Residential Lease has a term of thirty years, which ends no earlier than the satisfaction or termination of the DASNY Bonds.  Since all of the Debtors' programs are closed and they are no longer utilizing the residential units, it makes economic sense to reject the Residential Lease, effective as of the closing of the Sale, so that the New Windsor Real Estate can be delivered to the Purchaser free of such lease.

18.    Under the GNC Lease, payments are made through tuition reimbursements from NYS Department of Education into a bank account used solely to pay down the DASNY mortgage in biannual payments.  As noted, the GNC Lease is scheduled to expire as of July 1, 2025 – the day the last installment of the DASNY Bonds are due and payable.  The PSA provides for different treatment of the GNC Lease depending on whether the Sale closes before or after July 1, 2025. The Debtors have assured GNC and DASNY that the GNC Lease will remain in place until its term expires on July 1, 2025 and the PSA provides that the Purchaser is buying the property subject to the GNC Lease if the Sale closes while the GNC Lease is in effect.  In that event, the Debtors seek to assume the GNC Lease so that it remains in place until the end of the current school year, on or about July 1, 2025.  Likewise, the Debtors have been discussing with DASNY an earlier payment – and satisfaction - of the DASNY Bonds, such that the Residential Lease can be rejected on or before the closing of the Sale.

D.    **The Marketing Process**

19.    Once the decision to sell the New Windsor Real Estate was made, McQuade engaged SVN Deegan-Collins Commercial Realty ("SVN") on or about October 12, 2024 as the exclusive listing broker to market the New Windsor Real Estate for sale.  The Court approved SVN's retention by Order dated December 23, 2024 [Dkt No. 191].

20.    Following pre-marketing due diligence, SVN created the sale brochure attached hereto as Exhibit 1 to the Collins Declaration (the "Sale Brochure") and embarked on an extensive marketing process.  Background information regarding Thomas Collins and Nilgun Foley, who led SVN's marketing and sale process, is contained in the Sale Brochure.  *See* Sale Brochure pgs 13-16. *Id*.

21.    Public mass marketing of the New Windsor Real Estate commenced on or about October 29, 2024, which included targeted phone call campaigns and email blasts to SVN's buyer database, consisting of several thousand contacts.  *Id*.  In addition to being listed on SVN's website, the offering was also posted on social media and third-party commercial real estate listing websites, including LoopNet, and Crexi.  *See* Collins Declaration at ¶ 7. The LoopNet ad can be accessed by clicking on the following link:  621 Blooming Grove Tpke, New Windsor, NY 12553 - Contract Pending Bankruptcy Court Approval | LoopNet.  *Id*.  The Crexi ad can be accessed by clicking on the following link:  621 Blooming Grove Turnpike, New Windsor, NY 12553 | Crexi.com.  LoopNet and Crexi are the two leading commercial real estate listings platforms that are viewable and searchable by the public at large. The reach of these platforms is nationwide. *Id*.

22.    SVN also reached out to (a) several "school brokers" in New York -- these are specialty brokers who have clients that are looking to purchase schools; (b) its "Constant Contact"

list, and (c) the New York State Commercial Association of Realtors (NYSCAR) via "blasts" to spread word of the offering far and wide. *Id*.

23.     The majority of interested parties who visited the New Windsor Real Estate after marketing began on October 29, 2024 originated from the LoopNet and Crexi listings, and the spread of knowledge among local schools that a residential school was for sale. *Id*.

24.     The first request for a tour of the New Windsor Real Estate was received on November 3, 2024. *Id*. The second tour request was received on November 4, 2024. *Id*. On November 6, 2024, a week after the LoopNet listing went live, the owner of a Texas-based private school who wanted to enter the New York market called to see if a joint venture with the public school tenant – the Kaplan School -- would be possible. *Id*. If so, the prospective purchaser was prepared to offer a competitive price for the New Windsor Real Estate. *Id*. The Superintendent of the Kaplan School, however, expressed no interest in the proposed joint venture. *Id*.

25.     These marketing efforts resulted in indications of serious interest from at least eight parties and ten different tours conducted by SVN. Parties that executed a confidentiality agreement gained access to a data room, where SVN has made available certain documents relevant to potential buyers.

