**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| ST. CHRISTOPHER'S, INC., *et al.*,[1] | : | Case No. 24-22373 (shl) |
| | : | Main Case |
| Debtors. | : | Jointly Administered |

**ORDER (I) APPROVING THE PRIVATE SALE OF THE NEW WINDSOR REAL ESTATE BY DEBTOR THE MCQUADE FOUNDATION TO 621 BLOOMING GROVE LLC UNDER THE PURCHASE AND SALE AGREEMENT FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS, AND ENCUMBRANCES EXCEPT FOR CERTAIN PERMITTED LIENS; (II) AUTHORIZING THE POTENTIAL ASSUMPTION AND ASSIGNMENT OF THE GNC LEASE AND THE REJECTION OF THE RESIDENTIAL LEASE IN CONNECTION THEREWITH; AND (III) GRANTING RELATED RELIEF**

Upon the motion dated April 3, 2025 (the "Motion")[2] of St. Christopher's, Inc. ("St. Christopher's") and The McQuade Foundation ("McQuade"), the above-captioned debtors and debtors-in-possession (collectively, the "Debtors") in the above-captioned Subchapter V Chapter 11 cases (the "Chapter 11 Cases"), pursuant to sections 105(a), 363, and 365 of Title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq*. (the "Bankruptcy Code"), Rules 2002, 6004, 6006, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and the Local Bankruptcy Rules for the Southern District of New York (the "Local Rules"), requesting entry of an order (a) approving the private sale of approximately 22.1 acres of real property owned by McQuade located in New Windsor, New York 12553, as described more specifically in the Collins Declaration (the "New Windsor Real Estate") by McQuade to 621 Blooming Grove LLC (the "Purchaser") under the Purchase and Sale Agreement dated February 14, 2025 (the "PSA") in the

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are: St. Christopher's, Inc. (0485) and The McQuade Foundation (2652).

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion or the PSA, as applicable. In the event a discrepancy between the definitions contained in the Motion and PSA, those contained in the PSA shall control.

form annexed hereto as **Exhibit A** free and clear of liens, claims, encumbrances and interests except for the DASNY Bonds and the GNC Lease (as defined below); (b) authorizing the potential assumption and assignment of the unexpired lease of nonresidential real property between McQuade and Greenburgh-North Castle Union Free School District ("GNC") dated January 1, 2012 (the "GNC Lease") and the rejection of the Residential Lease (as defined herein); and (c) granting related relief (collectively, the "Sale"); and upon the Purchaser and McQuade having entered into the PSA; and the Debtors having determined in their business judgment, after an extensive marketing and sale process, that Purchaser has submitted the highest or otherwise best offer for the New Windsor Real Estate and that receipt of the proposed Sale proceeds under the PSA is in the best interests of the Debtors' estates and have, in the exercise of their business judgment, approved the Sale, subject only to this Court's approval of the Sale; and all parties in interest having been heard or having had the opportunity to be heard regarding the Sale and the PSA and all relief related thereto; and upon due, adequate and proper notice of the Motion, the PSA, and all other related transactions contemplated thereunder and in this Sale Order having been given and that no other or further notice need be given; and the Court having conducted a hearing (the "Sale Hearing") to consider entry of the Motion on April 24, 2025;

**AND** the Court finding and determining that:

A.    Jurisdiction.  This Court has jurisdiction over the Motion and the transactions contemplated therein pursuant to 28 U.S.C. § 1334, and this matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

B.    Venue.  Venue in this district is proper under 28 U.S.C. §§ 1408 and 1409.

C.    Statutory and Legal Predicates.  The statutory and legal predicates for the relief requested in the Motion are Bankruptcy Code sections 105(a), 363 and 365, Bankruptcy Rules

2002, 6004, and 6006, Local Rule 9014, and applicable provisions of the Amended Guidelines for

the Conduct of Asset Sales, Approved by Administrative Order Number 383 in the United States

Bankruptcy Court for the Southern District of New York (as amended, the "Asset Sale

Guidelines").

D.     Notice.  In accordance with the Motion, and as evidenced by the Certificate of

Service of Audrey A. Vrooman filed with this Court [Docket No. 213] (the "Certificate of

Service"), the Debtors served the Notice of and Motion on the (i) Office of the United States

Trustee; (ii) Subchapter V Trustee; (iii) counsel to Purchaser; (iv) counsel to DASNY; (v) counsel

to the Bond Trustee; (vi) all parties that have requested or that are required to receive special notice

pursuant to Bankruptcy Rule 2002; (vii) all persons known or reasonably believed by the Debtors

to have asserted any lien, claim, encumbrance, right of first refusal, or other interest in or upon the

New Windsor Real Estate; (viii) all persons known or reasonably believed to have expressed an

interest in acquiring the New Windsor Real Estate within the six (6) months prior to the motion;

(ix) all taxing authorities, including the Internal Revenue Service and all other federal, state, and

local taxing and regulatory authorities reasonably expected by the Debtors to have claims,

contingent or otherwise, in connection with the ownership of the New Windsor Real Estate, or to

have any known interest in the relief requested by the Motion; (x) New York State Education

Department; (x)the Office of the New York State Attorney General, both regional and capital

offices; and (xi) all parties to any litigation involving the Debtors.

E.     Notice Sufficient.  Based upon the Certificate of Service and the evidence presented

at the Sale Hearing, actual written notice of the Motion, the Sale Hearing, the Sale, and the

transactions and PSA contemplated thereby, has been provided in accordance with sections 105(a),

363 and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006, and 9006.  A

reasonable opportunity to object to or be heard regarding the Motion and the relief requested therein and to the entry of this Order has been afforded to those parties entitled to notice pursuant to Bankruptcy Rules 6004(a) and 6006(c).  Based on the representations of counsel at the Sale Hearing, due, proper, timely, adequate, and sufficient notice of the Motion, the Sale Hearing, the Sale, and the transactions and PSA contemplated thereby, has been provided in accordance with sections 102(1), 363 and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006, and 9014 and the Local Bankruptcy Rules.  Notice of the Motion, the Sale Hearing, and the Sale was and is timely, proper, sufficient, appropriate under the particular circumstances, and reasonably calculated to provide the Notice Parties and all other interested parties with timely and proper notice under the circumstances of these Chapter 11 Cases, and no other or further notice with respect to such matters is, or shall be, required.

F.    <u>Sufficiency of Marketing</u>.  (i) The Debtors and their advisors engaged in a robust and extensive marketing and sale process for the New Windsor Real Estate through their post-petition marketing efforts; (ii) the Debtors and their advisors conducted a fair and open sale process; (iii) the sale process and the actions of the Debtors and the Purchaser in connection therewith were non-collusive; and (iv) the process conducted by the Debtors obtained the highest or otherwise best value for the New Windsor Real Estate for the Debtors and their estates, and any other transaction would not have yielded as favorable a result.

G.    <u>Corporate Authority</u>.  Subject to the entry of this Sale Order, McQuade has (i) full requisite corporate or other organizational power and authority to execute, deliver, and perform the PSA and all other documents contemplated thereby and (ii) taken all requisite corporate or other organizational action and formalities necessary to authorize and approve the execution, delivery and performance of the PSA and to consummate the transactions contemplated by the

PSA (including the Sale) (collectively, the "<u>Transactions</u>"), including as required by its organizational documents and, upon execution thereof, the PSA and the related documents will be duly and validly executed and delivered by McQuade and enforceable against McQuade in accordance with its terms and, assuming due authorization, execution, and delivery thereof by the other parties thereto, will constitute a valid and binding obligation of McQuade.  No government, regulatory, or other consents or approvals, other than those expressly provided for in the PSA or this Sale Order are required for the execution, delivery, and performance by the Debtors of the PSA and the consummation of the Transactions contemplated thereby.  No consents or approvals of the Debtors, other than those expressly provided for in the PSA or this Sale Order, are required to consummate the Sale.

H.    <u>Arm's-Length and Purchaser's Good Faith</u>.    The PSA was negotiated and is undertaken by McQuade and its management and board of directors, and the Purchaser, its management and board of directors or equivalent governing body, at arm's length without collusion or fraud, and in good faith within the meaning of section 363(m) of the Bankruptcy Code. The Purchaser is not an "insider" of either Debtor as that term is defined by section 101(31) of the Bankruptcy Code.  The Purchaser recognized that the Debtors were free to deal with any other party interested in acquiring the New Windsor Real Estate.  Neither the Debtors nor the Purchaser has engaged in any conduct that would cause or permit the PSA or the consummation of the Sale to be avoided, or costs or damages to be imposed, under section 363(n) of the Bankruptcy Code. All payments to be made by the Purchaser and other agreements or arrangements entered into by the Purchaser in connection with the Sale have been disclosed, neither the Purchaser nor the Debtors have violated section 363(n) of the Bankruptcy Code by any action or inaction, and no common identity of directors, managers or controlling stockholders exists between and among the

Purchaser on the one hand, and either Debtor, on the other.  As a result of the foregoing, the Purchaser is a "good faith" purchaser within the meaning of section 363(m) of the Bankruptcy Code, and as such, is entitled to the full rights, benefits, privileges, and protections afforded thereby, including in the event this Sale Order or any portion thereof is reversed or modified on appeal, and each of the Purchaser and Debtors otherwise have proceeded in good faith in all respects in connection with the Sale specifically and these Chapter 11 Cases generally.

I.    <u>Highest or Best Offer</u>.  The total consideration provided by the Purchaser for the New Windsor Real Estate as reflected in the PSA is the highest and best offer received by the Debtors for the New Windsor Real Estate.  No other person or entity or group of persons or entities has submitted a higher or better offer for the New Windsor Real Estate.  Therefore, the Debtors determined that the PSA constituted the highest and best offer and selected the PSA as the successful offer.  The Debtors' determination that the PSA constitutes the highest and best offer and the Debtors' selection of the PSA as the successful offer each constitutes a valid and sound exercise of the Debtors' business judgment and the Debtors' decision to enter into the PSA and the Transactions constitutes a proper exercise of the fiduciary duties of the Debtors.  The offer of the Purchaser, upon the terms and conditions set forth in the PSA, including the total consideration to be realized by the Debtors thereunder, (i) is the highest or otherwise best offer received by the Debtors after extensive marketing, and (ii) is in the best interests of the Debtors, their creditors, their estates and other parties in interest.  Taking into consideration all relevant factors and circumstances, no other entity has offered to purchase the New Windsor Real Estate for greater value to the Debtors or their estates.

J.    <u>No Fraudulent Purpose</u>.  The PSA was not entered into, and none of the Debtors nor the Purchaser have entered into the PSA, or propose to consummate the Sale, for the purpose

of hindering, delaying or defrauding the Debtors' present or future creditors.  Neither of the

Debtors nor the Purchaser have entered into the PSA, or are proposing to consummate the Sale,

fraudulently for the purpose of statutory and common law fraudulent conveyance and fraudulent

transfer claims whether under the Bankruptcy Code or the laws of the United States, any state,

territory, possession thereof, the District of Columbia or any other applicable jurisdiction with

laws substantially similar to the foregoing.

