**BARCLAY DAMON LLP**
Janice B. Grubin
Allen J. Underwood II
1270 Avenue of the Americas, Suite 2310
New York, New York 10020
Telephone: (212) 784-5800
jgrubin@barclaydamon.com
aunderwood@barclaydamon.com

*Counsel to Debtors and Debtors-in-Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | : | Chapter 11, Subchapter V |
| | : | |
| ST. CHRISTOPHER'S, INC., *et al.*,[1] | : | Case No. 24-22373 (shl) |
| | : | Main Case |
| Debtors. | : | Jointly Administered |

### NOTICE OF DESIGNATION OF QUALIFIED AND SUCCESSFUL BID FOR APPROVAL AT SALE HEARING ON OCTOBER 22, 2025 FOR JENNIE CLARKSON REAL ESTATE

**PLEASE TAKE NOTICE** that on July 28, 2025, the Court entered its *Order (A) Approving Bid Procedures Relating to the Sale of the Jennie Clarkson Real Estate, (B) Approving Notice Procedures, (C) Setting Deadlines and Hearing Dates, and (D) Granting Related Relief* (Docket No. 240) (the "Bid Procedures Order").

**PLEASE TAKE FURTHER NOTICE** that paragraph 21 of the Bid Procedures Order provides that:

> Except as otherwise provided in this Bid Procedures Order, the Debtors in their business judgment, further reserve the right as they may reasonably determine to be in the best interests of their estates, subject to the terms and conditions under the Bid Procedures, to, among other things: (a) determine which Potential Bidders are Qualified Bidders; (b) determine which Written Offers are Qualified Bids; (c) determine which Qualified Bid is the highest

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are: St. Christopher's, Inc. (0485) and The McQuade Foundation (2652).

or otherwise best proposal – the Successful Bid – and which is the next highest or otherwise best proposal – the Backup Bid; (d) reject any bid that is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bid Procedures or the requirements of the Bankruptcy Code, or (iii) contrary to the best interests of the Debtors and their estates; (e) waive terms and conditions set forth herein with respect to all Qualified Bidders to the extent permissible under the Bid Procedures; (f) impose additional terms and conditions with respect to all Qualified Bidders; (g) extend the deadlines set forth herein; (h) adjourn or cancel the Auction and/or Sale Hearing, provided that the Debtors shall use reasonable efforts to provide notice of adjournment or cancellation of the Auction to all Qualified Bidders 24 hours before the commencement of the Auction; and (i) modify the Bid Procedures or withdraw the request to sell the Assets to the Successful Bidder or Backup Bidder, as applicable, at any time with or without prejudice.

Bid Procedures Order, ¶ 21.

**PLEASE TAKE FURTHER NOTICE** that paragraph 6 of the Bid Procedures approved in the Bid Procedures Order established a Bid Deadline of 5:00 p.m. (prevailing Eastern Time) on September 12, 2025 at 5:00 p.m. (prevailing Eastern Time), which date  was adjourned to September 26, 2025 at 5:00 p.m. (prevailing Eastern Time), along with related dates, pursuant to the Notice Of Extended Dates And Deadlines With Respect To The Jennie Clarkson Real Estate Sale Process, dated September 11, 2025 (Docket No. 249) (the "Notice").

**PLEASE TAKE FURTHER NOTICE** that, on the Bid Deadline, the Debtors received two bids.  In the course of assessing and determining, in the exercise of their business judgment and in consultation with the Subchapter V Trustee, whether these two bids were Qualified Bids, one of the bidders withdrew its bid.  Accordingly, there is now one bid for the Jennie Clarkson Real Estate from Cranlake Berry LLC ("Cranlake"). The Debtors have determined that Cranlake submitted a Qualified Bid under the Bid Procedures for the Jennie Clarkson Real Estate.

**PLEASE TAKE FURTHER NOTICE** that, since no second qualifying bid was received, no Auction was held pursuant to the Bid Procedures.

**PLEASE TAKE FURTHER NOTICE** that the Cranlake Bid and Cranlake Bidder are declared to be the Successful Bid and Successful Bidder, respectively, for the Jennie Clarkson Real Estate.

**PLEASE TAKE FURTHER NOTICE** that attached hereto as Exhibit 1 is the Purchase and Sale Agreement with Cranlake (the "Cranlake PSA") signed by the Successful Bidder.

**PLEASE TAKE FURTHER NOTICE** that a hearing to approve the Cranlake PSA (the "Sale Hearing") is scheduled to occur on **October 22, 2025 at 10:00 a.m. (prevailing Eastern Time)** before the Honorable Sean H. Lane, United States Bankruptcy Judge for the Southern District of New York, 300 Quarropas Street, White Plains, New York 10601, at which the Debtors shall seek approval of the Successful Bidder.  Any parties wishing to participate in the Sale Hearing can attend in person or via the Zoom for Government platform.  Participants in the Sale Hearing are required to register their appearance before the hearing utilizing the e-Court Appearances tool at https://ecf.nysb.uscourts.gov/cgi-bin/nysbAppearances.pl.  The deadline to object to the sale to the Successful Bidder is **October 16, 2025 at 5:00 p.m. (prevailing Eastern Time)**, with objections, in writing, to be filed and received by (i) the undersigned, Janice B. Grubin, Esq. (jgrubin@barclaydamon.com) and Allen J. Underwood, II, Esq. (aunderwood@barclaydamon.com), (ii) the Successful Bidder, David Michael Riley, Esq. (david.riley@us.dlapiper.com) and John Canoni, Esq. (john.canoni@usdlapiper.com), and (iii) the Hon. Sean H. Lane, United States Bankruptcy Court for the Southern District of New York, 300 Quarropas Street, White Plains, New York 10601.

**PLEASE TAKE FURTHER NOTICE** that copies of the Bid Procedures Order (including the Bid Procedures), the Notice, and the Cranlake PSA Schedules may be obtained by

visiting the Court's website at http://www.nysb.uscourts.gov in accordance with the procedures

and fees set forth therein, or by contacting the undersigned.

Dated: October 8, 2025
      New York, New York        **BARCLAY DAMON LLP**

                                By*:*    */s/Janice B. Grubin*
                                Janice B. Grubin
                                Allen J. Underwood II
                                1270 Avenue of the Americas, Suite 2310
                                New York, New York 10020
                                Telephone:  (212) 784-5800
                                jgrubin@barclaydamon.com
                                aunderwood@barclaydamon.com

                                *Counsel to Debtors and Debtors-in-Possession*

# **<u>EXHIBIT 1</u>**

## PURCHASE AND SALE AGREEMENT

This Purchase and Sale Agreement (hereinafter "Agreement") is dated October 8, 2025 for reference purposes by and between Cranlake Berry LLC ("Buyer"), a Delaware limited liability company, with a registered office at 251 Little Falls Drive, Wilmington, DE 19808 and **St. Christopher's, Inc.** ("Seller" and, together with the Buyer, the "Parties"), a New York not-for-profit corporation with an address at c/o Barclay Damon LLP, 1270 Avenue of the Americas, Suite 2301, New York, New York 10020, Attn Janice Grubin, Esq. This Agreement shall be effective on the date (the "**Effective Date**") it is executed by Seller and a fully executed counterpart is delivered to Buyer or Buyer's counsel as designated beneath Seller's signature hereof.

**Background**. Seller is the owner of a certain parcel of real property situated in North Castle, New York, sometimes described as the Jennie Clarkson Campus or the Jennie Clarkson Real Estate, and as more particularly described in **Schedule A** attached hereto, incorporated herein and made a part hereof (the "Land"). Seller wishes to sell to Buyer and Buyer wishes to purchase from Seller, the Property (as defined below). On April 29, 2024, Seller filed a voluntary petition for relief under Subchapter V of Chapter 11 of Title 11 of the United States Code (11 U.S.C. Sections 101 *et seq*., as amended, and, collectively with the Federal Rules of Bankruptcy Procedure, the "Bankruptcy Code"), commencing bankruptcy proceedings captioned In re St. Christopher's, Inc., Case No. 24-22373 (shl) (the "Bankruptcy Case"), in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"). The Parties intend to effectuate this Agreement and the transactions contemplated hereby under Sections 105 and 363 of the Bankruptcy Code. The Bankruptcy Court has issued a Bidding Procedures Order governing the sale process for the Property (as defined below), a copy of which is attached hereto as **Schedule B**, incorporated herein and made a part hereof (the "Bidding Procedures Order"). This Agreement is entered into and delivered pursuant to and subject to the Bidding Procedures Order. This Agreement is subject to approval of the Bankruptcy Court and will be consummated only under the Sale Order (as defined below) to be entered in the Bankruptcy Case.

In consideration of the foregoing and the agreements hereinafter set forth, the Parties agree as follows:

1.     **PROPERTY TO BE CONVEYED:**  In consideration of the Purchase Price hereinafter specified, Seller hereby agrees to sell and convey to Buyer, and Buyer hereby agrees to purchase from Seller the Land, together with:

(a)  all of Seller's right, title and interest in the buildings and improvements on the Land, including all fixtures, heating, ventilation and air conditioning, plumbing and electrical systems, parking areas, landscaping and utilities located on or in and used in connection with such buildings and improvements;

(b)  all of Seller's right, title and interest in all personal property assets, equipment, supplies, goods and material objects located on the Land, if any, (the "Personal Property"), provided that any vehicles stored on the Land shall not be Personal Property, and that Seller shall

1

retain title to books and records other than those related to the Land (the "Seller Records") but stored on the Land (reserving Seller's rights to make copies of same or request from Purchaser copies of same), if any, at the time of Closing, for a period of 45 days following Closing;

(c) all right, title and interest of Seller in and to all easements, rights, interests, claims and appurtenances, if any, in any way belonging or appertaining to the Land;

(d) all right, title and interest of Seller in and to all adjoining streets, alleys and other public ways (before or after vacation thereof);

(e) all right, title and interest of Seller in and to easements, rights-of-way, passages, sewer rights, waters, water courses, water rights and powers belonging, relating or pertaining to the Land; and

(f) All permits, licenses, consents and authorizations held in connection with the ownership, use, occupancy or operation of the Land to the extent assignable by Seller to Buyer;

subject to the encumbrances and exceptions to title set forth or referred to in **Schedule A** or in paragraph 3(c) below. The Land, together with (a) through (f) above is hereinafter referred to as the "Property").

2.      **CONSIDERATION**.  (a) The purchase price is Four Million Four Hundred and Forty Five Thousand and 00/100 ($4,450,000.00) DOLLARS U.S. (the "Purchase Price") (subject to adjustment as described in Section 7 below) which Buyer agrees to pay as follows:

(i) As the deposit (the "Deposit") upon the signing of this Agreement, receipt of which is hereby acknowledged, by wire transfer to Barclay Damon LLP, as escrow agent (the "Deposit Escrow Agent") as described below;           $ 445,000.00

(ii) Upon the Closing, to Seller by wire transfer as described below (such amount, the "Purchase Price Balance") subject to adjustment as described in this Agreement;           $ 4,005,000.00

TOTAL                                                                        **$ 4,450,000.00**

(b) The Deposit shall be paid by wire transfer initiated by a financial institution insured by the Federal Deposit Insurance Corporation to the Deposit Escrow Agent, who shall hold the same as escrow agent subject to the terms and conditions hereof and release same to Seller at the time of closing or to the party entitled thereto upon sooner termination of this Agreement. Payments to the Deposit Escrow Agent hereunder shall be made in accordance with the following wire instructions:

Bank:  KeyBank National Association

2

201 South Warren Street
Syracuse, NY 13202
(800) 821-2829
Routing Number: ██████████
Account Number: ██████████
Account Name: Barclay Damon LLP
Reference: St. Christopher's, Inc./Jennie Clarkson (3210387)

(c) At Closing, the Purchase Price Balance and the Deposit shall be paid by wire transfer directly to Seller in accordance with the following wire instructions:

Bank:   KeyBank National Association
201 South Warren Street
Syracuse, NY 13202
(800) 821-2829
Routing Number: ██████████
Account Number: ██████████
Account Name: Barclay Damon LLP
Reference: St. Christopher's, Inc./Jennie Clarkson (3210387)

3.    **TITLE.** (a) Within five (5) business days after the Effective Date, Buyer shall procure(at its sole cost and expense) a preliminary title commitment for a standard owner's title insurance policy issued by a nationally recognized title company of its choice. Buyer shall (i) provide Seller with a copy of said preliminary title commitment and (ii) notify Seller in writing of Buyer's reasonable disapproval of any exception but excluding those exceptions caused by Buyer and/or Buyer's representatives, employees, contractors or invitees (each a "Disapproved Exception", collectively, the "Disapproved Exceptions") contained in said preliminary title commitment that is not set forth in **Schedule A** or Paragraph 3(c) hereof, all within five (5) business days after Buyer's receipt of said preliminary title commitment or Buyer shall be deemed to have approved of all exceptions shown in said preliminary title commitment. If Buyer notifies Seller within the above-described time frame, then Seller shall attempt to obtain the release or termination of each Disapproved Exception. If, at least two business days prior to the the Closing Date, Seller shall be unable to obtain the release or termination of each Disapproved Exception, then Seller shall be allowed a reasonable postponement of Closing, not to exceed ten (10) calendar days, within which to obtain the release or termination of each Disapproved Exception by providing notice to Buyer. If at the end of said time Seller is still unable to deliver or cause to be delivered the Deed conveying its interest in the Property, subject as aforesaid, then Buyer (i) may elect to accept such title as Seller can convey, without modification of the Purchase Price, or (ii) may reject such title by providing Seller with written notice thereof within three (3) business days after the end of such ten (10) day period, time being of the essence. The exceptions not contested by Buyer or waived by Buyer shall be deemed to be permitted exceptions ("Permitted Exceptions"). Upon such rejection, Buyer shall be entitled to a return of the Deposit without interest thereon. Upon receipt of such payment, this Agreement shall terminate and the Parties hereto shall be released and discharged from all further claims and obligations hereunder except those obligations which by the terms of this Agreement survive the termination of this Agreement. If Buyer does not timely provide the notice described in (ii) above, Buyer shall be

3

deemed for all purposes to accept the status of title to the Property as indicated in the above described preliminary title commitment. Notwithstanding the foregoing, no exception shall constitute a Disapproved Exception if Buyer or Seller, at Buyer's expense, can obtain a title insurance policy issued by a title insurance company licensed to do business in the State of New York, at standard rates, naming Buyer as insured in an amount equal to the Purchase Price which either omits or insures over such exception. As used in this Agreement, "business day" means any day other than a Saturday, Sunday or day on which banks in the State of New York are permitted or required to close.

(b)     Notwithstanding the provisions of Paragraph 3(a), the title to be furnished by Seller shall be subject to the items set forth in **Schedule A** and Paragraph 3(c) hereof.

(c)     The Property will be conveyed to and accepted by Buyer subject to:

(i)     Any and all zoning and/or building restrictions, limitations, regulations, ordinances, and/or laws; any and all building lines; and all other restrictions, limitations, regulations, ordinances and/or laws imposed by any governmental authority and any and all other provisions of any governmental restrictions, limitations, regulations, ordinances and/or public laws.

(ii)     Real property taxes and any and all existing tax payments, municipal liens and assessments, not yet due or payable as of the Closing Date; Buyer shall by acceptance of the Deed assume and agree to pay, any and all such tax payments, liens and assessments which may after the Closing Date be assessed, levied against or become a lien on the Property subject to apportionments as provided in this Agreement.

(iii)     Any state of facts which a survey and/or physical inspection of the Property might reveal.

(iv)     Common law or riparian rights of others and/or other rights, if any, in and to any natural watercourse or body of water flowing through or adjoining the Property, and all statutory and other rights of others in and to any such watercourse or body of water.

4.     **CLOSING**:  The closing of title (the "Closing") shall take place through escrow at the office of Seller's counsel, Barclay Damon LLP, 1270 Avenue of the Americas, New York, NY 10020 on the third (3rd) business day following entry of the Sale Order (as defined below)) or by Order of the Bankruptcy Court, or sooner or later by mutual written agreement of the Buyer and Seller following entry of the Sale Order.   The date of the Closing is referred to herein as the "Closing Date".

5.     **CLOSING OBLIGATIONS.**

(a) At the Closing, Seller shall deliver to Buyer:

32491035.1
1624417475.5

(i)     A Quit Claim Deed, sufficient to convey title to the Property (the "Deed").

(ii)    Checks to the order of the appropriate officers in payment of any real property transfer taxes due hereunder.

(iii)   Seller's certificate stating Seller's Federal taxpayer identification number and certifying that Seller is not a foreign person, corporation, partnership, trust or estate as defined in the Internal Revenue Code and Regulations thereunder, pursuant to the Foreign Investment in Real Premises Tax Act of 1980.

(iv)    Keys and security pass codes (if applicable) to the buildings on the Property.

(v)     An affidavit to the best of Seller's knowledge relative to the status of mechanics liens and tenants in possession in the usual form used by title insurers doing business in New York.

(vi)    A Certificate of Existence for Seller.

(vii)   Authorizing resolutions of Seller's board of directors authorizing the sale of the Property to Buyer and approving the terms of this Agreement.

(viii)  An original or certified copy of the Sale Order (as defined below).

(b) At the Closing, the Buyer shall:

(i)     Pay to Seller's counsel the Purchase Price Balance in accordance with the wire instructions in Section 2(c) above.

(ii)    Authorize and direct the Deposit Escrow Agent to pay the Deposit to Seller.

(iii)   Record the Deed.

(iv)    Deliver to Seller a Certificate of Existence or Good Standing for Buyer issued by the Secretary of State of the State of Buyer's organization and, if Buyer is not organized in the State of New York, a certificate issued by the Secretary of State of the State of New York certifying Buyer's authorization to do business as a foreign entity in the State of New York.

(v)     Deliver to Seller authorizing resolutions of Buyer's directors, members/managers and/or shareholders, as applicable, authorizing the purchase of the Property from Seller and approving the terms of this Agreement.

Docusign Envelope ID: 183B6ED6-32F8-4058-85A8-33C5846F1F5C

The Parties shall also provide the Deposit Escrow Agent with all other customary documents necessary to consummate the transaction contemplated hereunder, including but not limited to a mutually agreeable signed settlement statement.

6.  **PURCHASE PRICE.** At the Closing, (i) the Buyer shall pay the Purchase Price Balance to the Seller's counsel by wire transfer as described in Section 2(c) above, (ii) the Deposit Escrow Agent shall pay the Deposit to or as directed by the Seller in accordance with instructions provided by the Seller to Deposit Escrow Agent and (iii) Seller's counsel  shall pay the Purchase Price Balance to or

as directed by the Seller in accordance with instructions provided by the Seller to Seller's counsel.

7.  **APPORTIONMENT, ADJUSTMENTS AND CLOSING COSTS**.

(a)    The following apportionments shall be made between the Parties at the Closing as of the close of business on the day prior to the Closing Date:

(i)    Non-delinquent real estate taxes, assessments, special district charges, water charges and sewer rents, if any, on the basis of the fiscal period for which assessed, except that if there is a water meter on the Property, apportionment at the Closing shall be based on the last available reading, subject to adjustment after the Closing when the next reading is available.

(b)    If the Closing shall occur before a new tax rate is fixed, the apportionment of any taxes at the Closing shall be upon the basis of the old tax rate for the preceding period applied to latest assessed valuation.

(c)    Seller and Buyer agree to comply in all respects with Section 1445 of the Code and the regulations issued thereunder (the "Regulations").  If Seller is not a "foreign person" (as defined in the Regulations), Seller shall deliver to Buyer at Closing a nonforeign certificate as prescribed by the Regulations, properly executed and in form and content satisfactory to Buyer.  If Seller is a "foreign person" or fails or refuses to deliver the nonforeign certificate, or if Buyer receives notice, or has actual knowledge, that the nonforeign certificate is false, a tax equal to 10% of the Purchase Price shall be withheld by Buyer at Closing and paid to the Internal Revenue Service in the manner prescribed by the Regulations, unless withholding is reduced or excused in the manner prescribed by the Regulations.  In the event of any withholding, Seller's obligations to deliver title and close this transaction shall not be excused or otherwise affected.

(d)    Seller shall pay any and all transfer, gains or documentary stamp taxes and other taxes due in connection with the transfer of the Property from Seller to Buyer.  No portion of the Purchase Price shall be allocated to any Personal Property.