26.     SVN discovered that the parties who expressed the most interest in, and spoke of the highest prices for, the New Windsor Real Estate, were private religious schools that currently rented premises/facilities, but whose boards and/or communities could access the funds to purchase a school of this caliber. *Id*. These private religious schools recognized that a turnkey residential school for sale is a rarity in the mid-Hudson Valley and were prepared to pay a premium for such a property. *Id*. Armed with that information, the Debtors, with the advice of SVN and counsel, publicized an initial asking price of $15 million, well above the most recent appraisal for the New Windsor Real Estate. After showing the campus to several buyer prospects and their brokers, the market reaction to

the listing pricing was loud and clear:  a more realistic price range was $10-$12 million.  In late November, the asking price was reduced to $12 million, with the goal of generating bids between $10 million and $12 million.  There was a small group of renting school boards/communities who could consider an all cash offer, with a prompt closing, and with no contingencies, provided, however, that, for religious/cultural reasons, there would be no auction. *Id.*  SVN reported that it had several conversations with interested parties and, unfortunately, the strongest contender went quiet with no offer at the end.  Id.

27.     After considering all information provided by all parties that expressed interest in purchasing the New Windsor Real Estate, the informal purchase prices proposed by numerous parties, certain parties' insistence that they would not participate in an auction format, and SVN's belief that a one bid "highest and best" offer process was the best way to maximize the value of the property, the Debtors chose to utilize the private sale route to sell the property.

28.     In consultation with SVN and counsel, the Debtors set an informal deadline of January 29, 2025 for the submission of offers, which included proof of funds, after SVN's extensive communications with prospective purchases.  Upon the expiration of this deadline to submit the highest and best offer to purchase the New Windsor Real Estate, Purchaser, 621 Blooming Grove LLC submitted the highest price, with proof of funds. The Purchaser's bid was $9MM. *Id*.

29.     Thus, those marketing efforts have resulted in the proposed Sale of the New Windsor Real Estate to Purchaser at a price that is almost double the most recent appraised value.

30.     The Debtors, in consultation with SVN and counsel, determined that the above-described private sale of the New Windsor Real Estate will maximize value while also meeting their  need for an efficient conclusion to the Sale process.  Collins Declaration, ¶ 21; Roback Declaration, ¶ 17. In that regard and based on consultation with its legal and real estate professionals, the Debtors decided that they would be unwilling to accept the risk associated with

foregoing the Sale to try to achieve the unlikely – a higher sale price for the New Windsor Real Estate,

31.     In light of (i) SVN's comprehensive post-petition marketing process, (ii) the extensive efforts of SVN and the Debtors to engage prospective purchasers, in particular a category of prospective purchasers who were willing to pay a premium for the turn key space, etc.; (iii) the difference between the recent appraisal price and the Purchaser's proposed sale price; and (iv) the Debtors' good faith, arm's length negotiations with Purchaser, the Debtors submit that the private sale and the terms and conditions of the PSA, including the total consideration, are fair and reasonable under the circumstances and that the Sale maximizes the value of the New Windsor Real Estate.

32.     The terms of the proposed Sale were negotiated in an arms-length transaction with a third party with no affiliation with the Debtors – the Purchaser - and are fair and equitable to the Debtors.  A public auction of the New Windsor Real Estate will not produce an increased purchase price for the New Windsor Real Estate, and will result in additional expense to the Debtors' estates, along with the significant risk of losing the current proposed Purchaser. and the auction resulting in a less favorable result and resulting loss to the Debtors' estates.

## RELIEF REQUESTED

33.     By this Motion, the Debtors seek entry of an order, substantially in the form attached as **Exhibit A** hereto: (i) approving the private sale of the New Windsor Real Estate by McQuade to Purchaser under the PSA free and clear of liens, claims, encumbrances and interests except, in still in place, the DASNY Bonds[7] and the GNC Lease; (ii) authorizing the potential

---

[7] The Debtors are discussing with DASNY and the Bond Trustee the possibility of making the final payment prior to the maturity date.

31071035.1

assumption and assignment of the GNC Lease, and the rejection of the Residential Lease, if both

leases are still in place; and (c) granting related relief.