K.     Transfer of Assets Free and Clear Except for Certain Permitted Liens.  McQuade

is the sole and lawful owner of the New Windsor Real Estate and title thereto is vested in

McQuade's estate within the meaning of section 541(a) of the Bankruptcy Code.  The transfer of

the New Windsor Real Estate to the Purchaser will be, as of the Closing Date, a legal, valid, and

effective transfer of the New Windsor Real Estate, which transfer vests or will vest the Purchaser

with all right, title, and interest of McQuade to the New Windsor Real Estate free and clear of all

liens, claims (including those that constitute a "claim" as defined in section 101(5) of the

Bankruptcy Code), interests, rights, liabilities, security interests, hypothecations, preferences,

debts, suits, licenses, options, judgments, orders and decrees of any court, taxes (including, without

limitation, income tax, sales tax, and use tax assessed by foreign, state and local taxing authorities),

covenants, or restrictions, against any of the Debtors or the New Windsor Real Estate, including,

without limitation, any debts arising under or out of, in connection with, or in any way relating to,

any acts or omissions, obligations, demands, guaranties, *de facto* merger claims, causes of action

(whether in law or in equity, under any law), whether arising prior to or subsequent to the

commencement of these Chapter 11 Cases, whether known or unknown, contingent or matured,

perfected or unperfected, liquidated or unliquidated, statutory or non-statutory, legal or equitable

or otherwise arising under or out of, in connection with, or in any way related to any of the Debtors,

any of the Debtors' interests in the New Windsor Real Estate, the operation of any of the Debtors' businesses before the effective time of the Closing (collectively, "Claims") with such transfer as set forth above except with the New Windsor Real Estate remaining subject to the DASNY Bonds and the GNC Lease being assumed and assigned to the Purchaser upon the Closing. The Debtors served the Notice of Sale Hearing together with a copy of the Motion on all parties who are known or reasonably believed, after reasonable inquiry, to have asserted any Claims or other interests with respect to the New Windsor Real Estate. The Purchaser would not have entered into the PSA and would not consummate the Transactions contemplated thereby if the sale of the New Windsor Real Estate that is owned by McQuade was not free and clear of all Claims and other interests other than the DASNY Bonds and GNC Lease, or if the Purchaser would, or in the future could, be liable for any such Claims or interests. A sale of the New Windsor Real Estate other than one free and clear of all Claims and interests with the exception of the DASNY Bonds and the GNC Lease would adversely impact the Debtors, their estates and their creditors, and would yield substantially less value for the Debtors' estates, with less certainty than the Sale.

L.      Satisfaction of Section 363(d) Standards. The Debtors, as not-for-profit entities, are authorized to sell the New Windsor Real Estate in accordance with non-bankruptcy law applicable to the transfer of property by a not-for-profit debtor, and the Sale would not be inconsistent with any relief granted under subsection (c), (d), (e), or (f) of section 363.

M.      Satisfaction of Section 363(f) Standards. The Debtors are also authorized to sell the New Windsor Real Estate free and clear of all Claims and interests (except for Assumed Liabilities, Permitted Encumbrances, and the DASNY Bonds and the GNC Lease, with the GNC Lease being assumed and assigned to the Purchaser upon the Closing) because, with respect to each creditor or other person or entity asserting a Lien or other interest, one or more of the

standards set forth in section 363(f)(l)-(5) of the Bankruptcy Code has been satisfied. Each creditor or other person or entity asserting a Lien or other interest has, subject to the terms and conditions of this Order, consented to the Sale or is deemed to have consented. All parties in interest, including without limitation any holders of Claims or other interests that did not object, who withdrew their objection, or whose objections were overruled, to the Sale or the Motion, are deemed to have consented to the relief granted herein pursuant to section 363(f)(2) of the Bankruptcy Code. Those holders of Claims who did object that have an interest in the New Windsor Real Estate could be compelled in a legal or equitable proceeding to accept money satisfaction of such Claim pursuant to section 363(f)(5) or fall within one or more of the other subsections of section 363(f) of the Bankruptcy Code and are therefore adequately protected by having their Claims and other interests in the New Windsor Real Estate, if any, attach solely to the proceeds of the Sale ultimately attributable to the property in which they have an interest, in the same order of priority and with the same validity, force and effect that such holders had prior to the Sale, subject to any defenses of the Debtors. All persons having Claims or other interests of any kind or nature whatsoever against the Debtors or the New Windsor Real Estate shall be forever barred, estopped and permanently enjoined from creating, perfecting, pursuing, enforcing, attaching, collecting, recovering, or asserting such Claims or other interests against the Purchaser or any of its assets, property, affiliates, successors, assigns, or the New Windsor Real Estate.

N.    <u>No Successor Liability</u>. The Purchaser is not a mere continuation of the Debtors or their estates, and there is no continuity of enterprise or common identity between the Purchaser and the Debtors. The Purchaser is not holding itself out to the public as a continuation of the Debtors or their estates. The Purchaser is not an "insider" or "affiliate" of either Debtor, as those terms are defined in the Bankruptcy Code, and no continuity or common identity of incorporators,

directors, managers or stockholders exists now or has ever existed between the Purchaser on the one hand, and the Debtors, on the other. The conveyance of the New Windsor Real Estate does not amount to a consolidation, merger or *de facto* merger of the Purchaser and the Debtors or the Debtors' estates, there is not substantial continuity between the Purchaser and the Debtors, and the Purchaser does not constitute a successor to the Debtors or the Debtors' estates. The Purchaser's acquisition of the New Windsor Real Estate shall be free and clear of any "successor liability" claims of any nature whatsoever, whether known or unknown and whether asserted or unasserted as of the Closing.

O.    <u>Sale as an Exercise of Business Judgment</u>. The Debtors have demonstrated good, sufficient, and sound business purposes and justifications for approval of or entry into the Motion, the Sale, the PSA, and all related agreements (the "<u>Related Agreements</u>"). The Debtors' entry into and performance under the PSA and Related Agreements: (i) are a result of due deliberation by the Debtors and constitute a sound and reasonable exercise of the Debtors' business judgment consistent with their fiduciary duties; (ii) provide value to and are beneficial to the Debtors' estates and are in the best interests of the Debtors and their estates, creditors and other parties in interest; and (iii) are reasonable and appropriate under the circumstances. Business justifications for the Sale include, but are not limited to, the following: (x) the purchase price set forth in the PSA constitutes the highest or otherwise best offer received for the New Windsor Real Estate; (y) the PSA and the transactions contemplated thereby present the best opportunity to maximize the value of the New Windsor Real Estate; and (z) the value of the Debtors' estates will be maximized through the sale of the New Windsor Real Estate pursuant to the PSA.

P.    <u>Compelling Reasons for an Immediate Sale.</u>    Good and sufficient reasons for approval of the PSA have been articulated by the Debtors, and the Debtors' decision to enter into

the PSA and the Transactions contemplated thereby represents an exercise of sound business judgment.  The Debtors have demonstrated compelling circumstances for the Sale outside of: (a) the ordinary course of business, pursuant to section 363(b) of the Bankruptcy Code; and (b) a plan of liquidation  in that, among other things, the immediate consummation of the Sale to the Purchaser is necessary and appropriate to preserve and to maximize the value of the Debtors' estates.  Accordingly, there is cause to lift the stay contemplated by Bankruptcy Rules 6004 and 6006 with respect to the transactions contemplated by this Sale Order and give immediate effect to the Sale Order upon entry.

Q.    <u>No Sub Rosa Plan</u>.  The PSA and the Sale does not constitute a *sub rosa* chapter 11 plan.  Neither the PSA nor the Sale impermissibly restructures the rights of the Debtors' creditors, nor impermissibly dictates the terms of a chapter 11 plan or plans for the Debtors.

R.    <u>Final Order</u>.  This Sale Order constitutes a final order within the meaning of 28 U.S.C. § 158(a).  Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), and to any extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rule 7054, the Court expressly finds that there is no just reason for delay in the implementation of this Sale Order, waives any stay, and expressly directs entry of judgment as set forth herein.  The Debtors have demonstrated compelling circumstances and a good, sufficient, and sound business purpose and justification for the immediate approval and consummation of the Sale as contemplated by the PSA.  Purchaser, being a good faith purchaser under section 363(m) of the Bankruptcy Code, may close the Sale contemplated by the PSA at any time after entry of this Sale Order.

**IT IS THEREFORE ORDERED, ADJUDGED AND DECREED THAT**:

1.      <u>Motion Granted</u>.  The relief requested in the Motion is GRANTED as set forth herein.

2.      <u>Findings of Fact and Conclusions</u>.  Any of the findings of fact contained herein shall constitute a finding of fact even if it is stated as a conclusion of law, and any conclusion of law contained herein shall constitute a conclusion of law even if it is stated as a finding of fact. The Court's findings of fact and conclusions of law in the record of the Sale Hearing are incorporated herein by reference.

3.      <u>Objections Overruled</u>.  All objections, if any, with regard to the relief sought in the Motion that have not been withdrawn, waived, settled, or otherwise dealt with as expressly provided herein or on the record at the Sale Hearing are hereby overruled on the merits, with prejudice.

4.      <u>Notice</u>.  Notice of the Motion, the Sale Hearing, the Sale, and the transactions and PSA contemplated thereby was fair and equitable under the circumstances and complied in all respects with section 102(1), 363, and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, and 6006.

5.      <u>Approval</u>.  Pursuant to sections 105, 363 and 365 of the Bankruptcy Code, the PSA, Sale, Related Agreements, and the other Transactions are hereby approved and the Debtors are authorized and directed to consummate the Sale by private sale to Purchaser in accordance with the terms of the PSA and this Sale Order.  The Debtors, as well as their officers, board members, employees, and agents are each hereby authorized and directed to take any and all actions necessary or appropriate to:  (a) consummate the Sale of the New Windsor Real Estate to the Purchaser and the Closing of the Sale and the Transactions pursuant to the PSA and this Sale Order

and (b) execute, deliver, perform, consummate, implement and close fully the PSA together with any and all additional instruments and documents that may be reasonably necessary or desirable to implement the PSA.  The Debtors are hereby authorized and directed to perform each of their respective covenants and undertakings as provided in the PSA prior to or after the Closing of the Sale without further order of the Court.  The failure specifically to include any particular provision of the PSA in this Sale Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the PSA (including, but not limited to, all ancillary agreements and Related Agreements contemplated thereby) be authorized and approved in its entirety.  All Persons are prohibited from taking any action to adversely affect or interfere with the ability of the Debtors to transfer the New Windsor Real Estate to the Purchaser in accordance with the PSA and this Sale Order.

6.      <u>Fair Purchase Price</u>.  The consideration provided by the Purchaser under the PSA is fair and reasonable and constitutes (i) reasonably equivalent value under the Bankruptcy Code and the Uniform Fraudulent Transfer Act or the Uniform Voidable Transactions Act, as applicable, (ii) fair consideration under the Uniform Fraudulent Conveyance Act or the Uniform Voidable Transactions Act, as applicable, and (iii) reasonably equivalent value, fair consideration and fair value under any other applicable laws of the United States, any state, territory or possession or the District of Columbia.