(e)    Seller shall pay any and all utility amounts and related costs that arose prior to Closing.

6

(f)        Buyer shall pay all recording and filing fees incurred in connection with recording the Deed.

8.    **SELLER'S COVENANTS.**

Seller covenants that between the Effective Date and the Closing Date:

(a)        It shall not encumber the Property or enter into any lease or other occupancy agreement with respect to the Property without the prior written consent of Buyer.

(b)        Seller shall comply with all notices, orders and requirements issued by any Governmental Authority having jurisdiction against or affecting the Property.

(c)        Seller shall not withdraw, settle or otherwise compromise any protest or reduction proceeding affecting real estate taxes or assessments imposed with respect to the Property for any fiscal period in which the Closing is to occur or for any subsequent fiscal period without the prior written consent of Buyer.

(d)        Seller shall not enter into any new service contract or enter into any new service contract with respect to the Property the term of which extends beyond the Closing Date or which cannot be cancelled on less than thirty (30) days' notice without Buyer's prior written consent, excepting such services as described in Paragraph 36.

(e)        Seller shall cause to be maintained in full force and effect property and casualty insurance on Property in such amount and with such coverage as is customary for property similar to the Property.

(f)        Seller shall cause to be maintained in full force and effect any utility services currently being provided to the Property.

(g)        Seller shall, at its sole cost, maintain, repair, manage and operate the Property in accordance with Seller's prior practices.

(h)        Seller shall, upon Buyer's request, provide Buyer with access to the Property for any purpose related to this Agreement during business hours and at all other reasonable times prior to the Closing, the right and privilege of going upon the Property, at Buyer's sole cost and expense, upon not less than twenty-four (24) hour telephonic notice to Seller for any lawful purpose, including without limitation, to make non-invasive investigations, inspections, examinations, surveys, tests and studies, subject to the rights of any tenants; provided, however, (a) Buyer shall not unreasonably interfere with the normal operation of the Property, and (b) Buyer shall promptly pay for all work performed by order of Buyer and shall not cause the creation of any lien with respect to the Property in favor of any person and/or entity.  If any such lien shall at any time be recorded or filed or a lien claimant files an action with the court and a hearing notice for an interlocutory lien is issued, Buyer shall, within twenty (20) days after the filing thereof or issuance of notice of an interlocutory hearing, cause such lien to be released of record or dismissed by

7

payment, bond, order of a court of competent jurisdiction or otherwise.  Seller or a representative of Seller, at its option, shall have the right to be present during all inspections.  Notwithstanding the foregoing, Buyer shall not have the right to conduct any intrusive testing or investigations of the Property, including but limited to a Phase II environmental assessment, without Seller's prior written consent, which consent shall be in Seller's sole discretion. Seller will cooperate in all reasonable respects with Buyer and its agents and contractors in connection with their respective inspections, review, studies and investigations by complying with all reasonable requests for information and records and assisting Buyer in obtaining all governmental agency records.  Buyer agrees that it shall be responsible for any damages to the same resulting from the exercise of Buyer's rights under or pursuant to this Section, and shall indemnify, defend and hold Seller, its employees and agents, and their respective successors and assigns, harmless from and against any and all claims and liabilities, demands, personal injuries and/or deaths, property damage, material disruptions, nuisance claims, suits, obligations, payments, damages, losses, penalties, liabilities, costs and expenses (including, but not limited to, reasonable attorneys' fees of a single law firm) arising out of Buyer's or Buyer's agents' and/or representative's, consultants', contractors' and/or subcontractors' (collectively, "Buyer's Representatives") actions or omissions taken in, on or about the Property in the exercise of the rights granted pursuant to this Section and shall promptly repair any physical damage or destruction to the Property to Seller's reasonably approval at Buyer's sole cost and expense; provided, however, in no event shall Buyer be responsible for any pre-existing environmental conditions discovered by Buyer during its investigations of the Property provided Buyer does not exacerbate such conditions.  Prior to such time as Buyer or any of Buyer's Representatives enter the Property, Buyer shall (i) have or obtain (or cause to be provided) policies of general liability insurance which insure Buyer and Buyer's Representatives with liability insurance limits of not less than Two Million and No/100 Dollars ($2,000,000.00) combined single limit for personal injury and property damage and name Seller as additional insured, and (ii) provide Seller with certificates of insurance evidencing that Buyer has obtained the aforementioned policies.  The foregoing shall survive the termination of this Agreement.

Notwithstanding anything to the contrary in this Section 8, Seller will notify Buyer of all material matters related to the Property that might arise between the Effective Date and the Closing Date.

9.    **DELIVERY OF PROPERTY**.  Subject to the terms and conditions of this Agreement and provided Buyer has fulfilled its obligations as specified herein, Seller agrees to deliver, simultaneously with the closing of title, possession of the Property which shall be vacant and free of all tenants and occupants.  Buyer grants Seller and Seller's document company ("Seller's Agent"), upon reasonable notice to Buyer and subject to Seller's Agent maintaining appropriate insurance to be provided to Buyer in advance of Seller's Agent's entry upon the Land and adding Buyer as additional insured if possible, a limited license for a period of 45 days after the Closing Date solely to remove Seller's Records from the Property, in the event that same have not been completely removed prior to Closing.

10.    **CONDITION OF PROPERTY.** Buyer represents to Seller that:  (a) it is relying on its own inspection, investigation and examination of the Property; and (b) neither Seller nor any representative of Seller has made any representation or promise upon which Buyer has relied

32491035.1
1624417475.5

Docusign Envelope ID: 183B6ED6-32F0-4058-85A8-33C5848F1FE7

concerning the condition of the Property or of any property covered by this Agreement, it being intended by the Parties that the Property is to be conveyed "AS IS" and "WITH ALL FAULTS". Specifically, but not by way of limitation, Seller does not make, has not made and specifically disclaims any representation or warranty, express or implied, regarding the environmental condition at, on, under or about the Property or the compliance or non-compliance of the Property with applicable environmental laws, including any administrative or judicial interpretation thereof. Without limiting the generality of this acknowledgement and agreement, it is specifically acknowledged and agreed that the Property shall be accepted by Buyer in "AS IS" condition, "WITH ALL FAULTS".

11.    **DEFAULT**.

(a)    If Buyer is in default hereunder, or, on or before the date of Closing as set forth herein, indicates that Buyer is unable or unwilling to perform and Seller stands ready to perform Seller's obligations, Seller's sole and exclusive remedy shall be the right to terminate this Agreement by written notice to Buyer and have the Deposit paid to Seller as reasonable liquidated damages for Buyer 's inability or unwillingness to perform.  It is the intention of the Parties hereto freely to make advance provision on the date of this Agreement for such event in order (i) to avoid controversy, delay and expense, and (ii) to specify now a reasonable amount agreeable to the Parties for compensation to Seller for losses which may not be readily ascertainable or quantifiable, such as any of the following which might be necessary to place Seller in the position Seller would have been in had Buyer made timely performance:  costs of carrying, maintaining, insuring and protecting the property; loss of interest income on the proceeds; loss of optimum market time, value and conditions; the uncertainty, delay, expense and inconvenience of finding a substitute buyer; additional commissions, fees, taxes and borrowing expenses to meet obligations entered into in anticipation of performance. In such event and upon Seller's written notice of termination and Seller's receipt of the Deposit, the Property shall be free of any claims or interest of Buyer therein by virtue of this Agreement.

(b)    If Seller is in material default hereunder, or, on or before the date of Closing as set forth herein, indicates that Seller is unable or unwilling to perform and Buyer stands ready to perform Buyer's obligations, Buyer's sole and exclusive remedy shall be the right to terminate this Agreement by written notice to Seller in which case the Deposit shall be returned to Buyer.  Upon receipt of such payment, this Agreement shall terminate and the Parties hereto shall be released and discharged from all further claims and obligations hereunder except those obligations which by the terms of this Agreement survive the termination of this Agreement. In such event and upon Buyer's written notice of termination and Buyer's receipt of the Deposit, the Property shall be free of any claims or interest of Buyer therein by virtue of this Agreement.

12.    **ESCROW.**

(a)    The funds represented by the Deposit shall be held in escrow by the Deposit Escrow Agent in a non-interest bearing deposit account at a Bank reasonably acceptable to Seller.  The Deposit: (i) shall become the property of Seller (A) upon the delivery of the Deed, or (B) after proper demand by Seller without objection from Buyer in the manner described below; (ii) shall

be returned to Buyer after proper demand by Buyer without objection from Seller in the manner described below; or (iii) shall be delivered to either Seller or Buyer in accordance with a final judgment, which is no longer subject to, or the subject of, an appeal, of a court of competent jurisdiction directing the disposition of the Deposit.

(b)    It is understood and agreed that the Deposit Escrow Agent's sole duties hereunder are as provided herein and that the Deposit Escrow Agent in the performance of its duties hereunder is hereby released and exculpated from all liability except for willful malfeasance or gross negligence and shall not be liable or responsible for anything done or omitted to be done in good faith as herein provided. If either Seller or Buyer makes a demand upon the Deposit Escrow Agent, setting forth the basis for such demand, for payment of all or a portion of the Deposit, the Deposit Escrow Agent shall give at least 10 business days' notice to the other party of such demand and of its intention to pay over the amount demanded on a stated date. If the Deposit Escrow Agent does not receive, before the proposed payment date, an objection to the proposed payment setting forth the basis for such objection, the Deposit Escrow Agent is hereby authorized and directed to make such payment. If before the proposed payment date such other party (or its counsel) delivers to the Deposit Escrow Agent an objection to such payment setting forth the basis for such objection, the Deposit Escrow Agent shall promptly deliver a copy of such objection to the party originally demanding payment, and shall continue to hold such amount until otherwise directed by the joint written instruction of Seller and Buyer or by a final judgment of a court of competent jurisdiction which is no longer subject to, or the subject of, an appeal. In the event that a dispute shall arise as to the disposition of all or any portion of the Deposit held by the Deposit Escrow Agent, the Deposit Escrow Agent shall, at its option, either (i) commence an action of interpleader and deposit the same with a court of competent jurisdiction, pending the decision of such court, and shall be entitled to rely upon the final judgment of any such court with respect to the disposition of all or any portion of the Deposit provided that such judgment is no longer subject to, or the subject of, an appeal or (ii) hold the same pending receipt of joint instructions from Seller and Buyer and shall be entitled to rely upon such joint instructions with respect to the disposition of all or any portion of the Deposit, or a final judgment, which is no longer subject to, or the subject of, an appeal, of a court of competent jurisdiction directing the disposition of the Deposit. The Deposit Escrow Agent shall be entitled to consult with counsel (including any member of the Deposit Escrow Agent's firm, if applicable) and be reimbursed for all reasonable expenses of such consultation with respect to its duties as Deposit Escrow Agent and shall be further entitled to be reimbursed for all reasonable out of pocket expenses incurred in connection with such activities including, without limitation, the fees and expenses incurred in connection with the commencement of any interpleader action. All such expenses shall be paid by the party whose position shall not be sustained.

(c)    The Deposit Escrow Agent may act or refrain from acting in respect of any matter referred to herein, in full reliance upon and by and with the advice of counsel which may be selected by the Deposit Escrow Agent (including any member of the Deposit Escrow Agent's firm, if applicable) and shall be fully protected in so acting or so refraining from acting upon the advice of such counsel. The Deposit Escrow Agent shall have the right to rely upon the certificates, notices and instruments delivered to it pursuant hereto, and all the signatures thereto or to any other writing received by the Deposit Escrow Agent purporting to be signed by any party hereto, and

10

upon the truth of the contents thereof. The Deposit Escrow Agent shall not be bound by any modification of this Agreement which affects the rights or duties of the Deposit Escrow Agent unless it shall have given its prior written consent thereto. The Deposit Escrow Agent may, but shall not be required to, institute or defend any action or legal process involving any matter referred to herein which in any manner affects the Deposit Escrow Agent or its duties or liabilities hereunder, unless or until requested to do so by Seller or Buyer and then only upon receiving full indemnity in an amount, and of such character, as the Deposit Escrow Agent shall require, against any and all claims, costs, liabilities, judgments, attorneys' fees and disbursements, and other expenses of any kind in relation thereto.

(d)     Seller and Buyer agree, jointly and severally, to defend and indemnify the Deposit Escrow Agent and hold the Deposit Escrow Agent harmless from all claims which may be incurred by the Deposit Escrow Agent by reason of its acceptance of, and its performance under, this Agreement.

(e)     The Deposit Escrow Agent may at any time resign hereunder by giving notice of its resignation to Seller and Buyer at least 30 days prior to the date specified for such resignation to take effect and, upon the effective date of such resignation, the Deposit shall be delivered by the Deposit Escrow Agent to such person or entity as Seller and Buyer may have jointly designated in writing or to such person or entity as may be designated as hereinafter provided as the successor Deposit Escrow Agent, whereupon all duties and obligations of the Deposit Escrow Agent named herein shall cease and terminate. If no such person or entity shall have been designated by both Seller and Buyer by the date which is 5 days prior to the date specified for such resignation to take effect then the Deposit Escrow Agent may designate a title insurance company or bank in the State of New York to act as escrow agent hereunder.

13.     **TERMINATION**. This Agreement may be terminated at any time prior to the Closing:

(a)     by the mutual written consent of Seller and Buyer;

(b)     by Buyer upon written notice to the Seller if Buyer is not then in material breach of any provision of this Agreement and there has been a material breach of, material inaccuracy in, or failure to perform any material representation, warranty, agreement, or covenant of Seller in this Agreement, and such breach, inaccuracy, or failure cannot reasonably be cured by Seller on or before November 14, 2025 (the **"Drop Dead Date"**);

(c)     by Seller upon written notice to Buyer if Seller is not then in material breach of any provision of this Agreement and there has been a material breach of, inaccuracy in, or failure to perform any representation, warranty, agreement, or covenant of Buyer in this Agreement, and such breach, inaccuracy, or failure cannot reasonably be cured by Buyer on or before the Drop Dead Date; or

(d)     by Seller or Buyer upon written notice to the other party:

(i)     if the Sale Order is not entered by the Drop Dead Date; or

11

(ii)    if the Bankruptcy Court enters an order dismissing the Bankruptcy Case or converting the Bankruptcy Case to a proceeding under chapter 7 of the Bankruptcy Code.

14.    **RISK OF LOSS:** Throughout the period between the Effective Date and the Closing Date, Seller shall bear the risk of loss. If the Property is damaged for any cause prior to the Closing, Seller shall have the option to repair or not to repair the same; and shall give written notice of its election to Buyer within five (5) days after the damage or on the Closing Date, whichever comes first.  If Seller elects to repair the same at Seller's expense (including use of insurance proceeds) it shall promptly and in good faith undertake to do so and shall complete such repairs prior to Closing.  If the Property is not in, or cannot be restored to, substantially the present condition, reasonable wear and tear excepted, prior to the Closing, Buyer shall have the option of:

(a)    Accepting title to the damaged Property in its damaged condition and receiving credit on the Purchase Price equal to any insurance monies paid or to be paid to Seller on account of such loss or an assignment Seller's rights to receive the same; or

(b)    Terminating this Agreement, in which event the Deposit shall be paid to Buyer the Deposit and neither Party shall have any further rights or obligations under this Agreement and this Agreement shall thereupon become void and have no effect except those obligations which by the terms of this Agreement survive the termination of this Agreement.

15.    **CONDEMNATION:**  If the whole or any part of the Property is taken by eminent domain from and after the Effective Date until the passing of the Closing Date (hereinafter a "Condemnation Proceeding"), Seller shall immediately notify Buyer of such fact.  Seller shall pay to Buyer any award received by Seller prior to Closing  on the Closing Date as reflected in the settlement statement and Buyer shall have the right to participate with Seller in any Condemnation Proceeding affecting the Property, and Buyer and Seller shall cooperate with each other in good faith.

16.     **REPRESENTATIONS AND WARRANTIES OF THE SELLER**: The Seller hereby represents and warrants to the Buyer, on and as of the Effective Date all of which representations and warranties shall be deemed to have been remade by Seller to Buyer on or as of the Closing as if first made on the Closing Date, as follows:

(a) Seller is a not-for-profit corporation which has been duly organized and is validly existing and  in good  standing under the laws of the  State of New York,  and  has the full power and authority to enter into, execute, deliver, consummate and carry out the transaction contemplated by this Agreement and any  instruments and agreements reasonably necessary therefor;

(b) Seller represents and warrants to Buyer that,  to the best of Seller's knowledge generally, and specifically with reference to the Land, paragraph 36 herein and excluding the NOV

12

referenced therein hereby,  the execution, delivery, and consummation of this Agreement and the transactions contemplated herein will not:

    a.  Violate any law, statute, rule, or regulation applicable to Seller;

    b.  Conflict with or result in a breach of any judgment, order, decree, or injunction of any court binding upon the Seller or be inconsistent with the Sale Order (as defined herein) issued pursuant to, inter alia, Section 363 of the Bankruptcy Code;

    c.  Require any consent, approval, or authorization of any third party (other than a governmental authority) that has not been obtained prior to Closing, including with specific reference any separate approval of the New York State Attorney General and/or the Supreme Court of the State of New York regarding a sale of a significant portion of the assets of a not-for-profit entity under Sections 510, 511 and 511-A of the New York Not-For-Profit Corporation Law, for which Seller shall only seek approval of this Agreement and the sale of the Property by the Bankruptcy Court in the Sale Order (as defined herein); or

    d.  Result in a default under or breach of any contract, agreement, or instrument to which the Seller is a party or by which the Seller is bound, subject to service contracts which are not assigned to the Buyer and which may be rejected by Seller under the Bankruptcy Code; and

(c) The person executing this Agreement on behalf of Seller is duly authorized to do so.

The foregoing representations, warranties, and covenants of Seller in this Section shall survive the Closing or termination of this Agreement for a period of 6 months.

17.    **REPRESENTATIONS AND WARRANTIES OF THE BUYER:** The  Buyer  hereby represents and warrants to the Seller, on and as of the Effective Date all of which representations and warranties shall be deemed to have been remade by Buyer to Seller on or as of the Closing as if first made on the Closing Date, as follows:

(a) Buyer is a limited liability company which has been duly organized and is validly existing and  in good  standing under the laws of the  State of Delaware and  has the full power and authority to enter into, execute, deliver, consummate and carry out the transaction contemplated by this Agreement and any  instruments  and agreements reasonably necessary therefor; and

(b) Buyer represents and warrants to Seller that the execution, delivery, and consummation of this Agreement and the transactions contemplated herein will not:

    a.  Violate any law, statute, rule, or regulation applicable to Buyer;

    b.  Conflict with or result in a breach of any judgment, order, decree, or injunction of any court binding upon the Buyer;

    c.  Require any consent, approval, or authorization of any third party (other than a governmental authority) that has not been obtained prior to Closing; or

13

Docusign Envelope ID: 182B6ED6-32F8-4058-85A8-33C5848F1EEO

    d.  Result in a default under or breach of any contract, agreement, or instrument to which the Buyer is a party or by which the Buyer is bound; and

(c) The person executing this Agreement on behalf of Buyer is duly authorized to do so.

The foregoing representations, warranties, and covenants of Buyer in this Section shall survive the Closing or termination of this Agreement for a period of six (6) months.

18.    **PROOF OF FUNDS.**  Buyer represents and warrants that it has sufficient funds and access to sufficient funds to close the purchase contemplated by this Agreement without the need to obtain new or additional financing.  As set forth in the Bidding Procedures Order, Buyer shall provide to Seller proof of such funds reasonably satisfactory to Seller.

19.    **ASSIGNMENT.** Except as otherwise provided below, this Agreement and Buyer's rights hereunder may not be assigned by Buyer without the prior written consent of Seller, and any purported assignment without such written consent shall be void and of no effect. Notwithstanding the foregoing, Buyer may assign its rights hereunder without Seller's consent to one or more affiliates 100% owned and controlled by Buyer by providing Seller with written notice of such assignment, which written notice shall state the relationship of the acquiring entity.  Upon any effective assignment of Buyer's rights hereunder, Buyer and Buyer's assignee shall be jointly and severally liable hereunder, unless otherwise agreed by Seller in writing. Seller may assign its rights and interests in this Agreement at any time without the consent of Buyer.