## BASIS FOR RELIEF REQUESTED

A.    **The Private Sale Should Be Approved Based on the Sound Business
Judgment of the Debtor**

34.    Ample authority exists for approval of the Sale contemplated by this Motion.

Section 363 of the Bankruptcy Code provides, in relevant part, "[t]he trustee, after notice and a

hearing, may use, sell, or lease, other than in the ordinary course of business, property of the

estate." 11 U.S.C. § 363(b)(1).  "In accordance with Bankruptcy Rule 6004(f)(1), sales of property

outside of the ordinary course of business may be by private sale or by public auction. Fed. R.

Bankr. P. 6004(f)(1)." *In re Weiss Multi-Strategy Advisers LLC*, 665 BR 578, 590 (Bankr.

S.D.N.Y. 2024).

35.    Courts in the Second Circuit and others applying Bankruptcy Code section 363(b)

have required that the sale of a debtor's assets be based upon the sound business judgment of the

debtor. *See Official Comm. of Unsecured Creditors of LTV Aerospace Def. Co., v. LTV Corp. (In

re Chateaugay Corp.)*, 973 F.2d 141 (2d Cir. 1992) (holding that a judge reviewing a section

363(b) application must find from the evidence presented a good business reason to grant such

application); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063,

1071 (2d Cir. 1983) (same); *In re Gen. Motors Corp.,* 407 B.R. 463, 493-94 (Bankr. S.D.N.Y.

2009), *aff'd sub nom. In re Motors Liquidation Co.*, 428 B.R. 43 (S.D.N.Y. 2010), and *aff'd sub

nom. In re Motors Liquidation Co.*, No. 09-50026 (MG), 2018 WL 1801234 (Bankr. S.D.N.Y.

Apr. 13, 2018), *and enforcement granted in part sub nom. In re Motors Liquidation Co.*, 585 B.R.

708 (Bankr. S.D.N.Y. 2018).

13

36.     The business judgment rule "is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *In re 8 W. 58th St. Hospitality, LLC*, 2017 Bankr, LEXIS 2194, at *7 (Bankr. S.D.N.Y. Aug. 4, 2017, No. 14-11524 (SHL)).

37.     Once a court is satisfied that there is a sound business justification for the proposed sale, the court must then determine whether (i) the debtor has provided the interested parties with adequate and reasonable notice, (ii) the sale price is fair and reasonable, and (iii) the purchaser is proceeding in good faith. *In re Gen. Motors Corp.,* 407 B.R. at 493-94*; Polvay v. B.O. Acquisitions, Inc. (In re Betty Owens Sch.)*, 1997 WL188127, *4 (S.D.N.Y. Apr. 17, 1997).

**B.      The Debtors Have Demonstrated a Sound Business Justification for the Proposed Sale**

38.     A sound business purpose for the sale of a debtor's assets outside the ordinary course of business exists where such sale is necessary for the debtor to preserve or access estate value for the benefit of creditors and interest holders. *See, e.g., In re Abbotts Dairies of Pa., Inc.,* 788 F.2d 143 (3d Cir. 1986); *In re Lionel Corp.*, 722 F.2d at 1063; *see also In re Food Barn Stores, Inc.*, 107 F.3d 558, 564-65 (8th Cir. 1997)) (recognizing that paramount goal of any proposed sale of property of estate is to maximize value).

39.     As set forth above, a clear business justification exists for the sale of the New Windsor Real Estate as described herein, particularly given the Debtors' liquidating posture.  As McQuade's only significant asset, an orderly and expeditious sale of the New Windsor Real Estate is critical to maximizing recoveries for the Debtors' economic stakeholders.  The proceeds of the Sale will fund the Debtors' wind-down in these Chapter 11 Cases and, ultimately, establish a pot for creditors with allowed claims to recover under a liquidating Chapter 11, Subchapter V plan (or plans), including the creation of a trust to reconcile and pay survivor holders of allowed claims

14

arising under New York's Child Victims Act or related litigation. For the reasons set forth in the Motion and the Collins Declaration, the consummation of the Sale to Purchaser for the New Windsor Real Estate will generate the highest and best offer to ensure that value for the Debtors' estate is preserved and maximized.