7.      <u>Amendments to PSA</u>.  The PSA and any related agreements, documents, or other instruments may be modified, amended, supplemented or restated by the parties thereto in a writing signed by such parties and in accordance with the terms thereof, without further order of this Court, provided that any such modification, amendment, supplement or restatement does not have a material adverse effect on the Debtors' estates.  The PSA and the Debtors' obligations therein shall

not be altered, amended, rejected, discharged or otherwise affected by any chapter 11 plan proposed or confirmed in these Chapter 11 Cases without the prior written consent of the Purchaser.

8.    <u>Transfer Free and Clear.</u>  One or more of the standards set forth in section 363(f)(1)-(5) of the Bankruptcy Code has been satisfied.  Pursuant to sections 105 and 363 of the Bankruptcy Code, the New Windsor Real Estate is conveyed by McQuade to the Purchaser free and clear of any Claims and other interests (except for Assumed Liabilities, Permitted Encumbrances, and the DASNY Bonds and GNC Lease, with the GNC Lease being assumed and assigned to the Purchaser upon the Closing).  The Debtors are authorized to transfer the New Windsor Real Estate in accordance with the terms of the PSA and this Sale Order.  The New Windsor Real Estate shall be transferred to the Purchaser in accordance with the terms of the PSA and this Sale Order, and upon the Closing, such transfer shall:  (i) be valid, legal, binding and effective; (ii) vest the Purchaser with all right, title and interest of the Debtors in the New Windsor Real Estate; and (iii) be free and clear of all Claims and any other claims and interests in accordance with section 363(f) of the Bankruptcy Code (except for Assumed Liabilities and Permitted Encumbrances and the GNC Lease).  Except as otherwise provided in this Order, all Persons having Claims or other interests of any kind or nature whatsoever against the Debtors or the New Windsor Real Estate shall be forever barred, estopped and permanently enjoined from creating, perfecting, pursuing, enforcing, attaching, collecting, recovering, or asserting such Claims or other interests against the Purchaser or any of its assets, property, affiliates, successors, assigns, or the New Windsor Real Estate.

(a)    Notwithstanding the foregoing or anything to the contrary contained herein or in any prior Order of this Court, (i) the Claims, liens, security interests, and other interests of The Dormitory Authority of the State of New York ("<u>DASNY</u>") on, in, and to the

New Windsor Real Estate, pursuant to that certain The McQuade Foundation Insured Revenue

Bonds, Series 2005 (the "DASNY Bonds") and all agreements, instruments, and documents

related thereto (including the Operating Agreement) (together with the DASNY Bonds, the

"Bond Documents") shall continue to exist on, in, and to the proceeds of the sale of the New

Windsor Real Estate (the "Sale Proceeds") in the same order, manner, and priority as they

existed on, in, and to the New Windsor Real Estate as security for all indebtedness, liabilities,

expenses, and other obligations of McQuade owed to DASNY under the Bond Documents (the

"Bond Obligations"); and (ii) upon the closing and consummation of the sale of the New

Windsor Real Estate, Sale Proceeds in an amount sufficient to repay all outstanding Bond

Obligations in full, including without limitation, the fees and expenses of AMBAC, DASNY and

the Bond Trustee payable in connection with such Bond Obligations shall be immediately paid to

DASNY (provided that, in the event there is a dispute regarding the amount of the fees and

expenses of AMBAC, DASNY and the Bond Trustee payable in connection with such Bond

Obligations, the disputed amount claimed by AMBAC, DASNY and the Bond Trustee shall be

segregated from the Sales Proceeds and held in escrow pending either agreement among

McQuade, AMBAC, DASNY and the Bond Trustee or order of this Court regarding the allowed

amount of such disputed fees and expenses) and promptly applied by DASNY to the fees and

expenses of AMBAC, DASNY and the Bond Trustee, unless DASNY agrees to different

treatment under terms and conditions, and pursuant to agreements, instruments, documents, and

further Orders of this Court, acceptable to DASNY in its sole and absolute discretion (except to

the extent that the different treatment affects the rights of and interests of AMBAC or the Bond

Trustee, in which event only with consent of each affected party).

(b)      Nothing in this Order shall otherwise impact, impair or alter: (i) DASNY's first liens on the funds in the possession of the Bond Trustee, which funds shall be applied in accordance with the terms of the Bond Documents to pay principal, interest, fees and expenses due under the Bond Documents on the final maturity date of the DASNY Bonds without further order of the Court or (ii) the right of GNC to occupy the Leased Premises (as defined in the GNC Lease) until July 1, 2025 which date is the final maturity date of the DASNY Bonds and the Stated Expiration Date (as defined in the GNC Lease).

9.      <u>Surrender of Possession</u>.  The New Windsor Real Estate shall be delivered to the Purchaser and deemed delivered at the time of Closing (or such other time as provided in the PSA).

10.      <u>Vesting of New Windsor Real Estate in the Purchaser</u>.  Effective upon the Closing, the transfer to the Purchaser of the New Windsor Real Estate pursuant to the PSA shall be, and hereby is deemed to be, a legal, valid, and effective transfer of the New Windsor Real Estate, and will vest in the Purchaser the New Windsor Real Estate free and clear of Claims.

11.      <u>Assumption and Assignment of the GNC Lease</u>.  The Debtors and Purchaser, as applicable, have met all the requirements of sections 365(b) and 365(f) of the Bankruptcy Code, in connection with the assumption and assignment of the GNC Lease to Purchaser. The GNC Lease is an "unexpired lease" within the meaning of Section 365 of the Bankruptcy Code.

12.      The Debtors are hereby authorized, in accordance with sections 105(a), 363(f), and 365 of the Bankruptcy Code, to assume and assign the GNC Lease to the Purchaser, only in connection with the assignment by the Debtors to the Purchaser as provided by this Sale Order, free and clear of (a) all interests including, but not limited to, any liens, claims, rights, interests, charges, or encumbrances, except with respect to any interests that run with the land, including those related to reciprocal easement agreements or that may be assumed liabilities under the PSA

16

("Interests"), and any Interests shall attach to the proceeds in the same order and priority, as applicable, and subject to all existing defenses, claims, setoffs, and rights and (b) any and all claims (as that term is defined in section 101(5) of the Bankruptcy Code), obligations, demands, guarantees of or by the Debtors, debts, rights, contractual commitments, restrictions, interests, and matters of any kind and nature, whether arising prior to or subsequent to the commencement of these chapter 11 cases, and whether imposed by agreement, understanding, law, equity, or otherwise (including claims and encumbrances (A) that purport to give to any party a right or option to effect any forfeiture, modification, or termination of the interest of any Debtor or Purchaser, as the case may be, in the GNC Lease, provided that any such assignment shall not be free and clear of any accrued but unbilled or not due rent and charges under the GNC Lease, including adjustments, reconciliations, and indemnity obligations irrespective of when accrued, liability for which shall be assumed by the Purchaser or (B) in respect of any taxes. The assumption and assignment of the GNC Lease, as approved by this Sale Order and as set out in the PSA, constitutes a legal, valid, and effective transfer of the GNC Lease and vests the Purchaser with all rights, titles, and interests to the GNC Lease.  Upon the closing of the Sale, the Purchaser shall be fully and irrevocably vested with all right, title, and interest of the Debtors under the GNC Lease and, pursuant to section 365(k) of the Bankruptcy Code, the Debtors shall be relieved from any further liability with respect to the GNC Lease.

13.    Injunction.  Except as expressly provided in the PSA or by this Sale Order, effective upon the Closing, all persons and entities, including, but not limited to, all debt holders, governmental, tax and regulatory authorities, lenders, vendors, suppliers, employees, trade creditors, litigation claimants and other persons holding Claims or other interests in or against the New Windsor Real Estate shall be and hereby are forever barred, estopped and permanently

enjoined from asserting, prosecuting or otherwise pursuing such Claims or other interests. All persons are hereby enjoined from taking any action that would interfere with or adversely affect the ability of the Debtors to transfer the New Windsor Real Estate in accordance with the terms of the PSA and this Sale Order.

14.     <u>Direction to Creditors and Parties in Interest</u>.  On the Closing Date, each of the Debtors' creditors and the holders of any Claims or other interests are authorized and directed to execute such documents and take all other actions as may be necessary to terminate, discharge or release their Claims or other interests against the New Windsor Real Estate, if any, as such Claims or other interests may otherwise exist.

15.     <u>Direction to Government Agencies</u>.  Each and every filing agent, filing officer, title agent, recording agency, governmental department, secretary of state, federal, state and local official, and any other person and entity who may be required by operation of law, the duties of its office or contract, to accept, file, register, or otherwise record or release any documents or instruments or who may be required to report or insure any title in or to the New Windsor Real Estate, is hereby authorized and directed to accept any and all documents and instruments necessary and appropriate to consummate the Sale and any other Transactions contemplated by the PSA and approved by this Sale Order.

16.     <u>Good Faith Purchaser</u>.  The Purchaser is entitled to the full rights, benefits, privileges, and protections afforded by section 363(m) of the Bankruptcy Code, and the Purchaser has proceeded in good faith in all respects in connection with the Sale specifically and these Chapter 11 Cases generally.

17.     <u>Consummation of Sale Transaction</u>.  Pursuant to sections 105, 363, and 365 of the Bankruptcy Code, the Debtors, as well as their officers, board member, employees, and agents, are

authorized to enter into, execute, deliver and perform their obligations under and comply with the terms of the PSA and the Related Agreements and to close and consummate the Sale, including by taking any and all actions as may be reasonably necessary or desirable to implement the Sale and each of the Transactions contemplated thereby pursuant to and in accordance with the terms and conditions of the PSA, the Related Agreements, and this Sale Order.

18.     <u>Transfer of Marketable Title</u>.  Upon the Closing, this Sale Order shall be construed and shall constitute for any and all purposes a full and complete general assignment, conveyance and transfer of the New Windsor Real Estate or a bill of sale transferring good and marketable title in the New Windsor Real Estate to the Purchaser at the Closing pursuant to the terms of the PSA, free and clear of all Claims and other interests.

19.     <u>No Successor Liability</u>.  By virtue of the Sale, the Purchaser and its affiliates, successors and assigns shall not be deemed or considered to:  (i) be a legal successor, or otherwise be deemed a successor to any of the Debtors; (ii) have, *de facto* or otherwise, merged with or into any or all Debtors; (iii) be a consolidation with the Debtors or their estates; or (iv) be an alter ego or a continuation or substantial continuation, or be holding itself out as a mere continuation, of any of the Debtors or their respective estates by any law or equity.  The Purchaser and its affiliates, successors and assigns shall have no successor, transferee or vicarious liability of any kind or character, including, without limitation, under any theory of foreign, federal, state or local antitrust, environmental, successor, tax, ERISA, WARN, assignee or transferee liability, labor, product liability, employment, *de facto* merger, substantial continuity, or other law, rule, regulation or doctrine, whether known or unknown as of the Closing Date, now existing or hereafter arising, whether asserted or unasserted, fixed or contingent, liquidated or unliquidated with respect to the Debtors or any obligations of the Debtors arising prior to the Closing Date, including, without

limitation, liabilities on account of any taxes or other governmental fees, contributions or surcharges, in each case arising, accruing or payable under, out of, in connection with, or in any way relating to, the operation of the Debtors prior to the Closing Date or arising based on actions of the Debtors taken after the Closing Date.