20.    **BROKER:**  The Parties represent that Ariel Property Advisors LLC, as broker for Seller (the "Broker"), is the only broker responsible for the sale of the Property. Seller agrees to pay the commission due such Broker in connection with the sale of the Property under separate agreement at the time of Closing. Each party represents to the other that no other broker or agent brought the Property to Buyer's attention, was, in any way, a procuring cause of this sale and purchase, or was otherwise involved in the presentation or negotiation of this transaction.  The provisions of this paragraph shall survive the delivery of the Deed.

21.    **BANKRUPTCY COURT APPROVAL**

(a) Seller and Buyer acknowledge and agree that this Agreement and the sale of the Property as described herein are subject to Bankruptcy Court approval.  Seller and Buyer acknowledge that (i) to obtain such approval, Seller must demonstrate that it has taken reasonable steps to obtain the highest and otherwise best offer possible for the Property, and that such demonstration shall include giving notice of the transactions contemplated by this Agreement to creditors and other interested parties as ordered by the Bankruptcy Court.

(b) From and after the date of execution of this Agreement and prior to the Closing or the termination of this Agreement in accordance with the terms hereof, Seller shall not take any action which is intended to or fail to take any action the intent of which failure to act is to, result in the reversal, voiding, modification or staying of the Sale Order, as defined below.

14

**(c)  RESERVED**

(d)  Seller shall file a proposed version of the Order (A) Authorizing the Sale of the Property Free and Clear of Liens, Claims, and Encumbrances Under Section 363 of the Bankruptcy Code, and (B) Granting Related Relief, (acceptable in form an substance to Buyer in its reasonable discretion, the "**Sale Order**"), in the Bankruptcy Case as soon as reasonably practicable prior to the hearing on the entry of the Sale Order.  Seller shall pursue diligently the entry of the Sale Order. Buyer agrees that it shall promptly take such actions as are reasonably requested by Seller to assist in obtaining entry of the Sale Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of demonstrating that Buyer is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code.  In the event that the entry of the Sale Order is appealed or a stay pending appeal is sought, Seller shall oppose the appeal or the stay pending appeal and seek the dismissal of any appeal (including a petition for certiorari, motion for rehearing, re-argument, reconsideration or revocation).  Notwithstanding the foregoing, any resulting changes to this Agreement or any related document shall be subject to the approval of Buyer in its reasonable discretion.

(e)  Seller acknowledges and agrees, and the Sale Order shall provide, among other things, that, on the Closing Date and concurrently with the Closing, all then existing or thereafter Disapproved Exceptions (other than Permitted Exceptions) of, against or created by Seller or the bankruptcy estate and in existence on or prior to the Closing Date shall be fully released from and with respect to the Property, which shall be transferred to Buyer free and clear of all such Disapproved Exceptions.

(f)  If an Auction (as defined in the Bidding Procedures Order) is conducted and Seller does not choose Buyer as the Successful Bidder (as defined in the Bidding Procedures Order), but instead chooses Buyer as the Back-Up Bidder (as defined in the Bidding Procedures), Buyer will be the Back-Up Bidder.  If Buyer is chosen as the Back-Up Bidder, Buyer will be required to keep its bid to consummate the transactions contemplated by this Agreement on the terms and conditions set forth in this Agreement (as may be amended with both Parties' written consent prior to or at the Auction) open and irrevocable until the closing of the sale of the Property to the Successful Bidder; *provided* that in no event shall Buyer be required to keep its bid to consummate the transactions contemplated by this Agreement open and irrevocable after 5:00 p.m. ET on the fifth business day after the Drop Dead Date.  If the Successful Bid with the Successful Bidder is terminated prior to closing but before 5:00 p.m. ET on the fifth business day after the Drop Dead Date, Buyer will be deemed to be the Successful Bidder and will forthwith consummate the transactions contemplated by this Agreement on the terms and conditions set forth in this Agreement and the Bidding Procedures Order (as the same may be amended with both Parties' written consent prior to or at the Auction).

22.    **NOTICES.** Any notice or other communication that is to be given hereunder shall be in writing and delivered by certified mail, or sent by reliable electronic means, or sent by nationally recognized overnight courier to such party at the address set forth below:

If to Seller:          Dr. Sarah Ruback
                         c/o Barclay Damon LLP

15

1270 Avenue of the Americas, Suite 2301
New York, NY 10020
Attn: Janice Grubin, Esq.
Email: sruback@sc1881.org

with a copy (which
shall not constitute
notice) to:

Barclay Damon LLP
1270 Avenue of the Americas, Suite 2301
New York, NY 10020
Attn: Janice Grubin, Esq.
Email: jgrubin@barclaydamon.com

If to Buyer:

Cranlake Berry, LLC
Attn: Maria Docters
2900 Purchase Street
Purchase, NY 10577
Email: maria.docters@gmail.com

with a copy (which
shall not constitute
notice) to:

DLA Piper LLP (US)
Attn: John Canoni and David Riley
1900 N. Pearl St.
Suite 2200
Dallas, TX 75201
Email: john.canoni@us.dlapiper.com
david.riley@us.dlapiper.com

If to Deposit Escrow Agent: Barclay Damon LLP
1270 Avenue of the Americas, Suite 2301
New York, NY 10020
Attn: Janice Grubin, Esq.
Email: jgrubin@barclaydamon.com

23. **RECORDING.** This Agreement shall not be recorded in the land records.

24. **RIGHT TO WITHDRAW.** This Agreement shall not be considered or construed as an offer by Seller. Seller reserves the right to withdraw this proposed Agreement at any time prior to the signature hereof by Buyer, Seller and Deposit Escrow Agent, receipt by the Deposit Escrow Agent of the full payment of the Deposit set forth herein, and delivery of a fully executed Agreement to Buyer.

16

25.    **IRS REPORTING COMPLIANCE**.  It is agreed that Buyer's attorney shall be deemed to be the "Settlement Agent" in this transaction for the purposes of Section 1521 of the Tax Reform Act of 1986. As such Settlement Agent, Buyer's attorney shall be responsible for properly filing the required information under said Section to the Internal Revenue Service and providing the required Notices of Filing to the appropriate parties. The provisions of this paragraph shall survive the closing.

26.    **ACCEPTANCE OF DEED**.  The Parties agree that, except to the extent expressly provided herein or by way of a specific agreement in writing which by its terms shall expressly survive the Closing, the delivery by Seller and the acceptance by Buyer of the Deed at the Closing shall be deemed to constitute full compliance by Seller with all of the terms, conditions and covenants of this Agreement on its part to be performed.

27.    **BINDING EFFECT.**  This Agreement shall be binding upon and inure to the benefit of the administrators, successors and permitted assigns of the respective Parties.

28.    **GOVERNING LAW; SUBMISSION TO JURISDICTION**.  This Agreement shall be construed and enforced in accordance with the Bankruptcy Code and the laws of the State of New York.  Any action or proceeding seeking to enforce any provision of, or based on any right arising out of, this Agreement may be brought against any of the Parties hereto in the courts of the State of New York located in New York or Westchester County or, if it has or can acquire jurisdiction, in the United States District Court for the Southern District of New York, including the Bankruptcy Court, and each of the Parties hereto consents to the jurisdiction of such courts (and of the appropriate appellate courts) in any such action or proceeding and waives any objection to venue laid therein.

29.    **COUNTERPARTS / FACSIMILE / ELECTRONIC MAIL.**  This Agreement may be executed in any number of counterparts, and by the Parties hereto in separate counterparts, each of which when so executed shall be deemed to be an original, and all of which when taken together shall constitute one and the same Agreement.  The Parties hereto agree that this Agreement may be transmitted between them or their respective attorneys by facsimile.  The Parties hereto intend that a manual signature delivered by facsimile, e-mail, or other means of electronic transmission, shall be deemed to have the same effect as delivery of an original signed copy of this Agreement, and that an Agreement containing the manual signatures (original or  delivered by facsimile, e-mail, or other means of electronic transmission) of all the Parties is binding on the Parties once sent via facsimile or via electronic mail to counsel for Buyer and Seller.

30.    **ENTIRE AGREEMENT.**  All prior understandings, agreements, representations and warranties, oral and written, between Seller and Buyer are merged in this Agreement.  This Agreement completely expresses the agreement of the Parties, and has been entered into by the Parties after discussion with their respective attorneys and after full investigation, neither party relying upon any statement made by anyone else that is not set forth in this Agreement.  Neither this Agreement nor any provision hereof may be waived, changed or cancelled except by a written

32491035.1
1624417475.5

instrument signed by all Parties.  In the event of inconsistency between this Agreement and the Sale Order, the Sale Order shall control.

31.    **MUTUAL AGREEMENT.** Each and every provision of this Agreement has been mutually negotiated, prepared and drafted. Each party hereto has been represented by legal counsel or has had the opportunity to be represented by legal counsel. In connection with the construction or interpretation of any provision hereof, no consideration shall be given to the issue of which party actually prepared, drafted, requested or negotiated any provision or deletion. This Agreement shall not be construed more severely against any one party hereto than against any other party hereto.

32.    **CAPTIONS**.  The captions preceding the paragraphs in this Agreement are for ease of reference only and shall be deemed to have no effect whatsoever on the meaning or construction of the provisions of this Agreement.

33.    **SEVERABILITY**.  In case any one or more of the provisions contained in this Agreement, or any of the documents or agreements contemplated hereby, should be invalid, illegal or unenforceable in any respect, the validity, legality, and enforceability of the remaining provisions contained herein shall not in any way be affected or impaired thereby.

34.    **ATTORNEYS' FEES.** In the event suit is brought to enforce any provisions of this Agreement, the prevailing party shall be entitled to costs of suit including reasonable costs and attorneys' fees.

35.    **WAIVER OF JURY TRIAL.  BUYER AND SELLER HEREBY WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY ACTION OR PROCEEDING TO ENFORCE OR DEFEND ANY RIGHTS UNDER THIS AGREEMENT.**

36. **SOIL REMEDIATION.**

   a.   Seller received a Notice of Violation ("NOV") from the New York City Department of Environmental Protection ("NYCDEP") alleging that, on October 26, 2021 and October 27, 2021, representatives of NYCDEP observed turbid stormwater runoff flowing from a 250 feet by 100 feet fill area in the northwest corner of the Property ("Fill Area") containing soil, sediment, coal, ash, glass, metals, plastics, tiles and other unidentifiable items, across the land of NYCDEP, and discharging into and degrading the water quality of the Kensico Reservoir.  A copy of that NOV, dated November 1, 2021, is attached and incorporated herein as **Schedule C**.  In response to the NOV, Seller ceased filling activities on the Property and implemented erosion and sediment control measures to stabilize the Fill Area, which remain in place today.  NYCDEP and the Town of North Castle ("Town") have demanded that Seller completely remove pursuant to a Town building permit all of such fill placed by Seller on the Property, and then properly dispose of the removed material in an off-site out-of-watershed landfill regulated by New Jersey, Pennsylvania or New York  in accord with all applicable laws ("Required Remedial Work").  Seller is actively engaged with the

18

Town and NYCDEP in the development of a scope of work, including approvable specifications and/or drawings, to accomplish the Required Remedial Work and promptly restore a vegetated surface of the impacted portion of the Property in order to receive a letter or other similar written communication from NYCDEP confirming the satisfactory completion of the Required Remedial Work and the absence of continuing obligations with respect to the NOV ("File Inactivation Letter"). Seller is also in the process of retaining PVEDI, Engineering, Architecture and Geology DPC and such other consultants ("Consultants") upon review and reasonable consent of the Buyer, such consent by the Buyer not being unreasonably withheld, to undertake the Required Remedial Work. The proposal to complete the Required Remedial Work, for the sake of clarity, shall not include the imposition of engineering or institutional controls.

b.  Prior to Closing, Seller, through its Consultants, will, to the best of its and its Consultants' abilities, promptly implement the Required Remedial Work to the reasonable satisfaction of the Buyer, such satisfaction not being unreasonable, and the Town and NYCDEP, including restoration of a vegetated surface on the impacted portion of the Property. Further, Seller shall pay in full all costs invoiced by Consultants as to the Required Remedial Work prior to Closing, with copies of Consultant invoices and proof of payment being provided to Buyer at or before Closing. The Seller and Consultants will use their best efforts to complete the physical elements of the Required Remedial Work and stabilize the surface prior to Closing, although the restoration of a vegetated surface on the impacted portion of the Property may not be completed until the 2026 growing season.

c.  In the event that the Required Remedial Work and restoration of a vegetated surface is not completed prior to the Closing Date or in the event that the Town or NYCDEP require additional work beyond the scope of the agreed services by Consultants prior to the provision of the File Inactivation Letter, Seller shall establish and fund at Closing a Required Remedial Work Escrow Account ("RRW Escrow Account") with a separate Required Remedial Work Escrow Agent ("RRW Escrow Agent") in the amount of $1,000,000.00 less all amounts documented and paid by Seller for Required Remedial Work and restoration of a vegetated surface pre-Closing, with all post-Closing invoices for costs and expenses relating to the Required Remedial Work and revegetation to be paid timely by the RRW Escrow Agent from the RRW Escrow Account, with copies to Buyer. The amount in the RRW Escrow Account as of the Closing date shall be a cap on all Seller's costs for Required Remedial Work and restoration of a vegetated surface post-Closing. Any amounts remaining in the RRW Escrow Account post-Closing shall be returned to the Seller by the RRW Escrow Agent not more than 10 days following receipt of the File Inactivation Letter, with a prompt copy to Buyer in advance of the return of such funds to Seller. Prior to, and as a condition to the return by the RRW Escrow Agent of all funds in the RRW Escrow Account to Seller, the Seller shall deliver to Buyer a letter from the Consultant confirming the completion of the Required Remedial Work ("Consultant Confirmation Reliance Letter") and permitting Buyer and its affiliates to rely on such

19

Docusign Envelope ID: 182B6ED6-32F0-4058-95A8-33C5846F1EE7

Consultant Confirmation Reliance Letter. Seller shall designate the RRW Escrow Agent in writing to Buyer in advance of Closing.

d.  In the absence of a File Inactivation Letter, post-Closing, Buyer shall provide Seller, its Consultant and such Consultant's contractors and subcontractors, NYCDEP and the Town with reasonable access to the Property and water to complete, solely at Seller's cost and expense, the Required Remedial Work and the restoration of a vegetated surface on the impacted portion of the Property  (which work shall not include the imposition of institutional or engineering controls absent written consent from Buyer, in its sole discretion) and to provide Buyer with a certificate of insurance evidencing the following insurance coverage with respect to  such Consultant, contractor or subcontractor is in full force and effect, and naming or scheduling Seller and Buyer as additional insureds:  (i) worker's compensation insurance for statutory obligations imposed by applicable Workers' Compensation laws; (ii) commercial general liability insurance with minimum amounts of coverage of $1,000,000 per occurrence for bodily injury, death and property damage liability, and $2,000,000 in the aggregate; and (iii) business automobile policy covering automobile bodily injury, death and property damage liability in an amount of not less than $1,000,000, with any such insurance policies being primary and non-contributory.  Seller will remain the prime contract party with respect to any Consultant, contractor, or subcontractor that Seller hires to implement Required Remedial Work and restoration of a vegetated surface on the impacted portion of the Property, with Buyer at Buyer's option being added to the prime Required Remedial Work contracts post-Closing, if all Required Remedial Work is not completed at the time of the Closing. Seller and its agents' rights of access to the Property, control over the Required Remedial Work and restoration of a vegetated surface on the impacted portion of the Property,  and oversight of the Consultants shall terminate upon receipt of the File Inactivation Letter.  All payments from the RRW Escrow Account to Consultants, contractors and subcontractors shall cease as of the date of issuance of a File Inactivation Letter – however all invoices for services rendered by Consultants, contractors and subcontractors prior to the issuance of the File Inactivation Letter for services rendered prior to same shall be satisfied (subject to commercial terms and objections) by the RRW Escrow Agent from the RRW Escrow Account prior to the return of the final balance (if any) of RRW Escrow Account balance to Seller. The Parties agree that in the event of exhaustion of the funds contained in the RRW Escrow Account post-Closing, Buyer alone shall be responsible for any outstanding, further and additional Required Remedial Work and restoration of a vegetated surface on the impacted portion of the Property, with Buyer specifically waiving, relinquishing and releasing any claim over and against the Seller post-Closing for same.

e.  Post-Closing, Buyer shall be entitled to discuss the status of the Required Remedial Work with the Consultants and any contractors or subcontractors, and all such parties shall provide full and complete information to Buyer.

20

32491035.1
1624417475.5

Docusign Envelope ID: 183B6ED6-32F8-4058-85A8-33C5848F1EE7

37.   **CONDITIONS PRECEDENT FOR BUYER**.  Buyer's obligation to close hereunder shall be subject to the occurrence of each of the following conditions, any one or more of which may be waived by Buyer in writing.

    a.   Seller shall have complied with all obligations hereunder in all material respects.

    b.   The representations and warranties of Seller contained herein were true in all material respects when made and are true in all material respects on the closing date, and Seller's representations and warranties shall not have been modified or changed in any respect after the Effective Date except as mutually agreed by Seller and Buyer, each in their respective sole discretion.

    c.   Seller shall have delivered to Buyer all of the Seller's deliveries and other items set forth in Section 5.a.

38.   **CONDITIONS PRECEDENT FOR SELLER.**  Seller's obligation to close hereunder shall be subject to the occurrence of each of the following conditions, any one or more of which may be waived by Seller in writing.

    a.   Buyer shall have complied with all obligations hereunder in all material respects.

    b.   The representations and warranties of Buyer contained herein were true in all material respects when made and are true in all material respects on the closing date, and Buyer's representations and warranties shall not have been modified or changed in any respect after the Effective Date except as mutually agreed by Seller and Buyer, each in their respective sole discretion.

    c.   Buyer shall have delivered to Seller all of the Buyer's deliveries and other items set forth in Section 5.b.

[Signature page follows.]

21

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement the day and year first written above.

**SELLER**

**St. Christopher's, Inc.**

By: _____
     Name:
     Title:

**BUYER**

**Cranlake Berry LLC**

By: _____
     Name: Stephan Feldgoise
     Title:   Sole Member

**Stephan Feldgoise**

By: _____
Name: Stephan Feldgoise, personally and individually, who agrees to bear directly, individually and personally, and jointly and severally with Buyer, any financial liability to Seller in the event of any breach by Cranlake Berry LLC with respect to this Purchase and Sale Agreement

The undersigned Deposit Escrow Agent agrees to be bound by the provisions of Section 12 above and the duties of Deposit Escrow Agent set forth in Section 2 above.