**C.      The Private Sale Satisfies Bankruptcy Rule 6004(f)**

40.      " In accordance with Bankruptcy Rule 6004(f)(1), sales of property outside of the ordinary course of business may be by private sale or by public auction. Fed. R. Bankr. P. 6004(f)(1)." *In re Weiss Multi-Strategy Advisers LLC*, 665 BR 578, 590 (Bankr. S.D.N.Y. 2024).

41.      Private sales outside the ordinary course of business are appropriate where the debtor demonstrates that the sale is permissible under section 363 of the Bankruptcy Code.

42.      In a recent decision from this District, Chief Judge Martin Glenn stated the following in connection with a debtor's motion for approval of a private sale:

> Indeed, this Court's Sale Guidelines recognize the propriety of private sales, imposing solely a requirement that a sale motion disclose that the sale is private and explain why the debtor seeks to structure the sale in such a manner and how it is likely to maximize the sale price. (*See* Sale Guidelines at 2 n.2 ("With the exception of providing for such disclosure, these Guidelines do not express a preference for public over private sales as a means to maximize the sale price.),
> . . .
> Here, the Debtors could and did act consistently with the Sale Guidelines in proposing the private sale. The Motion makes explicit in several instances that the sale of the Bonds is a private sale. Additionally, the Debtors explain in extensive detail why they elected a private sale and how it would maximize value for the Debtors' estates. (*See, e.g., id.* ¶ 36 (stating that an auction is not warranted on account of the cost and time associated with an auction process and, after an extensive marketing process, the Debtors do not believe that higher bids will be obtained); *see also* Debtors Reply ¶ 2 (stating that the Motion outlines the basis for the private sale and that the Debtors have already exhausted their extensive marketing process).
>
> Accordingly, the Debtors' reasons for a private sale were adequately outlined in the Motion, satisfying the Sale Guidelines.

*Id.*, at 591-592.

43.    Here, paragraphs 19 through 32, above, the Collins Declaration, and the Roback Declaration, collectively set forth facts and evidence demonstrating that the Debtors could and did act consistently with the Sale Guidelines in pursuing and proposing the private sale. The Motion makes explicit in several instances that the Sale of the New Windsor Real Estate is a private sale. Additionally, the Debtors explain in detail why they elected a private sale and how it would maximize value for the Debtors' estates. (*See, e.g., id.* ¶ 17-1 (stating that an auction is not warranted on account of the cost and time associated with an auction process and, after an extensive marketing process, the Debtors do not believe that higher bids will be obtained); *see also*, Roback Declaration, at ¶ 11-24 (stating the basis for the private sale and that the Debtors have already exhausted their extensive marketing process).

### D.    The Private Sale is Permitted Pursuant to 11 U.S.C. §§ 363(b) and (d)

44.    In conjunction with Bankruptcy Code section 363(b) permitting the sale of property of the estate outside of the ordinary course of business after notice and a hearing, the Debtors are providing notice and setting a hearing on full, 21 days' notice to approve the Sale.

45.    "Although section 363 of the Bankruptcy Code does not specify a standard for determining when it is appropriate for a court to authorize the use, sale, or lease of property of the estate, bankruptcy courts routinely authorize sales of a debtor's assets so long as they can articulate a sound business justification for doing so. *See, e.g., In re Chateaugay Corp.*, 973 F.2d 141, 144-45 (2d Cir. 1992) (affirming bankruptcy court's approval of asset sale under section 363(b) because good business reason supported the sale as delay in the sale of assets may diminish their value); *see also Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983) ("The rule we adopt requires that a judge determining a § 363(b) application expressly find from the evidence presented before him at the hearing a good business reason to grant such

an application."); *In re Global Crossing Ltd.*, 295 B.R. 726, 743 (Bankr. S.D.N.Y. 2003) (holding that the standard for approval of a motion under section 363 is whether there is a "good business reason" to support the motion)." *In re Weiss Multi-Strategy Advisers LLC*, 665 BR at 590.

46.     Section 363(d) of the Bankruptcy Code requires transfer of a property by a not-for-profit corporation to comply with applicable nonbankruptcy law governing the transfer. *See* 11 U.S.C. § 363(d). Specifically, Section 363(d) provides that a sale can only be authorized: (1) "in accordance with non-bankruptcy law applicable to the transfer of property by a debtor that is such a corporation or trust; and (2) only to the extent not inconsistent with any relief granted under subsection (c), (d), (e), or (f) of section 362." *In re HHH Choices Health Plan, LLC*, 554 B.R. 697, 699 (Bankr. S.D.N.Y. 2016).