20.    <u>Approval to Release Claims and Interests</u>.  If any person or entity that has filed financing statements or other documents or agreements evidencing Claims or other interests on or in the New Windsor Real Estate shall not have delivered to the Debtors before the Closing Date, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of liens, and any other documents necessary for the purpose of documenting the release of all Claims and other interests that the person or entity has or may assert with respect to the New Windsor Real Estate, the Debtors and the Purchaser are hereby authorized to execute and file such statements, instruments, releases and other documents on behalf of such person or entity with respect to the New Windsor Real Estate on or after the Closing Date. The Purchaser is hereby authorized to file, register or otherwise record a certified copy of this Sale Order, which, once filed, registered or otherwise recorded, shall constitute conclusive evidence of the release of all Claims and other interests on or in the New Windsor Real Estate.

21.    <u>Effect of Recordation of Order</u>.  This Sale Order, once filed, registered, or otherwise recorded, (a) shall be effective as a conclusive determination that, upon the Closing Date, all Claims, of any kind or nature whatsoever existing as to the New Windsor Real Estate prior to the Closing Date have been unconditionally released, discharged, and terminated and that the conveyances described herein have been effected, and (b) shall be binding upon and shall govern the acts of all persons and entities.

22.     <u>Inconsistencies with Prior Orders, Pleadings or Agreements</u>.  To the extent this Sale Order is inconsistent with any prior order or pleading with respect to the Motion in these Chapter 11 Cases, the terms of this Sale Order shall govern.  To the extent there is any inconsistency between the terms of this Sale Order and the terms of the PSA (including all ancillary documents executed in connection therewith), the terms of this Sale Order shall govern.

23.     <u>Subsequent Orders and Plan Provisions</u>.  Unless otherwise agreed to by the Debtors and the Purchaser, this Sale Order shall not be modified by any chapter 11 plan confirmed in these Chapter 11 Cases or any subsequent order(s) of this Court.

24.     <u>Binding Effect of Sale Order</u>.  This Sale Order and the PSA shall be binding in all respects upon the Debtors, their estates, all creditors of the Debtors, any holders of Claims on or other interests in the New Windsor Real Estate (whether known or unknown), the Purchaser and all successors and assigns of the Purchaser, notwithstanding the dismissal of any of the Debtors' cases or any subsequent appointment of any trustees, examiners, "responsible persons" or other fiduciaries in these Chapter 11 Cases or upon a conversion of these Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, and the PSA shall not be subject to rejection or avoidance under any circumstances.

25.     <u>No Avoidance of Purchase Agreement</u>.  Neither the Debtors nor the Purchaser have engaged in any conduct that would cause or permit the PSA to be avoided or costs or damages to be imposed under section 363(n) of the Bankruptcy Code.  Accordingly, the PSA and the Sale shall not be avoidable under section 363(n) or chapter 5 of the Bankruptcy Code, and no party shall be entitled to any damages or other recovery pursuant to section 363(n) of the Bankruptcy Code in respect of the PSA or the Sale.

26.    <u>Rejection of Residential Lease</u>.  The New Windsor Real Estate is subject to a lease agreement between McQuade, as landlord, and St. Christopher's, as tenant, for McQuade's residential units, dated January 1, 2012 (the "Residential Lease").   Since all of the Debtors' programs are closed and they are no longer utilizing the residential units, it makes economic sense to reject the Residential Lease, effective as of the closing of the Sale, so that the New Windsor Real Estate can be delivered to the Purchaser free of such lease.  As the Residential Lease between the two Debtors must be rejected as part of the Sale and is therefore burdensome to the Debtors' estate, the Court sees no reason to disturb the Debtors' business judgment to reject the Residential Lease.  *In re Balco Equities Ltd.*, 323 BR 85, 99 (Bankr. S.D.N.Y. 2005) quoting *In re G Survivor Corp.,* 171 B.R. 755, 757 (Bankr. S.D.N.Y. 1994) ("Generally, absent a showing of bad faith, or an abuse of business discretion, the debtor's business judgment [in determining to reject an executory contract] will not be altered.").   Therefore, the Residential Lease shall be deemed rejected automatically, without further action required, effective immediately on the closing of the Sale.

27.    <u>Immediate Effect</u>.  This Sale Order constitutes a final order within the meaning of 28 U.S.C. § 158(a).  Notwithstanding any provision in the Bankruptcy Rules to the contrary, the terms of this Sale Order shall be immediately effective and enforceable upon its entry and not subject to any stay, notwithstanding the possible applicability of Bankruptcy Rule 6004(h), 6006(d), or otherwise.

28.    <u>Satisfaction of Conditions Precedent</u>.  Neither the Purchaser nor the Debtors shall have an obligation to close the Transactions until all conditions precedent in the PSA to each of their respective obligations to close the Transactions have been met, satisfied, or waived in accordance with the terms of the PSA.

29.     <u>Bulk Sales</u>.  No bulk sales law, bulk transfer law or similar law of any state or other jurisdiction shall apply in any way to the transactions contemplated by the PSA, the Sale Motion or this Sale Order.

30.     <u>Automatic Stay</u>.  The Purchaser shall not be required to seek or obtain relief from the automatic stay under section 362 of the Bankruptcy Code to enforce any of its remedies under the PSA, and Related Agreements, documents or other instruments with respect to the New Windsor Real Estate.  The automatic stay imposed by section 362 of the Bankruptcy Code is modified to the extent necessary to implement the provisions of this Sale Order.

31.     <u>Retention of Jurisdiction</u>.  The Court shall retain jurisdiction to, among other things, interpret, implement, and enforce the terms and provisions of this Sale Order and the PSA (and all amendments thereto) and adjudicate, if necessary, any and all disputes concerning the Debtors and related in any way to the Sale; provided, however, that in the event the Court abstains from exercising or declines to exercise jurisdiction or is without jurisdiction, such abstention, refusal or lack of jurisdiction shall have no effect upon and shall not control, prohibit or limit the exercise of jurisdiction of any other court having competent jurisdiction with respect to any such matter.  For the avoidance of doubt, nothing in this Sale Order shall be construed to mean that the Court has jurisdiction over issues concerning an inter-creditor dispute.

Dated:    May 5, 2025
          White Plains, New York

                                    _/s/ Sean H. Lane_
                                    Hon. Sean H. Lane
                                    United States Bankruptcy Judge

## **EXHIBIT A**

**Purchase and Sale Agreement**

## PURCHASE AND SALE AGREEMENT

This Purchase and Sale Agreement (hereinafter "Agreement") is dated February 14 , 2025 for reference purposes by and between **621 Blooming Grove LLC**, ("Buyer"), a New York limited liability company with an address at 368 New Hempstead Road, New City, New York 10956 and **The McQuade Foundation** ("Seller" and, together with the Buyer, the "Parties"), a New York not-for-profit corporation with an address at 623 Blooming Grove Turnpike, New Windsor, New York 12553. This Agreement shall be effective on the date (the "Effective Date") it is executed by Seller and a fully executed counterpart is delivered to Buyer or Buyer's counsel as designated beneath Seller's signature hereof.

**Background**. Seller is the owner of a certain parcel of real property situated in New Windsor, New York as more particularly described in **Schedule A** attached hereto, incorporated herein and made a part hereof (the "Premises"). Seller wishes to sell to Buyer and Buyer wishes to purchase from Seller, the Property (as defined below). On April 29, 2024, Seller filed a voluntary petition for relief under Subchapter V of Chapter 11 of Title 11 of the United States Code (11 U.S.C. Sections 101 *et seq*., as amended, and, collectively with the Federal Rules of Bankruptcy Procedure, the "Bankruptcy Code"), commencing bankruptcy proceedings captioned In re: McQuade Foundation, Case No. 24-22374 (the "Bankruptcy Case"), in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"). The Parties intend to effectuate this Agreement and the transactions contemplated hereby under Sections 105, 363 and 365 of the Bankruptcy Code. This Agreement is subject to approval of the Bankruptcy Court and will be consummated only under the Sale Order (as defined below) to be entered in the Bankruptcy Case and is also subject to approval by the Attorney General of the State of New York or the New York Supreme Court pursuant to Articles 5 and 10 of the New York Not-for-Profit Corporation Law.

In consideration of the foregoing and the agreements hereinafter set forth, the Parties agree as follows:

1.      **PROPERTY TO BE CONVEYED:** In consideration of the Purchase Price hereinafter specified, Seller hereby agrees to sell and convey to Buyer, and Buyer hereby agrees to purchase from Seller, the Premises, together with:

    (a) all of Seller's right, title and interest in the buildings and improvements on the Premises, including all fixtures, heating, ventilation and air conditioning, plumbing and electrical systems, parking areas, landscaping and utilities located on or in and used in connection with such buildings and improvements;

    (b) all right, title and interest of Seller in and to all easements, rights, interests, claims and appurtenances, if any, in any way belonging or appertaining to the Premises; and

    (c) all right, title and interest of Seller in and to all adjoining streets, alleys and other public ways (before or after vacation thereof);

(d) all right, title and interest of Seller in and to easements, rights-of-way, passages, sewer rights, waters, water courses, water rights and powers belonging, relating or pertaining to the Premises; and

(e) All certificates of occupancy or use and all permits, licenses, consents and authorizations held in connection with the ownership, use, occupancy or operation of the Premises to the extent assignable by Seller to Buyer;

subject to the encumbrances and exceptions to title set forth or referred to in **Schedule A** or in paragraph 3(c) below. The Premises, together with (a) through (e) above is hereinafter referred to as the "Property").