1624417475.5

**DEPOSIT ESCROW AGENT**

**Barclay Damon LLP**


By: _____
      Name:
      Title:

32491035.1
1624417475.5

## __Schedule A__
## Property Description

32491035.1
1624417475.5

# CONTROL POINT
## A S S O C I A T E S   I N C   P C
**traditional methods | modern approaches**

200 West 41st Street, 14th Floor
New York, NY 10036
Tel: 646.780.0411
cpasurvey.com

June 09, 2025
JOB# 04-250054-00
PAGE 1 OF 3

### METES & BOUNDS DESCRIPTION
LOT 2, BLOCK 1, SECTION 118.01
TOWN OF NORTH CASTLE, WESTCHESTER COUNTY, STATE OF NEW YORK

ALL THAT CERTAIN PLOT, PIECE OR PARCEL OF LAND, SITUATE, LYING AND BEING IN THE TOWN OF NORTH CASTLE, COUNTY OF WESTCHESTER AND STATE OF NEW YORK, DESIGNATED AS PARCEL 1 ON A CERTAIN MAP ENTITLED "FINAL LOT LINE CHANGE PREPARED FOR ST. CHRISTOPHERS, INC. SITUATED IN THE TOWN OF NORTH CASTLE WESTCHESTER COUNTY, NEW YORK", PREPARED BY THOMAS C. MERRITTS LAND SURVEYORS, P.C., DATED MAY 13, 2008, LAST REVISED ON MAY 20, 2014, AND FILED IN THE WESTCHESTER COUNTY CLERK'S OFFICE, DIVISION OF LAND RECORDS, ON JULY 29, 2014, AS MAP NO. 28790, BEING BOUNDED AND DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT ON THE NORTHERLY RIGHT OF WAY LINE OF OLD ORCHARD STREET (A.K.A. PARK ROAD, A.K.A. ORCHARD DRIVE, A VARIABLE WIDTH RIGHT OF WAY, AS WIDENED PER SAID MAP NO. 28790), SAID POINT BEING LOCATED ON THE DIVISION LINE BETWEEN LOT 2, BLOCK 1, SECTION 118.01 (A.K.A. PARCEL 1, MAP NO. 28790, LANDS NOW OR FORMERLY OF JENNIE CLARKSON HOME FOR CHILDREN / ST. CHRISTOPHER JENNIE CLARKSON CHILD CARE SERVICES INC.), ON THE WEST, AND LOT 5, BLOCK 1, SECTION 118.03 (LANDS NOW OR FORMERLY OF DAVID YANCEY BRADSHAW AKIN AND COURTNEY HUNTLEY AKIN), ON THE EAST, BOTH LOCATED IN THE TOWN OF NORTH CASTLE, WESTCHESTER COUNTY, STATE OF NEW YORK;

THENCE NORTHWESTERLY, ALONG THE NORTHERLY RIGHT OF WAY LINE OF OLD ORCHARD STREET, AS WIDENED, THE FOLLOWING SIXTEENTH (16) COURSES AND DISTANCES:

1)  NORTH 74 DEGREES 06 MINUTES 19 SECONDS WEST, A DISTANCE OF 78.69 FEET TO A POINT;

2)  THENCE NORTH 72 DEGREES 43 MINUTES 18 SECONDS WEST, A DISTANCE OF 68.29 FEET TO A POINT;

3)  THENCE NORTH 68 DEGREES 28 MINUTES 18 SECONDS WEST, A DISTANCE OF 17.76 FEET TO A POINT;

4)  THENCE NORTH 58 DEGREES 16 MINUTES 18 SECONDS WEST, A DISTANCE OF 38.00 FEET TO A POINT;

5)  THENCE NORTH 54 DEGREES 38 MINUTES 18 SECONDS WEST, A DISTANCE OF 49.40 FEET TO A POINT;

6)  THENCE NORTH 46 DEGREES 56 MINUTES 18 SECONDS WEST, A DISTANCE OF 64.59 FEET TO A POINT;

7)  THENCE NORTH 41 DEGREES 07 MINUTES 18 SECONDS WEST, A DISTANCE OF 51.23 FEET TO A POINT;

8)  THENCE NORTH 41 DEGREES 03 MINUTES 18 SECONDS WEST, A DISTANCE OF 233.42 FEET TO A POINT;

9)  THENCE NORTH 59 DEGREES 39 MINUTES 18 SECONDS WEST, A DISTANCE OF 13.83 FEET TO A POINT;

10) THENCE NORTH 31 DEGREES 17 MINUTES 50 SECONDS EAST, A DISTANCE OF 9.44 FEET TO A POINT;



*Professional Land Surveying, Geospatial, and Consulting Services*

**CONTROL POINT**
ASSOCIATES INC PC
traditional methods | modern approaches

im Avenue, 14th Floor
New York, NY 10036
Tel: 646.780.0411
cpasurvey.com

11)  THENCE NORTH 69 DEGREES 27 MINUTES 50 SECONDS WEST, A DISTANCE OF 37.58 FEET TO A
     POINT;

12)  THENCE NORTH 72 DEGREES 19 MINUTES 00 SECONDS WEST, A DISTANCE OF 13.84 FEET TO A
     POINT;

13)  THENCE NORTH 59 DEGREES 39 MINUTES 18 SECONDS WEST, A DISTANCE OF 3.31 FEET TO A
     POINT;

14)  THENCE NORTH 65 DEGREES 19 MINUTES 18 SECONDS WEST, A DISTANCE OF 38.77 FEET TO A
     POINT;

15)  THENCE NORTH 73 DEGREES 46 MINUTES 18 SECONDS WEST, A DISTANCE OF 97.54 FEET TO A
     POINT;

16)  THENCE NORTH 77 DEGREES 52 MINUTES 18 SECONDS WEST, A DISTANCE OF 179.30 FEET TO A
     POINT ON THE DIVISION LINE BETWEEN SAID LOT 2, BLOCK 1, SECTION 118.01, ON THE EAST,
     AND LOT 4, BLOCK 1, SECTION 118.02 (LANDS NOW OR FORMERLY OF CITY OF NEW YORK BUREAU
     OF WATER SUPPLY), ON THE WEST;

THENCE NORTHEASTERLY AND SOUTHEASTERLY, ALONG SAID DIVISION LINE, THE FOLLOWING FIVE (5)
COURSES AND DISTANCES:

1)  NORTH 12 DEGREES 06 MINUTES 00 SECONDS EAST, A DISTANCE OF 1,491.89 FEET TO A POINT;

2)  THENCE SOUTH 55 DEGREES 20 MINUTES 30 SECONDS EAST, A DISTANCE OF 230.95 FEET TO A
    POINT;

3)  THENCE SOUTH 53 DEGREES 58 MINUTES 30 SECONDS EAST, A DISTANCE OF 327.59 FEET TO A
    POINT;

4)  THENCE SOUTH 55 DEGREES 37 MINUTES 13 SECONDS EAST, A DISTANCE OF 138.98 FEET TO A
    POINT;

5)  THENCE SOUTH 54 DEGREES 10 MINUTES 23 SECONDS EAST, A DISTANCE OF 581.25 FEET TO A
    POINT ON THE DIVISION LINE BETWEEN SAID LOT 2, BLOCK 1, SECTION 118.01, ON THE WEST,
    AND LOT 3, BLOCK 1, SECTION 118.01 (LANDS NOW OR FORMERLY OF DORMITORY AUTHORITY OF
    THE STATE OF NEW YORK), ON THE EAST;

THENCE SOUTHWESTERLY AND SOUTHEASTERLY, ALONG THE DIVISION LINE BETWEEN SAID LOT 2, BLOCK
1, SECTION 118.01, ON THE WEST, AND, IN PART, SAID LOT 3, BLOCK 1, SECTION 118.01, AND IN
PART, LOT 7, BLOCK 1, SECTION 118.03, TOWN OF NORTH CASTLE, COUNTY OF WESTCHESTER, STATE
OF NEW YORK (LANDS NOW OR FORMERLY OF DORMITORY AUTHORITY OF THE STATE OF NEW YORK), ON
THE EAST, THE FOLLOWING TWO (2) COURSES AND DISTANCES:

1)  SOUTH 20 DEGREES 39 MINUTES 45 SECONDS WEST, A DISTANCE OF 653.48 FEET TO A POINT;

2)  THENCE SOUTH 26 DEGREES 16 MINUTES 10 SECONDS EAST, A DISTANCE OF 430.53 FEET TO A
    POINT ON THE DIVISION LINE BETWEEN SAID LOT 2, BLOCK 1, SECTION 118.01 (A.K.A.
    PARCEL 1, MAP NO.28790), ON THE NORTH, AND LOT 6, BLOCK 1, SECTION 118.03, TOWN OF
    NORTH CASTLE, COUNTY OF WESTCHESTER, STATE OF NEW YORK (A.K.A. PARCEL 2, MAP NO.
    28790, LANDS NOW OR FORMERLY OF RALPH HERRERA AND JENNIFER HERRERA), ON THE SOUTH;

THENCE SOUTHWESTERLY, ALONG SAID DIVISION LINE, SOUTH 85 DEGREES 32 MINUTES 53 SECONDS
WEST, A DISTANCE OF 218.80 FEET TO A POINT ON THE DIVISION LINE BETWEEN SAID LOT 2, BLOCK
1, SECTION 118.01, ON THE NORTH AND WEST, AND SAID LOT 5, BLOCK 1, SECTION 118.03, ON THE
SOUTH AND EAST;



*Professional Land Surveying, Geospatial, and Consulting Services*

**CONTROL POINT**
**A S S O C I A T E S   I N C   P C**
traditional methods | modern approaches

45 Broadway, 14th Floor
New York, NY 10036
Tel: 646.780.0411
cpasurvey.com

PAGE 3 OF 3

THENCE NORTHWESTERLY AND SOUTHWESTERLY, ALONG THE LAST MENTIONED DIVISION LINE, THE
FOLLOWING TWO (2) COURSES AND DISTANCES:

1)    NORTH 53 DEGREES 51 MINUTES 40 SECONDS WEST, A DISTANCE OF 209.61 FEET TO A POINT;

2)    THENCE SOUTH 18 DEGREES 34 MINUTES 43 SECONDS WEST, A DISTANCE OF 312.29 FEET TO THE
      POINT OR PLACE OF BEGINNING.

         CONTAINING 1,559,984 SQUARE FEET OR 35.812 ACRES OF LAND, MORE OR LESS.

THIS DESCRIPTION IS BASED ON A MAP ENTITLED "FINAL LOT LINE CHANGE PREPARED FOR ST.
CHRISTOPHERS, INC. SITUATED IN THE TOWN OF NORTH CASTLE WESTCHESTER COUNTY, NEW YORK",
PREPARED BY THOMAS C. MERRITTS LAND SURVEYORS, P.C., DATED MAY 13, 2008, LAST REVISED ON
MAY 20, 2014, AND FILED IN THE WESTCHESTER COUNTY CLERK'S OFFICE, DIVISION OF LAND
RECORDS, ON JULY 29, 2014, AS MAP NO. 28790.

THIS PROPERTY IS SUBJECT TO AN EASEMENT TO "COMMISSIONERS OF THE SEWER DISTRICT NO. 4 OF
THE TOWN OF NORTH CASTLE", FILED IN THE WESTCHESTER COUNTY CLERK'S OFFICE, DIVISION OF LAND
RECORDS, ON AUGUST 21, 1998, AS LIBER 12088, PAGE 143.

THIS DESCRIPTION WAS PREPARED WITH REFERENCE TO AN ALTA COMMITMENT FOR TITLE INSURANCE
ISSUED BY CORNERSTONE LAND ABSTRACT, LLC, AGENT FOR OLD REPUBLIC TITLE INSURANCE COMPANY,
TITLE NO. CL-35261-W, WITH AN EFFECTIVE DATE OF MARCH 02, 2024.


                    **CONTROL POINT ASSOCIATES INC PC**




                    _____    **06/09/2025**
                    ANDREW J. FLANAGAN                        DATE
                    NEW YORK PROFESSIONALLAND SURVEYOR #50417



*Professional Land Surveying, Geospatial, and Consulting Services*

**<u>Schedule B</u>**
**Bidding Procedures Order**

32491035.1
1624417475.5

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| ST. CHRISTOPHER'S, INC., *et al.*,[1] | : | Case No. 24-22373 (shl) |
| | : | Main Case |
| Debtors. | : | Jointly Administered |

**ORDER (A) APPROVING BID PROCEDURES RELATING TO THE
SALE OF THE JENNIE CLARKSON REAL ESTATE, (B) APPROVING
NOTICE PROCEDURES, (C) SETTING DEADLINES AND HEARING
DATES AND (D) GRANTING RELATED RELIEF**

Upon the motion dated July 1, 2025 [Doc. No. 232] (the "Motion")[2] of St. Christopher's,

Inc. ("St. Christopher's") and The McQuade Foundation, the above-captioned debtors and debtors-

in-possession (collectively, the "Debtors"), pursuant to sections 105(a)and 363 of Title 11 of the

United States Code, 11 U.S.C. §§ 101, *et seq*. (the "Bankruptcy Code"), Rules 2002, 6004, and

9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and the Local

Bankruptcy Rules for the Southern District of New York (the "Local Rules"), for entry of an order

(this "Bid Procedures Order"): (i) approving the bid procedures in the form annexed hereto as

**Exhibit 1** (as amended or modified, the "Bid Procedures"), including the potential designation of

a stalking horse bidder, to be implemented in connection with a sale (the "Sale") of approximately

35 acres of real property owned by St. Christopher's located at 1700 Old Orchard Street, North

Castle, New York 10604), as described more specifically in the Tortorici Declaration (as defined

below) (the "Jennie Clarkson Real Estate" or "Assets"); (ii) approving the notice procedures (the

"Notice Procedures") to advise parties in interest and Potential Bidders (as defined below) of the

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are:  St. Christopher's, Inc. (0485) and The McQuade Foundation (2652).

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed thereto in the Motion.

1

Bid Procedures, the potential auction of the Jennie Clarkson Real Estate (the "Auction"), and the

sale hearing for the Jennie Clarkson Real Estate (the "Sale Hearing"); and (iii) granting related

relief; the Court, having determined that the relief provided herein is in the best interests of the

Debtors, their estates, creditors and other parties in interest and calculated to result in the highest

or otherwise best offer for the Assets, and that the legal and factual bases set forth in the Motion

establish just cause for the relief granted herein; and all objections and responses to the Motion

having been resolved and otherwise withdrawn or overruled; and due and adequate notice of the

Motion having been given under the circumstances; and upon the record of the hearing on the

Motion, and the full record of these Chapter 11 Cases; and after due deliberation thereon; and good

and sufficient cause appearing therefore:

**IT IS HEREBY FOUND AND DETERMINED THAT:**

A.      This Court has jurisdiction over the Motion and the transactions contemplated

therein pursuant to 28 U.S.C. § 1334, and this matter is a core proceeding pursuant to 28 U.S.C. §

157(b)(2). Venue in this district is proper under 28 U.S.C. §§ 1408 and 1409.

B.      The Motion and the Bid Procedures comply with all applicable provisions of the

Bankruptcy Code, the Bankruptcy Rules, and the Local Rules.

C.      The notice given by the Debtors of the Motion and the hearings with respect to the

Motion constitutes proper, timely, adequate and sufficient notice thereof and complies with the

Bankruptcy Code, the Bankruptcy Rules and Local Rules, and no other or further notice is

necessary, except as set forth herein.

D.      A reasonable opportunity to object or be heard regarding the relief provided herein

with respect to the Motion has been afforded to parties in interest.

2

E.      The proposed Notice Procedures are appropriate and reasonably calculated to provide all interested parties with timely and proper notice of the Auction, the Bid Procedures to be employed in connection therewith, the Sale, and the Sale Hearing.  The Notice Procedures comply with Bankruptcy Rule 2002 and constitute sufficient notice to all interested parties and provide sufficient notice of the proposed Sale.

F.      The Debtors have articulated good and sufficient business reasons for this Court to approve (i) the Bid Procedures, (ii) the scheduling of the Auction and the Sale Hearing, and (iii) related deadlines in connection with each of the foregoing, including but not limited to the deadline for the designation of a stalking horse bidder (if any), and the establishment of a hearing date to approve same.  Such good and sufficient reasons were set forth in the Motion or have been described at the hearing, are incorporated by reference herein, and, among other things, form the basis of the findings of fact and conclusions of law set forth herein.  The Debtors have demonstrated that the Bid Procedures are fair, reasonable and appropriate and are designed to maximize the value of the Debtors' estates.

G.      The Bid Procedures are reasonably designed to enable the Debtors to receive bids for the Assets and represent the best method for maximizing the realizable value of the Assets and serve to maximize the value of the Debtors' estates for the benefit of all of the Debtors' stakeholders and parties in interest.

H.      Entry of this Bid Procedures Order and the granting of the relief set forth herein are in the best interests of the Debtors, their estates, creditors and other parties in interest.

**IT IS HEREBY ORDERED THAT:**

1.      The relief requested in the Motion as it relates to the Bid Procedures, the Notice Procedures, and the scheduling of, and notice to be approved with respect to, the Auction and the Sale Hearing is granted and approved as set forth in this Bid Procedures Order.

2.      All objections and responses to the Motion or the relief provided herein that have not been withdrawn, waived or settled, and all reservations of rights included therein, are hereby overruled and denied on the merits.

3.      The Bid Procedures, attached hereto as **Exhibit 1**, are incorporated herein and are approved in their entirety, and shall apply with respect to the sale of the Assets.  The failure to specifically include or reference a particular provision of the Bid Procedures in the Motion or in this Bid Procedures Order shall not diminish or impair the effectiveness of such provision.  The Debtors are authorized to take all actions necessary or appropriate to implement the Bid Procedures.  Notwithstanding the foregoing, the consummation of the Sale shall remain subject to entry of a further order of this Court (the "Sale Order") which shall serve as an order approving the Sale of the Assets, free and clear of any interests, liens, claims, or encumbrances under section 363 of the Bankruptcy Code.  In the event of an inconsistency between this Bid Procedures Order and the Bid Procedures, the Bid Procedures Order shall prevail.

4.      The Debtors are hereby authorized to pursue a Sale of the Assets in accordance with the Bid Procedures and any subsequent order that may be entered with respect to a Stalking Horse Bid.

5.      The process for submitting Qualified Bids (as set forth in the Bid Procedures) is fair, reasonable, and appropriate and is designed to maximize recoveries for the benefit of the

Debtors' estates, their creditors and other parties-in-interest. Any disputes as to the selection of a Qualified Bidder and the Successful Bidder shall be resolved by this Court.

6.      All information relating to the Assets provided to assist a person or entity in evaluating whether to participate in the Auction is confidential. Any person or entity that is provided with such information shall: (i) use such information solely for the purpose of evaluating whether to participate in the Auction; (ii) not use such information for any other purpose; (iii) hold such information in strict confidence; (iv) not, directly or indirectly, disclose any of such information, subject to certain limited exceptions; (v) undertake reasonable precautions to protect the confidentiality of such information; and (vi) be solely responsible for any ramifications resulting from any disclosure of such information.

7.      As further described in the Bid Procedures, the deadline for submitting Written Offers for the Assets (the "Bid Deadline") is **September 12, 2025 at 5:00 p.m**. **(prevailing Eastern Time)**.

8.      As further described in the Bid Procedures, in the event of a Stalking Horse Bidder, Debtors shall file designation of same on or before **July 29, 2025.**

9.      In the event of the Debtors' filing of a designation of Stalking Horse Bidder, this Court shall schedule a hearing to approve same returnable **Thursday, August 14, 2025.**

10.     The Debtors are authorized to conduct the Auction in the event they receive more than one (1) Qualified Bid in accordance with the Bid Procedures. If the Debtors do not receive more than one (1) Qualified Bid in accordance with the Bid Procedures, then (a) the Debtors will not hold the Auction; (b) the Qualified Bidder will be deemed to be the Successful Bidder; and (c) the Debtors shall seek approval of the PSA at the Sale Hearing.

31626812.1

11.     The Debtors' deadline to designate qualified bids is **Monday, September 15, 2025 at 5:00 p.m. (prevailing Eastern Time)**

12.     If there is one (1) or more Qualified Bids received in accordance with the Bid Procedures, the Auction shall take place on **September 18, 2025 at 11:00 a.m. (prevailing Eastern Time)** at the offices of Barclay Damon LLP, 1270 Avenue of the Americas, Suite 2310, New York, NY 10020, or such other place and time as the Debtors shall notify all parties in interest attending the Auction.

13.     The Auction shall be conducted in accordance with the Bid Procedures.

14.     The Auction will be conducted openly.

15.     Bidding at the Auction will be transcribed.

16.     The Sale Hearing shall be held before this Court on **September 26, 2025 at 11:00 a.m. (prevailing Eastern Time)** or as soon thereafter as counsel and interested parties may be heard. Objections, if any, to the Sale of the Assets to any Successful Bidder and/or the relief requested in the Motion, other than the relief approved in this Order, must be in writing and filed with the Court **on or before September 23, 2025 at 5:00 p.m. (prevailing Eastern Time)**.

17.     The Purchaser's deadline to close on the Sale shall be **Friday, October 3, 2025.**

18.     The notice procedures described in subparagraphs (a) – (e) below are approved and shall be good and sufficient, and no other or further notice shall be required if given as follows:

      a.     On or before three (3) business days after entry of this Bid Procedures Order, or as soon as practicable after such parties can be identified, the Debtors will cause (a) a notice in substantially the form annexed hereto as **<u>Exhibit 2</u>** (the "<u>Notice of Bid Procedures, Auction Date and Sale Hearing</u>") and (b) a copy of the Bid Procedures Order to be sent by first-class mail, postage prepaid, to the following: (i) the Office of the United States Trustee; (ii) the Subchapter V Trustee; (iii) all parties that have requested or that are required to receive special notice pursuant to Bankruptcy Rule 2002; (iv) all persons known or reasonably believed by the Debtors to have asserted any lien, claim, encumbrance, right of first refusal, or other interest in or

upon the Jennie Clarkson Real Estate; (v) all persons known or reasonably believed to have expressed an interest in acquiring the Jennie Clarkson Real Estate within the last six (6) months; (vi) all taxing authorities, including the Internal Revenue Service and all other federal, state and local taxing and regulatory authorities reasonably expected by the Debtors to have claims, contingent or otherwise, in connection with the ownership of the Jennie Clarkson Real Estate, or to have any known interest in the relief requested by the Motion; (vii the Westchester regional office of the New York State Attorney General's Office and (viii) all parties to any litigation involving the Debtors.

b.       On or before three (3) business days after entry of the Bid Procedures Order, the Debtors will serve the Notice of Bid Procedures, Auction Date and Sale Hearing on all known creditors of the Debtors.

c.       On or before seven (7) days after entry of this Bid Procedures Order, subject to applicable submission deadlines, the Debtors will publish an abbreviated version of the Notice of Bid Procedures, Auction Date and Sale Hearing in one or more regional or national publication that the Debtors, in their business judgment, deem appropriate.

d.       In addition to the foregoing, electronic notification of the Motion, the Bid Procedures Order, and the Notice of Bid Procedures, Auction Date and Sale Hearing, will be posted on the main case docket on the Court's electronic case filing (ECF) website.