47.     Outside of bankruptcy, a not-for-profit corporation that seeks to sell all or substantially all of its assets is required, pursuant to sections 510 and 511 of the New York Not-for-Profit Corporation Law, to submit a verified petition to the New York State Supreme Court or the New York Attorney General.  The Supreme Court will approve the proposed sale transaction if it finds that "the consideration and the terms of the transaction are fair and reasonable to the corporation and that the purposes of the corporation or the interests of the members will be promoted." N.Y. Not-for- Profit Corp. Law § 511-a(c) (the "NY Test"). This same language embodying the NY Test is in Section 511-a(c) of the New York Not-for-Profit Corporation Law, which governs the approval of a sale by the Attorney General.

48.     As determined by Judge Wiles , a bankruptcy court, rather than a state court, has exclusive jurisdiction over the estate and the disposition of its assets, and thus is the court that will decide if a proposed sale of the assets of a not-for-profit in bankruptcy should be approved. *In re HHH Choices Health Plan, LLC*, 554 B.R. at 700.

> While a transfer must comply with the substantive requirements of state law, my interpretation of section 363 is that any determination that would be made by a state court, under section 511 of the Not-For-Profit Corporation Law, in the absence of a bankruptcy case, is now a determination to be made by me, and not by the state court.

*Id., at* 700-01.

49.    Judge Wiles noted that New York courts have deemed the NY Test satisfied, and approved sales, by not-for-profit corporations that would enable creditors to be paid, because the sale furthers the purposes and interests of any corporation, including a not-for-profit corporation, to pay its debts:

> As I have already noted, the ordinary determination of what is fair and equitable under the state court decisions is fair market value and best price. **Whether a deal is fair and equitable to a corporation has to include consideration of how it compares to other offers, and how it affects the corporation's ability to pay its legitimate debts. As the New York courts have held, it furthers the purposes and interests of any corporation, including a not-for-profit corporation, to pay its debts**. *See, e.g., Friends World College v. Nicklin*, 249 A.D.2d 393, 671 N.Y.S.2d 489, 490 (App. Div. 1998) (approving a sale under section 511 of the not-for-profit corporation law, and noting that the sale furthered the purposes and interests of the corporation by enabling it to pay its debts); *In re Sculpture Center, Inc.*, No. 113773/01, 2001 N.Y. Misc. LEXIS 1019, 2001 WL 1568739 (Sup. Ct. Aug. 24, 2001) (holding that a transaction furthered the purposes of a not-for-profit corporation by enabling debt payments, even though some sculpture classes would be terminated).

*In re HHH Choices Health Plan, LLC*, 554 B.R. 697, 703 (Bankr. S.D.N.Y. 2016) (emphasis added). Here, the Sale proceeds further the purposes and interests of the Debtors by providing them with significant funds to execute an orderly wind down in a manner consistent with their missions, and to pay their creditors.

50.    Citing *Lionel*, Judge Glenn observed that "the sale price to be obtained with reference to any appraisals of the property" is a relevant factor to be considered when private sale approval is sought. *In re Weiss Multi-Strategy Advisers LLC*, 665 BR 578, 590 (Bankr. S.D.N.Y. 2024). Here, the private Sale price is the highest and best offer obtained by the Debtors after the extensive marketing process described herein, and significantly exceeds the recent Appraisal values obtained by the Debtors by millions of dollars, which demonstrates that the Sale price is fair and reasonable to the Debtors' estates.

51.     The marketing process undertaken and the resulting PSA are fair and reasonable under the circumstances and satisfies the requirements of Bankruptcy Code sections 363(b) and (d).