2.      **CONSIDERATION**.  (a) The purchase price is Nine Million and 00/100 ($9,000,000.00) DOLLARS U.S. (the "Purchase Price") (subject to adjustment as described in Section 7 below) which Buyer agrees to pay as follows:

| | |
|---|---|
| (i) As the deposit (the "Deposit") upon the signing of this Agreement, receipt of which is hereby acknowledged, by wire transfer to Barclay Damon LLP, as escrow agent (the "Escrow Agent") as described below; | $ 900,000.00 |
| (ii) Upon the Closing, to Seller by wire transfer as described below (such amount, the "Purchase Price Balance") subject to adjustment as described in this Agreement; | $8,100,000.00 |
| TOTAL | **$9,000,000.00** |

(b) The Deposit shall be paid by wire transfer initiated by a financial institution insured by the Federal Deposit Insurance Corporation to the Escrow Agent, who shall hold the same as escrow agent subject to the terms and conditions hereof and release same to Seller at the time of closing or to the party entitled thereto upon sooner termination of this Agreement. Payments to the Escrow Agent hereunder shall be made in accordance with the following wire instructions:

      Bank:  KeyBank National Association
            201 South Warren Street
            Syracuse, NY 13202
            (800) 821-2829
      Routing Number: 021300077
      Account Number: 320900058167
      Account Name: Barclay Damon LLP
      Reference: The McQuade Foundation (3210387)

(c) At Closing, the Purchase Price Balance shall be paid by wire transfer directly to Seller's counsel in accordance with the following wire instructions:

Bank:    KeyBank National Association
          201 South Warren Street
          Syracuse, NY 13202
          (800) 821-2829
Routing Number: 021300077
Account Number: 320900058167
Account Name: Barclay Damon LLP
Reference: The McQuade Foundation (3210387)

3.    **TITLE**. (a) Within fifteen (15) business days after the Effective Date, Buyer shall procure (at its sole cost and expense) a preliminary title commitment for a standard owner's title insurance policy issued by a nationally recognized title company of its choice. Buyer shall (i) provide Seller with a copy of said preliminary title commitment and (ii) notify Seller in writing of Buyer's reasonable disapproval of any exception (each a "Disapproved Exception") contained in said preliminary title commitment that is not set forth in **Schedule A** or Paragraph 3(c) hereof, all within twenty (20) business days after the Effective Date, or Buyer shall be deemed to have approved of all exceptions shown in said preliminary title commitment. If Buyer notifies Seller within the above-described time frame, then Seller shall attempt to obtain the release or termination of each Disapproved Exception. If, on the Closing Date, Seller shall be unable to obtain the release or termination of each Disapproved Exception, then Seller shall be allowed a reasonable postponement of Closing, not to exceed thirty (30) calendar days, within which to obtain the release or termination of each Disapproved Exception by providing notice to Buyer. If at the end of said time Seller is still unable to deliver or cause to be delivered the Deed conveying its interest in the Premises, subject as aforesaid, then Buyer (i) may elect to accept such title as Seller can convey, without modification of the Purchase Price, or (ii) may reject such title by providing Seller with written notice thereof within five (5) business days after the end of such thirty (30) day period, time being of the essence. Upon such rejection, Buyer shall be entitled to a return of the Deposit without interest thereon. Upon receipt of such payment, this Agreement shall terminate and the Parties hereto shall be released and discharged from all further claims and obligations hereunder except those obligations which by the terms of this Agreement survive the termination of this Agreement. If Buyer does not timely provide the notice described in (ii) above, Buyer shall be deemed for all purposes to accept the status of title to the Property as indicated in the above described preliminary title commitment. Notwithstanding the foregoing, no exception shall constitute a Disapproved Exception if Buyer or Seller, at Buyer's expense, can obtain a title insurance policy issued by a title insurance company licensed to do business in the State of New York, at standard rates, naming Buyer as insured in an amount equal to the Purchase Price which either omits or insures over such exception. As used in this Agreement, "business day" means any day other than a Saturday, Sunday or day on which banks in the State of New York are permitted or required to close. Any exception or encumbrance that is not either (i) a Disapproved Exception, (ii) set forth in **Schedule A** or (iii) set forth in Paragraph 3(c) hereof is hereinafter referred to as a "Permitted Encumbrance."

30690598.1

(b)    Notwithstanding the provisions of Paragraph 3(a), the title to be furnished by Seller shall be subject to the items set forth in **Schedule A** and Paragraph 3(c) hereof.

(c)    The Premises will be conveyed to and accepted by Buyer subject to:

(i)    Any and all zoning and/or building restrictions, limitations, regulations, ordinances, and/or laws; any and all building lines; and all other restrictions, limitations, regulations, ordinances and/or laws imposed by any governmental authority and any and all other provisions of any governmental restrictions, limitations, regulations, ordinances and/or public laws.

(ii)    Real property taxes and any and all existing tax payments, municipal liens and assessments, coming due after the Closing Date; Buyer shall by acceptance of the Deed assume and agree to pay, any and all such tax payments, liens and assessments which may after the date hereof be assessed, levied against or become a lien on the Premises.

(iii)    Any state of facts which a survey and/or physical inspection of the Premises might reveal.

(iv)    Common law or riparian rights of others and/or other rights, if any, in and to any natural watercourse or body of water flowing through or adjoining the Premises, and all statutory and other rights of others in and to any such watercourse or body of water.

(v)    The rights of the Greenburgh-North Castle Union Free School District (the "Greenburgh Tenant") pursuant to a Lease Agreement dated January 1, 2012 between Seller and the Greenburgh Tenant (the "Greenburgh Lease") for a portion of the Property as described in the Greenburgh Lease (the "Greenburgh Leased Premises") if such lease is still in effect, as more fully described in paragraph (d) below. Seller makes no representation that the Greenburgh Lease will be in effect on the Closing Date.

(vi)    The rights of St. Christopher's, Inc. (the "St. Christopher's Tenant") pursuant to a Lease Agreement dated January 1, 2012 between Seller and the St. Christopher's Tenant (the "St. Christopher's Lease") for a portion of the Property as described in the Greenburgh Lease (the "St. Christopher's Leased Premises") if such lease is still in effect, as more fully described in paragraph (e) below. Seller makes no representation that the St. Christopher's Lease will be in effect on the Closing Date.

(vii)    Subject to paragraph (f) below, that certain mortgage from Seller in favor of the Dormitory Authority of the State of New York ("DASNY") dated November 3, 2005 securing the Bonds (as defined below).

(d)    The term of the Greenburgh Lease expires on the date the DASNY Bonds (as defined and more fully described in the Greenburgh Lease) are no longer Outstanding (as defined

4

in the documentation pertaining to the Bonds). The last installment payment on the Bonds is due and payable on July 1, 2025. If the Closing occurs prior to July 1. 2025, at Closing Seller shall deposit in escrow with the title insurance company issuing buyer's owner's title insurance company an amount equal to the final installment due on the Bonds subject to such title insurance company's agreeing to pay such amount to DASNY on July 1, 2025 as payment in full of the Bonds (the "Payoff Deposit") and Buyer shall accept title subject to the Greenburgh Lease.

(d)     The St. Christopher's Lease cannot be terminated while the above referenced Bonds remain outstanding. Additionally, any termination of the St. Christopher's Lease would require agreement by the St. Christopher's Tenant, approval by the Bankruptcy Court in the Bankruptcy Case and approval by the Bankruptcy Court in the St. Christopher's Tenant's pending bankruptcy case captioned In re: St. Christopher's, Inc., Case No. 24-22373 (the "St. Christopher's Bankruptcy Case"). If the Closing is scheduled to occur on or after July 1, 2025, Seller shall make the final installment payment due on the Bonds on July 1, 2025 If the Closing is scheduled to occur prior to July 1, 2025, at Closing Seller shall make the Payoff Deposit, as described in paragraph (d) above.  Additionally, Seller shall use reasonable efforts to cause the St. Christopher's Lease to be terminated, including, without limitation, (1) requesting the above described agreement of the St. Christopher's Tenant, (2) requesting approval of the Bankruptcy Court in the Bankruptcy Case and (3) requesting that the St. Christopher's Tenant seek Bankruptcy Court approval in the St. Christopher's Bankruptcy Case, provided that such efforts shall not require Seller to make any payments other than the Payoff Deposit. Seller shall not incur any liability to Buyer if Seller is unable to cause such termination.  If Seller is unable to cause such termination by the Closing Date, Buyer, by written notice to Seller not less than two (2) business days prior to the Closing Date, shall be entitled to extend the Closing Date to a date not later than the Drop Dead Date in order allow Seller further time attempt to cause such termination.  If, thereafter, Seller is unable to cause such termination by the Drop Dead Date, the Closing shall occur on the Drop Dead Date and Buyer shall accept title subject to the St. Christopher's Lease.

(f)     If the Closing occurs on or after July 1, 2025, Seller shall pay in full the DASNY Bonds and cause the release of the DASNY Mortgage, all prior to Closing.  If the Closing occurs prior to July 1. 2025, at Closing Seller shall make the Payoff Deposit, as described in paragraph (d) above, and Buyer shall accept title to the Property subject to the DASNY Mortgage.

4.     **CLOSING**: The closing of title (the "Closing") shall take place at the office of Seller's counsel, Barclay Damon LLP, 1270 Avenue of the Americas, New York, NY 10020 on the tenth business day following the later of (i) entry of the Sale Order (as defined below) and such order becoming final, unappealable and unstayed or (ii) receipt of the New York Approval (as defined below) and such approval becoming final, unappealable and unstayed, or as otherwise provided in Section 3(a) above, or sooner by mutual agreement of the Buyer and Seller.   The date of the Closing is referred to herein as the "Closing Date".

5.     **CLOSING OBLIGATIONS.** (a) At the Closing, Seller shall deliver to Buyer:

(i)      a Bargain and Sale Deed in the usual New York form, sufficient to convey title to the Property (the "Deed");

(ii)      Checks to the order of the appropriate officers in payment of any real property transfer taxes due hereunder.

(iii)      Seller's certificate stating Seller's Federal taxpayer identification number and certifying that Seller is not a foreign person, corporation, partnership, trust or estate as defined in the Internal Revenue Code and Regulations thereunder, pursuant to the Foreign Investment in Real Premises Tax Act of 1980.

(iv)      Keys and security pass codes (if applicable) to the buildings on the Premises other than (i) buildings included in the Greenburgh Leased Premises pursuant to the Greenburgh Lease if Buyer is taking title subject to the Greenburgh Lease as described in Section 3(d) above and (ii) buildings included in the St. Christopher's Leased Premises pursuant to the St. Christopher's Lease if Buyer is taking title subject to the St. Christopher's Lease as described in Section 3(e) above.

(v)      An affidavit to the best of Seller's knowledge relative to the status of mechanics liens and tenants in possession in the usual form used by title insurers doing business in New York.

(vi)      If Buyer is taking title subject to the Greenburgh Lease as described in Section 3(d) above, an assignment of lease conveying to Buyer all of Seller's right, title and interest thereto and a copy of the Greenburgh Lease.

(vii)      If Buyer is taking title subject to the St. Christopher's Lease as described in Section 3(e) above, an assignment of lease conveying to Buyer all of Seller's right, title and interest thereto and a copy of the St. Christopher's Lease.

(viii)      Any security deposit under the Greenburgh Lease or the St. Christopher's Lease in Seller's actual possession.

(ix)      A Certificate of Existence for Seller.

(x)      Authorizing resolutions of Seller's board of directors authorizing the sale of the Premises to Buyer and approving the terms of this Agreement.

(xi)      An original or certified copy of the Sale Order (as defined below).

(xii)      An original or certified copy of the New York Approval

(b) At the Closing, the Buyer shall:

30690598.1

(i)     Pay to Seller's counsel the Purchase Price Balance in accordance with the wire instructions in Section 2(c) above.

(ii)    Authorize and direct the Escrow Agent to pay the Deposit to Seller.

(iii)   Record the Deed.

(iv)    Deliver to Seller a Certificate of Existence or Good Standing for Buyer issued by the Secretary of State of the State of Buyer's organization and, if Buyer is not organized in the State of New York, a certificate issued by the Secretary of State of the State of New York certifying Buyer's authorization to do business as a foreign entity in the State of New York.