19.      The Notice of Bid Procedures, Auction Date and Sale Hearing to be issued in connection with the proposed Sale, substantially in the forms annexed hereto as **Exhibit 2**, is approved.

20.      Within one (1) business day after the conclusion of the Auction (if an Auction is held), the Debtors will file a statement with the identity of the Successful Bidder and Backup Bidder for the Assets and the total consideration received for the Assets (the "Notice Designating Successful Bidder"), and serve such Notice Designating Successful Bidder on the United States Trustee and Subchapter V Trustee in satisfaction of Bankruptcy Rule 6004(f)(1).

21.      Except as otherwise provided in this Bid Procedures Order, the Debtors, in their business judgment, further reserve the right as they may reasonably determine to be in the best interests of their estates, subject to the terms and conditions under the Bid Procedures, to, among

7

other things: (a) determine which Potential Bidders are Qualified Bidders; (b) determine which Written Offers are Qualified Bids; (c) determine which Qualified Bid is the highest or otherwise best proposal – the Successful Bid – and which is the next highest or otherwise best proposal – the Backup Bid; (d) reject any bid that is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bid Procedures or the requirements of the Bankruptcy Code, or (iii) contrary to the best interests of the Debtors and their estates; (e) waive terms and conditions set forth herein with respect to all Qualified Bidders to the extent permissible under the Bid Procedures; (f) impose additional terms and conditions with respect to all Qualified Bidders; (g) extend the deadlines set forth herein; (h) adjourn or cancel the Auction and/or Sale Hearing, provided that the Debtors shall use reasonable efforts to provide notice of adjournment or cancellation of the Auction to all Qualified Bidders 24 hours before the commencement of the Auction; and (i) modify the Bid Procedures or withdraw the request to sell the Assets to the Successful Bidder or Backup Bidder, as applicable, at any time with or without prejudice.

22.     For the avoidance of doubt and notwithstanding anything herein to the contrary, nothing in this Bid Procedures Order, the Bid Procedures, or the Motion shall, or shall be construed to, in any way amend, impair, prejudice, alter or otherwise modify the terms of the PSA or the Stalking Horse Bidder's rights thereunder, and the PSA shall remain in full force and effect unless terminated in accordance with its terms.

23.     The stay provided for in Bankruptcy Rule 6004(h) is waived and this Bid Procedures Order shall be effective immediately upon its entry.

24.     All time periods set forth in this Bid Procedures Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

31626812.1

25.     This Court shall retain jurisdiction with respect to all matters arising from or relating to the interpretation or implementation of this Bid Procedures Order.


Dated: July 28, 2025
        White Plains, New York

                                        */s/ Sean H. Lane*
                                        United States Bankruptcy Judge

31626812.1

**<u>Exhibit 1</u>**

**Bid Procedures**

31626812.1

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| ST. CHRISTOPHER'S, INC., *et al.*,[1] | : | Case No. 24-22373 (shl) |
| | : | Main Case |
| Debtors. | : | Jointly Administered |

## **BID PROCEDURES**

These bid procedures (the "Bid Procedures") set forth the process by which St. Christopher's, Inc. ("St. Christopher's") and The McQuade Foundation, the above-captioned debtors and debtors-in-possession (collectively, the "Debtors"), debtors and debtors-in-possession in the above-captioned Chapter 11 Subchapter V bankruptcy cases pending in the United States Bankruptcy Court for the Southern District of New York (the "Court"), shall market to interested parties and conduct a sale (the "Sale") by auction (the "Auction") of approximately [35] acres of real property owned by St. Christopher's located in North Castle, New York 10604, as described more specifically in the Tortorici Declaration (as defined in the Motion) and sometimes described as the Jennie Clarkson Campus (the "Jennie Clarkson Real Estate"). The Sale will be subject to bidding as set forth herein and subject to the approval of the Court, pursuant to sections 105 and 363 of title 11 of the United States Code (the "Bankruptcy Code").

On July 1, 2025, the Debtors filed the *Debtors' Motion for Entry of Orders (I)(a) Approving Bid Procedures Relating to the Sale of the Jennie Clarkson Real Estate; (b) Approving Notice Procedures, (c) Setting Deadlines and Hearing Dates and (d) Granting Related Relief; and (II)(a) Authorizing the Sale of the Jennie Clarkson Real Estate, Free and Clear of Liens, Claims, Encumbrances, and Other Interests; and (iii) Granting Related Relief* [Docket No. 232] (the "Motion"). The portion of the Motion requesting approval of the Bid Procedures and related relief was heard by the Court on July 22, 2025. The Debtors' request for approval of the Sale and certain other matters relating to the Motion will be heard on September 26, 2025 at 10:00 a.m. (prevailing Eastern Time) (the "Sale Hearing").

On [_____, __, 2025], the Court entered an *Order (A) Approving Bid Procedures Relating to the Sale of the Jennie Clarkson Real Estate, (B) Approving Notice Procedures, (C) Setting Deadlines and Hearing Dates and (D) Granting Related Relief* [Docket No. __] (the "Bid Procedures Order"), thereby approving these Bid Procedures.

The Debtors have proposed a form Purchase and Sale Agreement ("PSA") , a copy of which was attached to the Motion and will be made available to interested parties and serve as the form of purchase and sale agreement and basis for bids in connection with this process.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are: St. Christopher's, Inc. (0485) and The McQuade Foundation (2652).

1

Capitalized terms used in these Bid Procedures and not otherwise defined shall have the meanings ascribed to such terms in the PSA or Bid Procedures Order, as applicable.

Any party desiring to obtain a copy of the PSA, a form of Non-Disclosure Agreement (as defined below) or other information regarding the sale process may do so by contacting Debtors' counsel at:

> **Barclay Damon LLP**
> Janice B. Grubin
> Allen J. Underwood II
> 1270 Avenue of the Americas, Suite 2310
> New York, New York 10020
> (212) 784-5800
> jgrubin@barclaydamon.com
> aunderwood@barclaydamon.com

The Debtors provide these Bid Procedures for use by Potential Bidders (defined below) and Qualified Bidders (defined below) in submitting bids proposing a transaction to purchase the Jennie Clarkson Real Estate, and, as necessary, qualifying for and participating in the Auction.

1.   <u>Important Dates.</u>

The following is a table setting forth key dates and deadlines with respect to the sale process:

| Event or Deadline | Date and Time (ET) |
|---|---|
| Deadline to Object to Bid Procedures Order | On or before Tuesday, July 15, 2025 at 4:00 p.m. |
| Hearing on Bid Procedures Order | On Tuesday, July 22, 2025 at 10:00 a.m. |
| Deadline to File Notice Designating Stalking Horse Bidder, if any | On or before Tuesday, July 29, 2025 |
| Hearing on Approval of Designation of Stalking Horse Bidder, if any | On or before Thursday, August 14, 2025 |
|  |  |
| Bid Deadline | On or before Friday, September 12, 2025 at 5:00 p.m. |
| Deadline to Designate Qualified Bids | On Monday, September 15, 2025 at 5:00 p.m. |

2

| Auction (if necessary) | On Thursday, September 18, 2025 at 11:00 a.m. |
|---|---|
| Deadline to File Notice Designating Successful Bidder | If no Auction is held, Thursday, September 18, 2025<br><br>If Auction is held: one (1) business day following conclusion of the Auction |
| Deadline to Object to Sale | On or before Tuesday, September 23, 2025 at 5:00 p.m. |
| Sale Hearing | Friday, September 26, 2025 at 10:00 a.m. |
| Deadline to Close on Sale | On or before Friday, October 3, 2025 |

2.      <u>Assets to be Sold.</u>

The Debtors seek to sell the Jennie Clarkson Real Estate.

3.      <u>Qualified Bidders, Non-Disclosure Agreements and Access to Data Room.</u>

Any person or entity wishing to bid on the Assets (each, a "<u>Potential Bidder</u>") must execute and deliver (unless previously delivered) to the Debtors a confidentiality and non-disclosure agreement (a "<u>Non-Disclosure Agreement</u>") available from, or in form and substance acceptable to, the Debtors.

The Debtors, in their discretion, will afford a Potential Bidder who executes and delivers a Non-Disclosure Agreement due diligence access or such additional information as may be reasonably requested by the Potential Bidder that the Debtors, in their business judgment, determine to be reasonable and appropriate, including, without limitation, access to the Debtors' confidential electronic data room, reasonable access, during normal business hours, to the Debtors' management, and access to all relevant information regarding the Jennie Clarkson Real Estate reasonably necessary to enable a Potential Bidder to evaluate the proposed Sale; provided that, prior to accessing such information, any such Potential Bidder has evidenced the financial wherewithal and ability to consummate the Sale. Debtors' counsel and the Debtors' broker will coordinate all due diligence access and requests for additional information from such Potential Bidders. The Debtors shall not be obligated to furnish any due diligence information after the conclusion of the Auction other than to the Successful Bidder (defined below) or any Backup Bidder. Neither the Debtors (nor their employees), their counsel nor their advisors are responsible for, or will bear any liability with respect to, any information obtained by Potential Bidders in connection with due diligence. Notwithstanding anything contained herein to the contrary, to the extent the Debtors believe that providing access to Potential Bidders to certain sensitive

commercial information is not advisable, the Debtors, in their business judgment, will decide what, if any, diligence information to make available to a particular Potential Bidder, and neither the Debtors nor their representatives will be obligated to furnish any information of any kind whatsoever to any party.

A "**Qualified Bidder**" is any Potential Bidder that (a) delivers to the Debtors a Non-Disclosure Agreement, (b) demonstrates to the Debtors a reasonable certainty of its ability to close the Sale in a timely manner (including the financial capability to close the Sale and the ability to obtain the necessary governmental, licensing, regulatory, or other approvals necessary for such Sale, if any), and (c) submits a Written Offer (as defined below) that satisfies all requirements of a Qualified Bid as set forth below, provided, however, that, except for the requirements set forth in sections 4(viii) and 4(x)–4(xii) of these Bid Procedures, the Debtors may waive one or more requirements for a Qualified Bidder. As promptly as practicable after a Potential Bidder delivers a Non-Disclosure Agreement and submits a Written Offer, and in any event not later than September 15, 2025 at 5:00 p.m. (prevailing Eastern Time), the Debtors shall determine, and the Debtors shall notify the Potential Bidder in writing, whether the Potential Bidder is a Qualified Bidder. Each Potential Bidder shall comply with all reasonable requests for information and due diligence access by the Debtors or their advisors regarding the ability of such Potential Bidder, as applicable, to consummate the proposed Sale.

4.      Requirements for a Qualified Bid.

In order to become a Qualified Bidder and participate in the Auction, if any, a Potential Bidder must deliver to counsel to the Debtors a written offer (each, a "Written Offer") that is deemed to be a Qualified Bid. To be deemed a "Qualified Bid", a Written Offer must meet each of the requirements listed below:

(i)      Delivery:  Be delivered no later than 5:00 p.m. (prevailing Eastern Time) on September 12, 2025 (the "Bid Deadline").

(ii)     Executed Agreement:  Be accompanied by (i) a clean and duly executed and binding purchase and sale agreement (together with the exhibits and schedules thereto, a "PSA"), and (ii) a marked Modified PSA reflecting any variations from the PSA (the "Modified PSA", both of which shall be subject to section 4(xii) hereof.

(iii)    Proof of Financial Ability to Perform:  Contain evidence of financing, access to funds or such other financial and other information that will reasonably allow the Debtors to make a determination as to such Qualified Bidder's financial and other capabilities to consummate the transactions contemplated by the Modified PSA, which evidence is satisfactory to the Debtors. Should the Potential Bidder be a newly formed or other single-purpose entity ("Newco"), such information shall be provided in respect of Newco's equity sponsors.

(iv)     Identification of Parties to Participate:  To the Debtors' satisfaction, (i) fully disclose the identity of each entity or person that will be bidding for the

4

Jennie Clarkson Real Estate or otherwise participating in connection with such bid, (ii) the terms of any such participation, and if an entity has been formed for the purpose of acquiring some, or all, of the Jennie Clarkson Real Estate, the parties that will bear liability for any breach by such entity, and (iii) the ability of such parties to obtain government, licensing or regulatory approval, if necessary, in connection with the consummation of any Sale.

(v)     <u>Irrevocable</u>:  State that the Written Offer is irrevocable until (i) the closing of the Sale, if such Potential Bidder is deemed a Qualified Bidder, and such Qualified Bidder is designated as a Successful Bidder (as defined below), or (ii) if such Potential Bidder is deemed a Qualified Bidder, and such Qualified Bidder is designated as a Backup Bidder (as defined below), until the earlier of (x) two (2) business days after the closing of the transaction(s) by which the Jennie Clarkson Real Estate that is subject to such Backup Bid (as defined below) has been transferred to one or more Qualified Bidders pursuant to these Bid Procedures and (y) one hundred twenty (120) days after the date of the Auction (the "<u>Backup Bid Expiration Date</u>").

(vi)     <u>No Break-Up Fee or Expense Reimbursement</u>:  Not request or entitle the Potential Bidder to any transaction or break-up fee, expense reimbursement, or similar type of payment; <u>provided</u>, <u>however</u>, that the PSA with a stalking horse bidder, if any, may contain a proposed break-up fee and expense reimbursement, as approved by further Court order.

(vii)     <u>Contingencies</u>:  Not contain any due diligence or financing contingencies.

(viii)     <u>Authorization to Consummate Sale</u>:  Provide evidence of authorization and approval from the Potential Bidder's board of directors (or comparable governing body), if any, with respect to the submission, execution, delivery and closing of the Modified PSA to the Debtors' satisfaction.

(ix)     <u>Minimum Purchase Price</u>:  Bids must provide for a minimum purchase price equal to or greater than $4,250,000.00.  If there is a stalking horse bidder, the minimum purchase price must be equal to or greater than the stalking horse purchase price plus the amount of any break-up fee and plus the amount of any expense reimbursement, plus a minimum overbid amount over any stalking horse bid $50,000.00.

(x)     <u>Good Faith Offer</u>:  Constitute a good faith, bona fide offer to purchase the Jennie Clarkson Real Estate.

(xi)     <u>Good Faith Deposit</u>:  Provide a good faith deposit (the "<u>Good Faith Deposit</u>") submitted via federal wire transfer in immediately available funds in accordance with the wire instructions to be provided by the Debtors, or such other form as is acceptable to the Debtors, in an amount equal to 10% of the purchase price set forth in the Written Offer.

31626812.1

(xii)  <u>Anticipated Timeline</u>:  Set forth the anticipated timeframe for (i) obtaining any required government, regulatory or other approvals, and (ii) consummating the Sale within the requirements of subparagraph (xv) of the Bid Procedures.

(xiii)  <u>Agreement with Bid Procedures, Provision of Additional Information and Submission to Bankruptcy Court Jurisdiction</u>  Include a written acknowledgement by such Potential Bidder that it: (i) agrees to the terms of the Bid Procedures; (ii) agrees to provide such other information as may be reasonably requested in writing by the Debtors prior to the Auction; and (iii) confirms that the Potential Bidder submits to the jurisdiction of the Court.

(xiv)  <u>As-Is, Where-Is</u>:  Include a disclaimer acknowledging that the Sale will be conducted on an As-Is, Where-Is Basis in accordance with section 8 of the Bid Procedures.

(xv)  <u>Closing Date</u>:  Provide for a closing date (the "<u>Closing Date</u>") in accordance with the PSA and section 1 of the Bid Procedures.

Between the Bid Deadline and the Auction, the Debtors may (i) negotiate or seek clarification of any Written Offer from a Qualified Bidder, (ii) request information from any Qualified Bidder, (iii) engage in discussions with any Qualified Bidder, and/or (iv) take such other actions contemplated under these Bid Procedures.  Without the consent of the Debtors, a Qualified Bidder may not amend, modify or withdraw its Written Offer.  All changes to the form of PSA reflected in the Modified PSA will be evaluated by the Debtors and must be acceptable to the Debtors, in their business judgment.  Any Good Faith Deposit accompanying a Written Offer that the Debtors determine not to be a Qualified Bid shall be returned promptly following such determination.

5.  <u>Bid Deadline.</u>

All Qualified Bids must be received by each of the parties listed below prior to the Bid Deadline.

**Debtors' Counsel**:

Janice B. Grubin
Allen J. Underwood II
Barclay Damon LLP
1270 Avenue of the Americas, Suite 2310
New York, New York 10020
(212) 784-5800
jgrubin@barclaydamon.com
aunderwood@barclaydamon.com

31626812.1

**Debtors' Real Estate Broker**

Michael A. Tortorici
122 East 42nd Street, Suite 2405
New York, New York 10168
(212) 257-1813
mtortorici@arielpa.com

6.  <u>Determination of Qualified Bidders.</u>

The Debtors shall, by no later than 5:00 p.m. (prevailing Eastern Time) on September 15, 2025, (i) determine, in their business judgment, whether a Potential Bidder is a Qualified Bidder, (ii) notify each such Potential Bidder that its Written Offer is a Qualified Bid and that such Potential Bidder is a Qualified Bidder, and (iii) provide a copy of the Opening Qualified Bid (defined below) to each Qualified Bidder.

7.  <u>No Break-Up Fee or Bid Protections.</u>

No Modified PSA may include any break-up fee or expense reimbursement or other similar bid protections unless otherwise provided by Court Order in connection with a Stalking Horse Offer.

8.  <u>"As Is, Where Is".</u>

Except as otherwise provided in the Final PSA (as defined below), the Sale of the Jennie Clarkson Real Estate shall be on an "as is, where is" basis and without representations or warranties of any kind, nature or description by the Debtors or their estates except to the extent set forth in the Final PSA as approved by the Court.  Except as otherwise provided in the Final PSA, all of the Debtors' right, title and interest in the Jennie Clarkson Real Estate subject thereto, as applicable, shall be sold free and clear of all liens, claims, interests and encumbrances (collectively, the "<u>Liens</u>"), in accordance with section 363 of the Bankruptcy Code, with such Liens to attach to the net proceeds of the Sale to the extent provided for under the final form of the applicable PSA or Modified PSA (the "<u>Final "PSA</u>") and applicable law.

Each Qualified Bidder shall be deemed to acknowledge and represent that it has had an opportunity to conduct any and all desired due diligence regarding the Jennie Clarkson Real Estate prior to making its Qualified Bid, that it has relied solely upon its own independent review, investigation and inspection of any documents relating to the Jennie Clarkson Real Estate in making its Qualified Bid, and that it did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express, implied, by operation of law or otherwise, regarding the Jennie Clarkson Real Estate, or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Bid Procedures or, as to the Successful Bidder and the Backup Bidder, the terms of the Sale(s) as set forth in Final PSA, which shall be on terms mutually acceptable to the Successful Bidder and Backup Bidder, on the one hand, and the Debtors, on the other hand.

31626812.1

9.      Auction.

If the Debtors have determined that there are one or more Qualified Bidders, the Debtors shall conduct an Auction to determine the highest and otherwise best Qualified Bid. This determination shall take into account any factors the Debtors, in their business judgment, reasonably deem relevant and may include, among other things, the following: (i) the amount and type of the consideration; (ii) the number, type and nature of any changes to the PSA requested by a Qualified Bidder in its respective Modified PSA; (iii) the extent to which such modifications are likely to delay closing of the Sale and the cost to the Debtors of such modifications or delay; (iv) the total consideration to be received by the Debtors; and (v) the likelihood of the Qualified Bidder's ability to close the Sale and the timing thereof.