**E.      The Private Sale of the New Windsor Real Estate Free and Clear of All Liens, Claims, Interests, and Other Encumbrances Except the DASNY Bond and the GNC Lease Is Also Authorized by Section 363(f) of the Bankruptcy Code**

52.     The Debtors further submit that it is appropriate to sell the New Windsor Real Estate free and clear of all liens, claims, interests, and other encumbrances, except the DASNY Bond and the GNC Lease, pursuant to section 363(f) of the Bankruptcy Code, with any such liens, claims, interests or other encumbrances attaching to the cash proceeds of the New Windsor Real Estate to the extent applicable.  Section 363(f) of the Bankruptcy Code authorizes a debtor to sell assets free and clear of liens, claims, interests and encumbrances if:

(1)     applicable nonbankruptcy law permits the sale of such property free and clear of such interests;

(2)     such entity consents;

(3)     such interest is a lien and the price at which such property is to be sold is greater than the value of all liens on such property;

(4)     such interest is in bona fide dispute; or

(5)     such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

53.     Satisfaction of any one of the five requirements of section 363(f) of the Bankruptcy Code will suffice to permit the sale of the New Windsor Real Estate "free and clear" of liens and interests.  *In re Dundee Equity Corp*., 1992 Bankr. LEXIS 436, at *12 (Bankr. S.D.N.Y. Mar. 6, 1992) ("[s]ection 363(f) is in the disjunctive, such that the sale free of the interest concerned may occur if any one of the conditions of § 363(f) have been met."); *see also Michigan Employment*

*Sec. Comm'n v. Wolverine Radio Co. (In re Wolverine Radio Co.)*, 930 F.2d 1132, 1147 n.24 (6th Cir. 1991) (stating that Bankruptcy Code section 363(f) is written in the disjunctive and holding that the court may approve the sale "free and clear" provided at least one of the subsections of Bankruptcy Code section 363(f) is met).

54.    One or more of the subsections of Bankruptcy Code section 363(f) are satisfied with respect to the sale of the New Windsor Real Estate pursuant to the PSA.  Pursuant to subsection (1), applicable non-bankruptcy law permits the sale of the New Windsor Real Estate free and clear of liens, claims, interests or encumbrances, except for the DASNY Bond, due to the absence of any other known, valid liens, claims, interests or encumbrances.  To the extent anyone challenges that right – which no one has -- such interest is in bona fide dispute.

55.    The only potential interest holder in the New Windsor Real Estate is DASNY. McQuade is already holding the funds needed to pay off the DASNY Bond without accounting for the Sale proceeds (*see* Order Approving DASNY Modification of Stay, Docket No. 115).  DASNY has agreed not to object to the Sale Motion if the proposed Sale Order provides (a) that the GNC Lease will remain in place for the duration of its term, and (b) for payment of the balance and associated costs due under the DASNY Bonds from the Sale proceeds.

56.    To the extent any Sale dispute materializes here, the debtor-in-possession may also sell property under § 363(b) free and clear of any interest in the property if such interest is in bona fide dispute.  *See* 11 U.S.C. § 363(f)(4).  "The purpose of § 363(f)(4) is to permit property of the estate to be sold free and clear of interests that are disputed by the estate 'so that liquidation of the estate's assets need not be delayed while such disputes are being litigated.'"  *TransUnion Risk & Alternative Data Sols., Inc. v Best One, Inc. (In re TLFO, LLC)*, 572 BR 391, 435-436 (Bankr S.D. Fla. 2016).

57.    "The authority to sell free and clear is broad because it reflects a compelling policy intended by Congress in § 363. [T]he purpose behind the free and clear language is to maximize the value of the asset, and thus enhance the payout made to creditors.  Without free and clear language, prospective buyers would be unwilling to pay a fair price for the property subject to sale; instead, the price would have to be discounted, perhaps quite substantially, to account for the liabilities that the buyer would face simply as a result of acquiring the asset." *In re Mundy Ranch, Inc.*, 484 BR 416, 422-23 (Bankr. D.N.M. 2012), quoting *In re Medical Software Solutions*, 286 B.R. 431, 446-47 (Bankr. D. Utah 2002).

58.    Based upon the evidence presented and arguments to be made at the Sale Hearing, the Debtors seek entry of an order authorizing the sale of the New Windsor Real Estate to the Purchaser, free and clear of all liens, claims, interests and encumbrances except the DASNY Bond and, if prior to its expiration, the GNC Lease.