(v)     Deliver to Seller authorizing resolutions of Buyer's members and managers authorizing the purchase of the Premises from Seller and approving the terms of this Agreement.

**6.     PURCHASE PRICE.** At the Closing, (i) the Buyer shall pay the Purchase Price Balance to the Seller's counsel by wire transfer as described in Section 2(c) above, (ii) the Escrow Agent shall pay the Deposit to or as directed by the Seller in accordance with instructions provided by the Seller to Escrow Agent and (iii) Seller's counsel  shall pay the Purchase Price Balance to or as directed by the Seller in accordance with instructions provided by the Seller to Seller's counsel.

**7.     APPORTIONMENT, ADJUSTMENTS AND CLOSING COSTS**.

(a)     The following apportionments shall be made between the Parties at the Closing as of the close of business on the day prior to the Closing Date:

(i)     Non-delinquent real estate taxes, assessments, special district charges, water charges and sewer rents, if any, on the basis of the fiscal period for which assessed, except that if there is a water meter on the Property, apportionment at the Closing shall be based on the last available reading, subject to adjustment after the Closing when the next reading is available; and

(ii)    prepaid rents (including, without limitation, any prepaid common area charges and real estate taxes) under the Lease, if any.

(b) If the Closing shall occur before a new tax rate is fixed, the apportionment of taxes at the Closing shall be upon the basis of the old tax rate for the preceding period applied to latest assessed valuation.

(c) If any past due rentals are owing by Tenant at the time of Closing, Seller is entitled to said past due rental. In such case Buyer agrees that the first monies received by Buyer from Tenant will be received by Buyer as trustee for Seller on account or in payment of such past due rentals and the Buyer agrees to remit forthwith to the Seller the amount of such rentals to which the Seller

30690598.1

is entitled, so collected, out of the first monies received by Buyer. Seller reserves the right to sue for arrears or for any additional rent due Seller and the same are not assigned to Buyer. From and after the Effective Date, Seller shall not commence any summary eviction proceedings.

(d) Seller and Buyer agree to comply in all respects with Section 1445 of the Internal Revenue Code and the regulations issued thereunder (the "Regulations"). If Seller is not a "foreign person" (as defined in the Regulations), Seller shall deliver to Buyer at Closing a nonforeign certificate as prescribed by the Regulations, properly executed and in form and content satisfactory to Buyer. If Seller is a "foreign person" or fails or refuses to deliver the nonforeign certificate, or if Buyer receives notice, or has actual knowledge, that the nonforeign certificate is false, a tax equal to 10% of the Purchase Price shall be withheld by Buyer at Closing and paid to the Internal Revenue Service in the manner prescribed by the Regulations, unless withholding is reduced or excused in the manner prescribed by the Regulations. In the event of any withholding, Seller's obligations to deliver title and close this transaction shall not be excused or otherwise affected.

(e) Seller shall pay any and all transfer, gains or documentary stamp taxes and other taxes due in connection with the transfer of the Premises from Seller to Buyer. All sales taxes due in connection with the transfer of the Personal Property shall be paid by Buyer.

(f)     Buyer shall pay all recording and filing fees incurred in connection with recording the Deed.

8.     **SELLER'S COVENANTS.**

Seller covenants that between the Effective Date and the Closing Date:

(a) It shall not encumber the Premises or enter into any lease or other occupancy agreement with respect to the Premises without the prior written consent of Buyer.

(b)     Seller shall, at its sole cost and expense, comply with all notices, orders and requirements issued by any Governmental Authority having jurisdiction against or affecting the Premises.

(c)     Seller shall not withdraw, settle or otherwise compromise any protest or reduction proceeding affecting real estate taxes or assessments imposed with respect to the Premises for any fiscal period in which the Closing is to occur or for any subsequent fiscal period without the prior written consent of Buyer.

(d)     Seller shall not modify or amend any existing service contract or enter into any new service contract with respect to the Premises the term of which extends beyond the Closing Date or which cannot be cancelled on greater than thirty (30) days' notice without Buyer's prior written consent.

(e)     Seller shall cause to be maintained in full force and effect all property and casualty insurance policies currently maintained with respect to the Property.

8

(f)     Seller shall maintain, repair and manage the Premises in accordance with Seller's prior practices.

(g)     Seller shall, upon Buyer's request, provide Buyer with access to the Premises (other than the Greenburgh Leased Premises and the St. Christopher's Leased Premises) for any purpose related to this Agreement.

9.    **DELIVERY OF PROPERTY**.  Seller agrees to deliver, simultaneously with the closing of title, possession of the Property, subject to (i) the rights of the Greenburgh Tenant to the Greenburgh Leased Premises pursuant to the  Greenburgh Lease if Buyer is taking title subject to the Greenburgh Lease as described in Section 3(d) above and (ii) the rights of the St. Christopher's Tenant to the St. Christopher's Leased Premises pursuant to the  St. Christopher's Lease if Buyer is taking title subject to the St. Christopher's Lease as described in Section 3(e) above.

10.    **CONDITION OF PROPERTY.** Buyer represents to Seller that:  (a) it is relying on its own inspection, investigation and examination of the Property; and (b) neither Seller nor any representative of Seller has made any representation or promise upon which Buyer has relied concerning the condition of the Property or of any property covered by this Agreement, it being intended by the Parties that the Property is to be conveyed "AS IS" and "WITH ALL FAULTS". Specifically, but not by way of limitation, Seller does not make, has not made and specifically disclaims any representation or warranty, express or implied, regarding the environmental condition at, on, under or about the Property or the compliance or non-compliance of the Property with applicable environmental laws, including any administrative or judicial interpretation thereof. Without limiting the generality of this acknowledgement and agreement, it is specifically acknowledged and agreed that the Property shall be accepted by Buyer in "AS IS" condition, "WITH ALL FAULTS".

11.    **DEFAULT**.

(a)     If Buyer is in material default hereunder, or, on or before the date of Closing as set forth herein, indicates that Buyer is unable or unwilling to perform and Seller stands ready to perform Seller's obligations, Seller's sole and exclusive remedy shall be the right to terminate this Agreement by written notice to Buyer and have the Deposit paid to Seller as reasonable liquidated damages for Buyer 's inability or unwillingness to perform.  It is the intention of the Parties hereto freely to make advance provision on the date of this Agreement for such event in order (i) to avoid controversy, delay and expense, and (ii) to specify now a reasonable amount agreeable to the Parties for compensation to Seller for losses which may not be readily ascertainable or quantifiable, such as any of the following which might be necessary to place Seller in the position Seller would have been in had Buyer made timely performance:  costs of carrying, maintaining, insuring and protecting the property; loss of interest income on the proceeds; loss of optimum market time, value and conditions; the uncertainty, delay, expense and inconvenience of finding a substitute buyer; additional commissions, fees, taxes and borrowing expenses to meet obligations entered into in anticipation of performance. In such event and upon Seller's written notice of termination and Seller's receipt of the Deposit, the Property shall be free of any claims or interest of Buyer therein by virtue of this Agreement.

(b)    If Seller is in material default hereunder, or, on or before the date of Closing as set forth herein, indicates that Seller is unable or unwilling to perform and Buyer stands ready to perform Buyer's obligations, Buyer's sole and exclusive remedy shall be the right to terminate this Agreement by written notice to Seller in which case the Deposit shall be returned to Buyer. Upon receipt of such payment, this Agreement shall terminate and the Parties hereto shall be released and discharged from all further claims and obligations hereunder except those obligations which by the terms of this Agreement survive the termination of this Agreement. In such event and upon Buyer's written notice of termination and Buyer's receipt of the Deposit, the Property shall be free of any claims or interest of Buyer therein by virtue of this Agreement.

12.    **ESCROW.**

(a)    The funds represented by the Deposit shall be held in escrow by the Escrow Agent in a non-interest bearing deposit account at a Bank reasonably acceptable to Seller. The Deposit: (i) shall become the property of Seller (A) upon the delivery of the Deed, or (B) after proper demand by Seller without objection from Buyer in the manner described below; (ii) shall be returned to Buyer after proper demand by Buyer without objection from Seller in the manner described below; or (iii) shall be delivered to either Seller or Buyer in accordance with a final judgment, which is no longer subject to, or the subject of, an appeal, of a court of competent jurisdiction directing the disposition of the Deposit.

(b)    It is understood and agreed that the Escrow Agent's sole duties hereunder are as provided herein and that the Escrow Agent in the performance of its duties hereunder is hereby released and exculpated from all liability except for willful malfeasance or gross negligence and shall not be liable or responsible for anything done or omitted to be done in good faith as herein provided. If either Seller or Buyer makes a demand upon the Escrow Agent, setting forth the basis for such demand, for payment of all or a portion of the Deposit, the Escrow Agent shall give at least 10 business days' notice to the other party of such demand and of its intention to pay over the amount demanded on a stated date. If the Escrow Agent does not receive, before the proposed payment date, an objection to the proposed payment setting forth the basis for such objection, the Escrow Agent is hereby authorized and directed to make such payment. If before the proposed payment date such other party (or its counsel) delivers to the Escrow Agent an objection to such payment setting forth the basis for such objection, the Escrow Agent shall promptly deliver a copy of such objection to the party originally demanding payment, and shall continue to hold such amount until otherwise directed by the joint written instruction of Seller and Buyer or by a final judgment of a court of competent jurisdiction which is no longer subject to, or the subject of, an appeal. In the event that a dispute shall arise as to the disposition of all or any portion of the Deposit held by the Escrow Agent, the Escrow Agent shall, at its option, either (i) commence an action of interpleader and deposit the same with a court of competent jurisdiction, pending the decision of such court, and shall be entitled to rely upon the final judgment of any such court with respect to the disposition of all or any portion of the Deposit provided that such judgment is no longer subject to, or the subject of, an appeal or (ii) hold the same pending receipt of joint instructions from Seller and Buyer and shall be entitled to rely upon such joint instructions with respect to the disposition of all or any portion of the Deposit, or a final judgment, which is no longer subject to, or the subject of, an appeal, of a court of competent jurisdiction directing the disposition of the Deposit. The Escrow Agent shall be entitled to consult with counsel (including

10

*including, without limitation, the fees and expenses incurred in connection with the commencement of any interpleader action.* BB

any member of the ~~Escrow~~ Agent's firm, if applicable) and be reimbursed for all reasonable expenses of such consultation with respect to its duties as Escrow Agent and shall be further entitled to be reimbursed for all reasonable out of pocket expenses incurred in connection with such activities. All such expenses shall be paid by the party whose position shall not be sustained.

6.6.

(c)   The Escrow Agent may act or refrain from acting in respect of any matter referred to herein, in full reliance upon and by and with the advice of counsel which may be selected by the Escrow Agent (including any member of the Escrow Agent's firm, if applicable) and shall be fully protected in so acting or so refraining from acting upon the advice of such counsel.  The Escrow Agent shall have the right to rely upon the certificates, notices and instruments delivered to it pursuant hereto, and all the signatures thereto or to any other writing received by the Escrow Agent purporting to be signed by any party hereto, and upon the truth of the contents thereof.  The Escrow Agent shall not be bound by any modification of this Agreement which affects the rights or duties of the Escrow Agent unless it shall have given its prior written consent thereto.  The Escrow Agent may, but shall not be required to, institute or defend any action or legal process involving any matter referred to herein which in any manner affects the Escrow Agent or its duties or liabilities hereunder, unless or until requested to do so by Seller or Buyer and then only upon receiving full indemnity in an amount, and of such character, as the Escrow Agent shall require, against any and all claims, costs, liabilities, judgments, attorneys' fees and disbursements, and other expenses of any kind in relation thereto.