The Auction shall commence at 11:00 a.m. (prevailing Eastern Time) on September 18, 2025, at the offices of Barclay Damon LLP, 1270 Avenue of the Americas, Suite 2310, New York, New York 10020, or such other place and time as determined by the Debtors, and continue thereafter until completed. The Debtors reserve the right to cancel, postpone, or continue the Auction, or conduct the Auction virtually.

Except as otherwise permitted in the Debtors' discretion, only the Debtors, the Subchapter V Trustee, the Qualified Bidders, and any creditor that submits a written request to attend to the Debtors in advance of the Auction, and, in each case, their respective professionals, shall be entitled to attend the Auction. Only a Qualified Bidder is eligible to participate in the Auction.

The Auction shall be governed by the following procedures:

(i)     Qualified Bidders shall appear in person at the Auction, or through a duly authorized representative, unless alternate advance arrangements are made with the Debtors to attend the Auction virtually.

(ii)    Except as otherwise set forth herein (including the limitations on modification of criteria for Qualified Bids), the Debtors may waive and/or employ and announce at the Auction additional rules that are reasonable under the circumstances for conducting the Auction provided that such rules are (i) not inconsistent with the Bid Procedures Order, the PSA, the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, or any order of the Court entered in connection with these Chapter 11 Cases, (ii) disclosed to each Qualified Bidder, and (iii) designed, in the Debtors' business judgment, to result in the highest and otherwise best offer for the Jennie Clarkson Real Estate.

(iii)   The Debtors will arrange for the actual bidding at the Auction to be transcribed. Each Qualified Bidder shall designate a single individual to be its designated spokesperson during the Auction.

(iv)    Each Qualified Bidder participating in the Auction must confirm on the record, at the commencement of the Auction and again at the conclusion of the Auction, that it has not engaged in any collusion with the Debtors or any

8

other Qualified Bidder regarding these Bid Procedures, the Auction or any proposed transaction relating to the Assets.

(v)     Prior to the Auction, the Debtors shall identify the highest and best of the Qualified Bids received (the "Opening Qualified Bid").  Subsequent bidding will continue in minimum increments valued at not less than $50,000 cash or in such amounts as to be determined by the Debtors announced at the Auction.

(vi)    All Qualified Bidders shall have the right to, at any time, request that the Debtors announce, subject to any potential new bids, the then-current highest and best bid and, to the extent requested by any Qualified Bidder, use reasonable efforts to clarify any and all questions such Qualified Bidder may have regarding the Debtors' announcement of the then-current highest and best bid.

(vii)   In the Debtors' discretion, all Qualified Bidders shall have the right to submit additional bids and make additional modifications to the PSA or Modified PSA, as applicable, at the Auction in accordance with the terms and provisions of these Bid Procedures; provided, however, that any such modifications to the PSA or Modified PSA, on an aggregate basis and viewed in whole, shall not be less favorable to the Debtors as determined by the Debtors in their business judgment.

(viii)  Upon conclusion of the bidding, the Auction shall be closed, and the Debtors shall, as soon as practicable, (i) identify and determine in their business judgment the highest and best Qualified Bid for the Assets (a "Successful Bid") and the entity or entities submitting such Successful Bid (the "Successful Bidder"), (ii) advise the Qualified Bidders of such determination, and (iii) require the Successful Bidder to deliver an executed Final PSA, which reflects its bid and any other modifications submitted and agreed to during the Auction, prior to commencement of the Sale Hearing.

(ix)    The Debtors will also determine which Qualified Bid, if any, is the next highest and best Qualified Bid to the Successful Bid, and will designate such Qualified Bid as a "Backup Bid" in the event the Successful Bidder fails to consummate the contemplated Sale.  A Qualified Bidder who submitted a Qualified Bid and is designated a Backup Bid is a "Backup Bidder".  Each Backup Bid shall remain open and binding until the Backup Bid Expiration Date.

10.     Sole Qualified Bidder.

11.     If, by the Bid Deadline, there is only one Qualified Bid, (i) that sole Qualified Bid shall be deemed the Successful Bid and the sole Qualified Bidder shall be deemed the Successful

Bidder, (ii) the Debtors shall not hold an Auction, and (iii) the Debtors shall proceed at the Sale Hearing and seek approval from the Court of the Successful Bid.Sale Hearing.

The Sale Hearing will be held before the Honorable Sean H. Lane on September 26, 2025 at 10:00 a.m. (prevailing Eastern time), at the United States Bankruptcy Court for the Southern District of New York, 300 Quarropas Street, White Plains, New York 10601.  At the Sale Hearing, the Debtors shall present the results of the Auction, if one is held, to the Court and seek approval of the Successful Bid and any related Backup Bid.

Following the Sale Hearing and entry of a Sale Order approving the Sale of the Jennie Clarkson Real Estate to a Successful Bidder, if such Successful Bidder fails to consummate the Sale for any reason, the Backup Bidder shall be designated the Successful Bidder and the Debtors shall be authorized to close such Sale with the Backup Bidder without further order of the Court. The Successful Bidder and Backup Bidder (if any) should be represented by counsel at the Sale Hearing.

12.    Consummation of the Purchase.

(a)    Closing Date; Good Faith Deposit

The Successful Bidder shall consummate the Sale contemplated by the Successful Bid (the "Purchase") on or before the Closing Date.  If the Successful Bidder successfully consummates the Purchase by the Closing Date, such Successful Bidder's Good Faith Deposit, if any, shall be applied to the purchase price of the Purchase.

If the Successful Bidder either: (i) fails to consummate the Purchase on or before the Closing Date, (ii) breaches the Final PSA, or (iii) otherwise fails to perform, the Debtors shall, without further order of the Court, deem such Successful Bidder to be a "Defaulting Buyer."

The Debtors shall be entitled to (a) retain the Good Faith Deposit as part of their damages resulting from the breach or failure to perform by the Defaulting Buyer and (b) seek all available damages from such Defaulting Buyer occurring as a result of such Defaulting Buyer's failure to perform in accordance with the terms of the PSA or Modified PSA, as applicable, and the Sale Order.

(b)    Backup Purchaser.

Upon a determination by the Debtors that the Successful Bidder is a Defaulting Buyer, the Debtors may consummate a Sale with the Backup Bidder on the terms and conditions of the Backup Bid (the "Backup Purchase") without further order of the Court.

If the Backup Bidder consummates the Backup Purchase, the Good Faith Deposit of such Backup Bidder will be applied to the purchase price of the Backup Purchase.  In the event that the Debtors seek to consummate the Backup Purchase with the Backup Bidder and such Backup Bidder (i) fails to consummate the Backup Purchase, (ii) breaches the Final PSA, or (ii) otherwise fails to perform, the Debtors may, in their discretion, and without further order of the Court, deem such Backup Bidder to be a "Defaulting Backup Buyer" and shall be entitled to (a) retain the Good Faith Deposit as part of their damages resulting from the breach or failure to

10

perform by the Defaulting Backup Buyer and (b) to the extent provided for under the PSA or Modified PSA, seek all available damages from such Defaulting Backup Buyer occurring as a result of such Defaulting Backup Buyer's failure to perform in accordance with the terms of the PSA or Modified PSA, as applicable, and the Sale Order.

13.    Return of Good Faith Deposits.

Good Faith Deposits shall be held in a non-interest bearing escrow account.  Except for those of the Successful Bidder and Backup Bidder, the Debtors shall promptly return the Good Faith Deposits of (i) all Qualified Bidders within five (5) business days following conclusion of the Auction; and (ii) the Backup Bidder after the Backup Bid Expiration Date.

14.    Consent to Jurisdiction and Authority as a Condition to Bidding

All Potential Bidders shall be deemed to have (i) consented to the core jurisdiction of the Court to enter an order or orders, which shall be binding in all respects, in any way related to the Bid Procedures, the Auction, or the construction and enforcement of any purchase agreement or any other document relating to the Sale; (ii) waived any right to jury trial in connection with any disputes relating to the Bid Procedures, the Auction, the construction and enforcement of any purchase agreement or any other document relating to the Sale; and (iii) consented to entry of a final order or judgment in any way related to the Bid Procedures, the Auction, or the construction and enforcement of any purchase agreement or any other document relating to the Sale if it is determined that the Court would lack Article III jurisdiction to enter such a final order or judgment absent the consent of the parties.

15.    Reservation of Rights.

The Debtors shall retain all rights to any of their assets that are not subject to the Sale that is approved by the Court at the Sale Hearing.

16.    Modifications.

Except as otherwise set forth herein (including the limitations on modification of criteria for Qualified Bids), the Debtors may modify the Bid Procedures in any manner that is not inconsistent with or otherwise in contravention of the other terms of these Bid Procedures, the Bid Procedures Order, or the PSA, including, without limitation, (a) waiving the terms and conditions set forth herein with respect to any or all potential bidders, (b) imposing additional terms and conditions with respect to any or all potential bidders, (c) extending the deadlines set forth herein or the date for the Auction and/or Sale Hearing (which may occur in open court); or (d) amending the Bid Procedures as they may determine to be in the best interests of their estates; *provided that* all material modifications are disclosed to all Potential Bidders (if applicable) or Qualified Bidders (if applicable) prior to or during the Auction.

17.    Involvement of Subchapter V Trustee.  The Subchapter V Trustee shall be deemed to be a Consultation Party such that information about submitted bids shall be shared with her and her views will be solicited concerning the designation of Qualified Bidders, the Auction, the selection of the Successful Bidder and all other aspects of the sale process.

31626812.1

## **Exhibit 2**

**Notice of Bid Procedures, Auction Date and Sale Hearing**

**BARCLAY DAMON LLP**
Janice B. Grubin
Allen J. Underwood II
1270 Avenue of the Americas, Suite 2310
New York, New York 10020
Telephone: (212) 784-5800
jgrubin@barclaydamon.com
aunderwood@barclaydamon.com

*Counsel to Debtors and Debtors-in-Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| ST. CHRISTOPHER'S, INC., *et al.*,[1] | : | Case No. 24-22373 (shl) |
| | : | Main Case |
| Debtors. | : | Jointly Administered |

## NOTICE OF BID PROCEDURES, AUCTION DATE AND SALE HEARING

**PLEASE TAKE NOTICE THAT:**

1.    On July 1, 2025, the above-captioned debtors and debtors-in-possession (collectively, the "Debtors") filed the *Debtors' Motion for Entry of Orders (I)(a) Approving Bid Procedures Relating to the Sale of the Jennie Clarkson Real Estate; (b) Approving Notice Procedures, (c) Setting Deadlines and Hearing Dates and (d) Granting Related Relief* (the "Bid Procedures Motion"); *and (II)(a) Authorizing the Sale of the Jennie Clarkson Real Estate, Free and Clear of Liens, Claims, Encumbrances, and Other Interests; and (iii) Granting Related Relief* (the "Sale Motion" and together with the Bid Procedures Motion, the "Motion") [Docket No. 232] with the United States Bankruptcy Court for the Southern District of New York (the "Court").

2.    By order dated [July __, 2025], the Court approved the Bid Procedures Motion [Docket No. _____] (the "Bid Procedures Order").

3.    The Debtors are seeking bids for approximately 35 acres of real property owned by St. Christopher's located in North Castle, New York 10604, as described more specifically in the Tortorici Declaration (as defined in the Motion) and sometimes described as the Jennie Clarkson Campus (the "Jennie Clarkson Real Estate"). The proposed sale will be free and clear of any and liens, claims, encumbrances and other interests, pursuant to section 363 of the Bankruptcy Code.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are: St. Christopher's, Inc. (0485) and The McQuade Foundation (2652).

1

4.      All interested parties are invited to submit a Written Offer to purchase the Jennie Clarkson Real Estate in accordance with the terms and conditions of the Bid Procedures attached hereto as **Exhibit A**, and the Bid Procedures Order. The deadline to submit a Written Offer (the "Bid Deadline") is **September 12, 2025 at 5:00 p.m. (prevailing Eastern Time)**.

5.      Prior to the Bid Deadline, a Potential Bidder that desires to purchase the Jennie Clarkson Real Estate shall deliver its Written Offer in accordance with the Bid Procedures.

6.      Pursuant to the Bid Procedures Order, and subject to the discretion of the Debtors, in the event that the Debtors receive more than one Qualified Bid by the Bid Deadline, the Debtors shall conduct an Auction to determine the highest and otherwise best bid with respect to the Jennie Clarkson Real Estate.  The Auction shall commence at **11:00 a.m. (prevailing Eastern Time) on September 18, 2025** at the offices of Barclay Damon LLP, 1270 Avenue of the Americas, Suite 2310, New York, NY 10020, or at such other place and time, or virtually, as the Debtors shall notify all parties in interest attending the Auction.  If only one Qualified Bid is received by the Bid Deadline, the Debtors shall seek approval of the that Qualified Bid at the Sale Hearing.

7.      Objections, if any, to the Sale of the Jenny Clarkson Real Estate as to any Successful Bidder and/or the other relief requested in the Sale Motion must be in writing and filed with the Court **on or before September 23, 2025 at 5:00 p.m. (prevailing Eastern Time)**.

8.      The Sale Hearing shall be conducted by the Court **on September 26, 2025 at 10:00 a.m. (prevailing Eastern Time)**, or on such other date as the Court may direct.  Requests for a copy of the PSA or for any other information concerning the Motion or the Sale should be directed, by written request, to the Debtors' counsel at the contact information listed below.

Dated:    July __, 2025              Respectfully submitted,
          New York, New York

                                     **BARCLAY DAMON LLP**

                                     By: _____
                                     Janice B. Grubin
                                     Allen J. Underwood II
                                     1270 Avenue of the Americas, Suite 2310
                                     New York, New York 10020
                                     Telephone:  (212) 784-5800
                                     jgrubin@barclaydamon.com
                                     aunderwood@abrclaydamon.com

                                     *Counsel to Debtors and Debtors-in-Possession*

31626812.1

**Exhibit B**

**Proposed Sale Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| ST. CHRISTOPHER'S, INC., *et al.*,[1] | : | Case No. 24-22373 (shl) |
| | : | Main Case |
| Debtors and Debtors-in-Possession. | : | Jointly Administered |

**ORDER (A) AUTHORIZING THE SALE OF THE JENNIE CLARKSON**
**REAL ESTATE, FREE AND CLEAR OF LIENS, CLAIMS,**
**ENCUMBRANCES, AND OTHER INTERESTS,**
**AND (B) GRANTING RELATED RELIEF**

Upon the motion dated July 1, 2025 (Docket No. 232) (the "Motion")[2] of St.

Christopher's, Inc. ("St. Christopher's") and The McQuade Foundation, the above-captioned

debtors and debtors-in-possession (collectively, the "Debtors") in the above-captioned

Subchapter V Chapter 11 cases (the "Chapter 11 Cases"), requesting entry of an order (this

"Sale Order"): (a) authorizing the Sale of the Jennie Clarkson Real Estate, free and clear of

liens, claims, encumbrances and other interests; and (b) granting related relief; and the Court

having entered an order on [July ___, 2025] [Docket No. ____] (the "Bid Procedures Order")

approving the bid procedures in connection with the Sale as attached as Exhibit 1 to the Bid

Procedures Order (the "Bid Procedures"), including, among other things, the proposed form of

notice of the Sale Hearing; and upon the Purchaser and the Debtors having entered into the

Final PSA; [and after conducting the Auction in accordance with the Bid Procedures Order]

[or] [no Auction being necessary with only one Qualified Bid having been received]; and the

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are: St. Christopher's, Inc. (0485) and The McQuade Foundation (2652).

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed thereto in the Motion., the PSA?, or the Bid Procedures, as applicable. In the event of a discrepancy between the definitions contained in the Motion, the PSA and the Bid Procedures, those contained in the PSA shall control.

Debtors having determined, after an extensive marketing and sale process, that [ _____

the "<u>Purchaser</u>" and its fully disclosed designee _____] has submitted the highest or

otherwise best bid for the Jennie Clarkson Real Estate and having selected the Purchaser as the

Successful Bidder in accordance with the Bid Procedures; and all parties in interest having been

heard or having had the opportunity to be heard regarding the Sale and the Final PSA and all

relief related thereto; and upon due, adequate and proper notice of the Motion, the Final PSA,

and all other related transactions contemplated thereunder and in this Sale Order having been

given and that no other or further notice need be given; and the Court having conducted the

Sale Hearing to consider entry of the Sale Order on [_____, __, 2025]; and upon the full record

of these Chapter 11 Cases and the Sale Hearing and all of the proceedings had before the Court;

and the Court having jurisdiction over this matter; and that the Court may enter a final order

consistent with Article III of the United States Constitution; and the Court having found and

determined that the relief granted herein is in the best interests of the Debtors, their estates, their

creditors, and all other parties in interest; and that the legal and factual bases set forth in the

Motion, the Tortorici Declaration, and the arguments of counsel made, and the evidence

proffered or adduced, at the Sale Hearing establish just cause for the relief granted herein; and

after due deliberation and good cause appearing therefor,

**IT IS HEREBY FOUND AND DETERMINED THAT**:

A.    <u>Jurisdiction</u>.  This Court has jurisdiction over the Motion and the transactions

contemplated therein pursuant to 28 U.S.C. § 1334, and this matter is a core proceeding

pursuant to 28 U.S.C. § 157(b)(2).

B.    <u>Venue</u>.  Venue in this district is proper under 28 U.S.C. §§ 1408 and 1409.

C.      <u>Statutory and Legal Predicates</u>.  The statutory and legal predicates for the relief

requested in the Motion are Bankruptcy Code sections 105(a) and 363, Bankruptcy Rules 2002,

and 6004, Local Rule 9014, and the Amended Guidelines for the Conduct of Asset Sales,

Approved by Administrative Order Number 383 in the United States Bankruptcy Court for the

Southern District of New York (as amended, the "<u>Asset Sale Guidelines</u>").

D.      <u>Notice</u>.  In accordance with the Bid Procedures Order, and as evidenced by the

[Certificate of Service of _____] filed with this Court [Docket No. _____] (the

"<u>Certificate of Service</u>"), the Debtors served the Notice of Bid Procedures, Auction Date and

Sale Hearing (as defined in the Bid Procedures Order), together with a copy of the Bid

Procedures Order and the Bid Procedures on: (i) the Office of the United States Trustee for the

Southern District of New York; (ii) the Subchapter V Trustee; (iii) all parties that have

requested or that are required to receive special notice pursuant to Bankruptcy Rule 2002; (iv)

all persons known or reasonably believed by the Debtors to have asserted any lien, claim,

encumbrance, right of first refusal, or other interest in or upon the Jennie Clarkson Real Estate;

(v) all persons known or reasonably believed to have expressed an interest in acquiring the

Jennie Clarkson Real Estate within the last six (6) months; (vii) all taxing authorities, including

the Internal Revenue Service and all other federal, state and local taxing and regulatory

authorities reasonably expected by the Debtors to have claims, contingent or otherwise, in

connection with the ownership of the Jennie Clarkson Real Estate, or to have any known interest

in the relief requested by the Motion; and (viii) the Westchester regional office of the New York

State Office of the Attorney General (ix) all parties to any litigation involving the Debtors.  On

[_____ ___, 2025], the Debtors filed an *Affidavit of Publication of Notice of Abbreviated Bid*

*Procedures, Auction Date, and Sale Hearing* [Docket No. _____] evidencing the publication

31626812.1

of an abbreviated version of the Notice of Bid Procedures, Auction Date and Sale Hearing by

the [_____ (publication) on _____, ___ and ___, 2025 and

_____(publication) on _____ _____, 2025].

  E. <u>Notice Sufficient</u>. Based upon the Certificate of Service and Affidavit of

Publication and the evidence presented at the Sale Hearing, actual written and publication notice

of the Motion, the Bid Procedures Order, the Bid Procedures, the Sale Hearing, the Sale (and

the Transactions and PSA contemplated in connection therewith), and the transactions

contemplated thereby, has been provided in accordance with the Bid Procedures Order, sections

105(a) and 363 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, and 9006.  A

reasonable opportunity to object to or be heard regarding the Motion and the relief requested

therein and to the entry of this Sale Order has been afforded to those parties entitled to notice

pursuant to Bankruptcy Rule 6004(a).  Based on the representations of counsel at the Sale

Hearing, due, proper, timely, adequate, and sufficient notice of the Motion, the Sale Hearing,

the Sale (and the Transactions and PSA contemplated in connection therewith) has been

provided in accordance with sections 102(1) and 363 of the Bankruptcy Code and Bankruptcy

Rules 2002, 6004, and 9014 and the Local Bankruptcy Rules and in compliance with the Bid

Procedures Order.  Notice of the Motion, the Sale Hearing, and the Sale was and is timely,

proper, sufficient, appropriate under the particular circumstances, and reasonably calculated to

provide the Notice Parties and all other interested parties with timely and proper notice under

the circumstances of these Chapter 11 Cases, and no other or further notice with respect to such

matters is, or shall be, required.