### F.    Assumption and Assignment of the GNC Lease

59.    The Debtors and Purchaser, as applicable, have met all the requirements of sections 365(b) and 365(f) of the Bankruptcy Code, in connection with the assumption and assignment of the GNC Lease to Purchaser. The GNC Lease is an "unexpired lease" within the meaning of Section 365 of the Bankruptcy Code.

60.    The Debtors seek authority, in accordance with sections 105(a), 363(f), and 365 of the Bankruptcy Code, to assume and assign the GNC Lease to the Purchaser, only in connection with the assignment by the Debtors to the Purchaser as provided by this Sale Order, free and clear of (a) all interests including, but not limited to, any liens, claims, rights, interests, charges, or encumbrances, except with respect to any interests that run with the land, including those related to reciprocal easement agreements or that may be assumed liabilities under the PSA ("Interests"),

and any Interests shall attach to the proceeds in the same order and priority, as applicable, and subject to all existing defenses, claims, setoffs, and rights and (b) any and all claims (as that term is defined in section 101(5) of the Bankruptcy Code), obligations, demands, guarantees of or by the Debtors, debts, rights, contractual commitments, restrictions, interests, and matters of any kind and nature, whether arising prior to or subsequent to the commencement of these chapter 11 cases, and whether imposed by agreement, understanding, law, equity, or otherwise (including claims and encumbrances (A) that purport to give to any party a right or option to effect any forfeiture, modification, or termination of the interest of any Debtor or Purchaser, as the case may be, in the GNC Lease, provided that any such assignment shall not be free and clear of any accrued but unbilled or not due rent and charges under the GNC Lease, including adjustments, reconciliations, and indemnity obligations irrespective of when accrued, liability for which shall be assumed by the Purchaser or (B) in respect of any taxes.

61.    The Debtor submit that the assumption and assignment of the GNC Lease, as approved by this Sale Order and as set out in the PSA, will constitute a legal, valid, and effective transfer of the GNC Lease and vest the Purchaser with all rights, titles, and interests to the GNC Lease.  Upon the closing of the Sale, the Purchaser shall be fully and irrevocably vested with all right, title, and interest of the Debtors under the GNC Lease and, pursuant to section 365(k) of the Bankruptcy Code, the Debtors shall be relieved from any further liability with respect to the GNC Lease.

### G.    The Sale Will Be Consummated in Good Faith and the Purchaser is a Good Faith Purchaser

62.    Section 363(m) of the Bankruptcy Code protects a good faith purchaser's interest in property purchased from a debtor notwithstanding that the sale conducted under Section 363(b)

31071035.1

of the Bankruptcy Code is later reversed or modified on appeal.  Specifically, Section 363(m) of

the Bankruptcy Code states that:

> The reversal or modification on appeal of an authorization under [section 363(b)] ... does not affect the validity of a sale ... to an entity that purchased ... such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale ... were stayed pending appeal.

11 U.S.C. § 363(m).

63.    Section 363(m) of the Bankruptcy Code fosters the "'policy of not only affording

finality to the judgment of the [B]ankruptcy [C]ourt, but particularly to give finality to those orders

and judgments upon which third parties rely.'" *Reloeb Co. v. LTV Corp (In re Chateaugay Corp.)*,

1993 U.S. Dist. Lexis 6130, at *9 (S.D.N.Y. May 10, 1993) (quoting *In re Abbotts Dairies of Pa.*,

Inc., 788 F.2d 143, 147 (3d Cir. 1986)); *see also Allstate Ins. Co. v. Hughes*, 174 B.R. 884, 888

(S.D.N.Y. 1994) ("Section 363(m) . . . provides that good faith transfers of property will not be

affected by the reversal or modification on appeal of an unstayed order, whether or not the

transferee knew of the pendency of the appeal"); *In re Stein & Day, Inc.*, 113 B.R. 157, 162 (Bankr.

S.D.N.Y. 1990) ("pursuant to 11 U.S.C. § 363(m), good faith purchasers are protected from the

reversal of a sale on appeal unless there is a stay pending appeal").  The Second Circuit has held

that a purchaser's good faith is shown by the integrity of his or her conduct during the course of

the sale proceedings, finding that where there is a lack of such integrity, a good faith finding may

not be made.  *See, e.g., Licensing By Paolo, Inc. v. Sinatra (In re Gucci)*, 126 F.3d 380, 390 (2d

Cir. 1997) (holding that a purchaser's good faith is lost by "fraud, collusion between the purchaser

and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders")

(internal citations omitted).