(d)   Seller and Buyer agree, jointly and severally, to defend and indemnify the Escrow Agent and hold the Escrow Agent harmless from all claims which may be incurred by the Escrow Agent by reason of its acceptance of, and its performance under, this Agreement.

(e)   The Escrow Agent may at any time resign hereunder by giving notice of its resignation to Seller and Buyer at least 30 days prior to the date specified for such resignation to take effect, and, upon the effective date of such resignation, the Deposit shall be delivered by the Escrow Agent to such person or entity as Seller and Buyer may have jointly designated in writing or to such person or entity as may be designated as hereinafter provided as the successor Escrow Agent, whereupon all duties and obligations of the Escrow Agent named herein shall cease and terminate.  If no such person or entity shall have been designated by both Seller and Buyer by the date which is 5 days prior to the date specified for such resignation to take effect then the Escrow Agent may designate a title insurance company or bank in the State of New York to act as escrow agent hereunder.

13.   **TERMINATION.**  This Agreement may be terminated at any time prior to the Closing:

(a)   by the mutual written consent of Seller and Buyer;

(b)   by Buyer upon written notice to the Seller if Buyer is not then in material breach of any provision of this Agreement and there has been a material breach of, material inaccuracy in, or failure to perform any material representation, warranty, agreement, or covenant of Seller in this Agreement, and such breach, inaccuracy, or failure cannot reasonably be cured by Seller on or before August 1, 2025 (the **"Drop Dead Date"**). In the event of such termination, Buyer's sole remedy shall be as described in Section 11(b) above;

11

(c)     by Seller upon written notice to Buyer if Seller is not then in material breach of any provision of this Agreement and there has been a material breach of, inaccuracy in, or failure to perform any representation, warranty, agreement, or covenant of Buyer in this Agreement, and such breach, inaccuracy, or failure cannot reasonably be cured by Buyer on or before the Drop Dead Date. In the event of such termination, Seller's sole remedy shall be as described in Section 11(a) above; or

(d) by Seller or Buyer upon written notice to the other party:

(i)     if the Sale Order is not entered by the Drop Dead Date;

(ii)    if the New York Approval is not obtained by the Drop Dead Date; or

(iii)   if the Bankruptcy Court enters an order dismissing the Bankruptcy Case or converting the Bankruptcy Case to a proceeding under chapter 7 of the Bankruptcy Code.

In the event of termination pursuant to this paragraph (c), the Deposit shall be returned to Buyer. Upon receipt of such payment, this Agreement shall terminate and the Parties hereto shall be released and discharged from all further claims and obligations hereunder except those obligations which by the terms of this Agreement survive the termination of this Agreement. In such event and upon Buyer's written notice of termination and Buyer's receipt of the Deposit, the Property shall be free of any claims or interest of Buyer therein by virtue of this Agreement.

14.     **RISK OF LOSS:** Throughout the period between the Effective Date and the Closing Date, Seller shall bear the risk of loss. If the Premises are damaged for any cause prior to the Closing, Seller shall have the option to repair or not to repair the same; and shall give written notice of its election to Buyer within five (5) days after the damage or on the Closing Date, whichever comes first.  If Seller elects to repair the same at Seller's expense (including use of insurance proceeds) it shall promptly and in good faith undertake to do so and shall complete such repairs prior to Closing.  If the Premises are not in, or cannot be restored to, substantially the present condition, reasonable wear and tear excepted, prior to the Closing, Buyer shall have the option of:

(a)     Accepting title to the damaged Property in its damaged condition and receiving credit on the Purchase Price equal to any insurance monies paid or to be paid to Seller on account of such loss or an assignment Seller's rights to receive the same; or

(b)     Terminating this Agreement, in which event the Deposit shall be paid to Buyer and neither Party shall have any further rights or obligations under this Agreement and this Agreement shall thereupon become void and have no effect except those obligations which by the terms of this Agreement survive the termination of this Agreement.

15.     **CONDEMNATION:** If the whole or any part of the Premises is taken by eminent domain from and after the Effective Date until the passing of the Closing Date and title, each party retains

30690598.1

the right to assert a claim for damages or compensation to the governmental authority asserting said eminent domain. Each party's claim shall be independent of the other.

16.    **REPRESENTATIONS AND WARRANTIES OF THE SELLER**: The Seller hereby represents and warrants to the Buyer that:

(a) Seller is a not-for-profit company which has been duly organized and is validly existing and in good standing under the laws of the State of New York, and has the full power and authority to enter into, execute, deliver, consummate and carry out the transaction contemplated by this Agreement and any instruments and agreements reasonably necessary therefor; and

(b) The person executing this Agreement on behalf of Seller is duly authorized to do so.

17.    **REPRESENTATIONS AND WARRANTIES OF THE BUYER:** The Buyer hereby represents and warrants to the Seller that:

(a)    Buyer is a limited liability company which has been duly organized and is validly existing and in good standing under the laws of the State of New York and has the full power and authority to enter into, execute, deliver, consummate and carry out the transaction contemplated by this Agreement and any instruments and agreements reasonably necessary therefor; and

(b)    The person executing this Agreement on behalf of Buyer is duly authorized to do so.

18.    **PROOF OF FUNDS.** Buyer represents and warrants that it has sufficient funds and access to sufficient funds to close the purchase contemplated by this agreement without the need to obtain new or additional financing. Upon request of Seller, Buyer shall provide to Seller proof of such funds reasonably satisfactory to Seller.

19.    **ASSIGNMENT.** Except as otherwise provided below, this Agreement and Buyer's rights hereunder may not be assigned by Buyer without the prior written consent of Seller, and any purported assignment without such written consent shall be void and of no effect. Notwithstanding the foregoing, Buyer may assign its rights hereunder without Seller's consent to one or more affiliates 100% owned and controlled by Buyer by providing Seller with written notice of such assignment, which written notice shall state the relationship of the acquiring entity. Upon any effective assignment of Buyer's rights hereunder, Buyer and Buyer's assignee shall be jointly and severally liable hereunder, unless otherwise agreed by Seller in writing.

20.    **BROKERS:** The Parties represent that SVN Deegan-Collins Commercial Realty, as broker for Seller and Rand Commercial, as broker for buyer (collectively, the "Brokers"), are the only brokers responsible for the sale of the Premises. Seller agrees to pay the commission due such Brokers in connection with the sale of the Premises under separate agreements at the time of Closing. Each party represents to the other that no other broker or agent brought the Premises to Buyer's attention, was, in any way, a procuring cause of this sale and purchase, or was otherwise

13

involved in the presentation or negotiation of this transaction. Buyer hereby agrees to indemnify and hold harmless Seller against the claim of any broker or agent for a commission due by reason of this sale, where it is alleged that said broker or agent called the Premises to Buyer's attention or interested Buyer therein or otherwise assisted in or facilitated Buyer's purchase of the Property, said indemnity to include all costs of defending any such claim, including reasonable attorney's fees. The provisions of this paragraph shall survive the delivery of the Deed.

21.    **BANKRUPTCY COURT APPROVAL**

(a) Seller and Buyer acknowledge and agree that this Agreement and the sale of Property as described herein are subject to Bankruptcy Court approval. Seller and Buyer acknowledge that to obtain such approval, Seller must demonstrate that it has taken reasonable steps to obtain the highest and otherwise best offer possible for the Property, and that such demonstration shall include giving notice of the transactions contemplated by this Agreement to creditors and other interested parties as ordered by the Bankruptcy Court and as required under the Bankruptcy Code.

(b) From and after the date of execution of this Agreement and prior to the Closing or the termination of this Agreement in accordance with the terms hereof, Seller shall not take any action which is intended to or fail to take any action the intent of which failure to act is to, result in the reversal, voiding, modification or staying of the Sale Order, as defined below.

(c) Seller shall file a proposed version of the Order (A) Authorizing the Sale of the Property, and (B) Granting Related Relief, (acceptable in form and substance to Buyer in its reasonable discretion, the "**Sale Order**"), in the Bankruptcy Case as soon as reasonably practicable prior to the hearing on the entry of the Sale Order. Seller shall pursue diligently the entry of the Sale Order. Buyer agrees that it shall promptly take such actions as are reasonably requested by Seller to assist in obtaining entry of the Sale Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of demonstrating that Buyer is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code. In the event that the entry of the Sale Order is appealed or a stay pending appeal is sought, Seller shall oppose the appeal or the stay pending appeal and seek the dismissal of any appeal (including a petition for certiorari, motion for rehearing, re-argument, reconsideration or revocation). Notwithstanding the foregoing, any resulting changes to this Agreement or any related document shall be subject to the approval of Buyer in its reasonable discretion.

(d) Seller acknowledges and agrees, and the Sale Order shall provide, among other things, that, on the Closing Date and concurrently with the Closing, all then existing or thereafter encumbrances on the Property (other than Permitted Encumbrances) of, against or created by Seller or the bankruptcy estate and in existence on or prior to the Closing Date shall be fully released from and with respect to the Property, which shall be transferred to Buyer free and clear of all such encumbrances.

22.    **NEW YORK APPROVAL**

(a) Seller and Buyer acknowledge and agree that this Agreement and the sale of Property as described herein are also subject to approval by the Attorney General of the State of New York or the New York Supreme Court pursuant to Articles 5 and 10 of the New York Not-for-Profit

30690598.1

Corporation Law ("New York Approval"). Seller and Buyer acknowledge that to obtain such approval, Seller must make certain demonstrations and disclose certain information regarding, among other things, the transaction contemplated by this Agreement, all as set forth in Articles 5 and 10 of the New York Not-for-Profit Corporation Law.

(b) Promptly following entry of the Sale Order and such order becoming final, unappealable and unstayed, Seller shall petition (a) the New York Attorney General, (b) the appropriate Supreme Court of the State of New York or New York County Court, or (c) both (a) and (b), the choice of (a), (b) or (c) to be in Seller's sole discretion, and shall take such other actions reasonably necessary to obtain the New York Approval. Seller shall pursue obtaining the New York Approval. Buyer agrees that it shall promptly take such actions as are reasonably requested by Seller to assist in obtaining the New York Approval, including furnishing affidavits or other documents or information for filing with the New York Attorney General and/or the applicable court. In the event that the New York Approval is appealed or a stay pending appeal is sought, Seller shall oppose the appeal or the stay pending appeal and seek the dismissal of any appeal (including a petition for certiorari, motion for rehearing, re-argument, reconsideration or revocation). Notwithstanding the foregoing, any resulting changes to this Agreement or any related document shall be subject to the approval of Buyer in its reasonable discretion.