  F. <u>Sufficiency of Marketing</u>.  (i) The Debtors and their advisors engaged in a robust

and extensive marketing and sale process for the Jenny Clarkson Real Estate through their pre-

4

petition marketing efforts and the post-petition marketing efforts and sale process, the latter pursuant to the Bid Procedures Order and the Bid Procedures; (ii) the Debtors and their advisors conducted a fair and open sale process; (iii) the sale process, the Bid Procedures and the actions of the Debtors and the Purchaser in connection therewith were non-collusive, duly noticed and provided a full, fair and reasonable opportunity for any entity to make an offer to purchase the Jenny Clarkson Real Estate; and (iv) the process conducted by the Debtors pursuant to the Bid Procedures obtained the highest or otherwise best value for the Jennie Clarkson Real Estate for the Debtors and their estates, and any other transaction would not have yielded as favorable a result.

G.    Bid Deadline and [Cancelled Auction].  The Bid Deadline passed on [September ___, 2025] at 5:00 p.m. (prevailing Eastern Time) in accordance with the Bid Procedures and Bid Procedures Order. [The Debtors canceled the Auction in accordance with the Bid Procedures and Bid Procedures Order because only one Qualified Bid (as defined in the Bid Procedures) was submitted]. Pursuant to the terms of the Bid Procedures, the Final PSA constituted the highest and best bid and, therefore, was designated as the Successful Bid. On [September ___, 2025], the Debtors filed and served the Notice of Successful Bidder [Docket No. _____] identifying the Purchaser as the Successful Bidder in accordance with the Bid Procedures Order.  As established by the record of the Sale Hearing, the bidding and related procedures established by the Bid Procedures Order have been complied with in all material respects by the Debtors and the Purchaser.  The Bid Procedures afforded a full, fair and reasonable opportunity for any entity or person to make a higher or otherwise better offer to purchase the Jennie Clarkson Real Estate, and the Final PSA constitutes the highest or otherwise best offer for the Jennie Clarkson Real Estate.

H.      Corporate Authority.  Subject to the entry of this Sale Order, St. Christopher's has (i) full requisite corporate or other organizational power and authority to execute, deliver, and perform the Final PSA and all other documents contemplated thereby and (ii) taken all requisite corporate or other organizational action and formalities necessary to authorize and approve the execution, delivery and performance of the Final PSA and to consummate the transactions contemplated by the Final PSA (including the Sale) (collectively, the "Transactions"), including as required by its organizational documents and, upon execution thereof, the Final PSA and the related documents will be duly and validly executed and delivered by St. Christopher's and enforceable against St. Christopher's in accordance with its terms and, assuming due authorization, execution, and delivery thereof by the other parties thereto, will constitute a valid and binding obligation of St. Christopher's.  No government, regulatory, or other consents or approvals, other than those expressly provided for in the PSA, are required for the execution, delivery, and performance by the Debtors of the PSA and the consummation of the Transactions contemplated thereby.  No consents or approvals of the Debtors, other than those expressly provided for in the Final PSA or this Sale Order, are required to consummate the Sale.

K.      Compliance with Bid Procedures and Bid Procedures Order.  As demonstrated by the testimony and other evidence proffered or adduced at the Sale Hearing and the representations made on the record at the Sale Hearing, the Debtors have adequately marketed the Jennie Clarkson Real Estate and conducted the sale process in compliance with the Bid Procedures and the Bid Procedures Order, and the bidding process was conducted in a non-collusive, fair, and good faith manner.  The Debtors and their professionals conducted the sale process in compliance with the Bid Procedures and the Bid Procedures Order and have afforded

31626812.1

potential purchasers a full and fair opportunity to participate in the bidding process for the

Jennie Clarkson Real Estate and make higher or better offers. In accordance with the Bid

Procedures Order, the Final PSA was deemed a Qualified Bid and the Purchaser was a Qualified

Bidder eligible to participate in the Sale process. The Purchaser acted in compliance with the

Bid Procedures and the Bid Procedures Order and conducted itself in a non-collusive, fair, and

good faith manner. In accordance with the Bid Procedures and the Bid Procedures Order, the

Debtors determined that the bid submitted by the Purchaser and memorialized by the Final PSA

is the Successful Bid.

L.    Arm's-Length and Purchaser's Good Faith. The Final PSA was negotiated and

is undertaken by St. Christopher's and its management and board of directors, and the

Purchaser, its management and board of directors or equivalent governing body, at arm's length

without collusion or fraud, and in good faith within the meaning of section 363(m) of the

Bankruptcy Code. The Purchaser is not an "insider" of either Debtor as that term is defined by

section 101(31) of the Bankruptcy Code. The Purchaser (i) recognized that the Debtors were

free to deal with any other party interested in acquiring the Jennie Clarkson Real Estate; (ii)

complied with the applicable Bid Procedures and the Bid Procedures Order in all respects; and

(iii) willingly subjected its bid to the competitive Bid Procedures approved in the Bid

Procedures Order. Neither the Debtors nor the Purchaser have engaged in any conduct that

would cause or permit the Final PSA or the consummation of the Sale to be avoided, or costs

or damages to be imposed, under section 363(n) of the Bankruptcy Code. All payments to be

made by the Purchaser and other agreements or arrangements entered into by the Purchaser in

connection with the Sale have been disclosed, neither the Purchaser nor the Debtors have

violated section 363(n) of the Bankruptcy Code by any action or inaction, and no common

7

identity of directors, managers or controlling stockholders exists between and among the Purchaser on the one hand, and either Debtor, on the other.  As a result of the foregoing, the Purchaser is a "good faith" purchaser within the meaning of section 363(m) of the Bankruptcy Code, and as such, is entitled to the full rights, benefits, privileges, and protections afforded thereby, including in the event this Sale Order or any portion thereof is reversed or modified on appeal, and each of the Purchaser and Debtors otherwise have proceeded in good faith in all respects in connection with the Sale specifically and these Chapter 11 Cases generally.

M.    <u>Highest or Best Offer</u>.  The total consideration provided by the Purchaser for the Jennie Clarkson Real Estate as reflected in the Final PSA is the highest and best offer received by the Debtors for the Jennie Clarkson Real Estate. No other person or entity or group of persons or entities has submitted a Qualified Bid prior to the Bid Deadline. Therefore, in accordance with the Bid Procedures Order, (i) the Debtors did not conduct the Auction and (ii) the Debtors determined that the Final PSA constituted the highest and best offer and selected the Final PSA as the Successful Bid. The Debtors' determination that the Final PSA constitutes the highest and best offer and the Debtors' selection of the Final PSA as the Successful Bid each constitutes a valid and sound exercise of the Debtors' business judgment and the Debtors' decision to enter into the Final PSA and the Transactions constitutes a proper exercise of the fiduciary duties of the Debtors.  The offer of the Purchaser, upon the terms and conditions set forth in the Final PSA, including the total consideration to be realized by the Debtors thereunder, (i) is the highest or otherwise best offer received by the Debtors after extensive marketing, including through the Bid Procedures, and (ii) is in the best interests of the Debtors, their creditors, their estates and other parties in interest.  Taking into consideration all relevant factors and circumstances,

31626812.1

no other entity has offered to purchase the Jennie Clarkson Real Estate for greater value to the Debtors or their estates.

N.    <u>Compliance with State Law.</u> The sale process and the Final PSA are in full compliance with New York State Law, including but not limited to Section 511 of the New York Not-For-Profit Corporation Law, regarding the sale of assets by New York Not-For-Profit entities, whose sale analysis is substantively co-extensive with Section 363 of the Bankruptcy Code.  This Bankruptcy Court has exclusive jurisdiction over the disposition of assets of a New York not-for-profit in bankruptcy, and the disposition of the bankruptcy estates' assets, and therefore the sale of the Jennie Clarkson Real Estate is approved and granted as a matter of New York State Law and in particular under Section 511 of the New York Not-For-Profit Corporation Law, in addition to the basis for relief under the Bankruptcy Code.

O.    <u>No Fraudulent Purpose</u>.  The Final PSA was not entered into, and none of the Debtors nor the Purchaser have entered into the Final PSA, or propose to consummate the Sale, for the purpose of hindering, delaying or defrauding the Debtors' present or future creditors. None of the Debtors nor the Purchaser have entered into the Final PSA, or are proposing to consummate the Sale, fraudulently for the purpose of statutory and common law fraudulent conveyance and fraudulent transfer claims whether under the Bankruptcy Code or the laws of the United States, any state, territory, possession thereof, the District of Columbia or any other applicable jurisdiction with laws substantially similar to the foregoing.

P.    <u>Transfer of Assets Free and Clear</u>.  St. Christopher's is the sole and lawful owner of the Jennie Clarkson Real Estate and title thereto is vested in St. Christopher's estate within the meaning of section 541(a) of the Bankruptcy Code.  The transfer of the Jennie Clarkson Real Estate to the Purchaser will be, as of the Closing Date, a legal, valid, and effective transfer

9

of the Jennie Clarkson Real Estate, which transfer vests or will vest the Purchaser with all right, title, and interest of St. Christopher's to the Jennie Clarkson Real Estate free and clear of all liens, claims (including those that constitute a "claim" as defined in section 101(5) of the Bankruptcy Code), interests, rights, liabilities, security interests, hypothecations, preferences, debts, suits, licenses, options, judgments, orders and decrees of any court, taxes (including, without limitation, income tax, sales tax, and use tax assessed by foreign, state and local taxing authorities), covenants, or restrictions, against any of the Debtors or the Jennie Clarkson Real Estate, including, without limitation, any debts arising under or out of, in connection with, or in any way relating to, any acts or omissions, obligations, demands, guaranties, *de facto* merger claims, causes of action (whether in law or in equity, under any law), whether arising prior to or subsequent to the commencement of these Chapter 11 Cases, whether known or unknown, contingent or matured, perfected or unperfected, liquidated or unliquidated, statutory or non-statutory, legal or equitable or otherwise arising under or out of, in connection with, or in any way related to any of the Debtors, any of the Debtors' interests in the Jennie Clarkson Real Estate, the operation of any of the Debtors' businesses before the effective time of the Closing (collectively, "Claims") with such transfer as set forth above. The Debtors served the Notice of Bid Procedures, Auction Date and Sale Hearing (as defined in the Bid Procedures Order), together with a copy of the Bid Procedures Order and the Bid Procedures (as defined in the Bid Procedures Order), on all parties who are known or reasonably believed, after reasonable inquiry, to have asserted any Claims or other interests with respect to the Jenny Clarkson Real Estate.  The Purchaser would not have entered into the Final PSA and would not consummate the Transactions contemplated thereby if the sale of the Jennie Clarkson Real Estate that is owned by St. Christopher's was not free and clear of all Claims and other interests, or if the

Purchaser would, or in the future could, be liable for any such Claims or interests. A sale of the Jennie Clarkson Real Estate, other than one free and clear of all Claims and interests, would adversely impact the Debtors, their estates and their creditors, and would yield substantially less value for the Debtors' estates, with less certainty, than the Sale.

Q.    <u>Satisfaction of Section 363(f) Standards</u>. The Debtors are authorized to sell the Jennie Clarkson Real Estate free and clear of all Claims and interests because, with respect to each creditor or other person or entity asserting a Lien or other interest, one or more of the standards set forth in section 363(f)(l)-(5) of the Bankruptcy Code has been satisfied. [Each creditor or other person or entity asserting a Lien or other interest has, subject to the terms and conditions of this Order, consented to the Sale or is deemed to have consented. All parties in interest, including without limitation any holders of Claims or other interests that did not object, who withdrew their objection, or whose objections were overruled, to the Sale or the Motion, are deemed to have consented to the relief granted herein pursuant to section 363(f)(2) of the Bankruptcy Code.] Those holders of Claims who did object that have an interest in the Jennie Clarkson Real Estate could be compelled in a legal or equitable proceeding to accept money satisfaction of such Claim pursuant to section 363(f)(5) or fall within one or more of the other subsections of section 363(f) of the Bankruptcy Code and are therefore adequately protected by having their Claims and other interests in the Assets, if any, attach solely to the proceeds of the Sale ultimately attributable to the property in which they have an interest, in the same order of priority and with the same validity, force and effect that such holders had prior to the Sale, subject to any defenses of the Debtors. All persons having Claims or other interests of any kind or nature whatsoever against the Debtors or the Assets shall be forever barred, estopped and permanently enjoined from creating, perfecting, pursuing, enforcing, attaching, collecting,

11

recovering, or asserting such Claims or other interests against the Purchaser or any of its assets, property, affiliates, successors, assigns, or the Jennie Clarkson Real Estate.

R.    <u>No Successor Liability</u>.  The Purchaser is not a mere continuation of the Debtors or their estates, and there is no continuity of enterprise or common identity between the Purchaser and the Debtors.  The Purchaser is not holding itself out to the public as a continuation of the Debtors or their estates.  The Purchaser is not an "insider" or "affiliate" of either Debtor, as those terms are defined in the Bankruptcy Code, and no continuity or common identity of incorporators, directors, managers or stockholders exists now or has ever existed between the Purchaser on the one hand, and the Debtors, on the other.  The conveyance of the Jennie Clarkson Real Estate does not amount to a consolidation, merger or *de facto* merger of the Purchaser and the Debtors or the Debtors' estates, there is not substantial continuity between the Purchaser and the Debtors, and the Purchaser does not constitute a successor to the Debtors or the Debtors' estates. The Purchaser's acquisition of the Assets shall be free and clear of any "successor liability" claims of any nature whatsoever, whether known or unknown and whether asserted or unasserted as of the Closing.

S.    <u>Sale as an Exercise of Business Judgment</u>.  The Debtors have demonstrated good, sufficient, and sound business purposes and justifications for approval of or entry into the Sale Motion, the Sale, the Final PSA, and all related agreements (the "<u>Related Agreements</u>").  The Debtors' entry into and performance under the Final PSA and Related Agreements: (i) are a result of due deliberation by the Debtors and constitute a sound and reasonable exercise of the Debtors' business judgment consistent with their fiduciary duties; (ii) provide value to and are beneficial to the Debtors' estates and are in the best interests of the Debtors and their estates, creditors and other parties in interest; and (iii) are reasonable and

31626812.1

appropriate under the circumstances. Business justifications for the Sale include, but are not limited to, the following: (i) the purchase price set forth in the Final PSA constitutes the highest or otherwise best offer received for the Jennie Clarkson Real Estate; (ii) the Final PSA and the transactions contemplated thereby present the best opportunity to maximize the value of the Jennie Clarkson Real Estate; (iii) the value of the Debtors' estates will be maximized through the sale of the Jennie Clarkson Real Estate pursuant to the Final PSA and (iv) all requirements of the New York State Not-For-Profit Law §§ 511(a)-(c) are met insofar as the requirements of Section 363 of the Bankruptcy Code are substantively co-extensive with the requirements of the New York statute – including that the consideration and the terms of the transaction are fair and reasonable to the corporation, and the purposes of the corporation and its creditors will be promoted by the Sale.

T.    <u>Compelling Reasons for an Immediate Sale.</u>  Good and sufficient reasons for approval of the Final PSA have been articulated by the Debtors, and the Debtors' decision to enter into the Final PSA and the Transactions contemplated thereby represents an exercise of sound business judgment.  The Debtors have demonstrated compelling circumstances for the Sale outside of: (a) the ordinary course of business, pursuant to section 363(b) of the Bankruptcy Code; and (b) a plan of reorganization or liquidation (as the case may be), in that, among other things, the immediate consummation of the Sale to the Purchaser is necessary and appropriate to preserve and to maximize the value of the Debtors' estates.  Accordingly, there is cause to lift the stay contemplated by Bankruptcy Rule 6004 with respect to the transactions contemplated by this Sale Order and give immediate effect to the Sale order upon entry.

U.    <u>No Sub Rosa Plan</u>.  The Final PSA and the Sale does not constitute a *sub rosa* chapter 11 plan.  Neither the Final PSA nor the Sale impermissibly restructures the rights of the

Debtors' creditors, nor impermissibly dictates the terms of a chapter 11 plan or plans for the

Debtors.

Y.    <u>Final Order</u>.  This Sale Order constitutes a final order within the meaning of 28

U.S.C. § 158(a). Notwithstanding Bankruptcy Rule 6004(h), and to any extent necessary under

Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure, as made

applicable by Bankruptcy Rule 7054, the Court expressly finds that there is no just reason for

delay in the implementation of this Sale Order, waives any stay, and expressly directs entry of

judgment as set forth herein.  The Debtors have demonstrated compelling circumstances and a

good, sufficient and sound business purpose and justification for the immediate approval and

consummation of the Sale as contemplated by the Final PSA. Purchaser, being a good faith

purchaser under section 363(m) of the Bankruptcy Code, may close the Sale contemplated by

the Final PSA at any time after entry of this Sale Order.

**IT IS THEREFORE ORDERED, ADJUDGED AND DECREED THAT**:

1.    <u>Motion Granted</u>.  The relief requested in the Motion is GRANTED as set forth

herein.

2.    <u>Findings of Fact and Conclusions</u>.  Any of the findings of fact contained herein

shall constitute a finding of fact even if it is stated as a conclusion of law, and any conclusion

of law contained herein shall constitute a conclusion of law even if it is stated as a finding of

fact. The Court's findings of fact and conclusions of law in the Bid Procedures Order and the

record of the hearings with respect to the Bid Procedures Order and the Sale Hearing are

incorporated herein by reference.

3.    <u>Objections Overruled</u>.  All objections, if any, with regard to the relief sought in

the Motion that have not been withdrawn, waived, settled, or otherwise dealt with as expressly

provided herein or on the record at the Sale Hearing are hereby overruled on the merits, with prejudice.

4.    <u>Notice</u>.  Notice of the Motion, Bid Procedures, Bid Procedures Order, Auction, Sale (and the Transactions and Final PSA contemplated in connection therewith) and Sale Hearing was fair and equitable under the circumstances and complied in all respects with section 102(1), 363 of the Bankruptcy Code and Bankruptcy Rules 2002 and 6004and the Bid Procedures Order.

5.    <u>Approval</u>.  Pursuant to sections 105 and 363 of the Bankruptcy Code, the Final PSA, Sale, Related Agreements, and the other Transactions are hereby approved and the Debtors are authorized and directed to consummate the Sale in accordance with the terms of the Final PSA. The Debtors as well as their officers, board members, employees, and agents are each hereby authorized and directed to take any and all actions necessary or appropriate to: (a) consummate the Sale of the Jennie Clarkson Estate to the Purchaser and the Closing of the Sale pursuant to the Final PSA and this Sale Order and (b) execute, deliver, perform, consummate, implement and close fully the Final PSA, together with any and all additional instruments and documents that may be reasonably necessary or desirable to implement the Final PSA.  The Debtors are hereby authorized and directed to perform each of their respective covenants and undertakings as provided in the Final PSA prior to or after the Closing of the Sale without further order of the Court.  The failure specifically to include any particular provision of the Final PSA in this Sale Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Final PSA (including, but not limited to, all ancillary agreements and Related Agreements contemplated thereby) be authorized and approved in its entirety.  All Persons are prohibited from taking any action to adversely affect or interfere with

15

the ability of the Debtors to transfer the Jennie Clarkson Real Estate to the Purchaser in accordance with the Final PSA and this Sale Order.

6.      Fair Purchase Price.  The consideration provided by the Purchaser under the Final PSA is fair and reasonable and constitutes (i) reasonably equivalent value under the Bankruptcy Code and the Uniform Fraudulent Transfer Act or the Uniform Voidable Transactions Act, as applicable, (ii) fair consideration under the Uniform Fraudulent Conveyance Act or the Uniform Voidable Transactions Act, as applicable, and (iii) reasonably equivalent value, fair consideration and fair value under any other applicable laws of the United States, any state, territory or possession or the District of Columbia.