64.    The PSA was executed by McQuade and the Purchaser at arms' length and in good

faith.  All parties in interest will have an opportunity to evaluate and object, if necessary, to any

particular party's conduct or a finding in the Sale Order that section 363(m) of the Bankruptcy Code applies. Accordingly, the Debtors seek a finding that the Purchaser is a good faith purchaser entitled to the full protections afforded by section 363(m) of the Bankruptcy Code. A finding of this nature will protect the Purchaser in the event of an appeal and maximize the value to the estate and creditors.

65.     For the reasons stated above, the Court should approve the Sale of New Windsor Real Estate to the Purchaser under the PSA.

**H.      Rejection of Residential Lease**

66.     The New Windsor Real Estate is subject to a lease agreement between McQuade, as landlord, and St. Christopher's, as tenant, for McQuade's residential units, dated January 1, 2012 (the "Residential Lease"). Since all of the Debtors' programs are closed and they are no longer utilizing the residential units, it makes economic sense to reject the Residential Lease, effective as of the closing of the Sale, so that the New Windsor Real Estate can be delivered to the Purchaser free of such lease.

67.     As the Residential Lease between the two Debtors must be rejected as part of the Sale and is therefore burdensome to the Debtors' estate, the Debtors' business judgment is to reject the Residential Lease. *In re Balco Equities Ltd.*, 323 BR 85, 99 (Bankr. S.D.N.Y. 2005) quoting *In re G Survivor Corp.,* 171 B.R. 755, 757 (Bankr. S.D.N.Y. 1994) ("Generally, absent a showing of bad faith, or an abuse of business discretion, the debtor's business judgment [in determining to reject an executory contract] will not be altered.").

68.     Therefore, the Debtor request that the Sale Order provide that the Residential Lease shall be deemed rejected automatically, without further action required, effective immediately on the closing of the Sale.

## NOTICE AND NO PRIOR REQUEST

69.     Notice of this Motion has been provided to: (i) the Office of the United States Trustee; (ii) the Subchapter V Trustee; (iii) counsel to Purchaser; (iv) counsel to DASNY; (v) counsel to the Bond Trustee; (vi) counsel to the DIP Loan lender; (vii) all parties that have requested or that are required to receive special notice pursuant to Bankruptcy Rule 2002; (viii) all persons known or reasonably believed by the Debtors to have asserted any lien, claim, encumbrance, right of first refusal, or other interest in or upon the New Windsor Real Estate; (ix) all persons known or reasonably believed to have expressed an interest in acquiring the New Windsor Real Estate within the last six (6) months; (x) all taxing authorities, including the Internal Revenue Service and all other federal, state and local taxing and regulatory authorities reasonably expected by the Debtors to have claims, contingent or otherwise, in connection with the ownership of the New Windsor Real Estate, or to have any known interest in the relief requested by the Motion; (xi) New York State Education Department; (xii) the Office of the New York State Attorney General, both regional and capital offices; and (xiii) all parties to any litigation involving the Debtors.  In light of the nature of the relief requested herein and the potential harm to the Debtors' estates if the relief requested herein is not granted, the Debtors respectfully submit that no other or further notice need be provided.

70.     No previous request for the relief sought herein has been made to this or any other court.

**WHEREFORE**, the Debtors respectfully request that this Court enter the order granting

the relief requested herein and for such other and further relief as is just and proper.


Dated:  April 3, 2025
       New York, New York

                                                **BARCLAY DAMON LLP**

                                                By: */s/ Ilan Markus*
                                                Janice B. Grubin
                                                Ilan Markus
                                                Scott L. Fleischer
                                                1270 Avenue of the Americas, Suite 501
                                                New York, New York 10020
                                                Telephone:  (212) 784-5800
                                                jgrubin@barclaydamon.com
                                                imarkus@barclaydamon.com
                                                sfleischer@barclaydamon.com

                                                *Counsel to Debtors and Debtors-in-Possession*

31071035.1