23.    **NOTICES.** Any notice or other communication that is to be given hereunder shall be in writing and delivered by certified mail, or sent by reliable electronic means, or sent by nationally recognized overnight courier to such party at the address set forth below:

| If to Seller: | Dr. Sarah Ruback<br>c/o Barclay Damon LLP<br>1270 Avenue of the Americas, Suite 501<br>New York, NY 10020<br>Attn: Janice Grubin, Esq.<br>Email: jgrubin@barclaydamon.com<br>          and<br>Email: sruback@sc1881.org |
|---|---|
| with a copy (which shall not constitute notice) to: | Barclay Damon LLP<br>1270 Avenue of the Americas, Suite 501<br>New York, NY 10020<br>Attn: Janice Grubin, Esq.<br>Email: jgrubin@barclaydamon.com |
| If to Buyer: | 621 Blooming Grove LLC<br>c/o Keith I. Braunfotel<br>Braunfotel & Fendel, LLC<br>49 Maple Avenue<br>New City, NY 10956 |

15

Email: Keith@BF-legal.com

If to Escrow Agent: Barclay Damon LLP
1270 Avenue of the Americas, Suite 501
New York, NY 10020
Attn: Janice Grubin, Esq.
Email: jgrubin@barclaydamon.com

24.    **RECORDING.**    This Agreement shall not be recorded in the land records. Any recordation of this Agreement by or at the direction of Buyer shall, at Seller's option, constitute a default by Buyer under this Agreement

25.    **ENTIRE AGREEMENT; AMENDMENT.** This Agreement embodies the entire agreement and understanding between the Parties relating to the subject matter hereof and there are no covenants, promises, agreements, conditions or understandings, oral or written, except as herein set forth. This Agreement may not be amended, waived or discharged except by an instrument in writing executed by the party against whom such amendment, waiver or discharge is to be enforced.

26.    **BINDING EFFECT.** This Agreement shall be binding upon and inure to the benefit of the Parties hereto and their successors and assigns.

25.    **RIGHT TO WITHDRAW.**    This Agreement shall not be considered or construed as an offer by Seller.  Seller reserves the right to withdraw this proposed Agreement at any time prior to the signature hereof by Buyer, Seller and Escrow Agent, receipt by the Escrow Agent of the full payment of the Deposit set forth herein, and delivery of a fully executed Agreement to Buyer.

26.    **IRS REPORTING COMPLIANCE**.  It is agreed that Buyer's attorney shall be deemed to be the "Settlement Agent" in this transaction for the purposes of Section 1521 of the Tax Reform Act of 1986. As such Settlement Agent, Buyer's attorney shall be responsible for properly filing the required information under said Section to the Internal Revenue Service and providing the required Notices of Filing to the appropriate parties. The provisions of this paragraph shall survive the closing.

27.    **ACCEPTANCE OF DEED**.    The Parties agree that, except to the extent expressly provided herein or by way of a specific agreement in writing which by its terms shall expressly survive the Closing, the delivery by Seller and the acceptance by Buyer of the Deed at the Closing shall be deemed to constitute full compliance by Seller with all of the terms, conditions and covenants of this Agreement on its part to be performed.

28.    **EFFECT**.    This Agreement shall be binding upon and inure to the benefit of the heirs, executors, administrators, successors, and permitted assigns of the respective Parties.

16

29.     **GOVERNING LAW; SUBMISSION TO JURISDICTION**.  This Agreement shall be construed and enforced in accordance with the laws of the State of New York.  Any action or proceeding seeking to enforce any provision of, or based on any right arising out of, this Agreement may be brought against any of the Parties hereto in the courts of the State of New York located in New York or Westchester County or, if it has or can acquire jurisdiction, in the United States District Court for the Southern District of New York, and each of the Parties hereto consents to the jurisdiction of such courts (and of the appropriate appellate courts) in any such action or proceeding and waives any objection to venue laid therein.

30.     **COUNTERPARTS / FACSIMILE / ELECTRONIC MAIL.**  This Agreement may be executed in any number of counterparts, and by the Parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original, and all of which when taken together shall constitute one and the same Agreement.  The Parties hereto agree that this Agreement may be transmitted between them or their respective attorneys by facsimile.  The Parties hereto intend that a manual signature delivered by facsimile, e-mail, or other means of electronic transmission, shall be deemed to have the same effect as delivery of an original signed copy of this Agreement, and that an Agreement containing the manual signatures (original or  delivered by facsimile, e-mail, or other means of electronic transmission) of all the Parties is binding on the Parties once sent via facsimile or via electronic mail to counsel for Buyer and Seller.

31.     **ENTIRE AGREEMENT.**  All prior understandings, agreements, representations and warranties, oral and written, between Seller and Buyer are merged in this Agreement.  This Agreement completely expresses the agreement of the Parties, and has been entered into by the Parties after discussion with their respective attorneys and after full investigation, neither party relying upon any statement made by anyone else that is not set forth in this Agreement.  Neither this Agreement nor any provision hereof may be waived, changed or cancelled except by a written instrument signed by all Parties.

32.     **MUTUAL AGREEMENT.** Each and every provision of this Agreement has been mutually negotiated, prepared and drafted. Each party hereto has been represented by legal counsel or has had the opportunity to be represented by legal counsel. In connection with the construction or interpretation of any provision hereof, no consideration shall be given to the issue of which party actually prepared, drafted, requested or negotiated any provision or deletion. This Agreement shall not be construed more severely against any one party hereto than against any other party hereto.

33.     **CAPTIONS**.  The captions preceding the paragraphs in this Agreement are for ease of reference only and shall be deemed to have no effect whatsoever on the meaning or construction of the provisions of this Agreement.

34.     **SEVERABILITY**.  In case any one or more of the provisions contained in this Agreement, or any of the documents or agreements contemplated hereby, should be invalid, illegal or unenforceable in any respect, the validity, legality, and enforceability of the remaining provisions contained herein shall not in any way be affected or impaired thereby.

17

35.    **WAIVER OF JURY TRIAL.   BUYER AND SELLER HEREBY WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY ACTION OR PROCEEDING TO ENFORCE OR DEFEND ANY RIGHTS UNDER THIS AGREEMENT.**

[Signature page follows.]

30690598.1

**SELLER**

**The McQuade Foundation**

By: _____

     Name: Dr. Sarah Ruback

     Title: Chief Executive Officer

Effective Date: _2/14/2025_____

**BUYER**

**621 Blooming Grove LLC**

By: _____

     Name:  EUGENE GOLDMAN

     Title:    Member

The undersigned Escrow Agent agrees to be bound by the provisions of Section 12 above and the duties of Escrow Agent set forth in Section 2 above.

**ESCROW AGENT**

**Barclay Damon LLP**

By: _____

     Name: Janice B. Grubin

     Title: Partner

30690598.1

**Schedule A**
**Property Description**

ALL THAT TRACT OR PARCEL OF LAND, situate in the Town of New Windsor,
County of Orange and State of New York, and being more particularly bounded and described as
follows:

Beginning at a point on the southeasterly right of way line of New York State Route #94 at
its intersection with the division line between the lands now or formerly of Ottway as described
in Book 2140 of Deeds at Page 620 on the southwest and the lands now or formerly of McQuade
Foundation as described in Book 1441 of Deeds at Page 534 on the northeast;

Thence along the said right of way line the following six (6) courses: 1) N 55 deg. 24 min.
41 sec. E, 191.55 ft. to a point; thence 2) N 56 deg. 30 min. 32 sec. E, 223.39 ft. to a point;
thence 3) N 62 deg. 24 min. 32 sec. E, 160.82 ft. to a point; thence 4) N 65 deg. 53 min. 37 sec.
E, 382.87 ft. to a point; thence 5) N 69 deg. 01 min. 31 sec. E, 70.79 ft. to a point; and 6) N 74
deg. 25 min. 07 sec. E, 136.40 ft. to its intersection with the division line between the said lands
of McQuade Foundation on the west and the lands now or formerly of S.D.C. Realty Corp. as
described in Book 1693 of Deeds at Page 314 and Book 2051 of Deeds at Page 892, Lamantia as
described in Book 4934 of Deeds at Page 213 and Sorrentino as described in Book 2838 of
Deeds at Page 274, in part by each, on the east;

Thence S 09 min. 37 min. 23 sec. E along said division line, 756.47 ft. to its intersection
with the division line between the said lands of McQuade Foundation on the north and the lands
now or formerly of Blair as described in Book 3329 of Deeds at Page 204 on the south;

Thence S 69 min. 34 min. 45 sec. W along said division line, 82.00 ft. to its intersection
with the division line between the said lands of McQuade Foundation on the west and the said
lands of Blair on the east;

Thence S 14 min. 50 min. 15 sec. E along said division line, 68.60 ft. to its intersection
with the division line between the said lands of McQuade Foundation on the north and the lands
now or formerly of Craig as described in Book 3313 of Deeds at Page 258 and the lands now or
formerly of Izer as described in Book 4213 of Deeds at Page 278, in part by each, on the south;

Thence S 72 min. 00 min. 45 sec. W along said division line, 184.21 ft. to its intersection
with the division line between the said lands of McQuade Foundation on the west and the said
lands of Izer, the lands now or formerly of Lockett as described in Book 3180 of Deeds at Page
110, the lands now or formerly of Lakritz as described in Book 3249 of Deeds at Page 112, and
the lands now or formerly of Martin as described in Book 5008 of Deeds at Page 255, in part by
each, on the east;

Thence S 07 min. 43 min. 15 sec. E along said division line, 447.75 ft. to its intersection
with the division line between the said lands of McQuade Foundation on the north and the lands
now or formerly of Seto as described in Book 2980 of Deeds at Page 218, the lands now or
formerly of Harrison as described in Book 4922 of Deeds at Page 299, the lands now or formerly

20

of Couzis as described in Book 4132 of Deeds at Page 129 and the lands now or formerly of Order of St. Helena as described in Book 2566 of Deeds at Page 70, in part by each, on the south;

Thence S 85 min. 02 min. 23 sec. E along said division line, 426.54 ft. to its intersection with the division line between the said lands of McQuade Foundation on the northeast and the lands now or formerly of Order of St. Helena as described in Book 1546 of Deeds at Page 297 and Book 3117 of Deeds at Page 278, the lands now or formerly of Zgrodecki as described in Book 3244 of Deeds at Page 37, the lands now or formerly of Rolfs as described in Book 3255 of Deeds at Page 32, the lands now or formerly of Maisonet as described in Book 1896 of Deeds at Page 210, the lands now or formerly of Miller as described in Book 1538 of Deeds at Page 384, the lands now or formerly of Bak as described in Book 1817 of Deeds at Page 740, the lands now or formerly of Ellis as described in Book 2749 of Deeds at Page 59 and the lands now or formerly of Ottway as described in Book 2140 of Deeds at Page 620, in part by each, on the southwest;

Thence N 33deg. 18 min. 20 sec. W along said division line, 1,021.06 ft. to the point of beginning, containing 22.085 acres more or less.

Being the same premises conveyed to McQuade Foundation by deed recorded in Book 1441 of Deeds at Page 534 in the Orange County Clerk's Office.

30690598.1