7.      Amendments to Final PSA.  The Final PSA and any related agreements, documents, or other instruments may be modified, amended, supplemented or restated by the parties thereto in a writing signed by such parties and in accordance with the terms thereof, without further order of this Court, provided that any such modification, amendment, supplement or restatement does not have a material adverse effect on the Debtors' estates.  The Final PSA and the Debtors' obligations therein shall not be altered, amended, rejected, discharged or otherwise affected by any chapter 11 plan proposed or confirmed in these Chapter 11 Cases without the prior written consent of the Purchaser.

8.      Transfer Free and Clear.  One or more of the standards set forth in section 363(f)(1)-(5) of the Bankruptcy Code has been satisfied. Pursuant to sections 105 and 363 of the Bankruptcy Code, the Jennie Clarkson Real Estate is conveyed by St. Christopher's to the Purchaser free and clear of any Claims and other interests. The Debtors are authorized to transfer the Jennie Clarkson Real Estate in accordance with the terms of the Final PSA and this Sale Order.  The Jenny Clarkson Real Estate shall be transferred to the Purchaser in accordance

16

with the terms of the Final PSA and this Sale Order, and upon the Closing, such transfer shall:

(i) be valid, legal, binding and effective; (ii) vest the Purchaser with all right, title and interest

of the Debtors in the Jennie Clarkson Real Estate; and (iii) be free and clear of all Claims and

any other claims and interests in accordance with section 363(f) of the Bankruptcy Code (.  All

Persons having Claims or other interests of any kind or nature whatsoever against the Debtors

or the Jennie Clarkson Real Estate shall be forever barred, estopped and permanently enjoined

from creating, perfecting, pursuing, enforcing, attaching, collecting, recovering, or asserting

such Claims or other interests against the Purchaser or any of its assets, property, affiliates,

successors, assigns, or the Jennie Clarkson Real Estate.

9.    <u>Surrender of Possession</u>.  The Jennie Clarkson Real Estate shall be delivered to

the Purchaser and deemed delivered at the time of Closing (or such other time as provided in

the Final PSA).

10.    <u>Vesting of Assets in the Purchaser</u>.  Effective upon the Closing, the transfer to

the Purchaser of the Jennie Clarkson Real Estate pursuant to the Final PSA shall be, and hereby

is deemed to be, a legal, valid and effective transfer of the Jenny Clarkson Real Estate, and will

vest in the Purchaser the Jennie Clarkson Real Estate free and clear of Claims.

11.    <u>Injunction</u>.  Except as expressly provided in the Final PSA or by this Sale Order,

effective upon the Closing, all persons and entities, including, but not limited to, all debt

holders, governmental, tax and regulatory authorities, lenders, vendors, suppliers, employees,

trade creditors, litigation claimants and other persons holding Claims or other interests in or

against the Jennie Clarkson Real Estate shall be and hereby are forever barred, estopped and

permanently enjoined from asserting, prosecuting or otherwise pursuing such Claims or other

interests. All persons are hereby enjoined from taking any action that would interfere with or

17

adversely affect the ability of the Debtors to transfer the Jennie Clarkson Real Estate in accordance with the terms of the Final PSA and this Sale Order.

12.    <u>Direction to Creditors and Parties in Interest</u>.    On the Closing Date, each of the Debtors' creditors and the holders of any Claims or other interests are authorized and directed to execute such documents and take all other actions as may be necessary to terminate, discharge or release their Claims or other interests against the Jennie Clarkson Real Estate, if any, as such Claims or other interests may otherwise exist.

13.    <u>Direction to Government Agencies</u>.    Each and every filing agent, filing officer, title agent, recording agency, governmental department, secretary of state, federal, state and local official, and any other person and entity who may be required by operation of law, the duties of its office or contract, to accept, file, register, or otherwise record or release any documents or instruments or who may be required to report or insure any title in or to the Jennie Clarkson Real Estate, is hereby authorized and directed to accept any and all documents and instruments necessary and appropriate to consummate the Sale and any other Transactions contemplated by the Final PSA and approved by this Sale Order.

14.    <u>Good Faith Purchaser</u>.    The Purchaser is entitled to the full rights, benefits, privileges, and protections afforded by section 363(m) of the Bankruptcy Code, and the Purchaser has proceeded in good faith in all respects in connection with the Sale specifically and these Chapter 11 Cases generally.

15.    <u>Consummation of Sale Transaction</u>.    Pursuant to sections 105 and 363 of the Bankruptcy Code, the Debtors, as well as their officers, board member, employees, and agents, are authorized to enter into, execute, deliver and perform their obligations under and comply with the terms of the Final PSA and the Related Agreements and to close and consummate the

18

Sale, including by taking any and all actions as may be reasonably necessary or desirable to implement the Sale and each of the Transactions contemplated thereby pursuant to and in accordance with the terms and conditions of the Final PSA, the Related Agreements, and this Sale Order.

16.    <u>Transfer of Marketable Title</u>.    Upon the Closing, this Sale Order shall be construed and shall constitute for any and all purposes a full and complete general assignment, conveyance and transfer of the Jennie Clarkson Real Estate or a bill of sale transferring good and marketable title in the Assets to the Purchaser at the Closing pursuant to the terms of the Final APA, free and clear of all Claims and other interests.

17.    <u>No Successor Liability</u>.    By virtue of the Sale, the Purchaser and its affiliates, successors and assigns shall not be deemed or considered to: (i) be a legal successor, or otherwise be deemed a successor to any of the Debtors; (ii) have, *de facto* or otherwise, merged with or into any or all Debtors; (iii) be a consolidation with the Debtors or their estates; or (iv) be an alter ego or a continuation or substantial continuation, or be holding itself out as a mere continuation, of any of the Debtors or their respective estates by any law or equity. The Purchaser and its affiliates, successors and assigns shall have no successor, transferee or vicarious liability of any kind or character, including, without limitation, under any theory of foreign, federal, state or local antitrust, environmental, successor, tax, ERISA, WARN, assignee or transferee liability, labor, product liability, employment, *de facto* merger, substantial continuity, or other law, rule, regulation or doctrine, whether known or unknown as of the Closing Date, now existing or hereafter arising, whether asserted or unasserted, fixed or contingent, liquidated or unliquidated with respect to the Debtors or any obligations of the Debtors arising prior to the Closing Date, including, without limitation, liabilities on account

19

of any taxes or other governmental fees, contributions or surcharges, in each case arising, accruing or payable under, out of, in connection with, or in any way relating to, the operation of the Debtors prior to the Closing Date or arising based on actions of the Debtors taken after the Closing Date.

18.    Approval to Release Claims and Interests.  If any person or entity that has filed financing statements or other documents or agreements evidencing Claims or other interests on or in the Jennie Clarkson Real Estate shall not have delivered to the Debtors before the Closing Date, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of liens, and any other documents necessary for the purpose of documenting the release of all Claims and other interests that the person or entity has or may assert with respect to the Jennie Clarkson Real Estate, the Debtors and the Purchaser are hereby authorized to execute and file such statements, instruments, releases and other documents on behalf of such person or entity with respect to the Jennie Clarkson Real Estate on or after the Closing Date.  The Purchaser is hereby authorized to file, register or otherwise record a certified copy of this Sale Order, which, once filed, registered or otherwise recorded, shall constitute conclusive evidence of the release of all Claims and other interests on or in the Jennie Clarkson Real Estate.

19.    Effect of Recordation of Order. This Sale Order, once filed, registered, or otherwise recorded, (a) shall be effective as a conclusive determination that, upon the Closing Date, all Claims, of any kind or nature whatsoever existing as to the Jennie Clarkson Real Estate prior to the Closing Date have been unconditionally released, discharged, and terminated and that the conveyances described herein have been effected, and (b) shall be binding upon and shall govern the acts of all persons and entities.

20

31626812.1

20.     [Next Highest Bidder. [_____] is hereby declared the Backup Bidder pursuant to its Backup Bid for the Jennie Clarkson Real Estate in the amount of $_____.  Pursuant to the Bidding Procedures, the Backup Bidder is directed to keep the Backup Bid open and irrevocable until the first to occur: (x) two (2) business days after the closing of the transaction(s) to the Purchaser; and (y) one hundred twenty (120) days after the date of the Auction.]

21.     Inconsistencies with Prior Orders, Pleadings or Agreements.  To the extent this Sale Order is inconsistent with any prior order or pleading with respect to the Motion in these Chapter 11 Cases, the terms of this Sale Order shall govern. To the extent there is any inconsistency between the terms of this Sale Order and the terms of the Final PSA (including all ancillary documents executed in connection therewith), the terms of this Sale Order shall govern.

22.     Subsequent Orders and Plan Provisions.  Unless otherwise agreed to by the Debtors and the Purchaser, this Sale Order shall not be modified by any chapter 11 plan confirmed in these Chapter 11 Cases or any subsequent order(s) of this Court.

23.     Binding Effect of Sale Order.  This Sale Order and the Final PSA shall be binding in all respects upon the Debtors, their estates, all creditors of the Debtors, any holders of Claims on or other interests in the Jennie Clarkson Real Estate (whether known or unknown), the Purchaser and all successors and assigns of the Purchaser, notwithstanding the dismissal of any of the Debtors' cases or any subsequent appointment of any trustees, examiners, "responsible persons" or other fiduciaries in these Chapter 11 Cases or upon a conversion of these Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, and the Final PSA shall not be subject to rejection or avoidance under any circumstances.

21

24.    <u>No Avoidance of Purchase Agreement</u>.  Neither the Debtors nor the Purchaser have engaged in any conduct that would cause or permit the Final PSA to be avoided or costs or damages to be imposed under section 363(n) of the Bankruptcy Code. Accordingly, the Final PSA and the Sale shall not be avoidable under section 363(n) or chapter 5 of the Bankruptcy Code, and no party shall be entitled to any damages or other recovery pursuant to section 363(n) of the Bankruptcy Code in respect of the Final PSA or the Sale.

25.    <u>Immediate Effect</u>.  This Sale Order constitutes a final order within the meaning of 28 U.S.C. § 158(a).  Notwithstanding any provision in the Bankruptcy Rules to the contrary, the terms of this Sale Order shall be immediately effective and enforceable upon its entry and not subject to any stay, notwithstanding the possible applicability of Bankruptcy Rule 6004(h) or otherwise.

26.    <u>Satisfaction of Conditions Precedent</u>.  Neither the Purchaser nor the Debtors shall have an obligation to close the Transactions until all conditions precedent [what are they?] in the Final PSA to each of their respective obligations to close the Transactions have been met, satisfied, or waived in accordance with the terms of the Final PSA.

27.    <u>Bulk Sales</u>.  No bulk sales law, bulk transfer law or similar law of any state or other jurisdiction shall apply in any way to the transactions contemplated by the Final PSA, the Sale Motion or this Sale Order.

28.    <u>Automatic Stay</u>.  The Purchaser shall not be required to seek or obtain relief from the automatic stay under section 362 of the Bankruptcy Code to enforce any of its remedies under the Final PSA, and related agreements, documents or other instruments with respect to the Jennie Clarkson Real Estate. The automatic stay imposed by section 362 of the Bankruptcy Code is modified to the extent necessary to implement the provisions of this Sale Order.

29.      <u>Retention of Jurisdiction</u>.  The Court shall retain jurisdiction to, among other things, interpret, implement, and enforce the terms and provisions of this Sale Order and the Final PSA (and all amendments thereto) and adjudicate, if necessary, any and all disputes concerning the Debtors related in any way to the Sale; provided, however, that in the event the Court abstains from exercising or declines to exercise jurisdiction or is without jurisdiction, such abstention, refusal or lack of jurisdiction shall have no effect upon and shall not control, prohibit or limit the exercise of jurisdiction of any other court having competent jurisdiction with respect to any such matter.  For the avoidance of doubt, nothing in this Sale Order shall be construed to mean that the Court has jurisdiction over issues concerning an inter-creditor dispute.

Dated:      _____, 2025
            White Plains, New York

                                        _____
                                        Hon. Sean H. Lane
                                        United States Bankruptcy Judge

23

## EXHIBIT A

**Purchase and Sale Agreement**

## **<u>Schedule C</u>**
### **Notice of Violation**

32491035.1
1624417475.5

# CITY OF NEW YORK
# DEPARTMENT OF ENVIRONMENTAL PROTECTION

## <u>NOTICE OF VIOLATION</u>

TO:    St. Christopher's Inc.,                  PROPERTY: Jennie Clarkson Campus
         Mr. Ralph Herrera                                1700 Old Orchard Street
         71 Broadway                                  (T) North Castle, NY 10504
         Dobbs Ferry, NY 10522                     Westchester County
                                                         TM # 118.01-1-2
                                                       DEP Log # 1996-KE-0459-OT.3

Via email: rherrera@sc1881.org

DATE:        November 1, 2021

**PLEASE TAKE NOTICE THAT:**

    Pursuant to Section 1100 et seq. of the New York State Public Health Law, Title 10, Part 128 of the New York Codes, Rules and Regulations (10 NYCRR Part 128), and Title 15, Chapter 18 of the Rules of the City of New York (15 RCNY 18) (the "Watershed Regulations"), the New York City Department of Environmental Protection ("DEP") is authorized to inspect the sources of the drinking water supply of the City of New York and determine whether any conduct within its watershed constitutes or threatens to constitute a temporary or permanent source or act of contamination of the water supply.

    Upon investigations conducted by DEP staff on October 26, 2021 and October 27, 2021, DEP determined that there is reasonable cause to believe that you have violated the following section(s) of 10 NYCRR Part 128 and 15 RCNY Chapter 18 (copies of the violated sections are attached):

| | | |
|---|---|---|
| **X** | 10 NYCRR § 128-2.1; 15 RCNY § 18-21: | Contamination from a Regulated Activity |
| ___ | 10 NYCRR § 128-3.1; 15 RCNY § 18-31: | Pathogenic Materials |
| ___ | 10 NYCRR § 128-3.2; 15 RCNY § 18-32: | Hazardous Substances and Hazardous Wastes |
| ___ | 10 NYCRR § 128-3.3; 15 RCNY § 18-33: | Radioactive Materials |
| ___ | 10 NYCRR § 128-3.4; 15 RCNY § 18-34: | Petroleum Products |
| ___ | 10 NYCRR § 128-3.5; 15 RCNY § 18-35: | Human Excreta |
| ___ | 10 NYCRR § 128-3.6; 15 RCNY § 18-36: | Wastewater Treatment Plants |
| ___ | 10 NYCRR § 128-3.7; 15 RCNY § 18-37: | Sewerage Systems, Service Connections, and Discharges to Sewerage Systems |
| ___ | 10 NYCRR § 128-3.8; 15 RCNY § 18-38: | Subsurface Sewage Treatment Systems |
| ___ | 10 NYCRR § 128-3.9; 15 RCNY § 18-39: | Stormwater Pollution Prevention Plans and Impervious Surfaces |
| ___ | 10 NYCRR § 128-3.10; 15 RCNY § 18-40: | Miscellaneous Point Sources |
| **X** | 10 NYCRR § 128-3.11; 15 RCNY § 18-41: | Solid Waste |
| ___ | 10 NYCRR § 128-3.12; 15 RCNY § 18-42: | Agricultural Activities |
| ___ | 10 NYCRR § 128-3.13; 15 RCNY § 18-43: | Pesticides |
| ___ | 10 NYCRR § 128-3.14; 15 RCNY § 18-44: | Fertilizers |
| ___ | 10 NYCRR § 128-3.15; 15 RCNY § 18-45: | Snow Disposal and Storage and Use of Winter Highway Maintenance Materials |
| ___ | 10 NYCRR § 128-2.7; 15 RCNY § 18-27 | Violation involves Noncomplying Regulated Activity |
| ___ | Other: | _____ |

-1-

**Description of Violation(s):**

On October 26, 2021, during a rain event, DEP observed turbid stormwater runoff flowing across DEP's property, originating from the adjacent Saint Christopher's Inc., Jennie Clarkson Campus (the "Property"), ultimately discharging into Kensico Reservoir and causing a visible turbidity plume within the reservoir. On October 27, 2021, DEP conducted a site inspection of the Property to identify the source of the turbid stormwater runoff. During this inspection, DEP discovered an area of the Property measuring approximately 250 feet by 100 feet, which contained fill material that was visibly contaminated with coal ash, glass, metals, plastics, tiles and other miscellaneous unidentifiable items. DEP inspectors also observed active erosion of this contaminated fill area, which they determined to be the cause and source of the turbid stormwater runoff identified the day prior, and which was migrating from the Property, onto and across DEP's property, and discharging into Kensico Reservoir. These actions constitute violations of Sections 18-21 and 18-41 of the Watershed Regulations.

Section 18-21(a)(1) of the Watershed Regulations states "*all regulated activities shall be planed, designed, scheduled and conducted in such manner as to not constitute a source of contamination to or degradation of the water supply.*" Section 18-16(a)(114) of the Watershed Regulations defines the term "Solid Waste" as:

> all putrescible and non-putrescible materials or substances that are discarded, abandoned, or rejected as being spent, useless, worthless or in excess to the owners at the time of such discard or rejection, including but not limited to garbage, refuse, industrial and commercial waste, sludges from air or water treatment facilities, rubbish, tires, ashes, contained gaseous material, incinerator residue, construction and demolition debris, discarded automobiles and offal, except where exempt from compliance with 6 NYCRR Part 360 as described in 6 NYCRR § 360.2(a)(3).

Discharge of Solid Waste is a regulated activity under the Watershed Regulations pursuant to Section 18-14(a)(12). Section 18-41(b) of the Watershed Regulations prohibits discharge of solid waste directly into a reservoir.

The materials observed by DEP in the contaminated fill on the Property on October 27, 2021 constitute Solid Waste as defined in the Watershed Regulations. The placement and storage of Solid Waste materials in the fill on the Property, including, but not limited to tile, plastic, coal ash, glass and metal, resulted in a direct discharge of turbid stormwater runoff containing Solid Waste into Kensico Reservoir. This discharge constitutes a source of contamination and degradation of the New York City water supply. As such, this Solid Waste storage and discharge violates Sections 18-21(a)(1) and 18-41(b) of the Watershed Regulations.

**Please be advised that you must take the following actions:**

1) Cease all fill importation, placement, storage and/or any other related activities on the Property immediately.
2) Immediately cease all construction activities on the Property.
3) Immediately implement appropriate erosion and sediment control measures to stabilize the Property, specifically including the area of the site containing fill material that is contaminated with Solid Waste, and prevent all further erosion on the Property. These measures must be implemented in accordance with the *NYS Standards and Specifications for Erosion and sediment Control* and the Watershed Regulations.
4) Any future activity on the Property must be conducted in accordance with the Watershed Regulations.
5) After consultation with DEP, evaluate and perform necessary analyses of the fill on the Property and submit the report to DEP.
6) Provide copies of any existing relevant reports and/or documents in your possession pertaining to and/or

detailing the contents of any testing and/or origination of the fill material on the Property.

7) Within 60 days of this notice, any fill placement in violation with the Watershed Regulations must be removed from the watershed and disposed of pursuant to direction from the New York State Department of Environmental Conservation (NYSDEC) Materials Management staff and in accordance with all applicable laws and regulations.

Failure to comply with this Notice, and the Watershed Regulations, shall entitle the City of New York:

(A) Pursuant to Public Health Law § 1102(3)(b), to maintain an action against you for the recovery of penalties incurred by your violation(s) and for an injunction restraining you from violating the Watershed Regulations or continuing a nuisance, and/or

(B) Pursuant to Public Health Law § 1102(3)(a), to summarily enforce compliance with the Watershed Regulations listed above and to summarily abate or remove the cause of the violation(s) of such Watershed Regulations or the nuisance resulting from such violation(s).

**You must contact Jean Marc H Roche, at (914) 749-5359, jroche@dep.nyc.gov within five (5) days of the date of this Notice to discuss resolution of these violations.**

**Jean Marc Roche, Supervisor**
EOH Construction Compliance Group
Regulatory & Engineering Programs
Bureau of Water Supply
New York City Department of Environmental Protection

c:    Natalie Browne, NYSDEC Region 3 Division of Water
      Ella Cattabiani, NYSDEC Materials Management
      Casey B. McCormack, DEP Bureau of Legal Affairs
      Rachel Ramirez-Guest, NYC Law Department
      David Alderisio, DEP Bureau of Water Supply
      Daniel Shedlo, DEP Bureau of Water Supply
      Matthew Giannetta, DEP Bureau of Water Supply
      Town of North Castle